# Exhibit T

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SCHOULEE CONES, an individual,
and DEXTER PASIS, an individual,
on behalf of themselves and all
others similarly situated,

        Plaintiffs,

    vs.

PAREXEL INTERNATIONAL
CORPORATION, a Massachusetts
corporation licensed to do
business in the State of
California; and PAREXEL
INTERNATIONAL, LLC, a
Massachusetts limited liability
company licensed to do business
in the State of California,

        Defendants.
_____

Case No.
3:16-cv-03084-L-
BGS

VIDEOTAPED DEPOSITION OF DEXTER PASIS

Monday, November 20, 2017, 10:15 a.m.

1230 Columbia Street, Suite 400

San Diego, California

Reported by:

Harry Alan Palter

CSR No. 7708, Certified LiveNote Reporter

```
 1   APPEARANCES:


 2


 3   For Plaintiffs:

 4           KEEGAN & BAKER
             BY:  PATRICK N. KEEGAN
 5           Attorney at Law
             6156 Innovation Way
 6           Carlsbad, California 92008
             760.929.9303   Fax 760.929.9260
 7           E-mail:  pkeegan@keeganbaker.com


 8
     For Defendants:
 9
             SEYFARTH SHAW LLP
10           BY:  DIANA TABACOPOULOS
             Attorney at Law
11           2029 Century Park East, Suite 3500
             Los Angeles, California 90067-3021
12           310.277.7200   Fax 310.201.5219
             E-mail:  dtabacopoulos@seyfarth.com
13

14   Also Present:

15           James Treglio (A.M. Session Only)
             Martin Mahoney
16           Cynthia Vibar
             Lisa Rahilly (Telephonically)
17


18   Videographer:

19           Huntington Paulson

20


21


22


23


24


25
```

```
 1                         INDEX

 2                                            PAGE

 3   APPEARANCES                                2

 4   DEPOSITION SUPPORT INDEX                   5

 5   PROCEEDINGS                                6

 6

 7              INDEX TO EXAMINATION

 8

 9            WITNESS:  DEXTER PASIS

10

11   EXAMINATION OF:

12   Dexter Pasis

13    BY MS. TABACOPOULOS                     7, 97

14

15   WITNESS DECLARATION                       243

16   ERRATA SHEET                              244

17   REPORTER'S CERTIFICATE                    245

18

19   INDEX OF VIDEO MEDIA

20   Media No. 1                                7

21

22           •_____•

23

24

25
```

1                    INDEX TO EXHIBITS

2                     DEXTER PASIS

3    Cones, Pasis vs. PAREXEL International Corporation, etc.

4                 Monday, November 20, 2017

5              Harry Alan Palter, CSR No. 7708

6

7    MARKED            DESCRIPTION                   PAGE

8    Exhibit 1    Mr. Pasis's application to          36
                  PAREXEL
9
     Exhibit 2    Mr. Pasis's Offer Letter            42
10
     Exhibit 3    Redacted copy of an application     44
11                submitted to Samumed including a
                  portion of the history with
12                PAREXEL

13   Exhibit 4    Copy of the resume submitted to     57
                  Samumed
14
     Exhibit 5    Copy of the Curriculum Vitae        58
15                submitted to Samumed

16   Exhibit 6    Defendant's Requests for            64
                  Production of Documents, Set One,
17                to Plaintiff Dexter Pasis

18   Exhibit 7    Copy of a resume submitted to      127
                  PAREXEL
19
     Exhibit 8    Mr. Pasis' Curriculum Vitae        202
20
     Exhibit 9    Job description for the position   208
21                held at PAREXEL

22   Exhibit 10   Copy of PAREXEL time records       217

23   Exhibit 11   Copy of the meal and rest period   220
                  policy and the timekeeping and
24                overtime policy

25

```
 1   MARKED              DESCRIPTION                    PAGE

 2   Exhibit 12    Copy of Mr. Pasis' resignation        240
                   letter
 3

 4                  •_____•

 5

 6                    DEPOSITION SUPPORT INDEX

 7

 8     MARKED QUESTIONS:

 9     Page 24, line 4

10     Page 26, line 8

11     Page 29, line 12

12     Page 30, line 15

13     Page 37, line 7

14     Page 51, line 22

15     Page 65, line 2

16     Page 114, line 25

17     Page 206, line 8

18     Page 206, line 25

19     Page 229, line 5

20     Page 229, line 16

21     Page 232, line 14

22

23                  •_____•

24

25
```

```
 1              MR. KEEGAN:  Was there a question

 2    pending?

 3              MS. TABACOPOULOS:  Yeah.

 4    BY MS. TABACOPOULOS:

 5       Q    The question is:  Does his resume          12:28:14

 6    indicate anywhere that he's managing 12 to 14 sites,

 7    as opposed to 800?

 8              MR. KEEGAN:  Object to the -- lacks

 9    foundation.

10              But go ahead.                            12:28:24

11              THE WITNESS:  Yeah.  It does -- it does

12    not.

13    BY MS. TABACOPOULOS:

14       Q    All right.  The first bullet point you

15    have listed there -- I mean, did you list it in that  12:28:38

16    order because you felt that was one of the paramount

17    job experiences?

18       A    I don't remember.

19       Q    All right.  True, then, that you were

20    PAREXEL's remote contact with a signed clinical     12:28:52

21    site?

22       A    Yes.

23       Q    So you were managing those clinical

24    sites?

25       A    I was monitoring those sites.  I -- I     12:29:00
```

```
 1   wasn't a manager, per se, overseeing any staff.  But

 2   I was managing based on, you know, the protocol that

 3   we -- as CMAs had to follow.

 4        Q    Okay.  It says here that you were,

 5   "acting as PAREXEL's remote contact with assigned       12:29:26

 6   clinical sites using judgment to assess and ensure

 7   overall intensity of study implementation and study

 8   protocol at clinical sites."  Is that a fair and

 9   accurate description of what you did at PAREXEL?

10        A    Yeah.  As stated.                              12:29:42

11        Q    Okay.  And in order to do that, would it

12   be fair to say that you had to be using your

13   judgment at all times, then, to ensure and assess

14   that those studies were properly implemented and

15   maintained?                                              12:30:08

16             MR. KEEGAN:  Objection.  Vague.

17   Ambiguous.  Overbroad.  Go ahead.

18             THE WITNESS:  Yeah.  As stated in the

19   statement, you know, basically, adhering to the

20   study protocol.                                          12:30:18

21   BY MS. TABACOPOULOS:

22        Q    Well, I understand you had to adhere to

23   study protocol.  Everybody has to adhere to study

24   protocol --

25        A    Sure.                                          12:30:25
```

```
 1        Q      -- correct?

 2        A      Yes.

 3        Q      I mean, these studies are managed in

 4   accordance of protocol --

 5        A      Right.                                    12:30:30

 6        Q      -- correct?

 7               Why is the protocol important?

 8        A      Well, it lays out the groundwork of how

 9   the study is supposed to be run and also aligns with

10   current GCPs and ICH guidelines.                      12:30:45

11        Q      And all those things are important

12   because, at the end of the day, these studies are

13   being done on human beings; correct?

14        A      Yes.

15        Q      So it's important to make sure that the   12:31:02

16   study is -- is being run correctly for that reason

17   and others.  Would that be a fair statement?

18        A      Yes.  That would be fair.

19        Q      And one of your responsibilities was to

20   ensure that the study protocol and -- and other       12:31:12

21   requirements were being met?

22               MR. KEEGAN:  Objection.  Vague,

23   ambiguous, lacks foundation.  Go ahead.

24               THE WITNESS:  Yeah.  I believe all

25   studies, you know, have to adhere to a -- you know,    12:31:32
```

Case 3:16-cv-03084-L-BGS  Document 84-20  Filed 04/09/18  PageID.1697  Page 10 of 98

Dexter et al. Page 4
November 20, 2017

```
 1   a written protocol.

 2   BY MS. TABACOPOULOS:

 3       Q    Okay.  So then in order, then, to make

 4   sure that the study was proceeding in accordance

 5   with protocol, did you have to read and understand        12:31:46

 6   the protocol?

 7       A    Yes.  As -- as far as requirements to be

 8   part of the study.  And, again, based on ICH

 9   guidelines, all who are involved in the study --

10   including representatives of the sponsor -- must be        12:32:10

11   trained appropriately and understood the protocol

12   and all other applicable guidelines.

13       Q    And did you have a pretty good working

14   knowledge of ICH guidelines and relevant

15   regulations?                                               12:32:30

16           MR. KEEGAN:  Object -- objection.  Vague

17   and ambiguous.  Go ahead.

18           THE WITNESS:  Yeah.  I -- I guess so.

19   The guidelines could be a little bit daunting at

20   times and certainly you can't remember every single       12:32:42

21   thing, but, you know, I try to make it a best

22   practice to refer to the appropriate guidelines if

23   I -- you know, unsure or don't remember.

24   BY MS. TABACOPOULOS:

25       Q    In order to make sure that the study was          12:33:03
```

Case 3:16-cv-03084-L-BGS  Document 84-20  Filed 04/09/18  PageID.1698  Page 11 of 98
Dexter et al. Page 11
November 20, 2017

 1   running smoothly, did you need to use your critical

 2   independent thinking to arrive at that conclusion?

 3            MR. KEEGAN:  Objection.  Calls for a

 4   legal conclusion.  Lacks foundation.  Argumentative.

 5            THE WITNESS:  I always followed the            12:33:18

 6   protocol.  And you certainly would get in trouble if

 7   you deviated.  So I -- I really used the protocol

 8   as -- as -- as Bible.  And if there are certain

 9   areas that are gray, we would -- as CMAs -- look

10   towards the project management or -- or even          12:33:47

11   sponsor.

12   BY MS. TABACOPOULOS:

13        Q    So you were charged with at least the

14   responsibility with spotting certain areas that

15   might be gray?                                         12:33:55

16            MR. KEEGAN:  Objection.  Lacks

17   foundation.  Argumentative.

18            THE WITNESS:  Yeah.  We -- again, I -- I

19   never took it upon myself to answer independently of

20   gray areas within the protocol.  That would be        12:34:06

21   really back -- escalated up to project management or

22   the sponsor.

23   BY MS. TABACOPOULOS:

24        Q    But in order to make sure that the

25   protocol that wasn't gray was being properly          12:34:36

```
 1   implemented, did you need to use your own judgment

 2   and discretion to arrive at those conclusions?

 3        A     No.

 4        Q     Why not?

 5        A     As stated before, you know, it's -- as --      12:34:44

 6   as a job of being a CMA, you certainly want to

 7   follow the protocol and not deviate from it.  So I

 8   mean that was my practice and that's how I was

 9   trained.  So I -- I can't speak for -- if I don't

10   follow the protocol, if I made my own independent      12:35:10

11   judgment -- I can't -- I can't say what would

12   happen.

13        Q     I understand that you're following

14   protocol.

15        A     Yes.                                          12:35:20

16        Q     You're also making a assessments along

17   the way as to whether a particular site is in line

18   with protocol; is that correct?

19        A     Yes.

20        Q     Okay.  And you were the person who was      12:35:27

21   making those assessments; right?

22        A     Yes.

23        Q     Okay.  Were --

24        A     Yes.  Using -- using the protocol --

25             MR. KEEGAN:  Let him finish his answer,      12:35:36
```

