# Exhibit Z

```
 1                UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 3
    SCHOULEE CONES, an individual,  )
 4  and DEXTER PASIS, an individual,)
    on behalf of themselves and     )
 5  all others similarly situated,  )Case No.:
                                     ) 16-CV-3084-L-BGS
 6                   Plaintiffs,     )
                                     )DEPOSITION TAKEN IN
 7          vs.                      )
                                     )BEHALF OF PLAINTIFF
 8  PAREXEL INTERNATIONAL            )
    CORPORATION, a Massachusetts     )
 9  corporation licensed to do       )
    business in the State of         )
10  California; and PAREXEL          )
    INTERNATIONAL, LLC, a            )
11  Massachusetts limited liability  )
    company licensed to do business  )
12  in the State of California,      )
                                     )
13                   Defendants.     )
14
15
16  VIDEO TELECONFERENCE DEPOSITION OF:  ALISON MOYER
17  DATE:  January 15, 2018
18  TIME:  9:58 a.m.
19  PLACE:  Latimer Reporting, 528 South 13th Street,
    Lincoln, Nebraska
20
21
22
23
24  PAGES 1 - 121
25
```

                                              Page 1

```
 1                    A P P E A R A N C E S
 2
    APPEARING ON BEHALF OF PLAINTIFF:
 3              Mr. Michael W. Kopp
                Attorney at Law
 4              SEYFARTH SHAW LLP
                400 Capitol Mall, Suite 2350
 5              Sacramento, California 95814-4428
                (916)448-0159
 6              mkopp@seyfarth.com
 7
 8  APPEARING ON BEHALF OF DEFENDANTS:
                Mr. Patrick N. Keegan -
 9                 VIA VIDEO & TELEPHONE
                Attorney at Law
10              KEEGAN & BAKER, LLP
                6156 Innovation Way
11              Carlsbad, California 92009
                (760)929-9303
12              pkeegan@keeganbaker.com
13
14
15  ALSO PRESENT:  Anna Grady - Videographer
    and Martin F. Mahoney
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1                        I N D E X
 2    WITNESS:            Direct   Cross   Redirect
 3    ALISON MOYER          5       112     116
 4
 5    EXHIBITS:                               Marked
 6    Exhibit 201 - Amended notice of deposition    45
 7    Exhibit 200 - Deposition produced documents   48
 8    Exhibit 203 - Offer letter marked PAR 1119
                    through 1121                     53
 9    Exhibit 210 - E-mail marked PAR 1130 through 1131   54
10    Exhibit 69A - Document marked Langley 10 through 18 63
11    Exhibit 205 - E-mail marked PAR 1128          83
12    Exhibit 208 - E-mail marked PAR 1124 through 1125   84
13    Exhibit 218 - E-mail marked PAR 1157          86
14    Exhibit 219 - E-mail marked PAR 1159 through 1169   88
15    Exhibit 220 - Document marked Cones 181       92
16    Exhibit 222 - Backtrack report marked Cones 183
                    through 189                      94
17    Exhibit 223 - Letter marked Cones 52          94
18    Exhibit 228 - E-mail marked PAR 1180 through 1183   95
19    Exhibit 229 - E-mail dated June 12, 2014      99
20    Exhibit 230 - Letter marked Cones 51         105
21    Exhibit 232 - Declaration of Alison Moyer    108
22
23
24
25
                                              Page  3
```

```
 1      assume that you understood my question.
 2           Do you understand?
 3      A.   Yes, I understand.
 4      Q.   From time to time, your counsel might object to
 5      one of my questions, but because there's no judge to
 6      rule on the objection, I'm still entitled to your
 7      response to the question unless he instructs you not
 8      to answer.
 9           Do you understand?
10      A.   Yes, I understand.
11      Q.   Ms. Moyer, are you currently employed?
12      A.   Yes, I am.
13      Q.   And who is your current employer?
14      A.   PRA.
15      Q.   And what is your current position at your
16      current employer?
17      A.   Manager of clinical operations.
18      Q.   Are you a line manager there?  Would you
19      consider that a line manager position?
20      A.   Yes.
21      Q.   And who -- were you previously employed?
22      A.   Yes.
23      Q.   Okay.  And who was your previous employer?
24      A.   Parexel International, LLC.
25      Q.   And if I refer to your former employer as
```

Page 9

```
 1    Parexel, would you understand that that means your
 2    former employer?
 3    A.   Yes.
 4    Q.   And what was the last position you held at
 5    Parexel?
 6    A.   Line manager.
 7    Q.   And did you hold any other positions at Parexel?
 8    A.   No.
 9    Q.   So is it correct to say the entire time that you
10    were employed at Parexel, you were a line manager?
11    A.   That's correct.
12    Q.   What were the -- what was the last date of your
13    employment at Parexel?
14    A.   September 6th, 2017.
15    Q.   And when did you start your employment at
16    Parexel?
17    A.   June 10th, 2013.
18    Q.   And did you voluntarily quit your employment the
19    Parexel?
20    A.   That's correct.
21    Q.   And when you -- on the date of your resignation
22    from Parexel, who did you directly report to?
23    A.   My senior manager was Amy Carothers.
24    Q.   Did you report to anyone else other than Amy
25    Carothers?
```

Page 10

1    A.    At that time?  Can you rephrase?

2    Q.    Sure.

3          At the time of your resignation from Parexel,

4    did you report to any other person --

5    A.    No.

6    Q.    -- directly?

7    A.    No.

8    Q.    At the time that you resigned at Parexel, how

9    many CRAs or CMAs did you -- who directly reported to

10   you?

11   A.    Approximately 11.

12   Q.    And where were these 11 -- well, let me lay a

13   foundation.

14         What types of positions did you oversee when you

15   resigned your position at Parexel?

16   A.    I was overseeing one CMA, a senior CMA, and the

17   remainder of CRAs of various levels.

18   Q.    And for record, can you tell me the different

19   levels of CRA at Parexel when you were there?

20   A.    CRA1, CRA2 and Senior CRA.

21   Q.    And what were the levels of positioning of CMA

22   at Parexel when you resigned?

23   A.    CMA1, CMA2 and Senior CMA.

24   Q.    And were the CMA and CRA potions that you just

25   stated for the record, were those the same positions

Page 11

1    of CMA and CRA that were in place at Parexel during

2    the entire time of your employment there?

3    A.    Yes, to my knowledge.

4    Q.    What was the greatest number of CRA, CMAs that

5    were assigned to you as the line manager during your

6    employment at Parexel?

7    A.    I would approximate that at 23.

8    Q.    And what was the fewest number of CMA, CRA

9    positions that you directly supervised during your

10   employment at Parexel?

11   A.    I would say about 11.

12   Q.    When you resigned your position at Parexel, the

13   11 CMA, CRA positions that you were assigned to, how

14   many different studies did those CMA, CRAs work on?

15                     MR. KOPP:   Objection, lacks

16         foundation, calls for speculation.

17   Q.    (BY MR. KEEGAN) Were they all working on one

18   study or were they working on different studies?

19                     MR. KOPP:   Same objection.

20   Q.    (BY MR. KEEGAN) You can answer --

21   A.    They were working on different studies.

22   Q.    Okay.  Can you recall the name of the CMA that

23   directly reported to you when you resigned at

24   Parexel?

25                     MR. KOPP:  I'm going to object on

Veritext Legal Solutions
866 299-5127

1           list.  And I'll instruct the witness not to

2           answer.

3      Q.   (BY MR. KEEGAN) Ms. Moyer, are you going to

4      follow your attorney's instruction?