Case 3:16-cv-03084-L-BGS  Document 84-23  Filed 04/09/18  PageID.1700  Page 13 of 98
Dexter et al 94/09
November 20, 2017

```
 1   please.

 2           THE WITNESS:  Using the protocol as a

 3   reference.

 4   BY MS. TABACOPOULOS:

 5       Q     And what were some of those assessments          12:35:43

 6   that you were charged with making when you were a

 7   PAREXEL CMA?

 8       A     How to -- how to deal with -- deal

 9   with -- let's say there was an SAE that happened at

10   a site.  And the site wanted to know how to proceed.    12:36:10

11   It was usually the best practice for me to refer

12   back to project management and, you know, provide

13   sort of a plan moving forward on how to address

14   that.

15       Q     Okay.  So if there was a serious adverse       12:36:30

16   effect?  That's an SAE -- correct? -- for the

17   record?

18       A     Yes.

19       Q     There was an SAE, he would come up with a

20   plan on how to deal with it and then discuss with      12:36:42

21   project management, perhaps?

22       A     No.  I had said that the -- I would refer

23   to the -- to project management on how to proceed.

24       Q     So you wouldn't come up with any plan of

25   your own?                                               12:37:14
```

```
 1        A     If it was instructed in the protocol, and

 2   detailed in the protocol, then we'd use that as

 3   basis for our judgment.

 4        Q     Any other assessments that you did?

 5              MR. KEEGAN:  Objection.  Vague.                    12:37:35

 6   Overbroad.

 7              THE WITNESS:  Specify --

 8   BY MS. TABACOPOULOS:

 9        Q     I'm using your terminology.

10              MR. KEEGAN:  Well, it's a very broad             12:37:44

11   question.  Objection.  Vague as to what study, what

12   period of time.  Lacks foundation.  Assumes facts

13   not in evidence.

14   BY MS. TABACOPOULOS:

15        Q     You worked on the online study when you        12:38:13

16   were at PAREXEL; correct?

17        A     That's correct.

18        Q     And it was either quality of the

19   cardiovascular study or the venous thrombosis;

20   correct?  Why don't we just call it the

21   "cardiovascular study" for the record.

22        A     Sure.

23        Q     Okay.  And when you came on board and

24   started to work on the study, it was already

25   underway; correct?                                          12:38:32
```

```
 1        A     Yes.  It was -- it was in a phase where

 2   it was just maintenance.  However, the -- that

 3   cardiovascular study was a very hard and grueling

 4   study.  So there was still efforts when I came on,

 5   even though the study was already ongoing, that the        12:38:49

 6   study was consistently trying to bring on more

 7   sites.

 8        Q     Were you involved in any kind of

 9   site-initiation activities with this particular

10   study?                                                      12:39:06

11        A     I was involved in a lot of the

12   feasibility where we would reach out to potential

13   sites.

14        Q     Were you involved in any other phase,

15   other than monitoring and reaching out regarding            12:39:21

16   feasibility?

17        A     Again, as mentioned, this -- this study

18   was in maintenance phase, so it was more or less

19   maintaining communication based on the CMP.

20        Q     How many times did you reach out             12:39:38

21   regarding feasibility?

22        A     Well, that was in the beginning of my

23   tenure.  So I don't remember how much time I had put

24   into that feasibility effort.

25        Q     And what do you mean when you say a            12:39:59
```

```
 1    "feasibility effort"?
 2        A    Well, again, we wanted to reach out to
 3    sites -- potential sites to see if they would be
 4    interested in joining the cardiovascular study.  And
 5    so there was things as part of the feasibility --          12:40:12
 6    excuse me -- the feasibility efforts that one would
 7    have to follow in -- in -- when reaching oust to
 8    sites, sending out a feasibility questionnaire,
 9    grabbing that information, collating that
10    information into a spreadsheet and providing it to         12:40:36
11    project management.
12              (Reporter clarification)
13    BY MS. TABACOPOULOS:
14        Q    Did you play any role in determining
15    whether sites could meet their criteria for                12:40:56
16    inclusion in the studies?
17        A    I never had a role in determining which
18    sites would be included into the study.
19        Q    And you said that the particular study
20    had problems with enrollment.  Did you ever, as a          12:41:09
21    CMA, do anything to -- to help with that challenge
22    in the study?
23              MR. KEEGAN:  Objection.  Vague.
24              THE WITNESS:  Can you please repeat the
25    question?                                                  12:41:33
```

```
 1              MS. TABACOPOULOS:  Have it read back.

 2              (Record read by the reporter as follows:)

 3                 "QUESTION:  And you said

 4              that the particular study had

 5              problems with enrollment.  Did

 6              you ever, as a CMA, do anything

 7              to help with that challenge in

 8              the study?"

 9              THE WITNESS:  In what sense?  'Cause --

10   in general, the study as a whole was a very          12:41:51

11   difficult site to enroll -- study to enroll.

12   BY MS. TABACOPOULOS:

13      Q    In the sense of did you ever come up with

14   ideas for expanding enrollment or helping with the

15   enrollment issue?                                    12:42:05

16      A    No.  That was directly from project

17   management.  Again, we didn't have an independent

18   role to show what might be good to help with

19   enrollment.  So -- yeah, I mean I didn't have an

20   independent say of how we -- the study would be run  12:42:26

21   in helping with enrollment.

22      Q    Well, whether you had a say or not, did

23   you ever make any suggestions in connection with the

24   study of how certain sites could improve enrollment?

25      A    I don't remember.                            12:42:42
```

```
 1       Q     Is that something that CMAs do and are

 2    charged with doing?

 3             MR. KEEGAN:  Objection.  Lacks

 4    foundation.  Assumes facts not in evidence.  You can

 5    answer.  Calls for lay opinion.                       12:42:53

 6             THE WITNESS:  I -- I don't know.

 7    BY MS. TABACOPOULOS:

 8       Q     Were you involved in any site startups?

 9       A     I believe so.  I just -- it's vague,

10    but -- I was -- I do remember being part of startups  12:43:19

11    for -- for a few sites.  'Cause, again, as -- as

12    this study was in maintenance mode, there was also

13    part of the study where we continuously had made

14    efforts to do feasibility and do site startup.

15       Q     Did you submit any SRPs for those sites?     12:43:47

16       A     Yes.  For review.  For -- for review to

17    our CTAs.

18             MR. KEEGAN:  For the record, none of

19    those documents have being produced in the

20    litigation before this deposition.  They were        12:44:06

21    requested.

22    BY MS. TABACOPOULOS:

23       Q     And with respect to the sites that you

24    were managing, did you pretty much work

25    independently?                                        12:44:20
```

Dexter Palmos
November 20, 2017

```
 1              MR. KEEGAN:  Objection.  Misstates the

 2    testimony.  Lacks foundation.  Assumes facts not in

 3    evidence.

 4    BY MS. TABACOPOULOS:

 5         Q    On a daily basis, did you work                   12:44:29

 6    independently, more or less?

 7              MR. KEEGAN:  Same objections.

 8              THE WITNESS:  Can you please define

 9    "independently"?

10    BY MS. TABACOPOULOS:                                       12:44:38

11         Q    Well, you had a -- you had a manager at

12    PAREXEL; correct?

13         A    Correct.

14         Q    And the first manager was Muriel Spencer?

15         A    Correct.                                         12:44:46

16         Q    And the second was Ms. Vibar?

17         A    No.

18         Q    Who was the second one?

19         A    Jason Irvine.

20         Q    Okay.  And your last manager was              12:44:52

21    Ms. Vibar?

22         A    Yes.

23         Q    And you didn't work with them throughout

24    the day; correct?

25              MR. KEEGAN:  Objection.  Vague.               12:44:59
```

```
 1            THE WITNESS:  What --

 2   BY MS. TABACOPOULOS:

 3        Q    In other words, you had one-on-one

 4   meetings at some intervals with your manager --

 5        A    Yes.                                        12:45:05

 6        Q    -- right?

 7        A    Yes.

 8        Q    And that was how often?  Every two weeks?

 9   Every month?

10            MR. KEEGAN:  Objection.  Vague.             12:45:11

11            Are you talking about line manage only?

12            MS. TABACOPOULOS:  Yeah.  I'm talking

13   about his direct manager.

14            MR. KEEGAN:  Okay.

15            THE WITNESS:  I don't remember.  May have   12:45:22

16   been monthly.

17   BY MS. TABACOPOULOS:

18        Q    But, otherwise, did you work

19   independently?

20            MR. KEEGAN:  Objection.  Vague.             12:45:32

21            THE WITNESS:  If you could please define

22   "independently."

23   BY MS. TABACOPOULOS:

24        Q    You weren't working hand in hand with

25   your manager; correct?  You were working           12:45:42
```

Case 3:16-cv-03084-L-BGS   Document 84-23   Filed 04/09/18   PageID.1708   Page 21 of 98
Dexter et al 30 4
November 20, 2017

```
 1   independently with your assigned sites; is that

 2   right?

 3              MR. KEEGAN:  Same objection.

 4              THE WITNESS:  Yeah.  With the study team,

 5   yes.                                                    12:45:51

 6   BY MS. TABACOPOULOS:

 7        Q    Well, it says here on your resume that

 8   you "managed sites and protocols across multiple

 9   therapeutic areas independently."  So I'm using your

10   language.                                               12:46:01

11              Is that a correct statement of what you

12   did at PAREXEL?

13        A    Right.

14        Q    Okay.  Good.

15              In connection with the sites that you       12:46:38

16   were managing, you were -- you were charged with,

17   you know, ensuring that the overall study was safe

18   for a patient; correct?

19              MR. KEEGAN:  Objection.  Lacks

20   foundation --                                          12:46:58

21   BY MS. TABACOPOULOS:

22        Q    Is that a goal?

23              MR. KEEGAN:  Objection.  Lacks

24   foundation.  Assumes facts not in evidence.  Go

25   ahead.  Do you understand the question?                12:47:04
```

```
 1                THE WITNESS:  Hmm-hmm.  Well, if there

 2    was any indication of a safety signal, then that

 3    would be escalated to project management:  Medical

 4    monitors or the sponsor as applicable.

 5    BY MS. TABACOPOULOS:

 6        Q     But you were responsible for spotting

 7    what you call "safety signals"; correct?

 8                MR. KEEGAN:  Objection.  Vague.  Assumes

 9    facts not in evidence.

10                THE WITNESS:  Spotting as -- as              12:47:45

11    meaning -- just monitoring -- monitoring what I see

12    as -- in the EDC -- any -- for example, if there was

13    a lab abnormality and the PI did not -- didn't know

14    CS or NCS, then I'd go and ask or raise a question

15    to the site, can the PI being a -- bring up or         12:48:13

16    confirm its significance.  And so that would -- that

17    is, you know, part of monitoring.

18    BY MS. TABACOPOULOS:

19        Q     Okay.  But the monitoring phase that you

20    were working on at PAREXEL required you to have as a   12:48:32

21    constant purpose throughout that job the protection

22    of rights and well-being of the study subjects;

23    correct?

24                MR. KEEGAN:  Objection.  Lacks

25    foundation.  Assumes facts not in evidence.           12:48:44
```

Case 3:16-cv-03084-L-BGS  Document 84-20  Filed 04/09/18  PageID.1710  Page 23 of 98
Dexter et al. 4/99/18
November 20, 2017

```
 1            THE WITNESS:  Well, as stated in the ICH

 2    guidelines that, you know, we want to ensure safety

 3    of patients.

 4    BY MS. TABACOPOULOS:

 5        Q     Yeah.                                            12:48:57

 6        A     And the data that's being collected is

 7    true, contemporaneous, and -- you know -- basically,

 8    there's nothing wrong with it.  And, obviously, we

 9    look towards, again, the project management, medical

10    monitors, and in some sense, the discretion of the     12:49:23

11    PIs to deem it as something that they should be

12    concerned about.

13        Q     But it was your job to monitor the study

14    to see if the integrity of the data was being

15    maintained; correct?                                     12:49:45

16        A     Yes.  As a monitor, yes.

17        Q     And it was your job to notice whether

18    that data was valid?

19            MR. KEEGAN:  Objection.  Vague and

20    ambiguous.                                                12:50:00

21    BY MS. TABACOPOULOS:

22        Q     Right?

23            MR. KEEGAN:  Assumes facts not in

24    evidence.

25            THE WITNESS:  Depending on the data.             12:50:04
```

```
 1   BY MS. TABACOPOULOS:

 2       Q    Okay.  And it was your job to notice

 3   anomalies in the data; correct?

 4             MR. KEEGAN:  Objection.  Vague and

 5   ambiguous.  Lacks foundation.  Assumes facts not in        12:50:13

 6   evidence.

 7             THE WITNESS:  If there was a query in the

 8   EDC, then, you know, I'd have the site address it as

 9   appropriate.

10   BY MS. TABACOPOULOS:                                       12:50:27

11       Q    For the record, what do you mean by

12   "EDC"?

13       A    "Electronic data capture."

14       Q    I'm just asking you if it was part of

15   your duties and responsibilities to assess the data       12:50:49

16   that you reviewed and notice any discrepancies or

17   areas of concern with respect to the data.

18             MR. KEEGAN:  Objection.  Asked and

19   answered.  Lacks foundation.  Assumes facts not in

20   evidence.  Vague and ambiguous.                           12:51:08

21             THE WITNESS:  It -- it depends on --

22   on -- on what particular data you're -- you know,

23   you're referring to, because it could be data from

24   source documentation.  It could be data from

25   regular -- regulatory documentation.  It could be        12:51:32
```

```
 1    data from the EDC.  It could be data from contact

 2    information.

 3              So if we found that there was a

 4    discrepancy between an SE and who was actually doing

 5    the coordination -- study coordination -- then, you          12:51:50

 6    know, if I see that discrepancy, other I would bring

 7    that up to the site and confirm.

 8    BY MS. TABACOPOULOS:

 9        Q    And did you have, as a constant purpose,

10    making sure that the data that was being generated           12:52:08

11    by the site was accurate, truthful data --

12              MR. KEEGAN:  Objection.

13    BY MS. TABACOPOULOS:

14        Q    -- as opposed to fraudulent data, for

15    example?                                                      12:52:25

16              MR. KEEGAN:  Objection.  Vague and

17    ambiguous.  Lacks foundation.  Assumes facts not in

18    evidence.  Go ahead.

19              THE WITNESS:  Yeah.  We wouldn't have

20    that position in determining that, obviously.  A lot         12:52:37

21    more parties have to be involved.  In particular,

22    project management; QA; medical monitors, if the

23    data needs to be reviewed.

24              MS. TABACOPOULOS:  Reread the question,

25    please.                                                      12:52:52
```

 1              If you could focus on the question, I

 2     think -- you didn't.  So we're going to have it

 3     reread.

 4              MR. KEEGAN:  Your question was

 5     tremendously overbroad.                              12:53:04

 6              (Record read by the reporter as follows:)

 7              "QUESTION:  And did you

 8              have, as a constant purpose,

 9              making sure that the data that

10              was being generated by the site

11              was accurate, truthful data, as

12              opposed to fraudulent data, for

13              example?"

14              THE REPORTER:  Objections are noted.

15              THE WITNESS:  We -- we wouldn't have     12:53:29

16     the -- the ultimate decision in deciding whether

17     data was true versus fraudulent.

18     BY MS. TABACOPOULOS:

19        Q    Okay.  But you were charged with the

20     responsibility of evaluating the data that you were  12:53:48

21     reviewing from the site and passing judgment on it,

22     whether it was accurate data or perhaps fraudulent

23     data or otherwise compromised data; is that correct?