5      A.   Yes.

6      Q.   During your employment at Parexel, how would --

7      how would CRAs and CMAs get assigned to you?

8      A.   The senior managers would instruct me that I

9      would be receiving someone new to my team.

10     Q.   And how would they do that --

11                    MR. KOPP:  Objection.

12     Q.   (BY MR. KEEGAN) What form of communication?

13     A.   Generally by e-mail.

14     Q.   Would you also be notified in other ways, such

15     as the -- system at Parexel?

16          (Court reporter interrupted for clarification.)

17     Q.   LMS system, learning management system?

18     A.   Can you repeat that?  I'm sorry.

19     Q.   Sure.  Did you utilize a -- the LMS system

20     during your employment at Parexel?

21     A.   Yes, I utilized LMS.

22     Q.   Okay.  Would you be notified that you would be

23     assigned a new CRA or CMA in the LMS system?

24     A.   That was not the route of notification.

25     Q.   Okay.  Just by e-mail, is that --

                                             Page 14

```
 1    A.   Correct.
 2    Q.   And when CRAs and CMAs would be assigned to you,
 3    would that be recorded somewhere at Parexel?
 4    A.   Just in the e-mail system.
 5    Q.   Okay.
 6    A.   And with -- I guess within HR.
 7    Q.   Would -- people assigned to you, would that be
 8    recorded in the P-Med (phonetic) system at all?
 9                   MR. KOPP:  Objection, vague and
10         ambiguous.
11    Q.   (BY MR. KEEGAN) At Parexel, did you use the
12    P-Med system?  Are you familiar with this term?
13    A.   Yes, I did.
14    Q.   Okay.  Is that a system that you utilize
15    performing your duties and responsibilities at
16    Parexel?
17    A.   Yes.
18    Q.   And during your employment at Parexel, did you
19    utilize the LMS system during the entire time of your
20    employment there?
21    A.   Yes.
22    Q.   And how would you access the LMS system at
23    Parexel during your employment at Parexel?
24    A.   It was accessed via company laptop and secured
25    internet, through the VPN and controlled access log
```

Page 15

1   on.

2   Q.   And do you recall the name of the VPN that you

3   utilized the at Parexel?

4   A.   I do not.

5   Q.   How would you access the P-Med system when you

6   were employed at Parexel?

7   A.   Also through company hardware and a VPN and a

8   secure log in.

9   Q.   Were there any other systems that you utilized

10   at Parexel in performing your duties and

11   responsibilities as a line manager?

12                    MR. KOPP:   Objection, vague and

13       ambiguous.

14   Q.   (BY MR. KEEGAN) Other than the P-Med and the LMS

15   system that you mentioned.

16                    MR. KOPP:   Objection, vague and

17       ambiguous.

18   A.   Yes.   Yes, there were other systems utilized.

19   Q.   (BY MR. KEEGAN) What systems did you -- what

20   other systems did you utilize?

21   A.   Time reporting system, expense reporting system.

22   I'm sure there were others, I'm just not able to

23   recall any other at this time.

24   Q.   Okay.   The time reporting system you referred to

25   in your response, what was that called?

Page 16

1    A.    The acronym was TIME, T-I-M-E.

2    Q.    And the expense reporting system that you were

3    referring to, what was that called?

4    A.    The name escapes me.

5    Q.    Can you describe for me your duties and

6    responsibilities as a line manager at Parexel?

7    A.    I was overseeing the operations of my staff,

8    helping to ensure quality and timely delivery of

9    projects.   Overseeing human resource needs,

10   developing staff.   Engaging in corrective action.

11   Ensuring appropriate resourcing.

12   Q.    And regarding your response, when you referred

13   to your staff, who were you referring to in your

14   answer?

15   A.    My group of CRAs or CMA.

16   Q.    Did you ever supervise your contract CRAs that

17   were employed by Parexel when you worked at Parexel?

18                         MR. KOPP:   Objection, compound.

19   Q.    (BY MR. KEEGAN) You can answer, if you

20   understand the question.

21   A.    Yes, I did.

22   Q.    Do you know how contract CRAs were paid at

23   Parexel when you -- of the contract CRAs that you

24   supervised?

25   A.    Yes.

Veritext Legal Solutions
866 299-5127

1    Q.    Okay.   And how were they paid?

2    A.    Hourly.

3    Q.    Were any of the CRAs or CMAs that you -- that

4    directly reported to you on the last day that you

5    were employed at Parexel, were any of those contract

6    CRAs?

7    A.    No.

8    Q.    Or CMAs?

9    A.    No.

10   Q.    As a line manager at Parexel, were you

11   responsible for negotiating the compensation for CRAs

12   or CMAs?

13                    MR. KOPP:   Objection, vague and

14        ambiguous.

15   Q.    (BY MR. KEEGAN) You can answer.

16   A.    Not within my staff, I was not.

17   Q.    In your position as line manager, would you have

18   any responsibility for agreements with any of the

19   study sites?

20   A.    No.

21   Q.    Did you ever review any site agreements during

22   your employment at Parexel?

23   A.    Can you clarify "review"?

24   Q.    Like read, read over a site agreement.   Were you

25   ever asked to review a site agreement?

                                        Page 18

1    A.   I was never asked to review a site agreement.

2    Q.   During your employment at Parexel, did you ever

3    review an FDA1572 form?

4    A.   Yes.

5    Q.   And with review of FD1572 forms, was that part

6    of your duties and responsibilities as a line

7    manager?

8    A.   No.

9    Q.   Do you recall how many times you reviewed a 1572

10   form during your employment at Parexel?

11   A.   I do not know how many times.

12   Q.   Okay.   Do you recall if it was -- you recall

13   reviewing a 1572 form before, correct?

14   A.   Yes.

15   Q.   Okay.   Do you remember if that was -- how

16   many -- was it more than 10 times during your

17   employment at Parexel that you would review a 1572

18   form?

19   A.   Yes, it would have been more than that.

20   Q.   Okay.   Were you asked to review 1572 forms

21   during your employment at Parexel?

22   A.   Not routinely, the review would have been done

23   as an assessment of our staff.

24   Q.   And can you tell me how you could utilize the

25   1572 form in order to assess your staff?

1    A.   Sure.  Reviewing it for completeness and

2    reviewing it against other portions of the regulatory

3    file for consistency.

4    Q.   As a line manager at Parexel, was it part of

5    your duties and responsibilities to negotiate in any

6    way with the compensation that sites would receive

7    from working on the clinical studies?

8    A.   No.

9    Q.   During your employment at Parexel, did you have

10   a -- were you -- well, strike that.

11        During your employment at Parexel, did you have

12   access to documents that would reflect how sites were

13   compensated for participating in the clinical studies

14   that, the parts that you worked on?

15   A.   Can you restate that?

16   Q.   Sure.  Do you have any understanding on how

17   clinical -- or, strike that.

18        Do you have any understanding how the sites were

19   compensated to work on clinical studies during your

20   employment at Parexel?

21   A.   A general understanding, yes.

22   Q.   And where does your general understanding come

23   from?