24              MR. KEEGAN:  Objection.  Argumentative.

25     He just answered your question.  Asked and answered.  12:54:08

```
 1   Vague, ambiguous, overbroad.  Assumes facts not in

 2   evidence.

 3              THE WITNESS:  Again, it just really

 4   depends on the data you're referring to.  I -- I use

 5   the escalation process as appropriate, but I mean

 6   main responsibility as a CRA is to ensure that

 7   there's -- the data has full integrity and that the

 8   safety of the patients is paramount.

 9   BY MS. TABACOPOULOS:

10      Q    I think you said "CRA" in your answer.

11   Do you mean "CMA"?

12      A    CMA.  It would be both.  I mean, overall,

13   the -- it's the CRO's goal.

14      Q    And if you found a problem with some of

15   the data, you would flag it and -- would you flag

16   it; correct?  You would make an issue of it, in

17   other words?

18              MR. KEEGAN:  Objection.

19   BY MS. TABACOPOULOS:

20      Q    Do something about it; is that right?

21              MR. KEEGAN:  Objection.  Vague and

22   ambiguous.  Assumes facts not in evidence.  Lacks

23   foundation.

24              THE WITNESS:  If there was -- if there

25   was a discrepancy with the data -- let's just say,
```

```
 1   for example, what's being documented on original

 2   source compared to EDC -- yes, I would flag it, as

 3   an example.  So -- then, the site would either

 4   confirm or deny correct as applicable the data point

 5   in question.                                        12:56:02

 6   BY MS. TABACOPOULOS:

 7       Q    So you would follow up in the case you

 8   just described with the site directly to resolve

 9   discrepancies you found with the data?

10       A    Yes.  What I -- the example that I         12:56:16

11   described, yes.

12       Q    And was it your responsibility to follow

13   up with sites with respect to any other

14   discrepancies you found in your -- when you were

15   performing your duties as a CMA?                    12:56:31

16       A    Yes.  Especially with regulatory

17   documentation as part of the SRP submission, we

18   wanted to ensure that all regulatory documentation

19   is true and aligns to the site's information.

20       Q    Why is that important?                     12:56:56

21       A    Because ultimately, those documentations

22   are -- are submitted into the TMF and as part of the

23   trial as a whole because -- as part of FDA guidance

24   and ICH, you want to make sure the site has

25   appropriate documentation in place prior to a study 12:57:22
```

```
 1   startup or before they commence being involved in a

 2   study.

 3        Q     How did you go about achieving that?

 4        A     Achieving --

 5        Q     What you just described.                      12:57:34

 6        A     Oh, well, as part of the process, just,

 7   you know, regular communication with the site, and

 8   making sure that they submit the appropriate

 9   documents within the appropriate time.  They do

10   their IRB submissions, get the appropriate IRB        12:57:59

11   approvals.

12        Q     For the record, what do you mean by "IRB"

13   and "TMF"?

14        A     "TMF" is "trial master file."  So,

15   basically, the TMF is all the documents for a         12:58:14

16   particular study from -- for each respective site

17   that's involved in the study.

18              And "IRB" is "Internal Review Board,"

19   where it's an intermediary.

20              Would it be okay if I take -- I'm sorry.    12:58:41

21   Take lunch?

22        Q     Now?

23              MR. KEEGAN:  It's 1:00 o'clock.

24              MS. TABACOPOULOS:  Yeah.  Just another

25   question or two.                                       12:58:51
```

```
 1   BY MS. TABACOPOULOS:

 2        Q     Why is it important that the documents

 3   that go to IRB are -- are accurate and truthful and

 4   in accordance with regulatory guidelines?

 5              MR. KEEGAN:  Objection.  Vague,                    12:59:07

 6   ambiguous, lacks foundation.  Assumes facts not in

 7   evidence.

 8              Go ahead.

 9              THE WITNESS:  I think that has to be a

10   true representation of, you know, the information       12:59:24

11   that's -- that the site's providing.  Especially

12   being involved in a study, they want to make sure

13   that whoever is involved is properly documented on,

14   you know -- 'cause one of the regulatory documents

15   FDA 1572 form where it's a form with a fill out and    12:59:46

16   sign as part of a sort of agreeance [sic] to, you

17   know -- an agreeance [sic] to do and conduct a study

18   per -- per guidelines and regulations.  So it's

19   important to have that information on there that's

20   correct and current.                                    13:00:17

21              MS. TABACOPOULOS:  Okay.

22              MR. KEEGAN:  Thanks.  Let's go off the

23   record.

24              THE VIDEOGRAPHER:  We're off the record

25   at 1:00.                                                 13:00:32
```

```
 1              A F T E R N O O N   S E S S I O N

 2                   Commenced at 1:57 P.M.

 3

 4              THE VIDEOGRAPHER:  We are back on the

 5    record at 1:57 P.M.                                    13:57:43

 6

 7                   EXAMINATION (Resumed)

 8    BY MS. TABACOPOULOS:

 9         Q     Are you able to continue with us and give

10    us your best testimony?                                13:57:53

11         A     Yes.

12         Q     Are you aware of any reason why you would

13    not be able to do that?

14         A     There's no reason.

15         Q     You started your employment with PAREXEL    13:58:05

16    on May 4th, 2015; is that correct?

17         A     That's correct.

18         Q     And you ended your employment with

19    PAREXEL in early July of 2016; correct?

20         A     That seems about right.  Correct.           13:58:27

21         Q     When you started with PAREXEL, you spent

22    the first, what, couple weeks in training; is that

23    right?

24         A     That's correct.

25         Q     Can you describe the training that you      13:58:39
```

```
 1   undertook?

 2       A    Well, all new employees traveled to

 3   PAREXEL's headquarters in North Carolina.  And it

 4   was a two-week onboarding program, went over -- and

 5   my class -- most of which were sort of new to the      13:59:05

 6   role, whether it had been a CMA or on the field

 7   CRA -- so it was a mixture of roles, different

 8   levels.

 9            And within a certain amount of time, we

10   were segregated from the on the field CRAs because     13:59:27

11   they had different training and where the -- all the

12   in-house folks had a separate training with a

13   different trainer and went over really what the role

14   was -- expectations, regulations.

15            Company as a whole went over different         13:59:53

16   scenarios based on experiences from other CRAs, or

17   from the trainers, did some role playing and did a

18   couple of -- we were also -- I don't want to say,

19   "tested," but we were given different types of

20   scenarios that we would then -- if I remember          14:00:22

21   correctly -- provide solutions using, you know,

22   the -- CTMS system that PAREXEL uses and documented,

23   you know, the -- the issue, whatever it may be --

24   conversation that you would have to any particular

25   site staff.                                            14:00:52
```

```
 1              And I guess it was graded by the

 2    trainers -- or so read.  And then there was a

 3    secondary review by the manager -- at that time,

 4    which was Ms. Spencer.

 5              So it was reviewed initially by the        14:01:14

 6    trainer, and then -- and then graded or reviewed by

 7    the CMAs or CRAs's respective manager.

 8         Q    I take it you passed.

 9         A    Yes.

10         Q    Can you tell me a little bit more about    14:01:33

11    the role playing did you during training?

12         A    It was really scenarios that was sort of

13    interactive on the computer.  I don't quite remember

14    the exacts of what the particular scenario was, but

15    it -- it sort of went over an issue that a site      14:01:59

16    would typically run into and how to utilize the CTMS

17    system -- how to document that, what to do in -- as

18    far as escalation wise, who do you reach out to,

19    what sort of relative documentation -- whether it

20    be, again, SOPs, the CMP protocol -- and this is     14:02:31

21    really high level.  Didn't go really into detail,

22    but just sort of an overall common scenario that one

23    would encounter.

24         Q    Did you find the training to be useful?

25         A    Some of those things I've already          14:02:52
```

Case 3:16-cv-03084-L-BGS  Document 84-20 Filed 04/09/18  PageID.1721  Page 34 of 98
Dexter, et al. Part 1
November 20, 2017

```
 1   experienced.  It was more catered to more or less

 2   the CMAs that were green -- just recently hired from

 3   college, no experience in the industry, new to

 4   dealing with situations like that.

 5            So -- but I did find it, you know,          14:03:16

 6   pretty -- pretty useful.

 7       Q    What were some of the things that you had

 8   already experienced by that point?  You came as a

 9   CRA from another company; right?

10       A    Right.  Just a multitude of, you know,     14:03:30

11   issues from sites, difficult site staff, you know,

12   queries that were performed by DM, how to --

13       Q    It would help every time you use an

14   acronym for the record to just say what it stands

15   for?                                                14:03:53

16       A    Sure.  Data management -- when data

17   management provides a query based on their review,

18   how to address that with the site.  So, yeah.

19   Those -- those types of experience while being on

20   the field helped a lot.  And it was added bonus,    14:04:09

21   just to go through that whole process during the

22   onboarding program.

23       Q    And what about difficult staff?  What

24   were you supposed to do with difficult staff?

25       A    Depends on the issue in question.          14:04:22
```

```
 1        Q      Can you give me some examples?
 2              MR. KEEGAN:  As far as training or --
 3   BY MS. TABACOPOULOS:
 4        Q      Well, what he meant by that.  You know --
 5              MR. KEEGAN:  Well, we're talking about        14:04:33
 6   the training; right?  Objection.  Vague and
 7   ambiguous.
 8              THE WITNESS:  A PI not performing as
 9   delegated per the delegation of authority and
10   responsibility log -- DOA -- or DOR.                     14:04:47
11   BY MS. TABACOPOULOS:
12        Q      Anything else?
13        A      Combative study coordinator, not wanting
14   to do with what the protocol says or -- and usually,
15   if -- those types of scenarios are continuous, we        14:05:07
16   certainly do want to escalate that and get further
17   guidance from project management, provide more of --
18   if it was dealt with a safety query or issue, we
19   would then reach out to -- to the medical monitor
20   for advice or for a more expert decision in how to       14:05:29
21   proceed.  There's several things that could be
22   particular for one site that may be different from,
23   you know, all other sites, but --
24        Q      Right.  There are a multitude of unique
25   issues that could occur on one side that you might       14:05:53
```

```
 1    not see on another site.  Is that fair to say?

 2        A     Absolutely.

 3        Q     So you were charged, though, with the

 4    responsibility given your level of professionalism

 5    of ascertaining whether there was a safety issue or          14:06:04

 6    a PI issue or an FC issue at the site and making a

 7    recommendation to the -- to either project

 8    management or medical monitor; is that correct?

 9              MR. KEEGAN:  Objection.  Lacks

10    foundation.  Assumes facts not in evidence.                  14:06:20

11    Misstates his prior testimony.

12              THE WITNESS:  We would escalate as

13    appropriate.

14    BY MS. TABACOPOULOS:

15        Q     You would make a decision if it's              14:06:28

16    appropriate to escalate it or whether you could

17    handle it yourself with your site that you were

18    managing; is that right?

19              MR. KEEGAN:  Objection.  Misstates his

20    former testimony.  Assumes facts not in evidence.           14:06:38

21    Lacks foundation.

22    BY MS. TABACOPOULOS:

23        Q     You can answer.

24        A     As appropriate.  We would escalate.

25        Q     But was it up to your judgment to decide          14:06:52
```

```
 1   when you were going to escalate and when you were

 2   going to deal one-on-one with a site to resolve a

 3   particular issue?  That's all I'm asking.

 4              MR. KEEGAN:  Objection.  Assumes facts

 5   not in evidence.  Misstates his prior testimony.          14:07:05

 6   Vague and ambiguous.

 7              THE WITNESS:  We would make the -- you

 8   know, the best judgment as per our job

 9   responsibilities and what, you know -- what the

10   appropriate best course of action -- really            14:07:23

11   depending on the situation.  So, you know, we make

12   sure to have our program management involved even in

13   the first instance of -- of, you know, a PI not

14   performing his delegated duties, for instance.

15   BY MS. TABACOPOULOS:                                    14:07:50

16       Q    That's a pretty serious problem, isn't

17   it?

18       A    Well, if a PI does not do what he's

19   delegated -- he's ultimately the person that

20   provides full oversight of his study staff and         14:08:02

21   ensures that whatever they perform -- they're duly

22   noted as being delegated appropriately.  And if

23   they're not doing it, that's -- you know, that's

24   potentially a serious problem.

25       Q    But as a CMA with responsibility for a        14:08:21
```

```
 1   particular site, you'd be the one who detects the

 2   issue in your later example of the PI not performing

 3   as expected; right?

 4              MR. KEEGAN:  Objection.  Misstates his

 5   testimony.  Assumes facts not in evidence.  Lacks          14:08:36

 6   foundation.

 7              THE WITNESS:  Yeah.  It -- it -- it

 8   depends on, you know, the situation.  If

 9   there's -- -- if there's full lack of knowledge on

10   the protocol and he's performing outside the              14:08:53

11   protocol and he's deviating, that's --

12   BY MS. TABACOPOULOS:

13       Q    That's something that would you

14   recognize, though; right?

15       A    I would initially recognize it and then          14:09:00

16   escalate it as appropriate.

17       Q    Okay.  Would you need to escalate it on

18   every occasion or on some occasions could you deal

19   with the PI directly to get him back on track or her

20   back on track?                                             14:09:12

21       A    Well, we make, you know, the conscious

22   efforts.  Obviously, we don't want to bombard

23   project management at every single issue.  You know,

24   CRAs and CMAs do know that if you have already an

25   established relationship with a site -- or if you          14:09:29
```