24   A.   Sample budgets.

25   Q.   And would your duties and responsibilities as a

Page 20

```
 1    line manager encompass looking at sample budgets?
 2    A.   No, not generally.
 3    Q.   On how many -- was it on a regular basis that
 4    you would review sample budgets of sites?
 5    A.   No.
 6    Q.   And what was the purpose of you reviewing the
 7    sample budgets when you did so on a non routine basis
 8    at Parexel?
 9    A.   Just to gain better understanding of how the
10    site was being compensated.
11    Q.   And do you recall where those sample budgets,
12    where you reviewed those on Parexel system?
13    A.   I don't recall.
14    Q.   Do you recall if CRAs and CMAs assigned to you
15    would have access to the sample budgets, per se?
16    A.   Yes, they would.
17    Q.   In your response regarding duties and
18    responsibilities, you mentioned that one of your
19    duties and responsibility was resourcing; do you
20    remember that?
21    A.   Yes.
22    Q.   Okay.  And what were you referring to when you
23    say, "resourcing"?
24    A.   Resourcing is the internal process of assigning
25    staff to appropriate studies.
```

Page 21

1    Q.   And by "staff," you're referring to the CRAs and

2    CMA positions, correct?

3    A.   That's correct.

4    Q.   And as a line manager, would you be tracking

5    attrition rates of CRAs and CMAs assigned to

6    different studies, would that be something you would

7    be tracking?

8    A.   Not per study, no.

9    Q.   Okay.  How would you -- how would you track

10   attrition rates with CRAs and CMAs?

11   A.   That was tracked at a higher level for the

12   company.

13   Q.   And what level of the company would track that?

14   A.   I'm not aware.

15   Q.   So how would you be involved in resourcing

16   different studies at Parexel?

17   A.   When I would have a member of my staff

18   available, I would work with the resourcing team to

19   evaluate projects that are currently in need of

20   resource, compare those studies against my CRA or

21   CMAs qualification, experience and availability.  And

22   then, then propose that person to that project.

23   Q.   And when you were referring to the resourcing

24   team in your response, what were you referring to?

25   A.   There's a sub department of resourcing that just

                                              Page 22

1    telephone, an e-mail?

2    A.    E-mail, telephone, instant message.

3    Q.    Okay.   What was the name of the instant message

4    system at Parexel when you were there?

5    A.    Can you clarify at what point?

6    Q.    Yeah, the last year of your employment at

7    Parexel, did you utilize an instant message system?

8    A.    Yes, Microsoft Lync.

9    Q.    And other than Microsoft Lync, were there any

10   other instant messaging systems that you utilized

11   during your employment at Parexel?

12   A.    I'm not sure.   There were some technology

13   changes during the duration.

14   Q.    As a line manager at Parexel, would you be

15   tracking the average life expectancy of a CRA at

16   Parexel?

17                      MR. KOPP:   Objection, vague and

18        ambiguous.

19   A.    Generally not at the individual manager level.

20   Those metrics were maintained by more senior members.

21   Q.    (BY MR. KEEGAN) And what more senior members are

22   you referring to?

23   A.    I'm unaware of the level.

24   Q.    Would you as a line manager be tracking the life

25   expectancy of CRAs on specific studies that you

Page 24

1    were -- that your staff was assigned to?

2                    MR. KOPP:  Objection, vague and

3        ambiguous.

4    A.   No.

5    Q.   (BY MR. KEEGAN) During your employment at

6    Parexel, were you -- as a line manager, were you

7    working in any specific therapeutic areas or would

8    you work on any and all therapeutic areas that

9    Parexel was managing studies for?

10   A.   It could be any therapy.

11   Q.   As part of your duties and responsibilities as a

12   line manager, responsible and tracking the training

13   that your staff would receive at Parexel?

14   A.   I was not responsible to track it, that was done

15   in the learning management system.

16   Q.   Was it part of your duties and responsibility as

17   line manager to ensure that the CRAs and CMAs

18   assigned to you were completing their training?

19   A.   Yes.

20   Q.   Okay.  And CRAs and CMAs at Parexel were

21   assigned trainings through the LMS system; is that

22   correct?

23   A.   That's correct.

24   Q.   Okay.  And would you be the one responsible to

25   push training to your CRAs and CMAs that were

                                        Page 25

1    assigned to you?

2    A.   Not solely.

3    Q.   Okay.   Partially?

4    A.   Correct.

5    Q.   Okay.   And partially; how would you be partially

6    assigning training to the CRAs and CMAs assigned to

7    you?

8    A.   The training could also be assigned by

9    administrative associates with regard to general

10   training curriculum.

11   Q.   By "administrative associates," who are you

12   referring to?

13   A.   Administrative assistants within the company.

14   Q.   Did you have an administrative assistant when

15   you were working as a line manager at Parexel at any

16   time?

17   A.   Not personally.   The entire department shared

18   administrative services.

19   Q.   Oh.   Would project managers at Parexel also

20   assign trainings to your CMAs and CRAs assigned to

21   you?

22   A.   No.

23   Q.   And how would you assign trainings to your CRAs

24   and CMAs assigned to you?

25   A.   By entering the LMS system and then linking that

Page 26

1    person with the appropriate training curriculum by

2    job code or by project code.

3    Q.   And by "job code," are you referring to the

4    different levels of position as CRA and CMA?

5    A.   That's correct.

6    Q.   Okay.   And did each study that the CRAs and CMAs

7    assigned to you that worked on each added code as

8    well that would assign trainings to them, for those

9    specific studies?

10   A.   That's correct.

11   Q.   And do you know who at Parexel would come up

12   with a list of trainings that were needed to work on

13   on each study, was that someone from the learning

14   management team or somebody from the project manager

15   team?

16                       MR. KOPP:   Objection, compound and

17         vague and overbroad.

18   A.   The project team would determine the trainings

19   required for their project.   The learning management

20   team would determine the generic trainings that staff

21   needed per role.

22   Q.   (BY MR. KEEGAN) During your employment at

23   Parexel, how much time would you spend on a weekly

24   basis managing CRA resourcing for particular sites?

25   A.   Probably about three hours a week.

Veritext Legal Solutions
866 299-5127

1    Q.   And what would that entail?  What kind of --

2    what kind of work would that entail?

3    A.    It would include a weekly teleconference to, to

4    be kept aware of the current resourcing needs that

5    exist.  Review of my staff's utilization to determine

6    if there are staff with availability.  Liaising with

7    the resourcing department, you know, in order to

8    propose candidates to trials.  Discussing resourcing

9    options with staff, if necessary.

10   Q.   And when you say, "discussing them with staff,"

11   were you referring to the CRAs and CMAs that you were

12   assigned to?

13   A.   Yes.

14   Q.   And would you be asking them questions like, you

15   know, their workload to determine whether or not they

16   could work on additional studies, would that be the

17   type of questions you would be discussing with them?

18   A.   That's correct.

19   Q.   What was the -- during your employment at

20   Parexel, what was the percentage of time per week

21   that you spent connecting one-on-one sessions with

22   the CRAs and CMAs assigned to you?

23   A.   Approximately 20 percent.

24   Q.   And how many hours a week would that be on a

25   weekly basis?

                                            Page 28

1    A.    Approximately 8 to 10.

2    Q.    Did you ever have a one-on-one session with

3    Schoulee Cones, the plaintiff in this case?

4    A.    Yes.

5    Q.    Do you recall when that occurred?

6    A.    I don't recall the exact dates.  It would have

7    been during her third week of employment, and several

8    other times as well.

9    Q.    How many one-on-one sessions do you recall

10   having with Ms. Cones?

11   A.    At least one per week.  I don't know the total

12   number.

13   Q.    And are you recalling that you had a one-on-one

14   session with her or are you saying that was your

15   standard business practice?

16   A.    I recall having one-on-one sessions with her.

17   And also for a new CRA, that would have been my

18   standard as well.

19   Q.    Okay.  And what was your custom and practice at

20   Parexel regarding new CMA accounts and conducting

21   one-on-ones?