November 20, 2017

```
 1   don't; it depends -- you could then try to handle it
 2   but in some cases, you know, there's a proper
 3   escalation process.
 4        Q    But whether you escalate or not depends
 5   on whether you, Mr. Pasis, have determined whether          14:09:45
 6   under the particular issues you needed to escalate;
 7   correct?
 8        A    Whatever particular circumstance is --
 9   whatever it may be, then.  I would escalate
10   appropriately.                                              14:10:02
11        Q    And when you escalate as a professional
12   in this industry with such a long tenure, did you
13   normally make a recommendation to whether it was the
14   project manager or the medical monitor about how to
15   solve a particular issue --                                 14:10:15
16             MR. KEEGAN:  Objection.  Vague.
17   BY MS. TABACOPOULOS:
18        Q    -- given your knowledge of what was
19   happening at the site?
20             MR. KEEGAN:  Objection.  Vague,                   14:10:21
21   ambiguous, overbroad.  Lacks foundation.
22             THE WITNESS:  I'm sorry.  Can you repeat
23   the question?
24             (Record read by the reporter as follows:)
25             "QUESTION:  And when you
```

```
 1              escalate as a professional in

 2              this industry with such a long

 3              tenure, did you normally make a

 4              recommendation to whether it

 5              was the project manager or the

 6              medical monitor about how to

 7              solve a particular issue, given

 8              your knowledge of what was

 9              happening at the site?"

10              THE WITNESS:  Yes.                         14:10:51

11   BY MS. TABACOPOULOS:

12        Q     What would go into those decisions?

13              MR. KEEGAN:  Objection.  Vague,

14   ambiguous, overbroad.  Lacks foundation.

15              THE WITNESS:  My decisions or the --      14:11:00

16   BY MS. TABACOPOULOS:

17        Q     Your decisions.

18        A     I think there are certainly obvious

19   indications.  But for instance, if a PI is

20   combative, certainly does not want to -- you know,   14:11:18

21   for instance, does not want to document a PD --

22   protocol deviation -- if he deems -- if he deems

23   that it's not a protocol deviation, but clearly, it

24   is according to the protocol, you know, one way

25   would be that he will take ownership and document it 14:11:43
```

```
 1    as so.

 2              But if the medical monitor or project

 3    management says: Yes, that is a protocol deviation,

 4    depending on whatever it is -- then further

 5    communications would possibly ensue with -- directly        14:12:00

 6    with the project manager or medical monitor with the

 7    site staff or PI.

 8        Q    So in the last example you gave us, it

 9    would have been your responsibility to recognize

10    there was a protocol deviation; correct?                    14:12:33

11              MR. KEEGAN:  Objection.  Misstates his

12    testimony.

13    BY MS. TABACOPOULOS:

14        Q    Does that misstate your testimony?  I

15    don't think so.  If it does, let me know.  I am not        14:12:41

16    here to misstate your testimony.  Just talking about

17    the last example --

18              MR. KEEGAN:  It's vague --

19    BY MS. TABACOPOULOS:

20        Q    -- would it have been your responsibility        14:12:51

21    to recognize that there had been a protocol

22    deviation by the PI that you used in your last

23    example?

24        A    If -- if it -- if it was in violation or

25    deviated -- a deviation from the protocol, as a           14:13:05
```

Case 3:16-cv-03084-L-BGS   Document 84-20 Filed 04/09/18   PageID.1729   Page 42 of 98
Dexter et al. v. ...
November 20, 2017

```
 1    monitor, would you monitor that -- that finding and,

 2    you know, address it with the site and show that

 3    what in violation it is according to the protocol.

 4              And, again, if there's -- if there's no

 5    agreement, you know, as stated as such in the              14:13:33

 6    protocol and that the PI does not agree, then that

 7    would be sort of grounds for escalation and

 8    proper -- for a proper response by project

 9    management or a medical monitor if applicable.

10         Q    But by that time, you had already tried         14:13:57

11    to work things out with the PI, then hadn't gotten

12    anywhere -- correct? -- and you decided to escalate?

13         A    If that's the case.

14         Q    Yeah.  In that example.

15         A    Yeah.  You try to -- again, you try not         14:14:12

16    to escalate every single problem to the -- to the --

17    to project management.  Because if you think about

18    it -- especially with a worldwide study, they'll

19    get -- that's all they're doing is escalation

20    triage.  So as monitors, you try to make sure that       14:14:32

21    the site understands what's per protocol.  And if it

22    sort of gets to the point where there's no

23    resolution, then you certainly want to have project

24    management involved.

25         Q    But it is certainly your responsibility        14:14:51
```

```
1    in general, as you put here, "to ascertain and

2    recommend appropriate follow-up responses to issues

3    with sites"; correct?

4              MR. KEEGAN:  Objection.  Lacks

5    foundation.  Misstates his testimony.  Assumes facts      14:15:09

6    not in evidence.

7              THE WITNESS:  As it's stated in the CV.

8    BY MS. TABACOPOULOS:

9         Q    Yup.

10        A    And as part of my responsibilities being     14:15:20

11   a monitor, you know, it -- again, you know, we --

12   you -- you want to sort of take an approach where

13   you don't want to escalate every single issue.  But

14   as appropriate, there is an escalation process.

15        Q    You've been in this industry for          14:15:50

16   12 years -- right? -- or maybe more than 12 years?

17        A    Almost 14.  Currently.

18        Q    Did you view yourself as a CMA that was

19   capable of flagging issue -- recognizing issues with

20   sites and adjusting appropriate remedies or courses    14:16:17

21   of action to them?

22             MR. KEEGAN:  Objection.  Vague and

23   ambiguous.

24             As to what time period?

25   ///
```

```
 1    BY MS. TABACOPOULOS:

 2        Q     During the time that you were a CMA

 3    PAREXEL.  That's what I'm asking about.

 4        A     I would on the basis of the protocol and

 5    any other applicable plans for the study.          14:16:34

 6        Q     SOPs, protocols, regulations -- those

 7    form the basis for a study but they're not a

 8    substitute for your own -- having your own thinking

 9    cap on during the time you're doing the job, are

10    they?                                              14:17:01

11              MR. KEEGAN:  Objection.

12    BY MS. TABACOPOULOS:

13        Q     You have to know all those provisions,

14    but you also have to think how to implement them

15    with respect to a site or a study; is that right?  14:17:06

16              MR. KEEGAN:  Objection.  Vague.

17              THE WITNESS:  With respect to a site

18    according to -- to the protocol or to the study

19    being implemented at that site, yes.

20    BY MS. TABACOPOULOS:                               14:17:17

21        Q     There was a time when you applied or

22    thought about applying part -- for a position called

23    the "training compliance specialist"; is that

24    correct?

25        A     Hmm-hmm.                                 14:17:33
```

```
 1   BY MS. TABACOPOULOS:

 2        Q     You --

 3        A     I have no relationship or don't know who

 4   of the other names who you would refer to in this

 5   class-action lawsuit.  So I'm just representing                    14:25:06

 6   myself and as such in this lawsuit.

 7        Q     And what is it about yourself that you

 8   want to -- strike that.

 9              Did you ever complain to anybody at

10   PAREXEL that you wanted to be paid overtime?                       14:25:34

11        A     I don't remember.

12        Q     Did you ever hear anybody else complain

13   that they wanted to be paid overtime?

14        A     I don't remember.

15        Q     So at some point, you got back from your               14:26:09

16   training in probably mid- May of 2015.  And then I

17   understand you took a bit of a vacation before you

18   were assigned to a study at PAREXEL; correct?

19              MR. KEEGAN:  Objection.  Lacks

20   foundation.  Assumes facts not in evidence.                       14:26:36

21              THE WITNESS:  I did, but that was already

22   agreed to before accepting that position.

23   BY MS. TABACOPOULOS:

24        Q     Sure.  That's fine.  I mean there's

25   nothing wrong with that.  I'm just trying to                      14:26:50
```

```
 1    establish when you first got assigned to a study.

 2    Was it sometime in April of 2015 or was it late May?

 3     'Cause by the time you got back from Durham, mid

 4    May, took vacation -- when, approximately, did you

 5    get on to your study?                                    14:27:10

 6         A    I don't remember.

 7         Q    Would it be reflected on your time

 8    sheets?

 9         A    Yeah, it should have.

10         Q    And you're the one who completed your       14:27:21

11    time sheets?

12         A    Yes.

13         Q    Okay.  Do you know the number of studies

14    that PAREXEL works on at any given time?

15              MR. KEEGAN:  Objection.  Vague as to          14:27:41

16    time.  Currently?

17              THE WITNESS:  I -- I don't know.

18    BY MS. TABACOPOULOS:

19         Q    During the time you worked for PAREXEL,

20    do you have any guesstimate or estimate as to how       14:27:47

21    many studies?

22         A    I wouldn't.

23         Q    There are lots -- there were a lot of

24    different studies going on at PAREXEL; right?  It

25    wasn't only the cardiovascular study, as far as --      14:28:01
```

```
 1    study.  I just don't remember.
 2            Really, my main focus was on the
 3    cardiovascular study.  And -- I -- you know, I was
 4    most likely more of a sounding board than anything
 5    else.  And, you know -- other -- other CMAs might          14:31:49
 6    have just -- I've had discussions with -- it's more
 7    or less high-level information.  I -- I simply don't
 8    remember any of the details of those conversations.
 9    BY MS. TABACOPOULOS:
10        Q    Okay.  Was there additional mandatory            14:32:14
11    training required at PAREXEL that you participated
12    in?
13        A    Aside from the two-week onboarding
14    program?
15        Q    Correct.                                          14:32:28
16        A    Yes.  We -- there was a system where we
17    had to do all training on applicable SOPs, corporate
18    SOPs, and then there were study-specific
19    documentation that we had to be trained on --
20    protocol -- the IB -- Investigator's Brochure, the         14:32:45
21    Clinical Monitoring Plan -- CMP.
22            And then also, join in on class -- class
23    trainings that was performed by a corporate trainer.
24    And that was usually via Skype.
25        Q    Did you -- start over.  Did you view             14:33:17
```

```
 1    based in San Diego; right?  It was various

 2    locations?

 3             MR. KEEGAN:  Objection.  Lacks

 4    foundation.  Yesterday.

 5             THE WITNESS:  Yeah.  I believe that was          14:35:06

 6    for an in-house position.  I don't remember what

 7    particular position you're referring to.  But if it

 8    was -- if it stated on the job portal, I don't

 9    remember.  Various locations -- I'm assuming that it

10    was either in the San Diego office, or an in-house     14:35:27

11    position, or working-from-home position.

12    BY MS. TABACOPOULOS:

13        Q    Is in-house something different from

14    San Diego, or what do you mean by "in-house"?

15        A    Well, in-house, you're primarily in the        14:35:39

16    office.  And then at a certain period of time, you

17    then get the opportunity to work remotely, which is

18    working from home.

19        Q    And when you were a CMA, you worked in

20    the office for a period of time in San Diego, and      14:35:58

21    then you started to work remotely at one point; is

22    that correct?

23        A    Yes.

24        Q    About when did you start to work

25    remotely?                                              14:36:05
```