22   A.    The one-on-one's cadence with CMAs is dependant

23   upon the manager and the CMA need.  It's all left to

24   the manager's discretion.

25   Q.    And what was your -- what was your personal

Page 29

1    custom and practice regarding conducting one-on-one's
2    to new CRAs and CMAs?
3    A.    With new CRAs, at least once a week a
4    one-on-one.   And I've never managed a new CMA.
5    Q.    And did you have a custom and practice with
6    meeting and conducting one-on-one's with the CRAs and
7    CMAs assigned to you after they onboarded?
8    A.    Yes, we would meet approximately every two to
9    three weeks, unless -- unless there was a need to
10   meet more frequently.   That was a personal cadence,
11   though, and not directed by the company.
12   Q.    All right.   And did you have a custom and
13   practice in conducting one-on-one's with newly
14   onboarded CRAs and CMAs during the time that you were
15   employed at Parexel?
16                     MR. KOPP:   Objection, asked and
17       answered.
18   A.    I would meet with new CRAs approximately -- or
19   at least once per week.   I never managed any new
20   CMAs.
21   Q.    (BY MR. KEEGAN) And during the time that you
22   worked at Parexel, you always worked out of your
23   home; is that correct?
24   A.    That's correct.
25   Q.    Did you ever accompany a CRA or a CMA at any

Page 30

1    during the time that you were employed at Parexel?

2                    MR. KOPP:  Objection, on the same

3         privacy grounds.

4              The same instruction, you can answer yes or

5         no.

6    A.    Yes.

7    Q.    (BY MR. KEEGAN) And can you please state for the

8    record the name of the CRA that you accompanied on

9    site visits?

10                    MR. KOPP:  Objection on privacy

11        grounds and on -- pursuant to the party's

12        pending agreement on the production of a contact

13        list.  I'll instruct the witness not to answer.

14   Q.    (BY MR. KEEGAN) Are you going to follow your

15   attorney's instruction, Ms. Moyer?

16   A.    I will follow my attorney's instruction.

17   Q.    During your employment at Parexel, did you spend

18   time onboarding CRAs and CMAs?

19   A.    Yes.

20   Q.    Okay.  And how would you do that?

21   A.    I would review with them clinical operations

22   guidelines, help familiarize them with systems, act

23   as a, you know, an answer for question and answer

24   sessions.  And just generally guide them through

25   their, their first days, including reminding them to

1    take training in the LMS, to complete time sheets and

2    other administrative items.

3    Q.    Did you utilize an onboarding checklist in

4    onboarding CRAs and CMAs assigned to you at Parexel?

5    A.    There were some checklists available, however, I

6    didn't usually utilize that.

7    Q.    Do you recall where the onboarding checklists

8    were located at Parexel?

9    A.    Those were in P-Med.

10   Q.    Any reason why you didn't follow the onboarding

11   checklists?

12   A.    It was simply a guide and not a requirement and

13   I was able to manage it in a, you know, in a more

14   flexible manner myself.

15   Q.    What part of -- strike that.

16         What was the percentage of time per week that

17   you would spend onboarding CRAs and CMAs on a weekly

18   basis?

19                    MR. KOPP:   Objection, lacks

20         foundation, assumes facts.

21   A.    It would really vary, depending on how many, if

22   any, new hires I had on my team at the time.

23   Q.    (BY MR. KEEGAN) Would you spend -- could you

24   estimate what percentage of the time you would spend

25   per month during your employment at Parexel

Page 33

1    onboarding CRAs and CMAs?

2                    MR. KOPP:  Objection, lacks

3         foundation and assumes facts.

4    A.   That would be the same answer, it would just, it

5    would be dependent on if I had anyone who was new at

6    the time.

7         (Discussion off the record.)

8                    VIDEOGRAPHER:  Let's go off the

9         record.

10           Please stand by as we go off the record.

11        The time is approximately 10:52 a.m.

12        (Recess was taken.)

13                    VIDEOGRAPHER:  We are back on the

14        record.  The time is approximately 11 o'clock,

15        a.m.

16   Q.   (BY MR. KEEGAN) Ms. Moyer, do you understand

17   you're still under oath?

18   A.   Yes.

19   Q.   Before we took a short break, I was speaking to

20   you about your activities of onboarding CRAs and CMAs

21   assigned to you.  Would part of that assisting CRAs

22   and CMAs onboarding, would that include helping them

23   set up the corporate credit cards?

24   A.   It would be directing them to the website to

25   enter their information, yes.

                                        Page 34

1    Q.   And would you also be supporting CRAs and CMAs

2    with IT issues as well?

3    A.   Generic ones where I could help, yes, you know,

4    but beyond that, it would be referring them to the

5    service desk.

6    Q.   And if CRAs or CMAs assigned to you needed help

7    with the IT department, would that be tracked in some

8    way at Parexel?

9    A.   Yes, the IT department has a service desk ticket

10   tracking mechanism.

11   Q.   Would that be referred to as, like, a help desk

12   ticket?

13   A.   That's right.

14   Q.   And could you run a help desk ticket report on

15   the CRAs and CMAs assigned to you?

16   A.   Not independently.

17   Q.   What do you mean by that, "not independently"?

18   A.   I could request one from IT, but not run myself.

19   Q.   In conducting your duties and responsibilities

20   as a line manager at Parexel, did you spend time

21   approving timecards for the CRAs and CMAs assigned to

22   you?

23   A.   Yes.

24   Q.   What percentage of time per week --

25        (Court reporter interrupted for clarification.)

                                            Page 35

1    Q.   During your employment at Parexel, what was the

2    percentage of time that you spent per week approving

3    timecards for CMAs and CRAs assigned to you?

4                        MR. KOPP:   Objection, overbroad

5         and assumes facts.

6    A.   The time sheets were done twice monthly, so it

7    would not typically be a weekly task.

8    Q.   (BY MR. KEEGAN) On a monthly basis, what would

9    you estimate the percentage of time that you spent

10   approving timecards for CRAs and CMAs assigned to

11   you?

12                       MR. KOPP:   Objection, assumes

13        facts, overbroad.

14   A.   It could vary, depending on the number of items

15   contained in the time sheet, the number of lines of

16   tasks.   I would estimate probably four hours per

17   month.

18   Q.   (BY MR. KEEGAN) During your employment at

19   Parexel, did you ever fill out timecards for CRAs and

20   CMAs?

21   A.   Only in exceptions where they were not able to

22   do it for themselves, such as extended medical leave

23   or if they had left the company.

24   Q.   And on those occasions where you filled out the

25   timecards for the CRAs and CMAs, would that be noted

Page 36

1    on the timecards in their employee file somewhere?

2    A.   Yes, in that case, the time sheet would be

3    signed by me and routed to my manager for approval.

4    Q.   But in all other occasions, the CRAs and CMAs

5    would submit their time sheets to you for approval;

6    is that correct?

7    A.   That's correct.

8    Q.   And then what -- how -- how did the approval

9    process go, can you explain it to me, after they had

10   sent the timecard to you?

11   A.   I would review the time sheet, if there were any

12   questions or omissions or clarifications needed, I

13   would click the reject button and enter any comments

14   or questions there in a text box.  It would be

15   received by the CRA or CMA and they would address

16   those.  Sometimes we would connect outside of the

17   system, you know, if it was something they just need

18   to explain to me over the phone, they could just give

19   me a call.  And we would, you know, end with

20   something that would satisfy, you know, the accurate

21   representation of how they spent their time.