Case 3:16-cv-03084-L-BGS  Document 84-20  Filed 04/09/18  PageID.1736  Page 49 of 98
Dexter et al Page 49
November 20, 2017

```
 1        A     I don't remember.

 2        Q     Was it halfway through your tenure?

 3   Three-quarters?  Do you remember?

 4        A     I -- I don't remember, but it may have

 5   been maybe three-quarters of my tenure I was in the      14:36:23

 6   office.  And then transitioned into working from

 7   home.

 8        Q     And there were other CMAs -- certainly

 9   CRAs -- that did not work in the office; correct?

10        A     That's correct.                               14:36:44

11        Q     So you would have no knowledge about what

12   duties they were performing on a weekly or daily

13   basis; is that right?

14        A     Right.

15             MR. KEEGAN:  Objection.                        14:36:52

16             THE WITNESS:  I don't know what they

17   perform, as far as study-specific responsibilities.

18   BY MS. TABACOPOULOS:

19        Q     Did you submit the -- strike that.

20             Did you apply for the PAREXEL job before      14:37:12

21   you applied for Samumed or vice versa?

22        A     Before.

23        Q     The PAREXEL job came first?

24        A     Yes.

25        Q     Did you -- what did you do to apply?          14:37:24
```

```
 1    getting the chance to interview for that position or

 2    positions.

 3    BY MS. TABACOPOULOS:

 4        Q      And at that point, when you applied, did

 5    you believe you were qualified for those positions?      15:07:15

 6                MR. KEEGAN:  Objection.  Asked and

 7    answered.  Compound.

 8                THE WITNESS:  Again, as stated, with my

 9    conversations on my one-on-one conversations with my

10    line manager and, you know, letting him know my         15:07:31

11    interests -- he recommended to apply for the

12    position.

13    BY MS. TABACOPOULOS:

14        Q      Did you need to have a thorough

15    understanding of the study requirements in order to      15:08:12

16    effectively detect whether there were adverse events

17    occurring at a site that were going unreported?

18                MR. KEEGAN:  Objection.  Incomplete

19    hypothetical.  Lacks foundation.  Assumes facts not

20    in evidence.                                             15:08:34

21                THE WITNESS:  To be part of the -- the

22    study, you would need to be trained on all

23    applicable documentation -- or study documents --

24    to, you know, determine, you know -- adverse events,

25    if any.                                                  15:09:03
```

```
 1    BY MS. TABACOPOULOS:

 2         Q      That was part of your job as a CMA;

 3    correct?

 4                MR. KEEGAN:  Objection.  Vague,

 5    ambiguous.                                              15:09:11

 6                THE WITNESS:  Depending on, you know, the

 7    situation.

 8    BY MS. TABACOPOULOS:

 9         Q      But would you make the determination;

10    right?                                                  15:09:38

11                MR. KEEGAN:  Objection.  Argumentative.

12    Assumes facts not in evidence.  Misstates his

13    testimony.

14                THE WITNESS:  Based on the protocol.

15    BY MS. TABACOPOULOS:                                    15:09:46

16         Q      Well, there are other things you had to

17    take into effect when you were monitoring a site,

18    other than the protocol; right?

19                MR. KEEGAN:  Objection.  Vague.

20                THE WITNESS:  I don't know specifically     15:09:57

21    what you're assuming.

22    BY MS. TABACOPOULOS:

23         Q      You had to know the study protocol?

24         A      Yes.

25         Q      And you had to know the regulations and     15:10:07
```

```
 1   you had to know SOPs.  But didn't you also have to

 2   know how to spot issues that either were prohibited

 3   by regulations or by protocol?

 4            MR. KEEGAN:  Objection.  Vague and

 5   ambiguous.                                              15:10:28

 6            THE WITNESS:  No.  Not necessarily.

 7   BY MS. TABACOPOULOS:

 8       Q    Didn't the protocol and the SOPs form the

 9   backbone for you to effectively manage the

10   day-to-day events at a study site?                      15:10:45

11            MR. KEEGAN:  Objection.  Vague as to

12   "backbone."

13            THE WITNESS:  I mean, the protocol sort

14   of allows you how to conduct a study.  So we

15   typically rely, or usually rely, on the protocol,      15:11:11

16   whatever is stated, and any SOPs that are relative,

17   and how to approach, you know, certain situations,

18   refer to the CMP -- Clinical Monitoring Plan -- and,

19   you know, we -- we -- for this study, we dealt with

20   a lot of local IRBs where they had their own          15:11:41

21   standardization of how to, you know, report certain

22   events.  So --

23   BY MS. TABACOPOULOS:

24       Q    But wasn't it your knowledge of the SOPs

25   and the protocol that allowed you to determine         15:12:04
```

```
 1   whether a site was in compliance or not?
 2              MR. KEEGAN:  Objection.  Assumes facts
 3   not in evidence.  Lacks foundation.  Misstates his
 4   testimony.
 5              THE WITNESS:  We primarily utilized, you        15:12:15
 6   know, the protocol, the relative SOPs and guidances
 7   to make, you know, sound decisions in addition to,
 8   you know, the guidance of project management and --
 9   and other parties involved if necessary.
10   BY MS. TABACOPOULOS:                                       15:12:41
11      Q     What are some of the more -- you know,
12   the decisions that you had to make yourself in the
13   day-to-day -- you know, in your day-to-day at
14   PAREXEL in dealing with sites?
15              MR. KEEGAN:  Objection.  Vague,                 15:12:59
16   ambiguous, overbroad.
17              THE WITNESS:  Rescheduling a phone call.
18   BY MS. TABACOPOULOS:
19      Q     Let me start with this:  You said here,
20   you used your judgment to assess and ensure overall        15:13:11
21   integrity of the study implementation and adherence
22   to the study protocol.  So would you tell me how you
23   would use your judgment to assess and ensure that
24   the overall integrity of the study implementation
25   and adherence to study protocol was effective at all       15:13:27
```

```
 1   clinical sites?

 2       A    So.  I think the last part of that

 3   statement or that responsibility sort of answers the

 4   question where, you know, adherence to the

 5   protocol -- and that's how I would then, you know,        15:13:43

 6   make those judgments based on those adherences.

 7       Q    So if you found that a study was out --

 8   out of protocol, not following the protocol, what

 9   would you do?  Can you give me some examples of what

10   would you do with a study that was out of protocol?      15:14:05

11           MR. KEEGAN:  Objection.  Vague as to "out

12   of protocol."  It's overbroad, vague, and ambiguous.

13           THE WITNESS:  A study being out of

14   protocol is unclear.  Can you restate that question?

15   BY MS. TABACOPOULOS:                                      15:14:21

16       Q    Well, yeah.  I should.  That was actually

17   a bad question.  A site that's out of protocol, not

18   following a protocol.  Can you give me an example of

19   how would you use your judgment to make sure that

20   the site adheres to protocol?                             15:14:32

21           MR. KEEGAN:  Objection.  Incomplete

22   hypothetical.  Vague and ambiguous.

23           THE WITNESS:  I think -- I think one

24   example I've already explained before is where a --

25   you know, a site performs a lab that was not part of     15:14:49
```

```
 1   the protocol.  Then that's a protocol deviation.

 2   BY MS. TABACOPOULOS:

 3       Q    And in that situation, how would you deal

 4   with the site about that?

 5       A    I would then, you know, let 'em know this        15:15:09

 6   was observed as a protocol deviation and that I

 7   would then refer to the project management on how to

 8   proceed based on what to do with documentation wise.

 9   And then get further guidance on what to -- you

10   know -- provide to the site.                              15:15:32

11            And then usually, that comes with program

12   management's instruction to adhere to -- adhere to

13   the protocol -- the site would.  And specifically

14   point out where, you know -- in the protocol -- it

15   does state to only conduct these -- these specific,       15:15:58

16   you know, requirements.  And that whatever lab draw

17   was done, you know, moving forward, should -- it

18   shouldn't be drawn for other subjects.

19       Q    Did you have to involve a PM in a

20   situation like that or was it your choice to involve      15:16:27

21   a PM in a situation like that?

22       A    I usually had the PMs', you know,

23   involvement.

24       Q    Do you know to what extent other CMAs or

25   CRAs involved PMs or medical monitors in resolving        15:16:55
```

```
 1   site issues for --

 2            MR. KEEGAN:  Objection.  Assumes facts

 3   not in evidence.  Lacks foundation.  Calls for --

 4   it's an incomplete hypothetical.  Go ahead.

 5            THE WITNESS:  Only within my study.  So      15:17:14

 6   there was other CMAs and CRAs involved in my study.

 7   Again, I wasn't privy to specifics or details from

 8   other CRAs and CMAs working on other studies.  It

 9   may have been discussed, but I just simply don't

10   remember.                                             15:17:36

11   BY MS. TABACOPOULOS:

12        Q    Well, there were some 800 sites in your

13   study.  You were only doing, you said, 12 to 14 of

14   them?

15        A    Yes.                                        15:17:45

16        Q    Would it be fair to say you don't know

17   what the CMAs and CRAs were doing on the other

18   700-something study sites that were under your

19   cardiovascular study?

20            MR. KEEGAN:  Objection.  Misstates his       15:17:57

21   testimony.  Lacks foundation.  Assumes facts not in

22   evidence.

23            THE WITNESS:  Only sites that were in

24   U.S. and Canada.

25   ///
```

```
 1   BY MS. TABACOPOULOS:

 2       Q    Is that a "yes"?

 3       A    Partly, yes.  Because -- because this was

 4   a worldwide study, there was a global project

 5   manager and then regional project managers.  And            15:18:24

 6   our -- the region that I managed sites for were --

 7   or watched sites for were primarily in U.S. and

 8   Canada.  And then there would be sites all over the

 9   world.  So I was more involved in the -- the U.S.

10   and in Canada sites.                                        15:18:54

11       Q    But you had personal knowledge what was

12   going on with respect to the sites you were assigned

13   to.  You don't have personal knowledge with respect

14   to the sites that were being managed by other CMAs;

15   correct?

16       A    Not in full detail.  And so we did have,

17   you know, weekly project management meetings where

18   we did call in at a certain specific time because

19   there were so many of us.  So project management had

20   sort of delineated 15 minutes of my time to call in        15:19:26

21   and provide site updates.

22            And it -- and I would hear the tail end

23   of one other conversation and then after my time was

24   done, someone else would call in and they possibly

25   heard whatever I was discussing regarding my sites.         15:19:45
```

```
 1        Q      Sitting here today, do you remember

 2   anything about the way any other CMA managed a site

 3   on a cardiovascular study that you did?

 4        A      I do not.

 5        Q      Can you tell me how you went about                    15:19:58

 6   recognizing out-of-scope activities on your studies.

 7              MR. KEEGAN:  Objection.  Vague,

 8   ambiguous.

 9              MS. TABACOPOULOS:  Strike that.

10   BY MS. TABACOPOULOS:                                              15:20:10

11        Q      Can you describe for me how you went

12   about recognizing out-of-scope activities on the

13   sites that you managed?

14              MR. KEEGAN:  Objection as to

15   "out-of-scope activities."                                        15:20:22

16              MS. TABACOPOULOS:  I'm using it in the

17   same sense he does on his resume.

18              MR. KEEGAN:  Lacks foundation.

19              Go ahead.

20              THE WITNESS:  I don't remember what "out                15:20:36

21   of scope" is defined as.  Having -- I'm just

22   throwing myself in the dark here.  Just maintaining

23   weekly communication or just responding back to

24   e-mails as being out of scope.  That's not really

25   necessarily part of the protocol itself, per se, but   15:21:10
```

```
 1   BY MS. TABACOPOULOS:

 2        Q     If you -- you know, for example, noticed

 3   on a particular site that staff was departing, for

 4   example, what role would you play in making sure

 5   that whoever was there was appropriately trained and      15:30:21

 6   understood the study --

 7              MR. KEEGAN:  Objection.  Assumes.

 8   BY MS. TABACOPOULOS:

 9        Q     -- requirements?

10              MR. KEEGAN:  Objection.  Assumes facts          15:30:33

11   not in evidence.  Lacks foundation.  Misstates his

12   prior testimony.  Vague and ambiguous.  Incomplete

13   hypothetical.

14              THE WITNESS:  So to clarify your

15   question, if -- if there was a site staff that left       15:30:48

16   and then some other person were placing that site

17   staff how would they sort of be up to speed with

18   being involved in the study -- is that your

19   question?

20   BY MS. TABACOPOULOS:                                      15:31:05

21        Q     Either that or you're just noticing

22   turnover at a particular site.  Would there be

23   something you would do in that situation to make

24   sure that whoever is there doing the study is doing

25   it the right way?                                         15:31:17
```

```
 1              MR. KEEGAN:  Objection.  Compound.  Vague
 2     and ambiguous.
 3              THE WITNESS:  To answer the first part of
 4     your question, I -- I haven't been involved with a
 5     site that has turnover as -- as, you know, what you      15:31:26
 6     would assume turnover would be.  I have monitored
 7     sites where PI had left or a study coordinator had
 8     left and there was a replacement.
 9              So in that instance, I gotta make sure as
10     a monitor that per ICH guidelines, they're fully        15:31:57
11     trained and understand the study they're involved,
12     in they are given the appropriate accesses to
13     different portals and, you know, they have the
14     appropriate documentation to document such training
15     per study requirements.                                 15:32:18
16              And so they would either produce that --
17     those documents for me to review electronically or
18     those CRAs would collect those documents and provide
19     them to me.
20     BY MS. TABACOPOULOS:                                    15:32:35
21        Q     And what would you do at that point?
22        A     As one of my job responsibilities is to
23     make sure and Q.C. these regulatory items and then
24     file 'em in the ETMF.
25        Q     And how do you go about making the             15:32:50
```

```
 1   decision whether, you know, a particular staff is,

 2   as you said, fully trained and understand the study

 3   they're involved in?  How do you make that

 4   determination?

 5            MR. KEEGAN:  Objection.  Assumes facts        15:33:05

 6   not in evidence.

 7            THE WITNESS:  Well, I make that

 8   determination, as far as what they provide me, as

 9   far as documentation.  Because I'm not going onsite

10   and asking them, you know, personally:  Did you       15:33:17

11   perform these trainings?

12            You know, I don't have that luxury where,

13   you know, part of retrieving this documentation is

14   that you -- they confirm that they did, you know,

15   conduct this type of training.  And, you know,        15:33:36

16   ensure that -- ensures the CRO -- the sponsor --

17   that they're fully trained up on performing any

18   study-related activity.

19   BY MS. TABACOPOULOS:

20       Q    Would a CRN -- sorry.  Would a CRA then       15:33:56

21   who goes onsite be able to assess whether site staff

22   is fully trained, as you say --

23            MR. KEEGAN:  Objection.  Lacks

24   foundation.

25   ///
```

 1            And depending on the issues, you know, I

 2    leave that up really to the decision of the project

 3    management on how to provide guidance.

 4    BY MS. TABACOPOULOS:

 5       Q    Okay.  But, again, to the project                    15:37:39

 6    manager -- gets lots of queries on a study so when

 7    you escalated something to project manager, you

 8    normally accompanied that with your own assessment

 9    of the problem and your own recommendation for a

10    fix; is that correct?                                        15:37:55

11            MR. KEEGAN:  Objection.  Misstates his

12    testimony.  Assumes facts not in evidence.  Lacks

13    foundation.  Vague and ambiguous.

14            THE WITNESS:  Well, I state what's --

15    what's found what's based on, again, whatever the            15:38:08

16    issues may be.  Let's just say there's a constant

17    observance of protocol deviations.  Then,

18    absolutely, you know, bring this to the attention of

19    project management.

20            If the site is just not responding to my             15:38:29

21    calls, and, you know, I'm able to reschedule a site

22    phone call, then that's something I don't, you

23    know -- I don't escalate to project management.