22   Q.   And then after, would you -- how would it go, if

23   you approved their timecard -- well, strike that.

24       In every occasion, did you have a discussion

25   with your CRA and CMA about their timecard or would

1    sometimes you just approve them?

2    A.    Some --

3                      MR. KOPP:   Objection, vague and

4        overbroad.

5    A.    Some were able to be approved without any, any

6    back and forth.

7    Q.    Okay.   And then after you -- how would you

8    approve them on the system; was there some

9    functionality that you would have to do?

10   A.    There's an approve button that you would click

11   and enter a password to sign, to digitally sign.

12   Q.    And then did somebody else oversee the timecard

13   after that, after you approved it, at Parexel?

14   A.    Not to my knowledge.

15   Q.    But is it correct to say that every timecard

16   that a CRA or CMA filled out would -- assigned to

17   you, it would have been approved by you; is that

18   correct?

19   A.    In most cases, yes.   Unless there were a reason

20   for someone to need a proxy for me, say I was on PTO

21   during the time or something like that, but yes.

22   Q.    All right.   And how would CRAs and CMA submit

23   their timecards to you when you were employed at

24   Parexel?

25   A.    It was done digitally within the T.I.M.E.

1    system.

2    Q.   And the T.I.M.E. system was the T, period, I,

3    period, M, period, E, period, system?

4    A.   That's correct.

5    Q.   Did you utilize that system throughout the

6    entire time that you were employed at Parexel?

7    A.   To the best of my recollection, yes.

8    Q.   I don't believe I asked this previously:  Were

9    you previously employed as a line manager before you

10   started your work at Parexel?

11   A.   No.

12   Q.   Who was your previous employer at Parexel?

13   A.   Quintiles International.

14   Q.   What period in time did you work at Quintiles?

15   A.   Q-U-I-N-T-I-L-E-S.

16        I worked there for 10 years from, from 2003 to

17   2013.

18   Q.   And what was the last position you held at

19   Quintiles?

20   A.   I was an alliance manager.

21   Q.   And what did -- what type of work did you do as

22   an alliance manager?

23   A.   I managed a partnership between a -- between the

24   company and a large hospital center that was doing

25   research on our behalf.

Page 39

1    A.    Not that I recall.

2    Q.    (BY MR. KEEGAN) Do you recall if you ever went

3    to, like, a classroom setting in order to receive

4    training on how to fulfill your duties and

5    responsibilities as a line manager at Parexel?

6    A.    I attended site management basic training.

7    Q.    And where did you -- well, strike that.

8          And the site manager basic training, that's the

9    SMBT training; is that correct?

10   A.    That's correct.

11   Q.    And where did you receive the SMBT training?

12   A.    In North Carolina.

13   Q.    How long was the SMBT training that you received

14   at Parexel?

15   A.    It was a week and a half.

16   Q.    As a line manager at Parexel, did you have --

17   was it part of your duties and responsibilities to

18   review trip reports for CRAs assigned to you?

19   A.    Only in the context of ensuring -- as an extra

20   step to ensure quality on the first, first couple of

21   reports.   In general, no.

22   Q.    So am I correct to understand that you would

23   review visit reports of the CRAs and CMAs assigned to

24   you for the first couple of reports and then

25   thereafter, you would not review any more of their

1    visit reports?

2    A.    I would not review anymore from that point,

3    that's correct.   Unless there were a quality concern

4    or as part of an assessment of their capabilities.

5    Q.    So is it correct to say that you would be

6    approving their visit reports of the CRAs and CMAs

7    assigned to you?

8    A.    That's correct.

9    Q.    And project managers, PMs, would be the ones

10   responsible for approving their visit reports?

11   A.    It could be the project manager, it could be the

12   clinical operations lead, it could be a report

13   reviewer.

14   Q.    And the correct clinic -- clinical operations

15   lead, lead would be referred to as a COL at Parexel;

16   is that correct?

17   A.    That's correct.

18   Q.    What would you say was the largest percentage of

19   time that you would spend in working as a line

20   manager at Parexel on a weekly basis?

21                     MR. KOPP:  Objection, vague and

22        ambiguous.

23   A.    Can you restate that?

24   Q.    (BY MR. KEEGAN) Sure.  I've asked you some

25   questions about, you know, what percentage of time

1    per week that you would spend on certain tasks with

2    CRAs and try to fill in the gaps for the others,

3    because we kind of got to a hundred percent of your

4    time.  What other weekly duties and responsibilities

5    would you fulfill as a line manager at Parexel during

6    your employment there?

7                    MR. KOPP:  Objection, overbroad.

8    A.   Attending teleconferences within the department,

9    within the management team and even with parties

10   outside of the department in the company.  And then

11   handling escalations of my staff, you know, if

12   somebody had -- had sent me a concern about a staff

13   member, I would be handling that.  And also helping

14   the -- any of my CRAs or CMA troubleshoot any issues

15   that they're dealing with.

16   Q.   (BY MR. KEEGAN) Regarding helping CRAs

17   troubleshoot with issues they're dealing with, what

18   were you referring to in your answer?

19   A.   It might be issues regarding balancing workload,

20   you know, they may come to me with conflicting

21   priorities or, or a difficult situation that they

22   need to make me aware of.  And we can, you know, work

23   together on solutions for how to proceed within the

24   trial.

25   Q.   During your employment at Parexel, were you ever

Page 43

1    responsible for directly hiring any CRAs or CMAs?

2    A.    Yes.

3    Q.    Was that part of your duties and

4    responsibilities, to hire CRAs and CMAs?

5    A.    Yes.

6    Q.    And did you also have the duty and

7    responsibility of firing CRAs and CMAs?

8    A.    Yes.

9    Q.    And when -- in your prior response when you were

10   referring to escalations, is that having to -- with

11   staff, what was that, what were you referring to

12   there?

13   A.    If there were compliments or complaints about

14   someone, one of my direct reports, I would need to

15   manage that situation, do fact finding, you know, and

16   work with the person who is escalating as well as the

17   person who is being escalated.

18   Q.    So what percentage of time per week would you

19   say that you spent on escalation issues with staff?

20              MR. KOPP:   Objection, assumes

21        facts and overbroad.

22   A.    I think that's a difficult thing to estimate.   I

23   don't know that I would be able to put a number.

24   Q.    (BY MR. KEEGAN) Would you think it would -- you

25   would have spent -- during the time that you were

Page  44

```
 1     internal document Page No. 46, do you see your name

 2     there?

 3     A.   That's -- yes, that's right there.

 4     Q.   Okay.   Have you ever seen this -- seen this page

 5     before?

 6     A.   This looks like the standard org charts that I'm

 7     familiar with from Parexel.

 8     Q.   And it shows that your direct report was Amy

 9     Carothers; is that correct?

10     A.   My direct manager, yes.

11     Q.   Okay.   And what period of time did you directly

12     report to Amy Carothers?

13     A.   I don't remember when she became my senior

14     manager.   It was probably about the last year of my

15     employment.

16     Q.   On how many occasions per month would you be in

17     contact with your senior manager during your

18     employment at Parexel?

19                    MR. KOPP:   Objection, assumes

20          facts.

21     A.   We would -- we would have one-on-one meetings

22     approximately every other week, but we would be in

23     routine contact in between those meetings as well.

24     We sat in on a lot of the same management meetings.

25     And also had ad hoc phone calls or e-mails throughout
```

Page 49

1    Q.    Okay.  Did you ever speak with Jeremy Bloom

2    about Schoulee Cones?