24    BY MS. TABACOPOULOS:

25       Q    Would there be times, for example, when             15:38:49

```
 1   you determined that certain site staff needed

 2   retraining in areas --

 3            MR. KEEGAN:  Objection.  Lacks

 4   foundation.

 5   BY MS. TABACOPOULOS:                                    15:39:03

 6        Q      -- and recommend that those individuals

 7   undergo further training?

 8        A      With the instruction of project

 9   management based on whatever issue that may be.

10            I -- I wouldn't -- you know, individually    15:39:15

11   or independently tell them, oh, you need training.

12   This -- this would certainly -- at that point, it

13   would be something that I would inform project

14   management about, again, depending on the severity,

15   you know -- I would then, you know, take that         15:39:32

16   opportunity to reach out to project management, have

17   a plan all set and if retraining is warranted, then

18   I would then inform them.

19        Q    Did you always need to check with project

20   management before you conveyed to a site that it       15:39:51

21   needed more training in one aspect or another?

22            MR. KEEGAN:  Objection.  Incomplete

23   hypothetical.

24            THE WITNESS:  Again, depending on the

25   situation -- usually, when it's up to that point,      15:40:12
```

```
 1   then, you know, we would -- we would instruct the

 2   site to conduct training as appropriate with project

 3   management's involvement.

 4   BY MS. TABACOPOULOS:

 5        Q    My question was, though:  Did you always          15:40:37

 6   have to check with project management before you

 7   recommended to a site that it needed to undergo more

 8   training?

 9        A    Yes.

10        Q    Why was that?                                     15:40:48

11        A    Because we wanted to make sure that the

12   directive was -- was clear to the site and

13   appropriate.

14        Q    Do you know whether other CMAs checked

15   with project management before they issued a           15:41:14

16   directive to a site to improve or conduct training

17   --

18             MR. KEEGAN:  Objection.  Lack --

19   BY MS. TABACOPOULOS:

20        Q    -- of site members?                           15:41:23

21             MR. KEEGAN:  Objection.  Lacks

22   foundation.  Calls for lay opinion.  Assumes facts

23   not in evidence.

24             THE WITNESS:  I do not.

25   ///
```

```
 1   BY MS. TABACOPOULOS:

 2        Q     Did you have biweekly management calls

 3   with your sites?

 4        A     It was part of our Clinical Monitoring

 5   Plan.                                                    15:43:45

 6        Q     Can you tell me about those?  What did

 7   you do during them and how did you conduct them?

 8             MR. KEEGAN:  Objection.  Calls for a

 9   narrative.  Go ahead.

10   BY MS. TABACOPOULOS:                                     15:43:54

11        Q     What was the purpose for the biweekly

12   site management calls you conducted as a CMA?

13        A     Well, not only to follow the CMP, but to

14   also provide them any updates on study-related

15   important updates.  Also, review anything that was      15:44:14

16   outstanding from our -- from the last phone call.

17   Ask the sites, you know, if they run into -- if they

18   have any issues at that moment -- the PI had any

19   questions.  Typically, my phone calls were with the

20   study coordinator.  So, you know, any -- anything       15:44:43

21   that was discussed was primarily through the SCs.

22             And, you know, it was -- it was more or

23   less trying to keep the conversation on a consistent

24   basis, letting them know that I'm available as -- as

25   a sponsor representative, even though I worked          15:45:06
```

```
 1   for -- excuse me -- even though I worked for

 2   PAREXEL, you know, if they -- if they needed any

 3   assistance, you know, they could directly contact

 4   me.  And then I could, you know -- if applicable,

 5   escalate as necessary.                              15:45:28

 6              And usually these phone calls are

 7   25 minutes, 30 minutes.

 8       Q      The study coordinators, are they usually

 9   nurses or a variety of different types of people?

10       A      Variety of backgrounds.                  15:45:49

11       Q      Okay.  And the PIs are usually

12   physicians; correct?

13       A      Correct.

14              MR. KEEGAN:  I think we can stipulate on

15   the record that a PI is's a doctor.  I would        15:46:07

16   stipulate to that.

17              MS. TABACOPOULOS:  Okay.

18   BY MS. TABACOPOULOS:

19       Q      If your particular site had issues -- it

20   wasn't, you know, on track or on time with something 15:46:24

21   in particular -- was it your job to, you know, find

22   ways to motivate them to get back on track?

23              MR. KEEGAN:  Objection.  Vague.

24   BY MS. TABACOPOULOS:

25       Q      Or figure out why they weren't on track? 15:46:39
```

```
 1              Is it okay if -- take another restroom

 2     break?

 3         Q     Sure.

 4              THE VIDEOGRAPHER:  We are off the record

 5     at 3:48 P.M.                                            15:48:38

 6              (Off the record)

 7              THE VIDEOGRAPHER:  We are back on the

 8     record at 4:04 P.M.

 9     BY MS. TABACOPOULOS:

10         Q     Are you able to continue and give us your    16:05:00

11     best testimony?

12         A     Yes.

13         Q     All right.  What kind of negotiations did

14     you perform with respect to informed-consent forms?

15              MR. KEEGAN:  Objection.  Lacks                16:06:12

16     foundation.  Assumes facts not in evidence.

17              Go ahead.

18              THE WITNESS:  Negotiations were -- I was

19     more or less the facilitator.  CT -- CTAs, clinical

20     trial assistants, did the negotiations for ICFs with   16:06:36

21     sites.

22     BY MS. TABACOPOULOS:

23         Q     Your resume indicates that you did

24     site-specific ICF negotiations.  Did you or didn't

25     you?                                                   16:06:59
```

```
 1              MR. KEEGAN:  Objection.  Argumentative.

 2    The document speaks for itself.

 3              Go on.

 4              Are you pointing to a specific page in a

 5    specific resume or --                                16:07:08

 6              MS. TABACOPOULOS:  All the resumes that

 7    we've marked so far today.

 8              THE WITNESS:  So, yes.  Again, I

 9    collaborated with the CTAs on the CSA of the

10    negotiations as required.  So if they wanted me      16:07:42

11    to -- if the CTAs wanted me to get clarification on

12    a specific finding that the CTAs sought in either

13    their budgets or their ICFs, then I would help

14    facilitate that to get clarification from the site,

15    gather that information, and then provide that back  16:08:04

16    to the CTAs.

17              (Reporter clarification)

18    BY MS. TABACOPOULOS:

19       Q    Can you give me an example of what you

20    would do in terms of discussing with a site a       16:09:02

21    particular ICF and then providing, you know, that

22    kind of information back to the CTA?

23              MR. KEEGAN:  Objection.  Lacks

24    foundation.  Incomplete hypothetical.  Assumes facts

25    not in evidence.  Calls for a narrative.             16:09:22
```

```
 1    BY MS. TABACOPOULOS:
 2        Q    I just want a few examples of how would
 3    you negotiate ICFs.
 4        A    Again, I did not negotiate personally
 5    with ICFs.  I did say that I collaborated with the      16:09:40
 6    CTAs on -- on, you know, ICFs and CSA.  And as
 7    required, followed up with the site based on their
 8    review and gathered the information as needed.
 9            So, for instance, something -- again, I
10    mentioned earlier in my testimony that I was dealing    16:10:08
11    with a lot of local IRBs -- local IRBs that sites
12    utilized, particularly if it's a institution at a --
13    a university.  So they have their own sets and
14    regulations that they would include specific to
15    their guidelines, and that they would include that     16:10:39
16    in their ICF as part of their review and inclusion.
17    That is sent back to the CTS for review and based
18    on, you know, their limitations on their review of
19    the ICF.  Then it would go back as far as the
20    negotiation process and -- you know, if the site has   16:11:09
21    something they would want to bring up, they can
22    surely contact me.  But I would then facilitate that
23    and bring that to the CTS's attention.
24            I find that sometimes the sites would
25    reach out to me, and then, usually, the CTS has        16:11:30
```

```
 1   communication directly with the site when it comes

 2   to negotiation.

 3       Q    But were you a resource in that respect

 4   for the CTS; is that correct?

 5       A    Yeah, more facilitator as needed.          16:11:45

 6       Q    Did you review informed-consent forms

 7   that were changed to see if they made sense?

 8       A    Yeah.  I -- you know, as being part --

 9   you know, sometimes I got copied on e-mails with the

10   attachment of the ICF.  So I did review, you know,    16:11:58

11   different versions or iteration of the ICFs as they

12   came along.  And as part of my SRP, I would still

13   ensure that I review the IRB-approved ICF, you know,

14   before submission.

15       Q    In general, when you were performing         16:12:41

16   document review, did you approach that activity more

17   on a systemic basis -- you know, doing a systemic

18   review of the documents?  For example, a

19   comprehensive look at those documents to see if

20   there were any trends or anomalies or questionable    16:13:06

21   information or patterns of questionable information?

22           MR. KEEGAN:  Objection.  Vague,

23   ambiguous.  Overbroad.

24           THE WITNESS:  If -- if there was -- I

25   mean, again, depending on the finding or the         16:13:24
```

Dexter Ulsh 94/99
November 20, 2017

```
 1   BY MS. TABACOPOULOS:

 2        Q      The documents that you reviewed as CMA of

 3   PAREXEL?

 4               MR. KEEGAN:  Objection.

 5   BY MS. TABACOPOULOS:

 6        Q      Study-site documents?

 7               MR. KEEGAN:  Objection.  Vague and

 8   ambiguous.  Overbroad.

 9               THE WITNESS:  Did you mean regulatory

10   documents?                                              16:15:01

11   BY MS. TABACOPOULOS:

12        Q      Let's start with regulatory documents and

13   then move through all the documents that you would

14   have -- types of documents that you reviewed.

15        A      As part -- as part of your job function,   16:15:10

16   you know, you are to, again, as mentioned before,

17   Q.C. these documents based on the information

18   provided to the site if there was a finding that was

19   not matching what was previously provided, let's

20   just say, then we would ask to -- whether confirm if  16:15:35

21   this is correct and, you know -- if it wasn't

22   correct, then we then asked for the site to provide,

23   you know, amended documents to ensure that it's now

24   true and correct according to who's onsite.

25        Q      Would you make that determination?          16:16:02
```

```
 1        A    No.  Based on, you know, the certain

 2   guidelines that we follow as far as our process when

 3   QC'ing documents.

 4        Q    But it was you who made the determination

 5   to ask the site for the amended documents to ensure       16:16:18

 6   they're now true and correct, as you said; correct?

 7        A    Well, it's, again, based on how we were

 8   trained when reviewing the documents and was part of

 9   our onboarding program provided by PAREXEL.  And,

10   you know, if it was simply -- again, depending on        16:16:45

11   the issue, if it was simply a typo, then let's just

12   say the name was incorrect of a PI.  Then a couple

13   letters that are different -- then -- then we would

14   ask the site to confirm and, you know, ensure that

15   whatever they provided -- whether it be -- needs         16:17:10

16   correcting or if it's true, then, you know, we

17   ensured that the sites confirmed that.

18        Q    Okay.  What about other types of

19   documents?  For example, the documents that the site

20   generated?  Other than regulatory documents, was it      16:17:31

21   your responsibility to sort of view those

22   comprehensively to look for any kinds of patterns of

23   fraud or abuse or anything of that nature?

24             MR. KEEGAN:  Objection.  Lacks

25   foundation.  Vague and ambiguous.  Overbroad.            16:17:45
```

 1    Assumes facts not in evidence.

 2              THE WITNESS:  Well, I know there's a

 3    fraud and misconduct SOP that CRAs train on.  So I

 4    would have referred to that if there -- you know,

 5    there's any indication of fraud, then there's an SOP          16:18:04

 6    and a whole process for that that PAREXEL employs

 7    for us as employees to utilize.

 8    BY MS. TABACOPOULOS:

 9        Q    Understood.  But the detection of the

10    fraud would be something that you did as a CMA, for          16:18:20

11    example?  You would be the one who was reviewing the

12    site documentation and making a determination of

13    whether they looked, you know -- if there had been

14    some fraud or whether they looked to be true and

15    accurate; is that correct?                                   16:18:39

16              MR. KEEGAN:  Objection.  Assumes facts

17    not in evidence.  Incomplete hypothetical.

18              THE WITNESS:  I would not independently

19    decide whether something was fraud.  So this

20    would -- something -- this would be something that          16:18:55

21    the project management would be aware about and

22    other parties may be involved, whether it be medical

23    monitors or the QA department.