3    A.    No.

4    Q.    I'll ask the court reporter to place before you

5    a document with the document control numbers on the

6    lower right-hand corner of PAR 1130 to 1131.

7          (Exhibit No. 210, marked for identification.)

8    Q.    Do you recognize Exhibit 210?

9    A.    Yes.

10   Q.    Okay.  Did you review this document in

11   preparation of your deposition today?

12   A.    Yes.

13   Q.    All right.  The table that appears on both the

14   first and second page of Exhibit 210; do you see

15   that?

16   A.    Yes.

17   Q.    Okay.  And how was that table created?

18   A.    This was a screen shot --

19   Q.    Screen shot, okay.

20   A.    -- from the learning management system.

21   Q.    All right.  Sorry, I talked -- I spoke over your

22   answer.

23         Is the table that appears in Exhibit 210, did

24   that come from the LMS system?

25   A.    Yes.

Page 54

1     Q.    Okay.  Did you run a report in the LMS system in

2     order to put it into this e-mail?

3     A.    Yes.

4     Q.    Can you describe how you ran a report in the LMS

5     system that appears in Exhibit 210?

6     A.    I don't recall the step-by-step method.  I would

7     have logged in and, you know, been able to access

8     Ms. Cones' transcript in order to see completed and

9     incomplete training.

10    Q.    Okay.  And the LMS system, as of the date of

11    your e-mail, allowed you to generate a report for

12    Ms. Cones; is that correct?

13    A.    That's correct.

14    Q.    And during your entire time employed at Parexel,

15    could you run LMS reports on any of the CRAs and CMAs

16    assigned to you?

17    A.    Yes.

18    Q.    And the first column of the table in your -- in

19    Exhibit 210, your e-mail, what -- does that list the

20    activity or training, training names assigned to

21    Ms. Cones?

22    A.    That's correct.

23    Q.    And did you -- did you prepare any of the

24    trainings listed in the first column?

25    A.    No.

Page 55

1    A.    Yeah, I'm just not familiar with regulatory

2    being a part of that.  Maybe it has different

3    meanings.

4    Q.    Are you familiar with that the LMS system can

5    produce what is entitled a regulatory transcript that

6    lists all the trainings completed by CRAs and CMAs?

7    A.    I know that it can produce a transcript, yes.

8    Q.    Did you look at such a transcript for Ms. Cones

9    in preparation of your deposition today?

10   A.    No, I did not have access to a full transcript.

11   Q.    Did you have access to a partial transcript?

12   A.    Only what is on this Exhibit 210.

13   Q.    Okay.  The second column in the table in Exhibit

14   210, what does that indicate?

15   A.    The second column describes the type of

16   activity, how the training is conducted.

17   Q.    And the first column, self-paced reading, what

18   type of activity is that referring to?

19   A.    A self-paced reading is, it would launch a PDF

20   file and the, the learner would then read that and

21   acknowledge that they've read it.

22   Q.    And the underneath the second column, second

23   row, it says, "E-learning."

24         Do you see that?

25   A.    Yes, I see that.

1    Q.    Okay.   And what kind of training is that

2    referring to?

3    A.    An E-learning would be more of, say, a delivered

4    PowerPoint or an interactive, you know, simulation,

5    that the user still generally does independently, but

6    interacting with the computer.

7    Q.    Would the E-learning at the end of it, would

8    there be a quiz of some sort?

9    A.    There may be.

10   Q.    What about for the self-paced reading, would

11   there be a quiz at the end of that?

12   A.    Again, there might be.   It depends on the

13   training, I don't know.

14   Q.    In order for you to determine that, you would

15   have to look at the training itself, right?

16   A.    That's correct.

17   Q.    In the fifth row in the second column, it refers

18   to a blended activity.

19        Do you see that?

20   A.    I see that.

21   Q.    And what kind of training is that referring to?

22   A.    The blended activities are a mix of E-learning

23   and self-paced reading.

24   Q.    Do you recall if blended activities would

25   conclude with a quiz?

1    A.   I don't know if this one would.   They could or

2    could not.

3    Q.   Okay.   You would have to look at the --

4        (Court reporter interrupted for clarification.)

5    Q.   You would have to look at the specific training

6    identified in Row 5 in order to determine if it had a

7    quiz; is that correct?

8    A.   That's correct.

9    Q.   The third column in Exhibit 210, what does that

10   column information reflect?

11   A.   That's simply the code for that training task,

12   the LMS code.

13   Q.   And the fourth column in Exhibit 210, what kind

14   of information is in that column?

15   A.   I'm not sure.

16   Q.   The fifth column on Exhibit 210, what does that

17   refer -- what information is referred to there?

18   A.   If it's required training.

19   Q.   Were there two types of trainings that would be

20   assigned to CRAs and CMAs would be required trainings

21   and recommended trainings; is that correct?

22   A.   That would be my understanding, yes.

23   Q.   Did you push all the trainings to Ms. Cones that

24   are listed in Exhibit 210?

25   A.   I don't recall.   It could have been me

Veritext Legal Solutions
866 299-5127

1   personally, but it could have also been the
2   administrative assistants who were helping with the
3   onboarding.
4   Q.   And the sixth column on Exhibit 210, what
5   information was recorded there?
6   A.   To the best of my knowledge, this is the start
7   time of the activities, so when the activity was
8   originally launched.
9   Q.   And the start time, is that start time in
10  particular to Ms. Cones or is that the start time for
11  the -- for the training for all CRAs and CMAs?
12  A.   The start time for the user, Ms. Cones.
13  Q.   And in the seventh column, what type of
14  information is in the seventh column?
15  A.   The seventh column is the due date.  When the
16  training was to be completed by.
17  Q.   And the eighth column, which is the last column
18  that has any information in it, what type of
19  information is in that column?
20  A.   That's essentially the days overdue.
21  Q.   And did you personally run this LMS report
22  that's in the Exhibit 210 e-mail?
23  A.   Yes.
24  Q.   Was that a -- was that a standard report that
25  would be ish -- that you could issue in LMS or was it

Page 60

```
1     a custom report --
2     A.    Standard.
3     Q.    -- in, you know, the types of information, the
4     columns that we just went over?
5     A.    That would be standard.
6     Q.    Did you run a report on a CRA or CMA assigned to
7     you with different information columns?
8                     MR. KOPP:  Objection, vague and
9          ambiguous.
10    A.    Not that I remember it being any different, no.
11    Q.    (BY MR. KEEGAN) Okay.  Did you run a report to
12    see what a CRA or CMA scored on any particular -- if
13    there was a quiz, did you run a report to see what
14    their score was on a particular quiz?
15    A.    Yes.
16    Q.    Could you also run a report in the LMS system
17    that would indicate when a training was assigned in
18    the company?
19                    MR. KOPP:  Objection, vague and
20         ambiguous.
21    Q.    (BY MR. KEEGAN) Yeah, let me -- let me give you
22    the following example and see if this is how
23    sometimes trainings were assigned at Parexel.
24         If there was changes to a study protocol,
25    would -- was it generally there would be a training
```

Page 61

1    assigned to that change in the study protocol through

2    the LMS system sent to the CRAs and CMAs assigned to

3    you?

4                        MR. KOPP:   Objection, overbroad,

5         incomplete hypothetical.

6    A.    Yes.

7    Q.    (BY MR. KEEGAN) And would the -- the start time,

8    would that indicate when the -- such a training that

9    a change in a study protocol, would that list the

10   start time when that -- when that change was made or

11   was that -- could you run that in the LMS report for

12   a particular CRA, CMA?

13   A.    To the best of my memory, you could see when

14   something was assigned.