24    BY MS. TABACOPOULOS:

25        Q    Would it be fair to say, though, that you          16:19:25

```
 1   levels of -- of people being in an industry, you

 2   will run into situations where you have to be

 3   professional and communicate what you have to

 4   provide them in your -- in your monitoring calls.

 5            And, again, I -- use strategies based on          16:37:46

 6   what was already observed, since I started in the

 7   study and being in maintenance phase.  So, you know,

 8   I utilized some of the strategies that project

 9   management had provided to go about addressing, you

10   know, issues for particular sites and different        16:38:11

11   personnel.

12   BY MS. TABACOPOULOS:

13      Q    Okay.  Utilized some of project

14   management.  Did you ever come up with any of your

15   own, if you were the person who actually had to have     16:38:22

16   communication with the sites?

17            MR. KEEGAN:  Objection.  Assumes facts

18   not in evidence.  Lacks foundation.

19            Go ahead.

20            THE WITNESS:  I primarily used the          16:38:34

21   strategies from project management based on what was

22   -- again, I learned from the past and how to move

23   forward with, for instance, helping with recruitment

24   for -- for these -- for particular sites -- you

25   know, sites that are having trouble enrolling.          16:38:58
```

```
 1    BY MS. TABACOPOULOS:

 2        Q     Do you know how other CMAs or other CRAs

 3    handled those tasks on other studies?

 4        A     I did not.

 5        Q     Did you refer to what you're now calling         16:39:20

 6    monitoring calls for the sites as biweekly

 7    management calls?

 8              MR. KEEGAN:  Objection.  Vague.

 9    BY MS. TABACOPOULOS:

10        Q     When you were the CMA at PAREXEL?               16:39:27

11              MR. KEEGAN:  Objection.  Vague.

12    Ambiguous.

13              THE WITNESS:  I don't remember.

14    BY MS. TABACOPOULOS:

15        Q     Do you know one way or the other whether        16:39:38

16    you used that terminology at PAREXEL that you were

17    going to be a biweekly management call with sites?

18              MR. KEEGAN:  Objection.  Assumes facts

19    not in evidence.  Vague.

20              THE WITNESS:  I don't -- I don't recall         16:39:56

21    if that was -- that was the term used for, you know,

22    site calls.

23    BY MS. TABACOPOULOS:

24        Q     Okay.  How long would these calls last on

25    average with each of the sites?                           16:40:20
```

```
 1        A     As mentioned, they typically run into 20,

 2   30 minutes.

 3        Q     Did you have reason to contact the sites

 4   by telephone in between the regular calls that you

 5   would have, whether you called them monitoring calls      16:40:49

 6   or biweekly management calls?

 7        A     Yes.

 8        Q     For what reasons would you do that?

 9        A     Any study updates.  You know, usually,

10   you get last-minute directives from sponsors to           16:41:05

11   inform, you know, sites of something important that

12   they need to be aware about.  And so we would --

13   depending on the severity or -- or importance of,

14   you know, the directive or -- or information, we

15   would contact them, whether it be phone or e-mail.        16:41:30

16        Q     And if the site had questions on what you

17   were imparting to them -- whether it was study

18   updates or anything else, was it your responsibility

19   to answer their questions?

20             MR. KEEGAN:  Objection.  Assumes facts          16:41:53

21   not in evidence.  Lacks foundation.  Incomplete

22   hypothetical.

23             THE WITNESS:  If it was protocol-based, I

24   could refer to the protocol, then I would.  And if

25   it's outside of, you know, what was not set in the        16:42:13
```

```
 1   protocol, I would then refer to the project

 2   management for a clearer directive or -- or -- or

 3   response.

 4   BY MS. TABACOPOULOS:

 5        Q    You said you'd also contact the sites        16:42:52

 6   with, you know, important information, for example.

 7   Can you give me an example of what you meant by that

 8   contacting the site between regular calls?

 9        A    In between regular monitoring calls?

10        Q    Yeah.  You said you would contact them       16:43:09

11   with updates and directives and other important

12   information.

13        A    Yeah.

14        Q    Can you give us an example?

15        A    For instance, amendment to the protocol,     16:43:17

16   amendment to the ICF, amendment to the budgets --

17   you know, couple of few things that I could recount.

18        Q    Weren't you the resource for the site to

19   answer any questions they might have about any of

20   this information you're imparting to them?            16:43:44

21             MR. KEEGAN:  Objection.  Vague and

22   ambiguous as to "resource."

23             THE WITNESS:  I typically was.  And,

24   again, if it was in reference to the protocol, or if

25   clarification needed to the protocol, I would -- I    16:44:05
```

```
 1    would then use that.  If it was unclear or gray,

 2    that I -- you know, simply cannot answer according

 3    to, you know, any type of study documentation,

 4    again, I would -- I would refer to project

 5    management for a clearer direction or guidance.          16:44:28

 6    BY MS. TABACOPOULOS:

 7         Q    Using your last example when you would

 8    make the reference to project management, would you

 9    also send along a recommendation as to how the issue

10    should be handled or would you just hoist it off on    16:44:46

11    project management?

12         A    Well, I --

13              MR. KEEGAN:  Objection.  Objection.

14    Lacks foundation and calls for speculation.  Go

15    ahead.                                                 16:44:57

16              THE WITNESS:  I would -- I would gather

17    information that I have and then provide that

18    information to project management so they have a

19    basis on their decision.

20    BY MS. TABACOPOULOS:                                   16:45:16

21         Q    Would you take any responsibility for

22    helping make the ultimate decision, whether it's

23    making a recommendation to project management or

24    otherwise?

25              MR. KEEGAN:  Objection.  Incomplete          16:45:32
```

```
 1    hypothetical.  Assumes facts not in evidence.
 2    Misstates his testimony.  Asked and answered.
 3    Incomplete hypothetical.
 4               You can answer.
 5               THE WITNESS:  Yeah.  I wouldn't be part        16:45:52
 6    of that -- you know, I wouldn't provide
 7    recommendation.  And I --
 8    BY MS. TABACOPOULOS:
 9        Q     You would or would not provide?
10        A     I would not.  I mean, I don't recall          16:46:03
11    any -- any instance where I did provide a
12    recommendation.  Again, it really depends on what
13    you're talking about.  But I -- I didn't use or
14    utilize any judgment to provide any type of
15    recommendation for -- for whatever situation.         16:46:24
16        Q     Do you know whether other CMAs or CRAs do
17    that?  Use judgment in those situations?
18        A     I do not.
19        Q     Who is the project manager that you keep
20    referring to having relayed all these issues to?      16:46:55
21               MR. KEEGAN:  Well, objection.  Assumes
22    facts not in evidence.  You never established that
23    any of the hypotheticals actually occurred on the
24    study, but -- you can answer.
25               THE WITNESS:  I don't remember her name.    16:47:12
```

```
 1   BY MS. TABACOPOULOS:

 2        Q     Who was it?  One person?

 3        A     Because this -- this study was fairly

 4   large, there were at one point one main project

 5   manager and then for the U.S. and Canada, there was          16:47:30

 6   at one point three project managers under that --

 7   that global project manager.  So we had other

 8   resources to reach out to, if, you know, we had a

 9   situation needing clarity or -- or guidance.

10        Q     Do you know how many times you reached          16:47:57

11   out to the project manager or anybody on that staff?

12              MR. KEEGAN:  Objection.  Lacks

13   foundation.  Go ahead.

14              THE WITNESS:  I don't remember.

15   BY MS. TABACOPOULOS:                                         16:48:24

16        Q     Do you know whether other CRAs or CMAs

17   would provide their opinions to project management

18   in connection with difficult issues as opposed to

19   what did you?  Not provide an opinion?

20              MR. KEEGAN:  Objection.  Vague,                   16:48:39

21   ambiguous.  Lacks foundation.

22              THE WITNESS:  I don't recall CRAs or CMAs

23   having -- or providing opinions.

24   BY MS. TABACOPOULOS:

25        Q     Well, the question is whether you know           16:48:54
```

Case 3:16-cv-03084-L-BGS  Document 84-28  Filed 04/09/18  PageID.1768  Page 81 of 98
Dexter et al., Page 81
November 20, 2017

```
 1   whether other CRAs or CMAs were approaching project

 2   management differently from how you were?

 3        A     Oh, I don't remember.

 4        Q     Do you know whether PAREXEL expected you

 5   to approach project management with an opinion based        16:49:08

 6   on the fact you knew the site best, and they didn't?

 7             MR. KEEGAN:  Objection.  Assumes facts

 8   not in evidence.  The SOPs speak for themselves.

 9   Lacks foundation.  Go ahead.

10             THE WITNESS:  I'm sorry.  Can you please        16:49:32

11   repeat that question?

12             (Record read by the reporter as follows:)

13               "QUESTION:  Do you know

14             whether PAREXEL expected you to

15             approach project management

16             with an opinion based on the

17             fact you knew the site best,

18             and they didn't?"

19             THE WITNESS:  No.  I did not.

20   BY MS. TABACOPOULOS:                                       16:50:12

21        Q     It is true that you knew the site better

22   than the project manager -- correct? -- as you were

23   responsible for the site; right?

24             MR. KEEGAN:  Objection.  Calls for

25   speculation.  How would he know what the project          16:50:24
```

```
 1   manager knows?

 2          THE WITNESS:  I was the first point of

 3   contact with the site.

 4   BY MS. TABACOPOULOS:

 5      Q    But I thought you testified earlier you          16:50:39

 6   were responsible for managing the site.  So would

 7   you say in general that you knew the sites that you

 8   were responsible for better than the project manager

 9   knew those sites?

10          MR. KEEGAN:  Objection.  Your question           16:50:54

11   misstates his testimony, assumes facts not in

12   evidence, asked and answered, calls for speculation.

13          You can answer.

14          THE WITNESS:  I would communicate more to

15   the sites than the project managers would.            16:51:24

16   BY MS. TABACOPOULOS:

17      Q    That's nonresponsive to the question.

18   I'll have it read back.

19          (Record read by the reporter as follows:)

20              "QUESTION:  But I thought

21              you testified earlier you were

22              responsible for managing the

23              site.  So would you say in

24              general that you knew the sites

25              that you were responsible for
```

```
 1              better than the project manager

 2              knew those sites?"

 3          MR. KEEGAN:  You're asking him for what

 4  the project manager -- his understanding about what

 5  the project manager knew?  That's -- completely          16:52:01

 6  calls for speculation.  How would he know?

 7          MS. TABACOPOULOS:  It's a speaking

 8  objection.  And you've been doing it all day long.

 9  It's insulting to the witness.

10          MR. KEEGAN:  You're asking an improper          16:52:13

11  question.  Come on.  You know that's not a proper

12  question.  It's not admissible.

13          THE WITNESS:  Again, you know, I was the

14  first point of contact with the sites and I -- I

15  can't speak for the relationships that have already     16:52:40

16  been established with project managers; I can only

17  speak to my -- my involvement with the sites as them

18  being -- me being the first point of contact and

19  providing, you know, study-related updates, anything

20  that they need to have me, you know -- want to get      16:53:00

21  ahold of me, they can.  Typically, the process is

22  they contact me and if it's something that needs to

23  be escalated or if they require intervention by the

24  PMs or the medical monitors, then I would facilitate

25  that.                                                   16:53:32
```

Case 3:16-cv-03084-L-BGS   Document 84-23   Filed 04/09/18   PageID.1771   Page 84 of 98
Dexter, et al. Page 84
November 20, 2017

```
 1              MR. KEEGAN:  You don't even know, because

 2     it doesn't have a Bates-stamped document.

 3              MS. TABACOPOULOS:  Oh, come on, Patrick.

 4              MR. KEEGAN:  But, look.  If the document

 5     bullet points match, nobody is --                        17:31:54

 6              MS. TABACOPOULOS:  It's an authentic

 7     document, because it's reflected, in large part, on

 8     his resume.

 9              MR. KEEGAN:  Look, if they match, the

10     documents speak for themselves.  Nobody's going to      17:32:05

11     object to that.  So it doesn't mean that there's a

12     prior one or a similar job description that also has

13     similar bullet points.

14              MS. TABACOPOULOS:  Okay.

15     BY MS. TABACOPOULOS:

16         Q    What was your -- let me back up.

17              You did a mixture of what we call

18     "hoteling," "working from home," and then "working

19     at the San Diego PAREXEL facility"; correct?

20         A    That's correct.                                 17:32:33

21         Q    Okay.  What were your work hours like?

22              MR. KEEGAN:  Objection.  Yeah.

23     Objection.  Vague.

24              Go ahead.

25              It calls for a narrative.                       17:32:50
```

```
 1              Go ahead.

 2              THE WITNESS:  In some instances -- so

 3   this being a global study, we typically had meetings

 4   where we had to deal with people in other parts of

 5   the world.  And so, for instance, data management        17:33:10

 6   was being housed in Japan.  The -- the Team "F"

 7   group was in Eastern Europe.  My project manager was

 8   in East Coast.

 9              And so there would be some instances

10   where my day started really early -- like 6:00,         17:33:37

11   7:00 -- and typically ends around -- depending how

12   busy I am, 4:00, 5:00, sometimes 6:00.  And found

13   myself, you know, trying to keep up with my metrics

14   working at night and sometimes on the weekends.

15   BY MS. TABACOPOULOS:                                     17:34:06

16        Q    You were charged with the responsibility

17   of recording all your time at PAREXEL; correct?

18        A    Correct.

19        Q    You -- you not only -- you recorded your

20   study time -- more time that was billable to a          17:34:17

21   study; correct?

22        A    I billed whatever I utilized that was

23   relative to the study within my -- the time sheet.

24        Q    Yeah.  And you were charged with the

25   responsibility of billing that out accurately --        17:34:36
```

     1    right? -- because it was getting charged to a

     2    client?

     3         A    That's correct, yes.

     4         Q    So are your time sheets in that respect

     5    accurate?                                              17:34:46

     6              MR. KEEGAN:  Objection.  Vague,

     7    ambiguous.  The documents speak for themselves.  Go

     8    ahead.

     9              THE WITNESS:  Yes.  So whatever I

    10    inputted into the time sheets, they were accurate.    17:34:55

    11    BY MS. TABACOPOULOS:

    12         Q    So would your time sheets at PAREXEL,

    13    then, be the best evidence of the hours you spent

    14    working there?

    15              MR. KEEGAN:  Objection.  Lacks             17:35:20

    16    foundation.  Misstates his testimony.  Assumes facts

    17    not in evidence.  Go ahead.