15   Q.    By looking at Exhibit 210 -- well, let me ask it

16   this way, strike that.

17         Do you recall what studies Ms. Cones was

18   assigned to when she was hired at Parexel?

19   A.    I know she was assigned to a Dynavax study and

20   to one other, but I don't remember either of the

21   protocol identifiers.

22   Q.    Okay.  Does Exhibit 210 list any study-specific

23   training?

24   A.    No.

25   Q.    And the Dynavax study that you referred to in

                                          Page 62

```
 1        to you worked on?
 2                        MR. KOPP:  Objection, overbroad,
 3              lacks foundation.
 4        A.    Yes, there are monitoring plans per study.
 5        Q.    (BY MR. KEEGAN) During your last year of
 6        employment at Parexel, were the CRAs assigned to you
 7        conducting -- did they conduct qualification visits
 8        during that last year?
 9        A.    Yes.
10        Q.    Did they conduct booster visits during that last
11        year?
12        A.    Yes.
13        Q.    Did they perform interim visits during that last
14        year?
15        A.    Yes.
16        Q.    Did they perform close-out visits during that
17        last year?
18        A.    Yes.
19        Q.    Did they conduct site initiation visits during
20        the last year?
21        A.    Yes.
22                        MR. KOPP:  And you're doing a good
23              job, but if you could just wait for him to
24              conclude the question.
25                        THE WITNESS:  Sorry, okay.
```

Page 66

```
 1     Q.   (BY MR. KEEGAN) Did the CRAs assigned to you in

 2     their last year of employment, did they conduct

 3     initiation visits?

 4                    MR. KOPP:   Just for clarification,

 5          are you asking each and every CRA or just one of

 6          them?

 7     Q.   (BY MR KEEGAN) Let's do the one of them to start

 8     with.

 9     A.   I wouldn't be able to speak to the granularity,

10     like, person by person of which types of visits.   I

11     was saying within my time, it's realistic that I had

12     members in the last year conducting, you know, all

13     those types of visits.

14     Q.   Okay.   And that source of what visits they

15     conducted would be recorded in the P-Med system?

16     A.   Their reports would be housed there, yes.

17     Q.   Where else -- would the studies that they were

18     assigned to and the types of visits they conducted,

19     would that be housed in any other database at

20     Parexel, that you know of?

21     A.   Yeah, it would be recorded in the clinical trial

22     master system, management system -- Clinical Trial

23     Management System, CTMS.

24     Q.   And did you access and utilize the CTMS system

25     during your employment as the line manager at
```

Page 67

1   Parexel?

2   A.   Yes.

3   Q.   Okay.  And how would you do that, how would you

4   utilize that?

5   A.   Using the company provided laptop, secure VPN

6   access and, you know, secure log in.

7   Q.   And would you be logging on the CTMS to get

8   certain types of documents in order to supervise

9   CRAs?

10  A.   Not to get documents, no.  To review information

11  that's already housed in there for completeness, for

12  consistency.

13  Q.   Okay.  And what kind of -- would that be CRA and

14  CMA trip reports?

15  A.   That would include that as well as visit dates,

16  scheduled in advance.  Or completed.

17  Q.   So were you tracking how many visits CRAs were

18  making on a monthly basis?

19  A.   Yes.

20  Q.   How would you track that?

21  A.   I would generally run a business intelligence

22  report that mimes that information from CTMS into a

23  usable format.

24  Q.   Was there -- how would you refer to those

25  reports?  Was there a certain reference that you

Page 68

1   would use in referring to those reports at Parexel?

2   A.   The business intelligence reports were BI

3   reports.   They were numbered, I couldn't tell you now

4   which number of report that I would run specifically,

5   but...

6   Q.   And you could run that report in the CTMS?

7   A.   No, you run the report in business

8   intelligences.

9   Q.   Oh, okay.

10  A.   Pulling data from --

11  Q.   Pull the data from the CTMS system?

12  A.   Correct.

13  Q.   And was there a certain metrics that CRAs

14  assigned to you have to meet regarding site visits

15  during that last year of your employment?

16                      MR. KOPP:   Objection, overbroad.

17  A.   Yes, there are expectations for quantity of

18  visits.

19  Q.   (BY MR. KEEGAN) Yes.   And what was that

20  expectation the last year that you worked at Parexel?

21  A.   Six to eight visits per month, or 99.7 hours of

22  travel plus on site time.

23  Q.   And how was the 99.7 calculated?

24  A.   By review of time sheets.

25  Q.   And then, was that metrics any different when

Page 69

1    you started at Parexel for the CRAs assigned to you?

2    A.   Not to my recollection.

3    Q.   Okay.  So is it correct to say based on --

4    strike that.

5         So am I understanding your testimony correctly

6    that the metrics for the CRAs assigned to you were

7    six to eight site visits per month?

8    A.   No, that's --

9    Q.   Throughout the time that you worked as line

10   manager at Parexel?

11   A.   That's partially correct.  It's six to eight

12   visits per month or 99.7 hours of monitoring plus

13   travel.

14   Q.   Okay.  And by your response "plus travel," what

15   do you mean by that?

16   A.   Well, allowing for the metric to be viewed

17   either way, either on-site visits or the days plus

18   travel, does take into account then if a CRA is asked

19   to do a lot of, you know, cross-country travel that's

20   requiring extra time, or multiple date visits that

21   may not allow you to do six to eight visits if you're

22   on site for four days in a row or something.

23   Q.   And were the CRAs and the one CMA assigned to

24   you at the time of -- you were with the nation from

25   Parexel, were they assigned any particular region of

Page 70

```
 1    time that you worked there?
 2    A.   None that I can recall.
 3    Q.   During the time that you were employed at
 4    Parexel, did CRAs utilize a qualification checklist
 5    in order to perform qualification visits?
 6                    MR. KOPP:  Objection, overbroad,
 7         lacks foundation.
 8    A.   Yes, they would have a qualification checklist
 9    to guide them as they did their on-site work.
10    Q.   (BY MR. KEEGAN) Are sites allowed to advertise
11    for participants to enroll onto the site, to your
12    understanding?
13    A.   That is something that they have to have
14    arrangements with their IRB for, but they could.
15    Q.   And any advertisement that the site would do
16    would have to be approved by the IRB; is that
17    correct?
18    A.   That's correct.
19    Q.   Also have to be approved by the sponsor?
20    A.   Yes.
21    Q.   During the time that you were employed at
22    Parexel, were CRAs given training materials to
23    provide to sites, during site initiation visits.
24    A.   Yes.  And occasionally, the CRAs would
25    contribute to development of those training
```

Page 72

1    materials, especially senior CRAs.  And then they
2    would deliver the training.  It wasn't handed off to
3    the sites, but it was delivered at the initiation
4    visit and really tailored to the needs of that site.
5    Q.   So part of the training materials, those would
6    be CRA would receive the trainings before -- through
7    the LMS system before they went on site initiation
8    visits, correct?
9    A.   They would receive training, either through the
10   LMS or through their project team, yes.
11   Q.   And then there would be trainings, such as
12   PowerPoint presentations that they would present to
13   the staff at the sites; is that correct?
14   A.   That's correct, the PowerPoints are used as a
15   guide to help them facilitate discussion with the
16   site, to bring up points that the sites might have
17   not considered or that may be of specific importance
18   to that trial.
19   Q.   And those PowerPoints are created by project
20   management team and the sponsor; is that correct?
21   A.   I have, I have had senior members of the CRA
22   team also contribute to those, in addition to the
23   people you mentioned, the COL, the project lead and
24   the sponsor.
25   Q.   And all materials would be approved by the PM,

Page 73

1    the COL and sponsor, correct, before they're shown to

2    the site, correct?