    18              THE WITNESS:  Yes, they should be.

    19              MS. TABACOPOULOS:  Mark that as

    20    Exhibit 10, please.                                   17:35:55

    21              (Exhibit 10 marked)

    22    BY MS. TABACOPOULOS:

    23         Q    Take a look at the document we've marked

    24    as Exhibit 10, and let me know if you recognize it

    25    as a true and correct copy of your PAREXEL time       17:36:24

```
 1   records.

 2       A      (Examining document).

 3            MR. KEEGAN:  For the record, Exhibit 10

 4   is -- contains document-control numbers of PAR 72

 5   through --                                            17:36:37

 6            MS. TABACOPOULOS:  112.

 7            MR. KEEGAN:  -- 112, I believe?  Yeah.

 8            THE WITNESS:  It seems like it is.

 9   BY MS. TABACOPOULOS:

10       Q    Okay.  So at PAREXEL, you recorded your     17:37:00

11   billable time to clients as well as your admin

12   time -- correct? -- or training time?

13            MR. KEEGAN:  Objection.  Vague.  Assumes

14   facts not in evidence.  Lacks foundation.  Go ahead.

15            THE WITNESS:  Yeah.  Whatever it is --      17:37:16

16   the charge code listed in the particular time sheet

17   shows that I provided times for each of those codes

18   as appropriate.

19   BY MS. TABACOPOULOS:

20       Q    So having reviewed your collection of       17:37:39

21   time sheets, would it be fair to say that you spent

22   a couple of hours of overtime or -- strike that.

23            Would it be fair to say that your daily

24   hours -- let me start again.  It's getting late in

25   the day.                                              17:38:08
```

```
 1              Would it be fair to say that the only

 2   weeks that you worked more than 40 hours at PAREXEL

 3   were during the time that you were taking the

 4   PAREXEL training and then during one week in April

 5   of 2016 and early May of 2016?                          17:38:27

 6              MR. KEEGAN:  Objection.  Vague,

 7   ambiguous, overbroad.  Lacks foundation.  Assumes

 8   facts not in evidence.  Misstates his testimony.

 9              THE WITNESS:  Would you mind repeating?

10              (Record read by the reporter as follows:)    17:39:04

11              "QUESTION:  Would it be

12              fair to say that the only weeks

13              that you worked more than

14              40 hours at PAREXEL were during

15              the time that you were taking

16              the PAREXEL training and then

17              during one week in April of

18              2016 and early May of 2016?"

19              THE WITNESS:  I don't -- I don't recall.

20   I don't know where I would find that here in my --    17:39:13

21   my time sheets.  But you can see that they're --

22   BY MS. TABACOPOULOS:

23       Q    Let me ask you this --

24       A    I'm going to assume that.

25       Q    Okay.  Let me ask you this:  Did you       17:39:27
```

```
 1    regularly work 40 hours a week?

 2         A     Regularly, yes.

 3         Q     Okay.  Mark that as 10, please.

 4               THE REPORTER:  11.

 5               MS. TABACOPOULOS:  11.  Sorry.          17:40:24

 6               (Exhibit 11 marked)

 7    BY MS. TABACOPOULOS:

 8         Q     Take a moment to review Exhibit 11.

 9         A     (Examining document).

10         Q     Let me know if you recognize Exhibit 11   17:40:46

11    as a true and correct copy of meal and rest period

12    policy, and the timekeeping and overtime policy?

13               MR. KEEGAN:  For the record, Exhibit 11

14    contains the document-control numbers of PAR 1094

15    through 1103.                                       17:41:16

16               (Brief pause)

17               MR. KEEGAN:  Do you have the question in

18    mind?

19               THE WITNESS:  So this exhibit has two

20    copies of the same policy.  I don't know if it's    17:44:10

21    different from --

22               MR. KEEGAN:  And --

23               MS. TABACOPOULOS:  Which policy?

24               MR. KEEGAN:  Are you referring --

25               THE WITNESS:  So I have --               17:44:31
```

```
 1              MS. TABACOPOULOS:  Let me see it.

 2              MR. KEEGAN:  One has a time --

 3              MS. TABACOPOULOS:  There's an extra page

 4    in there that doesn't belong in there.  But this

 5    is -- as I see it, there's the meal and rest period      17:44:49

 6    policy and the California version of it.

 7              THE WITNESS:  No.  There's two of the

 8    rest and meal policy -- the first five pages.

 9              MS. TABACOPOULOS:  Hmm-hmm.

10              MR. KEEGAN:  Looks like it's three          17:45:07

11    documents, but --

12              MS. TABACOPOULOS:  All right.  Well, you

13    got an extra copy there, then.  Okay.  Whatever.  We

14    can probably remedy that by re-marking this.  So,

15    what, they copied a couple of extra pages here?        17:45:25

16    Yeah, yeah, yeah.  1094 repeats.  All right.  Thanks

17    for catching that.

18              So we've got -- all right.  So there.

19    1094, 1095, 96, '7, '8, '9 -- okay.  I think we're

20    good now.  Why don't we re-mark this as Exhibit 11,     17:45:50

21    please.  Want this back?

22              MR. KEEGAN:  So what page are we starting

23    on the document control number for Exhibit 11 now?

24              MS. TABACOPOULOS:  I'll read you the

25    Bates range in a second.  So now it's PAR 1094          17:46:03
```

```
 1   through 1102.

 2              MR. KEEGAN:  1102?

 3              MS. TABACOPOULOS:  Yup.

 4              MR. KEEGAN:  For the record, that's -- so

 5   Exhibit 11 has three different policy documents.          17:46:19

 6   One part is all meal and rest period policy.  Then a

 7   California meal and rest policy --

 8              MS. TABACOPOULOS:  Yeah.

 9              MR. KEEGAN:  -- starting on 1096.  Then

10   the timekeeping and over time policy starting on          17:46:31

11   1098.

12              MS. TABACOPOULOS:  Correct.

13              MR. KEEGAN:  Okay.  So there was three

14   policies.  All right.  So what -- what is your

15   question?                                                 17:46:44

16   BY MS. TABACOPOULOS:

17       Q     Do you recognize this as a true and

18   correct copy of PAREXEL's meal and rest period

19   policies and timekeeping policies?

20       A     I'm sure I reviewed it in the beginning         17:46:52

21   during my onboarding program -- process.  It seems

22   to me that's a true copy.  I just -- I don't

23   remember with the multitude of policies and SOPs

24   that -- you know, as far as your onboarding program.

25   I'm sure I reviewed this, but I just can't              17:47:13
```

```
 1    recollect.
 2        Q    Okay.  Did you generally have access to
 3    PAREXEL's policies such as meal and rest period
 4    policy and timekeeping policy when you were an
 5    employee there?                                        17:47:34
 6        A    We were able to refer back to, you know,
 7    any company policy -- you know, typically, employees
 8    referred to the intranet, where they had those
 9    provided.
10        Q    When you were employed by PAREXEL, did      17:47:51
11    you take 30-minute meal periods or meal periods of
12    whatever length you wanted?
13        A    Not always.  Again, you know, with trying
14    to manage different sites all over the country and
15    working with their schedules, I -- I found myself      17:48:16
16    working through lunch and trying to appease with
17    their schedules.  And so I -- I found myself, you
18    know, working through lunch and not taking my meals.
19        Q    I mean you worked independently when you
20    were in the office; correct?  I mean you didn't have   17:48:45
21    anybody telling what you to do and when to do it; is
22    that right?
23             MR. KEEGAN:  Objection.  Misstates his
24    testimony.  It's vague, ambiguous, overbroad.  Are
25    you saying he worked with no supervision?              17:49:00
```

```
 1              THE WITNESS:  Can you rephrase the

 2   question?

 3   BY MS. TABACOPOULOS:

 4       Q    Yeah.  When you were working at the

 5   PAREXEL facility, you pretty much set your own          17:49:12

 6   schedule for the day.  You decided, you know, when

 7   your calls were going to be and that type of thing;

 8   is that correct?

 9       A    Yeah.  I would work with the sites to

10   schedule a time for -- to conduct the calls, based     17:49:25

11   on their availability.

12       Q    And you pretty much were able to regulate

13   your schedule so that you worked 40 hours a week;

14   right?

15              MR. KEEGAN:  Objection.  Vague and          17:49:41

16   ambiguous.  Overbroad.  Misstates his testimony.

17              THE WITNESS:  Well, you know, I -- I

18   typically made sure that I completed my 40 hours

19   of -- of -- a week of work.

20   BY MS. TABACOPOULOS:                                   17:50:02

21       Q    Then you had the flexibility to take a

22   meal period when you wanted to?

23              MR. KEEGAN:  Objection.

24   BY MS. TABACOPOULOS:

25       Q    I mean nobody at PAREXEL precluded you        17:50:11
```

```
 1   from taking your lunch; is that correct?

 2              MR. KEEGAN:  Objection.  Vague,

 3   ambiguous, overbroad.

 4              THE WITNESS:  I didn't have my line

 5   manager, you know, tell me to take my lunch at a      17:50:24

 6   certain time, if that -- if that's what you're

 7   alluding to.  So, you know, based on my schedule

 8   that day, you know, it really depended on whether or

 9   not I was going to, you know, take lunch or not.

10   So --                                                  17:50:51

11   BY MS. TABACOPOULOS:

12       Q    Did you have an understanding based on

13   PAREXEL's written policies that you were entitled to

14   take a 30-minute meal period every day if you wanted

15   to?                                                    17:51:05

16              MR. KEEGAN:  Objection.  Lacks

17   foundation.

18              THE WITNESS:  Well, based on policy

19   and -- from what I understand, yes.  Previous work

20   experience.  Typically, to get a lunch period.        17:51:14

21   BY MS. TABACOPOULOS:

22       Q    And did you typically take your lunch

23   period at PAREXEL with other employees in the lunch

24   room down at the San Diego facility?

25       A    Few occasions.                                17:51:29
```

```
 1        Q      What do you mean?

 2        A      But I was usually at my desk -- or if I

 3   was working remotely by myself and had my own sort

 4   of -- if I did do lunch, had my own lunch schedule.

 5   I found myself, you know, just being -- being by          17:51:55

 6   myself most of the time.

 7        Q      Would it be fair to say that nobody from

 8   PAREXEL ever prevented you from taking at least a

 9   30-minute meal period each day in whatever form or

10   fashion you so chose?                                     17:52:22

11             MR. KEEGAN:  Objection.  Argumentative.

12   BY MS. TABACOPOULOS:

13        Q      Whether it was at your desk or leaving

14   the premises or otherwise?

15             MR. KEEGAN:  Objection.  Lacks               17:52:29

16   foundation.  Assumes facts not in evidence.

17   Misstates his testimony.

18             THE WITNESS:  I was never coerced, if --

19   or told to, you know, take my lunch.

20   BY MS. TABACOPOULOS:                                     17:52:48

21        Q      The question was whether anybody ever

22   prevented you from taking -- and I'll have it read

23   back.

24             (Record read by the reporter as follows:)

25             "QUESTION:  Would it be
```

Case 3:16-cv-03084-L-BGS   Document 84-20   Filed 04/09/18   PageID.1783   Page 96 of 98
Dexter et al. Part 4
November 20, 2017

```
 1              fair to say that nobody from

 2              PAREXEL ever prevented you from

 3              taking at least a 30-minute

 4              meal period each day in

 5              whatever form or fashion you so

 6              chose?

 7               Objection noted.

 8                  "Whether it was at your

 9              desk or leaving the premises or

10              otherwise?"                          17:53:14

11              THE WITNESS:  Yeah.  I -- no one, again,

12    told me to -- or instructed me to take lunches.  But

13    sorry, it's getting late.  Sorry.

14    BY MS. TABACOPOULOS:

15       Q    Would it be a fair statement to say that    17:53:41

16    nobody at PAREXEL ever prevented you from taking a

17    meal period whenever you wanted to and whenever you

18    wanted to?

19       A    Nobody at PAREXEL prevented me from

20    taking a meal period.                          17:53:55

21       Q    What about rest breaks?  Did you have an

22    understanding from the policy that you were entitled

23    to two rest breaks a day?

24       A    I don't remember if there was a policy,

25    as I didn't typically take rest breaks.        17:54:09
```

```
 1        Q    Well, having looked at the policy, does

 2    it refresh your recollection that you were entitled

 3    to take two 10-minute paid rest breaks every four

 4    hours or a major fraction thereof?

 5             MR. KEEGAN:  Objection.  Calls for          17:54:28

 6    speculation.  Lacks foundation.

 7             THE WITNESS:  Looking at the policy now,

 8    you know, it does state that.  But I don't remember

 9    at the time that I read that.  Again, it was during

10    the process where there was a lot of policies that   17:54:46

11    we had to understand and train on.

12             So if I indeed read this, I'm sure it

13    was -- part of the policy and that I read it.

14    BY MS. TABACOPOULOS:

15        Q    Would it be fair to say that nobody at      17:55:15

16    PAREXEL ever prevented you from taking rest breaks

17    whenever and wherever you wanted to?

18        A    Nobody at PAREXEL ever prevented me from

19    taking my break -- rest breaks.

20        Q    Did you ever hear any CMA or CRA at         17:55:32

21    PAREXEL complain that they weren't getting meal and

22    rest periods in accordance with the policy that

23    we've marked as -- the policies that we've marked as

24    Exhibit 11?

25             MR. KEEGAN:  Objection.  Lacks              17:55:44
```

1    foundation.  Calls for speculation.

2              THE WITNESS:  I did not.

3    BY MS. TABACOPOULOS:

4        *Q*    Do you understand that if you were

5    successful in this litigation in making CRAs subject          17:56:34

6    to overtime compensation, that that will affect the

7    CRAs that you're currently managing at Samumed?

8              MR. KEEGAN:  Objection.  Calls for

9    attorney-client privilege.  I instruct him not to

10   answer.                                                       17:56:53

11             THE WITNESS:  I don't understand.

12             MR. KEEGAN:  I instructed you not to

13   answer, but that's fine.  You didn't wait.

14   BY MS. TABACOPOULOS:

15       *Q*    And do you understand that if you're            17:57:08

16   successful in this litigation in establishing that

17   CRAs/CMAs, are entitled to overtime as opposed to

18   being exempt, that you will be changing the way the

19   industry does business, and that will affect your

20   current employer adversely?                                   17:57:26

21             MR. KEEGAN:  Are you suggesting that if

22   he's -- if he prevails on his case against PAREXEL

23   that every other person -- every other defendant has

24   to follow that judgment?

25             MS. TABACOPOULOS:  I'm not --                       17:57:37