3                        MR. KOPP:   Objection, overbroad,

4        lacks foundation.

5    A.    It would be a study by study decision.   If the

6    sponsor was involved in every training material or

7    not.   But generally, the COL and the PL would have

8    ownership over that.

9    Q.    (BY MR. KEEGAN) You mentioned in a response you

10   had a situation where senior CRAs contributed to

11   PowerPoint or the slide decks presented to the site;

12   do you recall the specific instance of that?

13   A.    Yes.

14   Q.    And what was that specific instance; do you

15   remember the study?

16   A.    I don't remember the study identifier, but I

17   remember the staff member who contributed to

18   preparation of some of the study materials that went

19   into that slide deck.

20   Q.    And what was that staff member's name?

21                       MR. KOPP:   I'm going to object on

22       privacy grounds.   Instruct not to answer.

23   A.    I'm following counsel's advice.

24   Q.    (BY MR. KEEGAN) Okay.   Other than that one

25   person, can -- do -- can you recall any other

Page 74

1    instance where a staff member contributed to the

2    PowerPoint presentation given to the site?

3    A.    Not by name, but only anecdotally.

4    Q.    Yeah.  Are printed copies of the presentation

5    also given to the site of these site initiation

6    visits?

7                         MR. KOPP:  Objection, overbroad,

8         lacks foundation.

9    A.    That would be a study-specific decision.

10   Q.    (BY MR. KEEGAN) But that occurred during the

11   time that you were employed at Parexel; is that

12   correct?

13   A.    I can't say it does every time, but I have seen

14   that happen, yes.

15   Q.    Part of the materials that the -- of PowerPoint

16   presentations that the CRAs would present to the

17   staff of a site would include background of the study

18   or drug; that correct?

19                         MR. KOPP:   Objection, assumes

20        facts, compound and overbroad.

21   A.    That's correct.

22   Q.    (BY MR. KEEGAN) Okay.  And would part of the

23   PowerPoint presentation that the CRAs would present

24   to the site at the initiation visits would also cover

25   the protocols of the setting?

Veritext Legal Solutions
866 299-5127

1                         MR. KOPP:   Objection, overbroad,

2          compound and lacks foundation.

3     A.    That's correct.

4     Q.    (BY MR. KEEGAN) And those PowerPoint

5     presentations would go over the schedule of

6     assessments; is that correct?

7                         MR. KOPP:   Objection, overbroad,

8          compound and lacks foundation.

9     A.    That's correct.

10    Q.    (BY MR. KEEGAN) And part of the PowerPoint

11    presentation would go over the inclusion criteria of

12    the study?

13                        MR. KOPP:   Objection, overbroad,

14         compound and lacks foundation.

15    A.    Correct.

16    Q.    (BY MR. KEEGAN) And would it also include the

17    exclusion criteria of the study, the PowerPoint

18    presentation?

19                        MR. KOPP:   Objection, overbroad,

20         compound, lacks foundation.

21    A.    That's correct.

22    Q.    (BY MR. KEEGAN) And would the PowerPoint

23    presentation cover the pharmacy manuals for the

24    study?

25                        MR. KOPP:   Objection, overbroad,

                                              Page 76

1      compound and lacks foundation.

2      A.   The PowerPoint may or may not include a --

3      details on the pharmacy manual, that may be a stand

4      alone training.

5      Q.   (BY MR. KEEGAN) Okay.  Would the PowerPoint

6      presentation that CRAs would present to the site at

7      the site initiation visit also cover vendor training,

8      like such as how to randomize a patient?

9                     MR. KOPP:  Objection, compound,

10          overbroad and lacks foundation.

11     A.   Again, that might be part of the training or it

12     might be a stand alone training supplied by that

13     vendor or by a different means.

14     Q.   Did Parexel, during the time that you were

15     employed there, did they have a -- did they offer a

16     system of patient randomization through their

17     clients; do you know?

18     A.   I'm unaware.

19     Q.   Okay.  During the time that you were employed at

20     Parexel, can you remember a specific example of a

21     study that was stopped midstream and restarted later?

22     A.   Yes.

23     Q.   Okay.  And what instance was that?

24     A.   It was an ophthalmology study that -- that had a

25     halted start up.

Veritext Legal Solutions
866 299-5127

```
 1     there any other additional instances of studies that
 2     stopped midstream and started later?
 3     A.   I really don't recall right now.
 4     Q.   Would you agree with me that that's a pretty
 5     rare instance, where a study stops midstream and
 6     starts later?
 7     A.   I'm not sure of the frequency, but it's not
 8     something I experienced, you know, an overwhelmingly
 9     large amount of the time, no.
10     Q.   And you can only remember the one study as you
11     sit here today, correct?
12                    MR. KOPP:  Objection, misstates
13          testimony.
14     A.   I can recall one by name right now.
15     Q.   (BY MR. KEEGAN) Were your -- the CRAs and CMAs
16     assigned to you, were they ever involved in database
17     logs?
18          (Court reporter interrupted for clarification.)
19     Q.   In a database log.
20     A.   Yes.
21     Q.   And can you describe kind of generally how they
22     would be involved in -- with database logs?
23     A.   The process is that the CRA or CMA would ensure
24     that all the data in the electronic data capture
25     system, the EDC, was input, was sourced data
```

Page 79

1    verified, was cleaned to the best of their ability.

2    And then those pages would be locked, data management

3    review would occur and a round of queries would be

4    issued for any other questions that would arise.

5         The queries would then be resolved by the sites.

6    The CRAs or CMAs would often be consulted by the

7    sites in resolving the queries.  And all that leads

8    to an eventual database lock.

9    Q.   And the database lock that you're referring to,

10   that happens in a situation where the study is closed

11   out, correct?

12   A.   There can be interim database locks as well

13   throughout studies, it's not only at the end.  But

14   there generally is one at the conclusion of every

15   trial.

16   Q.   And there was, you mentioned that data

17   management.  There was a data management team with --

18   employed at Parexel during your employment at

19   Parexel, correct?

20   A.   There was data management team at Parexel.

21   Occasionally, projects also use other vendors for

22   their data management.

23   Q.   But -- sure.

24        And data managers also have access to the source

25   documentation as well; is that correct?

Page 80

1    Q.   Now, referring your attention to the third page

2    of that document, Langley 12 through Langley 13,

3    which is Pages 3 and 4 of that document.  Do those

4    two pages reflect trainings that were completed by

5    Ms. Cones on May 6th?

6    A.   Those do reflect trainings that reported, as

7    completed on May 6th.  However, at the time that I

8    had requested her to work on her LMS trainings or

9    refresh her mind that she needed to be working on

10   them, those had not reflected in the report at that

11   point.  So there's -- I don't see a time stamp on

12   these to say when they were completed, it's possible

13   they were completed after the fact on May 6th.

14   Q.   And you could have ran an LMS report that would

15   indicate the times that Ms. Cones had started those

16   trainings and when they completed in June of 2014; is

17   that correct?

18   A.   Yes.  But the fact remained that she didn't

19   complete any from 25th through 5th, you know, on all

20   of those days as well.

21   Q.   And there's no report of, no LMS -- is there --

22   well, strike that.

23        Is there an LMS report attached to your June 12,

24   2014 e-mail to Laura -- or to Leah Bugg?

25   A.   Can you restate that?  Sorry.

Page 104