# Exhibit AA

```
 1                 UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   SCHOULEE CONES, an        )
     individual, and DEXTER    )
 5   PASIS, an individual, on  )
     behalf of themselves and  )
 6   all others similarly      )
     situated,                 )
 7           Plaintiffs,        )
                               )
 8           VS.               ) Case No. 16-cv-3084-L-BGS
                               )
 9   PAREXEL INTERNATIONAL      )
     CORPORATION, a            )
10   Massachusetts corporation )
     licensed to do business in)
11   the State of California;  )
     and PAREXEL INTERNATIONAL,)
12   LLC, a Massachusetts      )
     limited liability company )
13   licensed to do business in)
     the State of California,   )
14           Defendants.        )
     _____)
15
                 DEPOSITION OF: CYNTHIA VIBAR
16               WEDNESDAY, MARCH 14, 2018
17                      9:40 A.M.
18
19   Reported by:
20   GINA M. CLOUD
21   CSR No. 6315
22   Job No. 2840881
23
     Pages 56 - 181 Are Confidential Pursuant to Protective
24   Order And Are Bound Separately
25   Pages 1 - 182


                                              Page 1
```

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS:

 4                    KEEGAN & BAKER LLP

 5                    BY:  PATRICK KEEGAN, ESQ.

 6                    6156 Innovation Way

 7                    Carlsbad, California 92009

 8                    (760) 929-9303

 9

10    FOR DEFENDANTS:

11                    SEYFARTH SHAW LLP

12                    BY:  DIANA TABACOPOULOS, ESQ.

13                    2029 Century Park East

14                    Suite 3500

15                    Los Angeles, California 90067

16                    (310) 277-7200

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1                    I N D E X

 2

 3  WITNESS              EXAMINATION        PAGE

 4  CYNTHIA VIBAR

 5                      (By Mr. Keegan)       5

 6

 7

 8

 9                    E X H I B I T S

10  NO.               DESCRIPTION            PAGE

11  Exhibit 233  Plaintiff's Second Amended    13

12               Notice of Deposition of

13               Cynthia Vibar and Request

14               For Production of

15               Documents

16  Exhibit 234  C.V. of Cynthia Vibar,        44

17               Bates PAR13198-13201

18  Exhibit 235  Document Bates PAR 13213     101

19  Exhibit 69B  Regulatory Transcript,       120

20               Bates LANGLEY00019-31

21  Exhibit 236  Document Bates PAR 13212     121

22  Exhibit 237  Document Bates PAR13208-209  124

23  Exhibit 238  One-on-One meeting notes     127

24               dated June 24, 2016

25  Exhibit 239  Document Bates 13195-13197   129
```

Page  3

```
1                     E X H I B I T S

2    NO.                 DESCRIPTION              PAGE

3    Exhibit 240  Document Bates               132

4                 PAR 001104-05

5    Exhibit 241  Document Bates               140

6                 PAR 013202-206

7    Exhibit 242  PDF documents from the       151

8                 reported time period of

9                 January 1, 2015 to

10                August 1, 2016, Bates

11                PAR 012988-13169

12   Exhibit 243  On-site Initiation, Bates    161

13                PAR 012587-596

14   Exhibit 244  On-site Qualification visit  170

15                dated 08-APR-2014

16   Exhibit 245  On-Site Monitoring           171

17                document, Bates

18                PAR 012791-12799

19   Exhibit 246  On-Site Termination          172

20                document, Bates

21                PAR 012981-12987

22   Exhibit 247  Cynthia Vibar's Linked In    179

23                profile

24

25
```

Page  4

```
 1    SAN DIEGO, CALIFORNIA, WEDNESDAY, MARCH 14, 2018

 2                          9:40 A.M.

 3

 4                       CYNTHIA VIBAR,

 5               having been first duly sworn, was

 6               examined and testified as follows:

 7

 8                        EXAMINATION

 9

10    BY MR. KEEGAN:

11        Q.   Can you please state and spell your name

12    for the record.

13        A.   Cynthia Vibar, C-y-n-t-h-i-a, V-i-b-a-r.

14        Q.   Are you employed?

15        A.   Yes.

16        Q.   Who is your employer?

17        A.   I'm employed by Parexel.

18        Q.   So if I refer to your employer as Parexel,

19    you'll understand that to mean your employer, or if

20    I just use the term Parexel, you'll understand that

21    to be your employer, correct?

22        A.   Yes.

23        Q.   Are you represented by counsel today?

24             MS. TABACOPOULOS:   I'm obviously counsel

25    for Parexel in connection with her role as a manager
```

Page 5

1   for Parexel.  I'll be representing the witness in

2   that capacity.

3   BY MR. KEEGAN:

4       Q.   Can I have the witness respond though to

5   the question?

6       A.   Can you repeat that?

7       Q.   Are you represented by counsel today?

8            MS. TABACOPOULOS:  Don't speculate.

9            THE WITNESS:  I'm trying to figure out the

10  question.  Counsel from Parexel is here.

11  BY MR. KEEGAN:

12      Q.   Do you have a written agreement with

13  counsel for Parexel to represent you at this

14  deposition today?

15      A.   I don't think so.

16      Q.   Do you recall signing a written agreement

17  with counsel for Parexel today?

18      A.   For today, no, I don't believe so.

19      Q.   Do you recall signing any agreement with

20  counsel who is representing you at the deposition

21  here today?

22           MS. TABACOPOULOS:  Objection, vague.

23           THE WITNESS:  Can you clarify that a little

24  further?

25  BY MR. KEEGAN:

                                        Page  6

1      Q.   You mentioned, and seated to your right is

2    counsel who is representing Parexel International

3    corporation and Parexel International LLC in the

4    litigation pending before the United States District

5    Court here in the Southern District of California.

6          Do you understand that the person sitting

7    on the right of you to be counsel representing you

8    at this deposition today, or are you estranged from

9    this person?

10     A.   No --

11          MS. TABACOPOULOS:   I'm going to object.

12    First the question misstates what the witness

13    previously testified to.   Second, vague and

14    ambiguous.   I've stated for the record my role here

15    is counsel for Parexel in connection with this

16    witness' role as a manager for Parexel.

17          MR. KEEGAN:   You're representing the

18    witness today, correct?

19          MS. TABACOPOULOS:   In her capacity as

20    manager for Parexel.

21    BY MR. KEEGAN:

22     Q.   So do you understand that you're being

23    represented by counsel here today?

24          MS. TABACOPOULOS:   I'm going to object

25    again, vague and ambiguous.   I've already stated the

Page  7

1  nature of the representation.

2  BY MR. KEEGAN:

3      Q.    Do you know the name of the person seated

4  to your right?

5      A.    First name, yes.

6      Q.    Can you state her name as you know it?

7      A.    Diana.

8      Q.    Did you speak with Diana before being sworn

9  as a witness here today?

10     A.    Yes.

11     Q.    And did you speak with her on more than one

12  occasion prior to today?

13     A.    Yes.

14     Q.    How many times?

15          MS. TABACOPOULOS:  Objection, overbroad.

16          THE WITNESS:  I can't recall the number of

17  times.  More than two.

18  BY MR. KEEGAN:

19     Q.    Did you also appear at the deposition for

20  Dexter Pasis, one of the plaintiffs in this case?

21     A.    Yes.

22     Q.    Did you speak with Diana before that

23  deposition?

24     A.    Yes.

25     Q.    How many times did you speak with Diana in

Page  8

1    between the time you spoke with her after the

2    deposition of Dexter Pasis and before your

3    deposition here today?

4         A.   I don't know the number of times

5    specifically.

6         Q.   How many times within the last week?

7         A.   At least twice.

8         Q.   In the last week, on what days of the week

9    did you speak with Diana?

10        A.   Yesterday, and what is today?   And Monday.

11        Q.   So you spoke with her on Monday,

12   March 12th; is that correct?

13        A.   Correct.

14        Q.   For how long did you speak with Diana on

15   Monday, March 12th?

16        A.   Approximately an hour.

17        Q.   Was that by telephone or face to face?

18        A.   Telephone.

19        Q.   Did you speak with Diana on March 13th?

20             MS. TABACOPOULOS:   Asked and answered.

21             THE WITNESS:   What day is that again?

22   BY MR. KEEGAN:

23        Q.   Yesterday.

24        A.   Sorry, I'm getting all the days mixed up

25   now.  Yes, I did speak with her yesterday.

Page 9

1      Q.   And how long did you speak with Diana

2   yesterday?

3      A.   About 4, 4 and a half hours.

4      Q.   Did you speak with her face to face or by

5   telephone?

6      A.   Face to face.

7      Q.   And then you spoke with her this morning

8   before your deposition; is that correct?

9      A.   Yes.

10      Q.   And how long did you speak with her?

11           MS. TABACOPOULOS:   Overbroad as to all the

12   objections -- as to all the questions regarding how

13   long we spoke.   Go ahead.   And vague.

14           THE WITNESS:   I'm not sure what time we

15   started here, but we were here at 8:30.

16   BY MR. KEEGAN:

17      Q.   Did you speak to her other than face to

18   face before your deposition started this morning?

19      A.   No.

20      Q.   Did you review any documents in order to

21   prepare for your deposition today?

22           MS. TABACOPOULOS:   I'm going to lodge an

23   objection to the extent the question calls for the

24   witness to divulge any privileged information or

25   work product information.

Page 10

1          MR. KEEGAN:  It's a yes-or-no question.

2          THE WITNESS:  Yes.

3    BY MR. KEEGAN:

4      Q.   How many documents did you review?

5      A.   I do not remember the exact number, but they

6    were the documents included in the notice that I got

7    from -- that thing.

8      Q.   Responsive to the notice for deposition?

9      A.   Correct.

10     Q.   Other than documents that are being

11   produced responsive to the notice of deposition, did

12   you review any other documents in order to prepare

13   for your deposition today?

14     A.   Only documents that were provided by

15   counsel.

16     Q.   And how many documents were those?

17     A.   I don't remember the exact number.

18     Q.   When did you review these documents?

19     A.   Yesterday.

20     Q.   Do you know what types of documents you

21   reviewed?

22     A.   Different types.  I couldn't classify them

23   into one specific type.

24     Q.   Do you know anything that they were about,

25   any particular category of documents?

Page 11

1          MS. TABACOPOULOS:   Again, getting into work

2   product privileged information.   You can describe

3   generally if you recall.

4          MR. KEEGAN:   Are you instructing the

5   witness not to answer on what documents she reviewed

6   for her deposition here today?

7          MS. TABACOPOULOS:   That wasn't an

8   instruction.

9          THE WITNESS:   I mean one of them was my

10  C.V. and that was part of the documents requested.

11  Some were e-mails, which were requested, so those I

12  wouldn't put in the same category, they're

13  different.

14  BY MR. KEEGAN:

15      Q.   Any other documents that you can recall

16  reviewing for your deposition today other than your

17  C.V. and the e-mails?

18      A.   I only specifically recall me looking at my

19  C.V. yesterday.

20      Q.   Did you look at any documents regarding

21  Dexter Pasis?

22      A.   Only the e-mails that I had.

23      Q.   So do you recall reviewing any other

24  documents, other than your C.V. and the e-mails?

25      A.   No.

```
 1              MR. KEEGAN:   I'm handing to the court

 2    reporter a document entitled Plaintiff's Second

 3    Amended Notice of Deposition of Cynthia Vibar and

 4    Request For Production of Documents.

 5              (The document referred to was marked

 6    by the reporter as Exhibit 233 for identification

 7    and is attached hereto).

 8              MR. KEEGAN:   I ask the court reporter to

 9    mark this as Exhibit 233.   I'm handing a copy to

10    your counsel.

11    BY MR. KEEGAN:

12       Q.   Have you seen Exhibit 233 before your

13    deposition today?

14       A.   Yes.

15       Q.   When did you review Exhibit 233?

16       A.   On Monday.

17       Q.   Did you search for any of the documents

18    listed in the document request appearing on page 5

19    through page 7 of Exhibit 233?

20       A.   I apologize, the sirens were distracting me.

21    Could you repeat it.

22       Q.   Did you search for any of the documents

23    requested on pages 5-7 of Exhibit 233?

24       A.   Yes.

25       Q.   How did you search for documents responsive
```

Veritext Legal Solutions
866 299-5127

1    to the document request appearing on pages 5-7 of

2    Exhibit 233?

3            MS. TABACOPOULOS:   Council the witness to

4    answer to the extent it doesn't divulge

5    attorney-client privilege communications in

6    connection with the search for documents.

7            THE WITNESS:   At the time on Monday, it was

8    in the evening, I looked for the documents that I

9    knew I could produce right away, which were my

10   resume, e-mails for Lori, Jennifer and Dexter.

11   BY MR. KEEGAN:

12      Q.   Were you able to find any e-mails from

13   Dexter Pasis as a result of your search?

14      A.   I did come across a couple that I thought

15   maybe weren't provided before, but just in case I

16   sent them, I believe it would have been sent before,

17   but just in case.

18      Q.   So you found some e-mails; is that correct?

19      A.   Three of them, yes.

20      Q.   And you produced them to your counsel; is

21   that correct?

22      A.   Yes.

23      Q.   Did you search for the e-mails for Kim

24   Anglin, A-n-g-l-i-n, document request No. 10 on

25   page 6?

Page 14

1      A.    I did not.

2      Q.    Why not?

3      A.    I looked at the names of 10, 11, 12, 13, 14,

4   15 and 16 and the only names I remember or know of

5   that I've worked with or could have had communication

6   with are -- was Jennifer, and while looking for

7   e-mails with Jennifer, I came across about three

8   e-mails for Lori, but I don't really know the other

9   people.

10     Q.    And Jennifer, you're referring to Jennifer

11  Pathak?

12     A.    Pathak.

13     Q.    P-a-t-h-a-k, correct?

14     A.    Correct.

15     Q.    And Lori in your response you're referring

16  to Lori Richard; is that correct?

17     A.    Yes.

18     Q.    When you were searching for e-mails with --

19  for Dexter Pasis, how did you do it, did you type in

20  his name into your Outlook program?   How did you

21  make the search?

22     A.    I wasn't particularly looking for documents

23  for him because I thought I had provided them

24  previously; however when I was looking through some

25  Outlook folders, I spotted three and I thought hey,

1    let's send them over just in case.

2        Q.    So when you were looking on your Outlook

3    for e-mails with Dexter Pasis, did you type Dexter

4    Pasis's name into the system?

5        A.    No.

6        Q.    How did you search for e-mails with Dexter

7    Pasis?

8              MS. TABACOPOULOS:   Objection, vague as to

9    time.

10             THE WITNESS:   I didn't search for them.  I

11   was in a folder and I saw them.

12   BY MR. KEEGAN:

13       Q.    So you personally did not search on your

14   Outlook computer for e-mail with Dexter Pasis; is

15   that correct?

16       A.    At this time.

17       Q.    When you received the notice?

18       A.    Correct.

19       Q.    On Monday.  So you made no search for

20   e-mails with Dexter Pasis when you received the

21   notice on Monday; is that correct?

22       A.    Correct.

23       Q.    Did you make a search for any of the

24   persons listed on document categories 10-16 on your

25   Outlook, you personally?

                                      Page 16

1      Q.   Were they in the folder that you referred

2  to in your prior response?

3      A.   Yes.

4      Q.   Where did you get the folder from?

5      A.   When I was searching for Jennifer, her last

6  name -- I would search by Pathak and it would filter

7  everything out and I just happened to see Lori

8  Richard, and I was trying to figure out why I had an

9  e-mail from Lori Richard, and so I looked at those

10  and I filtered by Lori Richard in that instance.  I

11  said oh, there is Lori Richard, I'll send those over.

12      Q.   And you did that search on Monday; is that

13  correct?

14      A.   Yes.

15      Q.   And you sent them over to who?

16      A.   Michael Kopp.

17      Q.   So when you're referring to a folder you're

18  not talking about a physical folder, you're talking

19  about a folder on Outlook?

20      A.   Correct.

21      Q.   Did you search for any communications with

22  Schoulee Cones?

23      A.   No, because I don't know her.

24      Q.   Have you ever had communications with

25  Schoulee Cones?

Veritext Legal Solutions
866 299-5127

1      A.    Not that I'm aware of.

2      Q.    You've never spoken to Schoulee Cones, is

3  that correct?

4      A.    I have not.

5      Q.    You've never e-mailed Schoulee Cones; is

6  that correct?

7      A.    I've never even heard of her until this.

8      Q.    And "this" meaning?

9      A.    This deposition.  I don't know the lawyer

10  terms, I'm sorry.

11      Q.    Category 5 asks for all documents referring

12  and reflecting agreements between you and Parexel

13  Corporation.  Did you search for those documents?

14          MS. TABACOPOULOS:  Let me state for the

15  record that objections to this request were served

16  timely and those objections speak for themselves.

17          MR. KEEGAN:  As we discussed off the

18  record, you haven't brought a copy of those

19  objections to the deposition, correct?

20          MS. TABACOPOULOS:  No, because I was

21  traveling, but I did confirm with Mr. Kopp it was

22  served on your office yesterday electronically.

23          MR. KEEGAN:  As I told you, I don't have a

24  copy because it wasn't served on me apparently.

25  Could be, I'm not saying it wasn't, but I just

Veritext Legal Solutions
866 299-5127

1           MS. TABACOPOULOS:  Why don't we just get

2      you the document.

3           MR. KEEGAN:  I'm just asking you.  That

4      would seem to be more simple.

5           MS. TABACOPOULOS:  We've objected to all of

6      them and with respect to No. 5, agreements between

7      her and Parexel as well as with the other witnesses,

8      if there is any agreement, employment agreement, if

9      there is any, we're not going to be producing it,

10     consistent with our position on the other witnesses,

11     but I think that I can have Michael e-mail you the

12     objections if you don't have them.  One moment

13     please.

14          MR. KEEGAN:  You're not objecting to

15     production of Category 1, all documents reflecting

16     her resume; is that correct, because you've produced

17     it, correct?

18          MS. TABACOPOULOS:  There were objections

19     made to No. 1.  Nevertheless, I do believe that her

20     resume was produced, subject to our objections.

21     BY MR. KEEGAN:

22          Q.   What is your current position with Parexel?

23          A.   I'm a manager for clinical operations.

24          Q.   How long have you held that position?

25          A.   This current title, about three months.

                                                Page 21

1      Q.    So you started your current position within

2    the last three months; is that correct?

3      A.    Correct.    I was promoted to manager around

4    end of November, December of last year.

5      Q.    And in your current position, do you

6    supervise or manage CRA's and CMA's employed at

7    Parexel?

8      A.    In my current position we don't have those

9    titles.

10     Q.    In your current position you don't have

11   these titles.    What does that mean?

12     A.    You stated CRA's and CMA's, and in my

13   current position as of right now, I do not have CRA's

14   and CMA's.

15     Q.    You don't have them or --

16     A.    I don't manage them.

17     Q.    The company hasn't reclassified the

18   positions of CRA and CMA's, right?

19           MS. TABACOPOULOS:    Objection, vague?

20   BY MR. KEEGAN:

21     Q.    There are still CRA and CMA's employed at

22   Parexel; is that correct, do you know?

23           MS. TABACOPOULOS:    Objection, vague.

24           THE WITNESS:    Their titles would say

25   otherwise.    They don't have those titles currently.

Page 22

1    BY MR. KEEGAN:

2        Q.    So CRA's and CMA's have been reclassified

3    as different job titles at Parexel within the last

4    five months?

5            MS. TABACOPOULOS:    Objection, vague and

6    ambiguous, calls for a legal conclusion, misstates

7    her testimony.

8    BY MR. KEEGAN:

9        Q.    What are CRA's called now?

10           MS. TABACOPOULOS:    Objection, assumes facts

11   not in evidence, lacks foundation.

12           THE WITNESS:    CRA's are at the time, could

13   look at different positions, and it's not

14   necessarily a CRA going into one title or the other,

15   so I can't say what a CRA is called now because a

16   CRA back then could have chosen something completely

17   different.

18   BY MR. KEEGAN:

19       Q.    So what job titles do CRA's serve in now

20   currently if they're not called CRA's anymore?

21           MS. TABACOPOULOS:    Same objections,

22   overbroad as well.

23           THE WITNESS:    I think it's a little -- I

24   think it would vary.    If we would look at a CRA

25   before five months ago, if they chose to stay in

Page 23

1  that path request, similar I guess responsibilities

2  and job duties, then they could go into a clinical

3  site manager.

4  BY MR. KEEGAN:

5       Q.    So one of the new positions that CRA's

6  currently are employed at at Parexel is clinical

7  site manager; is that correct?

8            MS. TABACOPOULOS:   I'm going to object to

9  the extent it misstates her testimony.

10           MR. KEEGAN:   She was giving an answer.

11           THE WITNESS:   One of them, that is one

12 position that we have that a former CRA could

13 potentially move into.

14 BY MR. KEEGAN:

15      Q.    What's another one?   You said there are

16 others.

17      A.    ICSM, which is Initiation Clinical Site

18 Manager.

19      Q.    Any other job positions other than this CSM

20 and the ICSM?

21      A.    No, not that I know of.

22      Q.    Are there persons still employed in the

23 position of CMA at Parexel currently?

24           MS. TABACOPOULOS:   Objection, overbroad,

25 lacks foundation.

Page 24

1              THE WITNESS:   No, no one has that title.

2    BY MR. KEEGAN:

3       Q.    Persons that were formerly employed as

4    CMA's at Parexel, what titles do they serve

5    currently?

6              MS. TABACOPOULOS:   Objection, overbroad,

7    lacks foundation, vague.

8              THE WITNESS:   It is the same situation with

9    the CRA's beforehand.   They have the ability, the

10   options to choose their career path, so I can't say

11   that a CMA went into one or the other definitely.

12   BY MR. KEEGAN:

13      Q.    That's not my question.   The question is

14   are there other job titles that former CMA's hold?

15   What are the new titles that CMA former employees

16   hold at Parexel?

17             MS. TABACOPOULOS:   Same objections.

18             THE WITNESS:   They could have chosen either

19   one of the two that I've spoken about, ICSM or CSM,

20   or if they choose to move into another role at

21   Parexel, they have the ability to look for that

22   opportunity.

23   BY MR. KEEGAN:

24      Q.    Prior to this reclassification of CRA and

25   CMA's into these two new job positions at Parexel,

1    is it correct that CMA's performed remote clinical

2    site monitoring for Parexel; is that a correct

3    statement?

4              MS. TABACOPOULOS:   Objection to the form of

5    the question, assumes facts not in evidence,

6    misstates the witness' testimony and overbroad as

7    well.

8              THE WITNESS:   Could you repeat the

9    question.   The word classification is throwing me

10   off.

11   BY MR. KEEGAN:

12       Q.   Before you said there are no CMA's and

13   CRA's employed at Parexel currently, correct?

14       A.   That title does not exist at Parexel.

15       Q.   When that title existed, the CMA title,

16   CMA's performed remote clinical site monitoring for

17   Parexel; is that correct?

18              MS. TABACOPOULOS:   Objection, overbroad.

19              THE WITNESS:   That is a little broad.

20   BY MR. KEEGAN:

21       Q.   You still have to answer my question.

22       A.   There are aspects of remote monitoring;

23   however that can be divided up into several different

24   things, so I think to answer your question better, I

25   would need a little more specifics.

1     Q.    Although CMA's, it could be broader or

2  there may be other aspects, remote site monitoring

3  is one of the job -- was one of the job duties and

4  responsibilities of CMA's; is that correct, when the

5  position existed?

6     A.    I would call it more remote site management

7  instead of monitoring.

8     Q.    So using your term, remote site management,

9  what job position performs remote site management

10  for Parexel currently?

11     A.    That would be the CSM.

12     Q.    And for the record, can you tell me what

13  the CSM stands for?

14     A.    Clinical site manager.

15     Q.    And that was a position created within the

16  last five months; is that correct?

17        MS. TABACOPOULOS:  Objection, lacks

18  foundation, calls for speculation, vague and

19  ambiguous.

20        THE WITNESS:  That title went into effect

21  first of January.  I do not know when it was

22  created.

23  BY MR. KEEGAN:

24     Q.    The CSM position went into effect

25  January 1, 2018; is that correct?

Veritext Legal Solutions
866 299-5127

1      A.    Correct.

2      Q.    Did you have any involvement in the

3    creation of the CSM position?

4      A.    No.

5      Q.    You didn't write the job title for the CMA

6    position, correct?

7      A.    No.

8      Q.    Did you ever write any of the job

9    descriptions for the CMA positions prior to

10   January 1st?

11     A.    No, it's a different department.

12     Q.    Did you write any of the job descriptions

13   for the CRA positions prior to January 1, 2018?

14     A.    No.

15     Q.    Was one of the responsibilities and duties

16   of CRA's to do in-person, on-site monitoring for

17   Parexel?

18          MS. TABACOPOULOS:  Objection, vague and

19   ambiguous, overbroad.

20          THE WITNESS:  Repeat it one more time

21   please.

22   BY MR. KEEGAN:

23     Q.    Sure.  Prior to the changing of the job

24   position when there were CRA's and persons employed

25   as CRA's at Parexel before January 1, 2018, one of

Page 28

1    their duties and responsibilities as a CRA was to

2    perform in-person, on-site clinical site monitoring;

3    is that correct?

4         MS. TABACOPOULOS:  I'm going to object to

5    the recharacterization of the question as assuming

6    facts not in evidence, overbroad and lacks

7    foundation.  Go ahead.

8         THE WITNESS:  One of them, yes.

9    BY MR. KEEGAN:

10    Q.   What job title at Parexel currently

11   performs on-site in-person clinical site monitoring

12   for Parexel?

13    A.   The clinical site manager.

14    Q.   So the CMS position with Parexel is

15   responsible for both remote and in-person on-site

16   monitoring?

17         MS. TABACOPOULOS:  Misstates the witness'

18   testimony.

19         THE WITNESS:  I think you said CMS.

20   BY MR. KEEGAN:

21    Q.   Maybe for the record instead of the

22   acronym, can you state who performs in-person

23   on-site monitoring currently at Parexel since

24   January 1, 2018?

25    A.   Clinical site manager.

Veritext Legal Solutions
866 299-5127

1    clarify that a little further?

2    BY MR. KEEGAN:

3        Q.    In your current position, at any time were

4    you --

5        A.    As a manager?

6        Q.    Right.

7        A.    Okay.

8        Q.    It's your current position, correct?

9        A.    Right.

10       Q.    And you started that in November, December

11   of last year, correct?

12       A.    Yes, with that title.

13       Q.    And there were still CRA's and CMA's

14   employed with Parexel at the end of last year,

15   correct?

16       A.    Yes.

17       Q.    Were you responsible for managing any CRA's

18   or CMA's last year in your current position?

19           MS. TABACOPOULOS:   Objection, vague.

20           THE WITNESS:   Yes.

21   BY MR. KEEGAN:

22       Q.    How many did you manage in December of last

23   year?

24       A.    To be honest, I can't remember.

25       Q.    Was there more than one?

                                      Page 32

```
 1        A.    Yes.

 2        Q.    More than 10?

 3        A.    Possibly.

 4        Q.    More than 20?

 5        A.    No.

 6        Q.    So less than 20?

 7        A.    The reason why is there was I believe

 8   someone who -- I believe somebody left around that

 9   time, so my numbers in terms of the staff I managed,

10   I don't remember what it was at that time.  I feel

11   like in November it was different from December, from

12   January.  I have more now than I had in December.  I

13   mean yes, more now than I had in December, but I

14   can't remember exactly which one.

15        Q.    And you understand at the deposition today

16   I'm entitled to your best testimony.  You may not

17   remember an exact number, or an exact date, but I'm

18   entitled to as much as you can remember.  So if you

19   have an estimate of how many people you have, I'm

20   entitled to that answer.

21              Do you have an estimate of how many people

22   did you manage?

23        A.    Between 10 and 15 for sure.

24        Q.    And in your response when you said somebody

25   left, what did you mean by that?  What does that
```

Page 33

```
 1              MS. TABACOPOULOS:  We can take this up at a
 2    break.  I would like to get on with the witness
 3    testimony at this point.
 4              MR. KEEGAN:  This is going to be 234.
 5              (The document referred to was marked
 6    by the reporter as Exhibit 234 for identification
 7    and is attached hereto).
 8    BY MR. KEEGAN:
 9       Q.   I've handed to the court reporter a
10    document which I've asked her to mark as
11    Exhibit 234.  I've handed a copy to your counsel.
12    It is a document that at the top says Parexel
13    International and below that on the left-hand side
14    it has your name.
15              Do you recognize Exhibit 234?  While you're
16    reviewing it, it bears the document control numbers
17    of PAR13198-13201?
18       A.   Yes, I do recognize this document.
19       Q.   What is Exhibit 234?
20       A.   This is my C.V.
21       Q.   Did you prepare Exhibit 234?
22       A.   Yes, I prepared it.  I did it, and obviously
23    put it together and I had provided it when requested.
24       Q.   So you wrote all the words in Exhibit 234,
25    correct?
```

Page 44

1      A.    Yes.

2      Q.    And Exhibit 234 correctly sets forth the

3  titles and positions that you've held at Parexel; is

4  that correct?

5      A.    Correct.

6      Q.    On your resume you list the position of

7  associate manager, clinical operations, Parexel

8  International Corporation.   Do you see that on

9  page 1 of Exhibit 234?

10      A.    Yes.

11      Q.    Would you consider that position that you

12  held as a position where you're fulfilling the role

13  as a line manager for Parexel?

14      A.    Yes.

15      Q.    So if I refer to that, to the position as

16  line manager, you'll understand what I mean,

17  correct?

18      A.    Yes.

19      Q.    During the time that you were a line

20  manager at Parexel, and it states here from

21  December 15th, it says current?

22      A.    I'm noticing an error here.   I need to

23  update it.

24      Q.    The lower right hand corner says C.V.

25  version date 01 January 2018.   Do you see that?

Page 45

1       A.    Yes.

2       Q.    Does that indicate that it was created that

3   day, or what does that refer to?

4       A.    That is the date that -- yes, I had created

5   it.

6       Q.    There is an effective date also in the

7   lower left hand footer of Exhibit 234 that says

8   "effective date 31 May 2017."   Does that refer to

9   May 31, 2017?

10      A.    Yes.

11      Q.    What does that refer to, the effective

12  date?

13      A.    That is the effective date for the C.V.

14  template.

15      Q.    So was the associate manager title that you

16  held in -- first held in 2015, was that the first

17  time you were employed as a line manager at Parexel?

18      A.    Yes.

19      Q.    Was there training that you had to go

20  through to become a line manager at Parexel before

21  you assumed the line manager position in

22  December 2015?

23           MS. TABACOPOULOS:  Objection, overbroad,

24  vague.

25           THE WITNESS:  There was no specific line

                                        Page 46

1    you're referring to?

2        A.   Yes.

3        Q.   I think you produced some documents

4    reflecting it, but when you have a session with a --

5    in the past when you had CRA's and CMA's reporting

6    to you and you had a direct session with a CRA or

7    CMA, they were reported somewhere at Parexel; is

8    that correct?

9            MS. TABACOPOULOS:   Objection, vague and

10   ambiguous.

11   BY MR. KEEGAN:

12       Q.   If you set up a meeting with a CRA or CMA,

13   that's recorded somewhere, right?   I think you

14   produced some documents reflecting those trainings?

15       A.   Only personal one-on-one meeting notes, but

16   they aren't recorded in an LMS or any type of system.

17   I think each manager has their own way of documenting

18   their meetings with their staff.

19       Q.   But during the time that you were a line

20   manager, you documented your one-on-one meetings; is

21   that correct?

22       A.   Yes.

23       Q.   And, in fact, some of those meetings with

24   Dexter Pasis have been produced; is that correct?

25       A.   Yes.

Veritext Legal Solutions
866 299-5127

```
 1        A.   Yes.
 2        Q.   And those trainings that were required,
 3   those would have been recorded in the LMS system,
 4   correct?
 5        A.   Yes.
 6        Q.   How were you compensated in your position
 7   when you held it as a clinical trial specialist or
 8   CTS, were you paid hourly or salary?
 9        A.   I believe I was paid hourly.
10        Q.   Prior to serving in the position of
11   clinical trial specialist, you were a clinical
12   research associate or CRA with Parexel; is that
13   correct?
14        A.   Yes.
15        Q.   And prior to becoming a CRA at Parexel, you
16   took specific trainings in order to become a CRA; is
17   that correct?
18        A.   Yes.
19        Q.   And those trainings would have been
20   recorded in the LMS; is that correct?
21        A.   Yes.
22        Q.   And how were you paid -- your resume
23   indicates that you were -- you served or were
24   employed in the job position of clinical research
25   associate from May 2010 through June of 2011; is
```

Page 51

1    that correct?

2        A.   Yes.

3        Q.   And how were you compensated as a CRA from

4    May 2010 to June 2011?

5             MS. TABACOPOULOS:   Objection to the

6    relevance, outside the class period.

7             THE WITNESS:   I believe I was salaried.

8    BY MR. KEEGAN:

9        Q.   And after you held the position of clinical

10   trial specialist, you became a clinical monitoring

11   associate, level 2; is that right?

12       A.   Correct.

13       Q.   And how long did you serve in that

14   position, CMA 2 position?

15       A.   About 3 to 4 years.   I can look.

16       Q.   Your recollection is fine.   When you

17   transitioned from CTS to CMA 2, did you have to take

18   any specific training to become -- that was required

19   that you take before you became a CMA?

20       A.   Yes.

21       Q.   What types of trainings did you take?   Did

22   you go spend a week, did you have a week long

23   training session or maybe more prior to becoming

24   CMA 2 after you were a CTS?   Did you start with the

25   onboarding training?

1      A.    Yes, I believe they sent me back to R2P for

2   about a week and a half.

3      Q.    So you had to take the onboarding training

4   when you first became a CRA before you held the CTS

5   position?

6      A.    Yes.

7            MS. TABACOPOULOS:   Objection, vague.

8   BY MR. KEEGAN:

9      Q.    And after you were a CTS and before you

10  became a CMA, you took -- you repeated and did

11  another onboarding, might have changed obviously

12  over the time, but you took onboarding again; is

13  that correct?

14           MS. TABACOPOULOS:   Objection, vague.

15           THE WITNESS:   Yes.

16  BY MR. KEEGAN:

17     Q.    How many studies were you assigned to when

18  you were a CMA 2 when you first became employed?

19  Were you assigned to more than one study?

20           MS. TABACOPOULOS:   Objection, vague.

21           THE WITNESS:   No, I was only assigned to

22  one.

23  BY MR. KEEGAN:

24     Q.    Do you recall the name of that study that

25  you were assigned to?

                                        Page 53

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    BY MR. KEEGAN:

2        Q.   She's not instructing you not to answer.

3    What's the name of the study that you were assigned

4    to?

5        A.   The name of the study was Summit.

6            MS. TABACOPOULOS:  I want to be sure this

7    portion is confidential.

8            MR. KEEGAN:  Sure.

9    BY MR. KEEGAN:

10       Q.   Other than the Summit study, were you

11   assigned any other studies when you worked as a

12   CMA 2 at Parexel?

13       A.   No, I only worked on -- actually, let me --

14   no, I was right the first time.  Just the one.

15       Q.   So just so the record is clear, so during

16   the entire time that you worked as a CMA 2 at

17   Parexel, you were only assigned and worked on the

18   Summit study; is that correct?

19       A.   Correct.

20       Q.   Did you take studies specific trainings

21   regarding the Summit study during the time that you

22   were a CMA?

23       A.   Yes.

24       Q.   And those would be recorded in the LMS

25   system; is that correct?

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1           MR. KEEGAN:  So you're instructing her not

2      to answer?

3           MS. TABACOPOULOS:  We'll take this question

4      up later after we've had a chance to meet and

5      confer.

6           MR. KEEGAN:  But right now you're

7      instructing her not to answer?

8           MS. TABACOPOULOS:  Yes, I think we should

9      move on.

10     BY MR. KEEGAN:

11          Q.   You're going to follow your attorney's

12     advice at this time?

13          A.   I'm going to follow Parexel's counsel's

14     advice, yes.

15          Q.   So other than the two co-monitoring SWAT

16     visits, was the rest of the time you were employed

17     as a CMA 2 for Parexel you were performing remote

18     site monitoring?

19          A.   Remote site management, yes.

20          Q.   What kind of -- what phase was the Summit

21     study in during the time that you worked on the

22     Summit study as a CMA 2?

23          A.   I believe it was Phase 3.

24          Q.   Let me ask this another way, so other than

25     the two SWAT co-monitoring visits, did you ever

Page 61

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    visit any site in-person during the time that you

2    were employed as a CMA 2?

3        A.   No.

4        Q.   Who did you directly report to when you

5    were a CMA 2 at Parexel?

6        A.   The last one I remember was Tom Winters.

7        Q.   Would that have been in the calendar year

8    of year of 2015 when you reported to Tom Winters?

9        A.   Yes.

10       Q.   What was Tom Winters' position at Parexel

11   when you reported to him?

12       A.   He was a manager of clinical operations.

13       Q.   When you were employed as a CMA 2, did you

14   work at home or did you work at one of Parexel's

15   offices?

16       A.   I worked from home.

17       Q.   During the entire time you were a CMA 2,

18   did you work from home?

19       A.   Yes.

20       Q.   And you were compensated on a salary basis

21   when you held the position of clinical monitoring

22   associate 2; is that correct?

23       A.   Yes.

24       Q.   When you were a CMA 2, where would you

25   record the time that you worked in Parexel systems?

Page 62

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1      A.   We have -- I'm blanking on the name, but it

2  is the time system where we would record our time

3  spent on each type of task.

4      Q.   And is the acronym for the time system TIME

5  actually?  There's been some testimony on that.

6      A.   I believe so.  Right off the top of my head,

7  I can't remember, but I know when I look on the

8  Parexel home page, it says "TIME."  So I go there.

9      Q.   Do you record your time in the TIME system

10  on the Parexel VPN that you were describing in your

11  answer currently, do you do that currently?

12      A.   Currently, yes.

13      Q.   When you worked as a CMA 2, did you utilize

14  that same time recording system in Parexel?

15      A.   Yes, I believe it was the same system.

16      Q.   When you were a CMA 2, were you assigned a

17  credit card for expenses in any way?

18      A.   No.

19      Q.   When you were a CRA, were you assigned a

20  credit card for your expenses for your on-site

21  monitoring visits?

22      A.   Yes.

23      Q.   Where would you record your expenses when

24  you were a CRA?

25      A.   When I was a CRA, it was a different system.

Page 63

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1     required to input their expenses in the Concur

2     system?

3          A.    Yes, business related expenses.

4          Q.    After you held the position of CMA 2

5     position and you assumed the senior clinical

6     monitoring associate position -- is that correct,

7     that was your next position at Parexel?

8          A.    Yes.

9          Q.    And was that a promotion?

10         A.    Yes, that was a promotion.

11         Q.    Did it come with an increase in pay?

12         A.    I don't remember.

13         Q.    Did you report to somebody differently when

14    you assumed the title of Senior CMA?

15         A.    No.

16         Q.    Did you continue to work on the Summit

17    study when you were employed as a Senior CMA?

18         A.    Yes.

19         Q.    Did you work on any other studies other

20    than the Summit study when you were a Senior CMA?

21         A.    No.

22         Q.    Did your duties and responsibilities change

23    as a result of the change in job title of Senior

24    CMA?

25              MS. TABACOPOULOS:   Objection, vague,

                                              Page 65

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

 1    overbroad.

 2              THE WITNESS:  Can you say that question one

 3    more time.

 4    BY MR. KEEGAN:

 5        Q.   Sure.  Did your duties and responsibilities

 6    change after you transitioned from the job position

 7    of CMA 2 to Senior CMA?

 8        A.   No.

 9        Q.   So did you directly report to Mr. Winters

10    the entire time that you were employed as a Senior

11    CMA?

12        A.   Yes.

13        Q.   And when you worked as a Senior CMA, did

14    you work also from home?

15        A.   Yes.

16        Q.   And that was during the entire time you

17    were a Senior CMA, you worked from home?

18        A.   Yes.

19        Q.   Did you have to take any additional

20    trainings prior to becoming a Senior CMA?

21        A.   No.

22        Q.   And during the time that you worked as a

23    CMA 2 and a Senior CMA, you would continuously

24    during that time period receive study specific

25    trainings over the time; is that correct?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1           MS. TABACOPOULOS:   May I hear that back

2    please.

3                   (Record read).

4           MS. TABACOPOULOS:   Objection, vague.

5    Overbroad.

6    BY MR. KEEGAN:

7        Q.   Do you understand my question?

8        A.   I do.  So yes.

9        Q.   And the study specific training you would

10   receive, was it regarding the Summit study, correct?

11       A.   Yes.

12       Q.   After you were employed in the position of

13   Senior CMA, your next position at Parexel was

14   associate manager, clinical operations, Parexel

15   International Corporation; is that correct?

16       A.   Correct.

17       Q.   When you were first -- when you first

18   became -- we refer to that as line manager, right?

19       A.   Yes.

20       Q.   When you first became a line manager at

21   Parexel, how many persons were assigned to directly

22   report to you?

23       A.   12.

24       Q.   Were they all assigned to the same study?

25       A.   No.

Page 67

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1          MS. TABACOPOULOS:  Objection, vague.

2     BY MR. KEEGAN:

3          Q.   What job positions did the 12 persons

4     directly assigned to you, when you first became a

5     line manager, what positions did they hold?

6          A.   All of them were CMA 1's or clinical

7     monitoring associate 1's.

8          Q.   And they all worked on different studies,

9     is that accurate or not more than one study?  Do you

10    understand my question?

11         A.   I do.  I'm thinking.  For the most part

12    everyone was on a different study.

13         Q.   Were there any persons assigned to you that

14    were working on the Summit study?

15         A.   No, thankfully that study was done by the

16    time I was a manager.

17         Q.   Do you recall names of any of the persons

18    first assigned to you when you took the position of

19    line manager?

20         A.   I do recall most of them.

21         Q.   Can you please state their names for the

22    record?

23         MS. TABACOPOULOS:  Same objection, we'll

24    take this up later.

25    BY MR. KEEGAN:

Page 68

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    Q.   And you're going to follow your counsel's

2    recommendation, correct?

3    A.   I will.

4    Q.   When you were first -- when you first

5    became a line manager at Parexel, what were your

6    duties and responsibilities?

7    A.   Well, when I first became a manager, the

8    staff that I had were all CMA 1's and so part of what

9    I did, in addition to normal line manager duties, was

10   additional support and additional training for those

11   who were newer.

12        Along with that, it is meeting with them on

13   a regular basis -- meeting with my staff on a regular

14   basis to review the general performance, review and

15   evaluate their performance.  Review any expense

16   reports, time sheets for their metrics, resourcing.

17   That's all I can think of at the moment.

18   Q.   That's fine.  In your response you said you

19   were listing things in addition to the regular line

20   manager duties and responsibilities, correct?

21   A.   Correct.

22   Q.   And just for the record, can you explain

23   what are the regular line manager duties and

24   responsibilities when you first held the position?

25   A.   Besides the additional training for much

Page 69

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    more newer experienced staff, which require much more

2    time, it's everything that I had stated before

3    performance reviews, valuations, insuring they're

4    basically doing what is expected of them for their

5    role, metrics, time sheets, expense reports,

6    resourcing onto studies.  That's it right now.

7         Q.   In your prior response you were talking

8    about that you would meet with your direct reports

9    on a regular basis, correct?

10        A.   Yes.

11        Q.   And what was the frequency that you were

12   meeting with your direct reports?

13             MS. TABACOPOULOS:  Objection, overbroad.

14             THE WITNESS:  It depends.  It depended on

15   the person.

16   BY MR. KEEGAN:

17        Q.   Did you have a rule of thumb when you would

18   meet with your direct reports?

19             MS. TABACOPOULOS:  Objection, vague.

20             THE WITNESS:  One that I personally set?

21   Yes.

22   BY MR. KEEGAN:

23        Q.   What was that?

24        A.   If they were newer, then I would meet with

25   them once a week or more if needed.  If they were

Page 70

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    experienced, I would meet with them at least monthly

2    unless they would like additional meetings.

3        Q.   And the meetings in your response were

4    one-on-one meetings, correct?

5        A.   Correct.

6        Q.   And were you recording -- were you

7    recording those one-on-one meetings in the Microsoft

8    One Note program back when you started as a line

9    manager?

10        A.   Yes, I was documenting them in there.

11        Q.   In your response you also mentioned

12    reviewing expense reports.  Would CMA 1's have

13    expense reports that you would need to review?

14        A.   Yes.

15        Q.   What types of expense reports would those

16    be?

17        A.   They had all gone out to RPT for training.

18    They all had expense reports when they came back.

19        Q.   Other than expenses incurred for the RPT

20    training, would CMA's have any other expenses that

21    they review reporting to Parexel --

22            THE REPORTER:  I didn't hear you.

23            MR. KEEGAN:  Let me restate it.

24    BY MR. KEEGAN:

25        Q.   Other than the RPT training expenses that

Page 71

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1          MS. TABACOPOULOS:  Objection, overbroad,

2     misstates the witness' testimony.

3          THE WITNESS:  For the specific CMA 1's when

4     I initially managed?  Yes.

5     BY MR. KEEGAN:

6          Q.   And all their expenses would be recorded in

7     a system, in the Concur system at Parexel, correct?

8          A.   For what they reported.

9          MS. TABACOPOULOS:  Excuse me.  Can you

10    repeat the question, please?

11               (Record read).

12         MS. TABACOPOULOS:  I'm going to object that

13    it's overbroad and vague.

14    BY MR. KEEGAN:

15         Q.   In your prior response of what your duties

16    and responsibilities were as a line manager when you

17    began your employment as a line manager with

18    Parexel, you stated you would review time sheets; is

19    that correct?

20         A.   Yes.

21         Q.   And where did the CMA 1's, where would they

22    record their time when you started as a line

23    manager?  Was it also in the TIME system that you

24    utilized?

25         A.   Yes, it's the same system that I use.

Page 74

1    Q.   And how would you review their time sheets,

2  what was the process?

3    A.   I would go into the time system.  I would be

4  able to see where they billed their time to, I would

5  look for any outliers, any red flags, and if there

6  are none, I would approve it.

7    Q.   So during the time that you worked as a

8  line manager at Parexel, you would be responsible

9  for approving timecards; is that correct, for your

10  direct reports?

11    A.   Yes, for my direct reports.

12    Q.   How many hours a week would you spend

13  reviewing expense reports for CMA's when you first

14  started as a line manager?

15          MS. TABACOPOULOS:  Objection, vague as to

16  time.

17          THE WITNESS:  Not long.

18  BY MR. KEEGAN:

19    Q.   It would be less than an hour a week?

20    A.   I only reviewed time sheets the day that

21  they are due, so it's not a weekly event.  They're

22  due twice a month.  I review them that day.  It takes

23  less than 30 minutes.

24    Q.   And expense reports, how often would you be

25  reviewing expense reports on a monthly basis for

Page 75

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1      Q.    If a CMA ever went on an observation visit,

2   that would be recorded at Parexel in some way,

3   correct?

4           MS. TABACOPOULOS:   Objection, overbroad.

5           THE WITNESS:   In some way, yes.

6   BY MR. KEEGAN:

7      Q.    Were they required after an observation

8   visit to prepare a report?

9      A.    Not an official one.

10     Q.    So the recording of their expense of going

11   out to an on-site visit, that would be a record

12   showing that they went on an observation visit; is

13   that correct?

14     A.    Yes.

15     Q.    Other than the expense report, would it be

16   recorded at Parexel in any other way when a CMA went

17   on an observation visit?

18     A.    Yes.

19     Q.    In what other way would it be recorded?

20     A.    Whenever there is a Parexel staff member

21   that goes on-site, they need to sign the log on-site

22   that they were present.   In addition to that, the

23   person who was writing the official report for the

24   site visit should put in the narrative that they were

25   accompanied by an observer.

Page 78

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1   Q.   The visit log you're referring to in your

2   response, that's at the site, correct?

3   A.   Correct.

4   Q.   And that would be recorded in another

5   system, correct?

6   A.   We collect that document and we store it in

7   our file system.

8   Q.   For the record, what's the name of the

9   central file system where it would be recorded?

10   A.   PMED.

11   Q.   During the time you held the associate

12   manager position, were you ever assigned contract

13   CRA's?

14           MS. TABACOPOULOS:  Objection, vague.

15           THE WITNESS:  No.

16   BY MR. KEEGAN:

17   Q.   Were you ever assigned any contracted CMA's

18   during the time you were employed as an associate

19   manager?

20           MS. TABACOPOULOS:  Objection, vague.

21           THE WITNESS:  No.

22   BY MR. KEEGAN:

23   Q.   So during the time that you were employed

24   as an associate manager, were all your direct

25   reports employees of Parexel?

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1      BY MR. KEEGAN:

2          Q.    In a prior response, you mentioned one of

3      the duties and responsibilities that you have as a

4      line manager when you held the position of associate

5      manager is reviewing metrics for your direct

6      reports, is that accurate?

7          A.    Yes.

8          Q.    What were you referring to, what metrics

9      were you referring to?

10         A.    They are performance metrics for the role.

11         Q.    During the time you've held the position

12     associate manager, was there a particular metric of

13     how many days on-site CRA's would have to be

14     on-site?  Did they have a particular on-site metric?

15         A.    For CRA's, yes.  There is a metric for the

16     number of visits.

17         Q.    During the time you held the associate

18     manager position, what was the number of visits

19     CRA's had to have on a monthly basis?

20              MS. TABACOPOULOS:  Overbroad.

21              THE WITNESS:  The number of visits expected

22     was eight.

23     BY MR. KEEGAN:

24         Q.    How would you keep track of the number of

25     visits -- strike that.  The number of visits, eight,

Page 85

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1      was on a monthly basis, correct?

2          A.    Correct.

3          Q.    Did CMA's have a metric for how many visits

4      they had to accomplish in a month?

5              MS. TABACOPOULOS:  Objection, lacks

6      foundation assumes facts not in evidence.

7              THE WITNESS:  No, not for CMA's.

8      BY MR. KEEGAN:

9          Q.    What kind of performance metrics did CMA's

10     have during the time that you held the position of

11     associate manager?

12         A.    CMA's, the main performance metrics were,

13     for the number of contacts, needed to be according to

14     what was outlined in the monitoring plan, the

15     timeliness of those contacts, the issue resolution at

16     their assigned sites.

17             We have a metric for when they should be

18     closed.  For CMA's working in study start up, we have

19     study start up metrics.  Other metrics that are not

20     necessarily study related would be timely time sheet

21     completion, expense report submission, LMS

22     completion, contacts and recruitment.

23         Q.    And by recruitment, what did you mean?

24         A.    So we have a metric -- performance metric

25     regarding the number of planned versus the number of

                                           Page 86

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1        A.    Correct.  Oh.

2        Q.    Are you recalling an additional metric?

3        A.    An additional one.  It's the reports.  There

4   is a time frame for draft and finalization of

5   reports, including the number of review cycles that

6   it goes through.

7        Q.    What were they for the CRA's that report

8   metrics for reports that you just mentioned?

9        A.    So site visit report drafts are to be

10  submitted within five days of the site visit and

11  finalized within ten days of the site visit.  A

12  performance metric, as I talked about before, is the

13  number of review cycles and we would like to keep

14  that under two.

15            THE REPORTER:  I can't hear you.

16            THE WITNESS:  1 to 2 cycles is the

17  expectation.

18  BY MR. KEEGAN:

19       Q.    And the reports you're talking about the

20  four types of monitoring or site visit reports,

21  qualification, initiation, monitoring and

22  termination sites, correct?

23       A.    Yes.

24       Q.    Types of visits I should say, is that more

25  accurate?

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1          MS. TABACOPOULOS:  Overbroad.

2          THE WITNESS:  The main type is the site

3    management contact.  There are remote visits which

4    CMA's can do and those are a different kind.

5    BY MR. KEEGAN:

6        Q.   And the remote visits, are those to CRA'S

7    also to your remote visits as well?

8        A.   They can.

9        Q.   Who typically does the remote visit, using

10   your term?

11         MS. TABACOPOULOS:  Overbroad, vague.

12   BY MR. KEEGAN:

13       Q.   What job duties?

14       A.   I would say both of them can do it.  Both of

15   them have done it.

16       Q.   And the site management contacts, once a

17   CMA does a site management -- has a site management

18   contact, they're required to do a site management

19   contact report; is that correct?

20         MS. TABACOPOULOS:  Vague and ambiguous.

21         THE WITNESS:  No.

22   BY MR. KEEGAN:

23       Q.   It's not a report, what is it?  They have

24   to complete a site management contact form?

25       A.   So the site management contact is not as

Page 90

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1        structured as a report is, so the contact could be

2        free-form narrative box where the CMA could document

3        what was discussed and not necessarily go through a

4        report format.

5             Q.    Was there a metric on repairing site

6        management contact recordings, some sort of

7        document?   I'm going to show you a giant stack of

8        the site management contact reports that Dexter

9        Pasis completed.   So was there a certain metric on

10       when those needed to be put into the system at

11       Parexel?

12            A.    So there were two associated with that.   One

13       is compliance to monitoring plan in terms of the

14       frequency of facts.   Two is the timeliness of those

15       contacts.

16            Q.    So the stack of site management contacts

17       that I have in front of me, where are they recorded

18       on the Parexel system, is that in the PMED system as

19       well?

20            A.    They can be stored in PMED.

21            Q.    Are they stored anywhere else?

22            A.    They are recorded in Impact Harmony.

23            Q.    Is that referred to as IH sometimes at

24       Parexel?

25            A.    Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    Q.   And is IH a CTMS system?

2    A.   Yes.

3    Q.   So any of the remote contact documents or

4  reports -- I'm using the word report, but any form

5  that is filled out by a CMA would be recorded on the

6  CTMS system for whatever particular study it's on;

7  is that correct?

8    A.   Yes.

9    Q.   And the PMED system is Parexel's own CTMS

10 system, correct?

11   A.   No.

12        MS. TABACOPOULOS:  Objection, lacks

13 foundation.

14 BY MR. KEEGAN:

15   Q.   I'm sorry, the Impact Harmony is Parexel's

16 CTMS system, correct?

17   A.   Correct.

18   Q.   Although I think you said you don't review

19 sponsor agreements, sometimes studies utilize

20 another company's CTMS system, is that true on some

21 occasions?

22   A.   I haven't experienced that myself.

23   Q.   So all the studies assigned to your direct

24 reports is always utilize Parexel CTMS system; is

25 that accurate?

Page 92

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1       A.   Yes.

2       Q.   During the time that you worked as a CMA

3   for Parexel, you utilized the Parexel CTMS system as

4   well, correct?

5       A.   Yes.

6       Q.   And during the time that you worked as a

7   clinical trial specialist, you used Parexel's CTMS

8   system as well, correct?

9       A.   Yes.

10      Q.   During the time that you worked as a

11  clinical research associate for Parexel, you

12  utilized Parexel's CTMS system as well, correct?

13      A.   Yes.

14      Q.   And the CRA reports that have the metrics

15  of five days, the reports have to be complete in

16  five days and finalized within ten.  You don't

17  approve those reports, correct, as an associate

18  manager at Parexel?

19      A.   I don't review them in that capacity, no.

20      Q.   And you don't approve CRA reports either,

21  correct?  You don't review them, you don't approve

22  them, correct?

23      A.   I don't approve them, and I don't review

24  them in a way that a study reviewer does.

25      Q.   And what's the purpose of your review of

Page 93

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, MARCH 14, 2018

2                        1:20 P.M.

3

4                  EXAMINATION (RESUMED)

5

6    BY MR. KEEGAN:

7         Q.   Do you understand you're still under oath?

8         A.   Yes.

9         Q.   Before the lunch break, we were talking

10   about the metrics that CMA's and CRA's assigned to

11   you, you would measure the performance by.  I'm

12   going to hand a document to the court reporter that

13   I intend to mark as the next exhibit in line,

14   Exhibit 235.  It is a single page document that's

15   been stamped or marked with the document control

16   number of PAR 13213.

17             (The document referred to was marked

18   by the reporter as Exhibit 235 for identification

19   and is attached hereto).

20   BY MR. KEEGAN:

21        Q.   I'm handing a copy to your counsel.  Do you

22   recognize Exhibit 235?

23        A.   Yes.

24        Q.   What is Exhibit 235?

25        A.   These are some of the notes that I took for

                                          Page 101

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    a one-on-one.

2        Q.   Was this one-on-one -- can you tell from

3    the document who the one-on-one was with?

4        A.   Yes.

5        Q.   Where is it indicated who the one-on-one

6    was with?

7        A.   It's not indicated anywhere on the document.

8        Q.   Because it's redacted in a couple of

9    places, but as produced to me, it's dated April 29,

10   2016, correct?

11       A.   Correct.

12       Q.   Who is this one-on-one with?

13            MS. TABACOPOULOS:  I'll make the same

14   objection on privacy as to the person's name if this

15   is a member of your staff or someone that you

16   manage.

17            THE WITNESS:  Not currently.  It's for

18   Dexter.

19   BY MR. KEEGAN:

20       Q.   That's what I thought these documents were

21   responsive to Dexter.  So this is a document

22   reflecting a one-on-one visit that you had with

23   Dexter Pasis on April 29, 2016, correct?

24       A.   Correct.

25       Q.   There is a section under assigned

Page 102

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1   Q. What document did you copy that table from?

2   A. A variety of reports.

3   Q. Do you recall which reports, the types of

4 reports obviously?

5   A. These are reports that are -- that pull data

6 from the CTMS.  One report is primarily focused on

7 issues.  One report is for contacts.  One report is

8 for LMS not pulled from CTMS.

9   Q. The report regarding issues, what is that

10 called that it was pulled from, that you're

11 referring to in your response?

12   A. The report number, we call them by numbers,

13 is 68.

14   Q. And the contacts report that you're

15 referring to in your response, do you remember what

16 report that is?

17   A. 66.

18   Q. And you pointed to Exhibit 235, the last --

19 second to last column in parens it says "BI66"?

20   A. Correct.

21   Q. What does the BI stand for?

22   A. Business Intelligence.

23   Q. And Parexel, during the time that you

24 worked as an associate manager at Parexel, has had

25 that Business Intelligence database, correct, you've

Page 104

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    utilized the Business Intelligence database during

2    the time you've worked at Parexel?

3            MS. TABACOPOULOS:  Objection, lacks

4    foundation.

5            THE WITNESS:  At the time I was working as

6    an associate manager, yes, I used the Business

7    Intelligence program.

8    BY MR. KEEGAN:

9        Q.   Would you run the reports yourself on

10   Business Intelligence or would you have somebody

11   else do it?

12       A.   I would run them myself.

13       Q.   How would you access the Business

14   Intelligence database, was it through the VPN?

15       A.   Yes.

16       Q.   What part of the VPN, was it called

17   something -- before you said when you were accessing

18   time records, it would have on the web page, it

19   would say "time."  Did it have something like that

20   for the Business Intelligence reports?

21       A.   It says Business Intelligence.

22       Q.   So you would click on, and was your access

23   to Business Intelligence information limited to your

24   direct reports or could you pull BI reports on any

25   CRA, CMA's?

Page 105

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1   and 8, that's all pulled from the LMS system,

2   correct?

3        A.   Yes.

4        Q.   And the second column, which is the only

5   column we haven't specifically discussed, in the

6   first row it says "compliance percentage."  And

7   below that it says Spotfire in parens.  Do you see

8   that?

9        A.   Yes.

10       Q.   What's the reference to Spotfire mean?

11       A.   I'm a little fuzzy on Spotfire.  I want to

12  say that it is a software program because I know that

13  there are multiple types of Spotfire, but for

14  compliance percentage Spotfire, I'm looking at the

15  Spotfire that focuses on compliance percentage.

16       Q.   So the compliance percentage referenced in

17  the column 2, what is that referring to?

18       A.   That refers to compliance in IH for various

19  information.

20       Q.   Do you know specifically what information

21  compliance is referring to in IH?

22       A.   It's different for different roles.

23       Q.   For Dexter Pasis's role in this instance,

24  what is it referring to, if you know?

25       A.   In this instance for Dexter at this time,

Page 118

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    the compliance would focus on IH event dates for his

2    study, assigned study sites and PMED compliance.

3        Q.   Did you use the information in column 2 to

4    evaluate Dexter's performance?

5        A.   Yes.

6        Q.   And how did you use it?

7        A.   Well, there is a certain percentage that

8    we're looking for to have them stay compliant above,

9    and that that is pretty consistent overall, so that

10   really shouldn't change too much over time.   The

11   expectation is that they stay above 95%.

12       Q.   And the information that was pulled from

13   the LMS system in the 7th and 8th columns, did you

14   use that information to evaluate Dexter's

15   performance?

16       A.   For LMS, yes.

17       Q.   Was there an expectation of completion

18   either in metrics or a recommendation of some sort

19   that CMA's are required to meet?

20       A.   I can't remember precisely, but it's either

21   95 or higher for sure.

22       Q.   Other than the information reflected in

23   column 7 and 8 from the LMS system, would you

24   utilize any other information from the LMS system to

25   evaluate CRA's and CMA's that directly reported to

Page 119

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1      you when you worked as an associate manager?

2              MS. TABACOPOULOS:  Overbroad, vague.

3              THE WITNESS:  Can you clarify that further,

4      is it only for the LMS system?

5      BY MR. KEEGAN:

6          Q.   I'm just wondering if there is any other

7      information in the LMS system that you would utilize

8      in order to evaluate performance of the CMA's and

9      CRA's that directly reported to you, other than what

10     appears in this table during the time that you

11     worked as an associate manager?

12         A.   No.

13             MR. KEEGAN:  Let me hand you a document.

14             (The document referred to was marked

15     by the reporter as Exhibit 69B for identification

16     and is attached hereto).

17             MR. KEEGAN:  This is 69b.

18     BY MR. KEEGAN:

19         Q.   So I've handed the court reporter to mark a

20     document that I'm identifying and marking as

21     Exhibit 69b to your deposition.  It is a multi-page

22     document marked with the document control numbers of

23     LANGLEY00019-31.  At the time top right hand corner

24     of the document it states Regulatory Transcript.

25     Below that it says source systems, sum total

                                              Page 120

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    reported to you during the time you worked as an

2    associate manager?

3         A.   No, I have not pulled a report.

4         Q.   Were you able to view on the LMS system the

5    times when CRA's and CMA's began trainings and when

6    they completed trainings during the time that you

7    worked as an associate manager?

8         A.   Yes.

9         Q.   So you had access to that type of

10   information.  Did you ever do that in order to

11   evaluate or instruct CRA's or CMA's?

12        A.   Instruct?

13        Q.   Or council them on their performance?  Did

14   you ever use that type of information when they

15   started and completed their trainings?

16        A.   No, I have not used the transcript to go

17   over performance whether or not -- when they started

18   and completed their trainings.

19        Q.   So the information that you would typically

20   utilize to evaluate performance would be the types

21   of information that's in columns 7 and 8 on 235; is

22   that correct?

23        A.   So this is what is listed in the notes, and

24   what is listed in the transcript is different in

25   terms of where that percentage is being pulled.

Page 122

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    The transcript shows everything completed.

2    The percentage looks at the to-do list and everything

3    that is expected to be completed.

4        Q.   And the to-do list would be trainings

5    pushed or assigned to the CRA's and the CMA's that

6    haven't been completed yet?

7        A.   Correct.

8        Q.   Is Exhibit 235 -- I'm going back to 69B,

9    but the prior exhibit, is that a genuine and correct

10   copy of your One Notes?  Not this one, I'm talking

11   about 235.

12       A.   Yes.

13            MR. KEEGAN:  I'm going to hand the court

14   reporter another document that I'm going to mark as

15   Exhibit 236.

16            (The document referred to was marked

17   by the reporter as Exhibit 236 for identification

18   and is attached hereto).

19   BY MR. KEEGAN:

20       Q.   This is a one page document with the

21   document control number PAR 13212.  I'm handing a

22   copy to counsel as well.  You can take as much time

23   as you need, but do you recognize Exhibit 236?

24       A.   Yes.

25       Q.   Did you create Exhibit 236 on the -- using

Page 123

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    Microsoft One Note?

2        A.    I did.

3        Q.    And is this -- does Exhibit 236 relate to a

4    one-on-one that you had with Dexter Pasis?

5        A.    Yes.

6        Q.    And that occurred on May 13, 2016?

7        A.    Yes.

8        Q.    And there is a time underneath the date on

9    the upper left-hand corner.  It says 11:42 a.m.  Do

10   you see that?

11       A.    Yes.

12       Q.    What does that time reference indicate to

13   you?

14       A.    Usually when I create a new page in One Note

15   it automatically pulls up time.

16       Q.    Is Exhibit 236 a true and correct copy?

17       A.    As far as I'm aware, yes.

18             MR. KEEGAN:  I'm going to hand another

19   document to the court reporter and instruct her to

20   mark it as 237.  Exhibit 237 is a two-page document

21   bearing the document control numbers of PAR

22   13208-209.

23             (The document referred to was marked

24   by the reporter as Exhibit 237 for identification

25   and is attached hereto).

Page 124

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    BY MR. KEEGAN:

2         Q.   Do you recognize Exhibit 237?

3         A.   Yes.

4         Q.   What is Exhibit 237?

5         A.   It is another set of meeting notes.

6         Q.   Is Exhibit 237 a document you created on

7    the Microsoft One Note program?

8         A.   Yes.

9         Q.   Does this document, Exhibit 237, reflect a

10   meeting that you had with Dexter Pasis on June 13,

11   2016?

12        A.   For the most part, yes.

13        Q.   In your response you said "for the most

14   part."  What else does it reflect then?

15        A.   My newness to the rule.

16        Q.   Why do you say that?

17        A.   I'm still a new LM around this time, and

18   from the way I write my notes now and the way I keep

19   track of things is completely different.

20        Q.   Under the quality issue statement of this

21   Exhibit 237, the last sentence says "submitting to

22   reviewer 6-13-2016."  Do you see that?

23        A.   Yes.

24        Q.   Do you know what that's referring to?

25        A.   Yes, that means we would have to back up to

                                        Page 125

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    the previous sentences.  We have a process where

2    Parexel would need to approve an ICF before the site

3    can use it, and in this instance, that was not done.

4    It's something that appears, according to these

5    notes, that Dexter was letting me know that that had

6    happened and that he was submitting it to the

7    reviewer that day.

8        Q.   And the ICF reference, for the record, what

9    does that stand for?

10       A.   Informed consent form.

11       Q.   And submitting it to the reviewer, do you

12   know who he was submitting it to?

13       A.   I don't know the reviewer.

14       Q.   Do you know what the job title was of the

15   reviewer?

16       A.   That would have been a clinical trial

17   specialist.

18       Q.   Is Exhibit 237 a true and correct copy of

19   your notes?

20       A.   Yes.

21            MR. KEEGAN:  Let me mark as Exhibit 238 a

22   two page document I'm going to ask the court

23   reporter to mark, bearing the document control

24   numbers of PAR 13210-211.  I'm handing a copy to

25   your counsel.

Page 126

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1              (The document referred to was marked

2       by the reporter as Exhibit 238 for identification

3       and is attached hereto).

4       BY MR. KEEGAN:

5           Q.    Do you recognize Exhibit 238?

6           A.    Yes.

7           Q.    What is 238?

8           A.    It's another one of my meeting notes.

9           Q.    Does Exhibit 238 reflect a meeting, a

10      one-on-one meeting you had with Dexter Pasis on

11      June 24, 2016?

12          A.    Yes, for the most part.

13          Q.    And by your response "for the most part,"

14      what do you mean by that?

15          A.    I'm trying to recall how I did things in the

16      past.  I believe from what I remember, I almost had a

17      running list when I was taking meetings, so I would

18      kind of copy and paste things over so that I can see

19      what I discussed the previous time and make sure that

20      I follow up on it and I can tell from here, because I

21      spotted a date issue here or there, that there is

22      newer information, but there's older information that

23      I keep there to follow up on.

24          Q.    But just so it's clear, Exhibit 238 has to

25      do with Dexter Pasis, correct?

                                            Page 127

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1     A.   Yes, these are notes from a one-on-one with

2   him.

3     Q.   So the top part where it says "one-on-one

4   with LM" and above that it says meeting date

5   June 13, 2016, that directly refers to Dexter Pasis,

6   correct?

7     A.   It does.  The only thing I would add to that

8   is some of the information for that specific one

9   would be the actual new information that happened at

10  that meeting.  There is some information that still

11  reoccurred from the previous meeting, but it's more

12  for me to follow up with it.

13    Q.   And was the meeting, the one-on-one that

14  you had with Dexter Pasis on June 24, 2016, was that

15  in-person or by telephone?

16    A.   I cannot remember that.

17    Q.   On the second page of Exhibit 238 there is

18  a bullet point that says "manage contract CRA's."

19  Do you see that?

20    A.   Yes.

21    Q.   It's at the top of the second page?

22    A.   Uh-huh.

23    Q.   What is that referring to?

24    A.   That refers to what he had told me this

25  offer was about and what it did.

Page 128

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
 1          Q.   Referring to "received an offer in-house,

 2     CRA 2 intended to accept"?

 3          A.   Uh-huh.

 4          MR. KEEGAN:  I'm going to ask the court

 5     reporter to mark the next document as Exhibit 239.

 6     It's a three page document bearing the document

 7     control numbers of 13195-13197.  I'm handing a copy

 8     to your counsel.

 9          (The document referred to was marked

10     by the reporter as Exhibit 239 for identification

11     and is attached hereto).

12          MS. TABACOPOULOS:  You keep saying "your

13     counsel."

14          MR. KEEGAN:  You don't need to object.  I

15     automatically say that all the time.  I'm not

16     implying anything.  I'll just say counsel.

17     BY MR. KEEGAN:

18          Q.   Do you recognize Exhibit 239?

19          A.   Yes.

20          Q.   What is Exhibit 239?

21          A.   It was an e-mail sent to me by Jennifer

22     Pathak in February of 2016.

23          Q.   Was this one of the documents you searched

24     for and found?

25          A.   Yes.
```

Page 129

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1      Q.   The second and third pages of Exhibit 239,

2   is that the attachment referenced as an attachment

3   on the first page of Exhibit 239 where it says

4   "Sample site agreement contact template"?

5      A.   Yes.

6      Q.   Is this a true and correct copy of the

7   e-mail that you sent to Jennifer Pathak in the

8   attached document?

9          MS. TABACOPOULOS:   Objection, misstates the

10   record.

11          THE WITNESS:   She sent the document to me.

12   BY MR. KEEGAN:

13      Q.   Is Exhibit 239 a true and correct copy of

14   the e-mail that she sent to you, along with the

15   attachment she sent to you?

16      A.   I believe so.

17      Q.   And you found this on your Outlook computer

18   system, correct?

19      A.   Yes.

20      Q.   Why was Jennifer Pathak sending you a

21   sample management site contact template on

22   February 26, 2016?

23      A.   At that time she was a mentor for some of

24   our newer CMA 1's and so since she was an experienced

25   CMA, we were asking those who have experience to kind

Page 130

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1      A.   I did.  I showed them here is one example of

2    how Jennifer organizes her calls and how she then

3    documents them.

4      Q.   Are there -- during the time that you

5    worked as an associate manager, had there been SOP's

6    in place regarding site management contacts?

7              MS. TABACOPOULOS:  Objection, vague.

8              THE WITNESS:  There are SOP's that

9    reference them.

10              MR. KEEGAN:  I'm going to ask the court

11    reporter to mark as Exhibit 240 to the deposition a

12    two-page document bearing the document control

13    numbers of PAR 001104-05.

14              (The document referred to was marked

15    by the reporter as Exhibit 240 for identification

16    and is attached hereto).

17    BY MR. KEEGAN:

18      Q.   I'm handing a copy to counsel.

19    Exhibit 240, the top of the first page has a title

20    of "Transition Staff," "Transitioning Staff."

21    Sorry.  Do you recognize Exhibit 240?

22      A.   Yes.

23      Q.   What is Exhibit 240?

24      A.   It is a staff transitioning form from

25    Dexter's former line manager to myself.

Page 132

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1        A.    I want to say at least two of them were.

2        Q.    Were the face-to-face -- let me put it this

3    way.

4              At some point of time, Dexter Pasis's

5    position, he worked from home, he transitioned to

6    home base or decentralized, as Parexel calls it.  Is

7    that correct?

8        A.    Yes.

9        Q.    After he transitioned to being a home based

10    CMA, did you ever have a face-to-face one-on-one

11    with him?  I'm just trying to pin down when the two

12    face-to-faces occurred, whether it was in the

13    beginning or at the end or whether you know?

14        A.    I can't remember.  I do remember the first

15    one was face to face.

16        Q.    Other than what's reflected on your notes,

17    can you recall any of the conversations you had with

18    Dexter Pasis at any of the one-on-ones that you had

19    with him?

20        A.    Other than one-on-ones?

21        Q.    No, at the one-on-ones.  Other than what's

22    reflected in your notes, do you recall any substance

23    of any of the conversations you had with Dexter

24    Pasis in any of your one-on-ones?

25        A.    I can remember his personality during them.

Page 137

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1       Certain things that he valued and was aspiring to,

2       and generally seemed like a nice guy to me.

3           Q.   Do you recall any of the words that you

4       spoke to him or words he spoke to you at any of

5       these one-on-ones?

6           A.   There was one one-on-one where he was

7       talking about career development, and usually when

8       that happens, I say well, where do you want to move

9       into, where do you want to go to?

10               He brought up line management.  He said that

11      he had applied and that he did not get the position

12      and he asked me my kind of opinion on that, and I

13      gave him my opinion on that.  And then I encouraged

14      him to keep working at it and to look at other

15      positions that are similar that could help him go

16      into management down the line, if there were no

17      opportunities available at that time.

18          Q.   Do you remember what your opinion was that

19      you referenced in your response?

20          A.   My opinion was that he needed a little more

21      experience with the Parexel systems, processes and

22      general understanding of the role.

23          Q.   And role meaning what, the line manager

24      role that he was applying for?

25          A.   Both.  His current role and line manager

Page 138

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    meetings are for them.

2        Q.   During the time you worked as an associate

3    manager at Parexel, did you have a particular

4    metrics on how many times you would have to meet

5    with your staff on a monthly basis?

6        A.   I believe there was guidance for it, but I

7    don't remember what that was.

8        Q.   Currently do you have any guidance or a

9    metric for how many times you have to meet with your

10   staff on a monthly basis?

11       A.   I believe it's the same guidance out there,

12   but I don't recall what it says, however I tend to

13   meet with my staff more frequently if they're newer,

14   less frequently if they're more experienced.

15            MR. KEEGAN:  I'm going to hand the document

16   to the court reporter and ask her to mark it as

17   Exhibit 241 to your deposition.  It's a document

18   bearing the document control numbers of PAR

19   013202-206.

20            (The document referred to was marked

21   by the reporter as Exhibit 241 for identification

22   and is attached hereto).

23   BY MR. KEEGAN:

24       Q.   I'm handing a copy to counsel.  For the

25   record, Exhibit 241 is a multi-page document with

Page 140

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    what appears to be e-mails to Jason Irvine on

2    February 5, 2016; April 1, 2016; February 5, 2016;

3    April 6, 2016, and February 12, 2016, all of which

4    refer to Dexter Pasis.

5             Do you recognize Exhibit 241 or any of the

6    documents marked in Exhibit 241?

7        A.   I definitely remember the ones that I wrote.

8        Q.   In Exhibit 241, which ones did you write?

9        A.   PAR 103203.

10       Q.   So the second page of Exhibit 241?

11       A.   And then the last page.

12       Q.   And your name is specifically identified on

13   those pages, correct?

14       A.   Correct.

15       Q.   Had you seen the other documents attached

16   as Exhibit 241 before today?

17       A.   I may have glanced at them, but I have not

18   read them in detail.

19       Q.   Are these documents you found for the

20   deposition today?

21       A.   Correct, yes.

22       Q.   And these are the ones you produced today,

23   correct -- or produced to your counsel or Parexel's

24   counsel?

25       A.   Yes.

Page 141

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1       Q.   So this 241, the documents marked as 241,

2    are those true and correct copies that you searched

3    for and found and produced to your counsel for

4    production today?

5       A.   I believe so.

6       Q.   On the second page of Exhibit 241, it says

7    sort of the mid part of the document, the sentence

8    starts:  "100 points have been deposited into your

9    account for immediate use."  Do you see that?

10      A.   Uh-huh.

11      Q.   What is that referring to?

12      A.   Parexel has a recognition program where we

13   provide -- it's one way for us to recognize our staff

14   by giving them points.  They can use those points to

15   obtain items off of the -- I don't know exactly what

16   it's called, but there is a catalog of items that

17   they can use the points to quote, unquote, purchase

18   the items, but they're not paying any money, they're

19   using their points.

20      Q.   Turning to the last page of Exhibit 241

21   which you wrote, correct, this is one that you

22   wrote?

23      A.   Yes.

24      Q.   The next part of the document it says

25   "today, I just wanted to thank" -- strike that.

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    BY MR. KEEGAN:

2        Q.    You understand you're still under oath?

3        A.    Yes.

4        Q.    Prior to the break and during today's

5    deposition, you talk about that CMA's would

6    sometimes attend observation visits.  Do you recall

7    that?

8        A.    Yes.

9        Q.    Would there be a code in the timekeeping

10   system that allowed the CMA to reflect the time that

11   they spend at an observation visit?

12       A.    Yes.

13       Q.    So observation visits attended by CMA's

14   would be reflected in the timekeeping system at

15   Parexel, correct?

16            MS. TABACOPOULOS:  Lacks foundation.

17            THE WITNESS:  Yes.

18   BY MR. KEEGAN:

19       Q.    When you attended assessment site visits

20   with CRA's, would that be reflected in the reports

21   that the CRA's would prepare regarding the visits

22   when you attended with them?

23            MS. TABACOPOULOS:  Objection, vague.

24            THE WITNESS:  Can you specify that a little

25   bit more.

                                    Page 150

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1     BY MR. KEEGAN:

2         Q.    I'm trying to.  If you attended a site

3     visit with a CRA as an assessment visit like you had

4     testified to previously, would the CRA's site visit

5     report reflect your attendance?

6         A.    Yes.

7         Q.    Would it be reflected in any other document

8     or report?

9         A.    The visit log, the site visit log.

10        Q.    You would sign in at the site if you

11    attended, correct?

12        A.    Correct.

13        Q.    And would you keep track in your time -- in

14    the timekeeping system for your time, the times that

15    you spent on assessment site visits?

16        A.    Yes.

17        Q.    And there was a particular code for that

18    for you?

19        A.    Yes.

20        Q.    I'm going to hand you a document that's

21    been produced to me, PDF documents from the reported

22    time period of January 1, 2015 to August 1, 2016,

23    bearing the document control numbers of PAR

24    012988-13169.  I'll ask the court reporter to mark

25    this as Exhibit 242.

                                        Page 151

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1              (The document referred to was marked

2     by the reporter as Exhibit 242 for identification

3     and is attached hereto).

4     BY MR. KEEGAN:

5          Q.   As I stated, Exhibit 242 was produced to me

6     as a single PDF and appears to be a compendium of

7     site visit contacts that Dexter Pasis had during his

8     entire employment with Parexel.  But my first

9     question to you is do you recognize any of the pages

10    contained in Exhibit 242?

11              MS. TABACOPOULOS:  Objection, vague.

12              THE WITNESS:  This is familiar to me, but

13    in a different format.

14    BY MR. KEEGAN:

15         Q.   How is it familiar to you?  Is the

16    information contained in Exhibit 242 familiar?

17         A.   The report -- I'm used to seeing this in a

18    spreadsheet, but these -- there is a report where you

19    can pull all contacts associated with a specific

20    study and that's what this looks like.

21         Q.   And the study, the Parexel study number

22    appearing on the first page of Exhibit 242, do you

23    understand that number is referencing the Marnier

24    study?

25         A.   I believe so.  Let me cross reference it

                                          Page 152

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    with other documents that I have.  I don't remember

2    the number off the top of my head.

3              MS. TABACOPOULOS:  We are still on the

4    confidential portion of the record?

5              THE REPORTER:  We never went off of it.

6              THE WITNESS:  So yes, I recognize that to

7    be the Parexel number for the study you mentioned.

8    BY MR. KEEGAN:

9         Q.   And you mentioned that you're used to

10   seeing this type of information in the spreadsheet;

11   is that correct?

12        A.   Yes.

13        Q.   So just looking at the two first pages of

14   Exhibit 242, which the first page has two rows as

15   well as every other page in the report.  Do the

16   headers appearing in the first row on the first two

17   pages of Exhibit 242, is that consistent with your

18   recollection of the headers of the tables that

19   you're used to referring to?

20        A.   Yes.

21        Q.   And you said this type of report could be

22   generated from Parexel systems; is that correct?

23        A.   It is another Business Intelligence report.

24        Q.   Do you know the name or the number of that

25   Business Intelligence report?

                                        Page 153

1    A.    Not off the top of my head.

2    Q.    Is this a type of report that you could

3    access and generate as a line manager?

4    A.    Yes, there are other roles as well that can

5    access this.

6    Q.    And I didn't mean to say you were the only

7    person, just saying you have access to it, correct?

8    A.    Yes, I have access to this.

9    Q.    And others at Parexel would have access to

10   the same type of report, correct?

11   A.    Correct.

12   Q.    Do you recall preparing this type of report

13   on Dexter Pasis's employment for this case?  You

14   asked to pull this report.  Is this a report that

15   you generated?

16        MS. TABACOPOULOS:  Objection, vague and

17   ambiguous.

18        THE WITNESS:  I provided a report with site

19   contact information regarding Dexter.

20   BY MR. KEEGAN:

21   Q.    Does Exhibit 242 appear to be the report

22   that you prepared?

23   A.    From my recollection, yes.  Not in this

24   form.

25   Q.    Not in a paper format, correct?

Page 154

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1        A.    Not in a paper or PDF format.

2        Q.    But in an Excel spreadsheet, correct?

3        A.    Yes.

4        Q.    So the original source document of 242

5    would be an Excel spreadsheet, correct?

6        A.    Correct.

7        Q.    And do you recall it has a report date of

8    17aug-2017 on the first page of Exhibit 242, do you

9    see that?

10       A.    Yes.

11       Q.    Is that the date that you prepared the

12   report?

13       A.    That is the date I would have run the

14   report.

15       Q.    So what does this report reflect?

16       A.    I'm looking at it.

17       Q.    Sure.

18       A.    It reflects all the contacts that Dexter had

19   attempted and/or completed from the time period of

20   January 1, 2015, to August 1, 2016.

21       Q.    And how did you run the report, in what

22   system did you query and run the report?

23       A.    Business Intelligence.

24       Q.    And you just can't recall the number of the

25   report; is that right?

Page 155

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1        A.    Correct.   It's not a report that I run

2    frequently.

3        Q.    Did anybody assist you in running the

4    report?

5        A.    No.

6        Q.    And so the types of contacts that are

7    contained in Exhibit 242, what would you call these

8    types of contacts?

9        A.    Remote site management contacts.

10        Q.    Could you generate the same type of report

11    for any CMA that was employed at Parexel during the

12    time period that you have worked as a line manager?

13            MS. TABACOPOULOS:   Objection, vague,

14    assumes facts not in evidence, overbroad.

15            THE WITNESS:   Can you clarify that a little

16    bit.

17    BY MR. KEEGAN:

18        Q.    You worked as a line manager essentially

19    from 2016, correct?

20        A.    Correct.

21        Q.    During that time period, could you have run

22    the same type of report on any CMA or any other CRA

23    that directly reported to you on the Business

24    Intelligence system?

25        A.    The report is available to anyone who has

Page 156

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    access to it.

2         Q.   So you can run this type of report on any

3    CMA or CRA employed by Parexel, correct?

4         A.   Correct, it's by study, it's not by person.

5         Q.   But this particular report, these are all

6    of Dexter Pasis's contacts, correct?

7         A.   Correct.

8         Q.   And so you can run a report under a study

9    for a particular person, correct?   A particular CMA

10   or CRA?

11             MS. TABACOPOULOS:   Objection, vague.

12             THE WITNESS:   No, I don't believe so.   You

13   can run a report for the study and have a designated

14   time period.   It has all the information at the top

15   of the column which you can then filter and only

16   look at Dexter's.

17   BY MR. KEEGAN:

18        Q.   So you could run the report and filter it

19   for a particular CMA on a particular study, correct?

20        A.   Right.

21        Q.   During the time that you've worked as a

22   line manager, did CRA's that were direct reports to

23   you, did they prepare remote site management contact

24   reports such as Dexter did, or was that limited to

25   just CMA's?

1    it's an attempt, it will say "attempt."

2        Q.   And this Exhibit 242 would reflect all of

3    the remote site management reports that Dexter

4    prepared during his entire employment at Parexel,

5    because he worked on one particular study; is that

6    correct?

7        A.   Right.

8             MS. TABACOPOULOS:   Objection, lacks

9    foundation.

10   BY MR. KEEGAN:

11       Q.   During his employment with Parexel, did

12   Dexter, during the time he reported to you, did

13   Dexter Pasis prepare any other types of reports,

14   other than what's reflected in Exhibit 242?

15       A.   Not that I'm aware of.

16       Q.   On the first page, second to last column in

17   the first row it says "primary investigator."   What

18   is that referring to?

19       A.   That is the primary investigator at the site

20   for this study.

21       Q.   Is that the -- it's referred to as PI,

22   correct?

23       A.   Correct.

24       Q.   Is that the PI side of the 1572 form?

25       A.   Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    Q.   I don't recall if I asked you this.  Is

2    Exhibit 242, is that a true and correct copy of the

3    report that you pulled on August 17, 2017?

4         MS. TABACOPOULOS:  I'll state for the

5    record it's been redacted.

6    BY MR. KEEGAN:

7         Q.   Other than the redactions?

8         A.   I believe so.

9         Q.   I'm hopeful Parexel didn't edit it in some

10   way, so I believe you, but I don't know, that's why

11   I asked.

12        MS. TABACOPOULOS:  Do I need to respond on

13   the record to that?

14        MR. KEEGAN:  If you want to, I don't care.

15        THE WITNESS:  I mean I'll say that when I

16   say I believe so, because I didn't read every single

17   one of the pages.

18   BY MR. KEEGAN:

19        Q.   Exactly, and it's a huge document.  I'm

20   obviously asking you if you believe it to be true,

21   and I haven't had the electronic copy of the

22   document that you created produced, so until I get

23   that, I won't be able to show you, but it's clearly

24   been redacted.  So it's been edited in that way, but

25   beyond that, if you recognize that to be your

                                        Page 160

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1   report?

2       A.   I do recognize this to be what I provided.

3   It's the redactions.

4       Q.   During your time that you worked as a line

5   manager for Parexel, it's part of your duties and

6   responsibilities to review CRA site visit reports,

7   correct, from time to time?

8       A.   Yes, but in a line manager capacity.

9       Q.   So if I handed you a copy of a CRA site

10   visit report, you would recognize it, correct?

11       A.   I would hope so.

12       MR. KEEGAN:  I'm going to hand to the court

13   reporter a document on the top states "On-site

14   Initiation."  It's a ten page document bearing the

15   document control numbers PAR 012587-596 and I'll ask

16   the court reporter to mark that as Exhibit 243.  I'm

17   handing a copy to counsel.

18       (The document referred to was marked

19   by the reporter as Exhibit 243 for identification

20   and is attached hereto).

21   BY MR. KEEGAN:

22       Q.   Exhibit 243 has a visit date of 14dec-2016.

23   That appears on the first page of Exhibit 243.  You

24   can take as much time as you need, but do you

25   recognize Exhibit 243?

Page 161

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1          MS. TABACOPOULOS:  One moment.  You're

2    simply referring to the visit date on the top?

3          MR. KEEGAN:  Top left corner underneath the

4    word "on-site initiation."

5          THE WITNESS:  Can you repeat the question

6    that you asked about this document?

7    BY MR. KEEGAN:

8       Q.  Do you recognize this document, Exhibit

9    243?

10      A.  Not this specific document.  I recognize

11   this to be, in general, a site initiation visit

12   report.

13      Q.  And this would be an on-site initiation

14   report that a CRA would have completed in 2016,

15   correct?

16      A.  Correct.

17         MS. TABACOPOULOS:  Lacks foundation.

18   BY MR. KEEGAN:

19      Q.  Exhibit 243 has been heavily redacted so

20   doesn't show the protocol number or Parexel project

21   number or the site number or the investigator, among

22   other, or let alone the monitor.  This has been

23   recently produced to me in this format.  Were you

24   asked to pull site visit reports for production in

25   this case?

                                        Page 162

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    correspond from the time that you received the

2    updated training, correct?

3         A.   Correct.

4         Q.   And you haven't reviewed it since that

5    training, correct?

6         A.   No.

7              MR. KEEGAN:  I'm going hand to the court

8    reporter and ask her to mark as Exhibit 244 to your

9    deposition a five-page document bearing the document

10   control numbers of PAR 12800-12804.

11             (The document referred to was marked

12   by the reporter as Exhibit 244 for identification

13   and is attached hereto).

14   BY MR. KEEGAN:

15        Q.   Exhibit 244 at the upper left hand corner

16   says "On-site Qualification," and below that has a

17   visit date of 08-APR-2014.  My question to you is do

18   you recognize Exhibit 244?  Have you ever seen it in

19   its unredacted or redacted version?

20        A.   I have not.

21        Q.   Does this look like a -- is it similar to

22   any site qualification visit reports that you've

23   reviewed prior to today?

24             MS. TABACOPOULOS:  Objection, vague and

25   ambiguous, overbroad.

                                        Page 170

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1          THE WITNESS:  Yes, it's similar to an

2     on-site qualification visit report that I've seen

3     previously, the template that is.

4     BY MR. KEEGAN:

5          Q.   So the template referring to the items

6     listed in the report, such as the checklist site

7     recruitment status?

8          A.   Correct.

9          Q.   Open issues?

10         A.   Yes.

11              MR. KEEGAN:  I'm going to hand to the court

12     reporter a document in the upper left-hand corner

13     that states "On-Site Monitoring."  It's a 9-page

14     document bearing document control numbers PAR

15     012791-12799.

16              (The document referred to was marked

17     by the reporter as Exhibit 245 for identification

18     and is attached hereto).

19     BY MR. KEEGAN:

20         Q.   Below the header on the upper left hand

21     side says:  Visit date 02-nov-2017."  Do you

22     recognize Exhibit 245?

23              MS. TABACOPOULOS:  Objection, vague.

24              THE WITNESS:  I don't recognize this report

25     specifically.

Page 171

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    BY MR. KEEGAN:

2         Q.    Have you ever seen Exhibit 245 in its

3    current format or unredacted form prior to your

4    deposition today?

5         A.    This specific one, no.

6         Q.    This wasn't a document you reviewed in

7    preparation for your deposition today?

8         A.    No.

9         Q.    Do you recognize this as similar to other

10   on-site monitoring reports that you've seen before

11   today?

12              MS. TABACOPOULOS:  Objection, vague and

13   ambiguous, overbroad.

14              THE WITNESS:  Yes, it's the monitoring site

15   visit report.

16              MR. KEEGAN:  I'm going to hand to the court

17   reporter a document that I'm going to mark as

18   Exhibit 246, a document entitled On-Site

19   Termination.  It's a 7-page document bearing the

20   document control numbers of PAR 012981-12987.

21              (The document referred to was marked

22   by the reporter as Exhibit 246 for identification

23   and is attached hereto).

24   BY MR. KEEGAN:

25        Q.    Have you ever seen Exhibit 246 prior to

                                    Page 172

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    today?

2        A.   No.

3        Q.   Is this a document you reviewed in

4    preparation for your deposition today?

5        A.   No.

6        Q.   Do you recall reviewing Exhibit 246 in

7    unredacted format prior to today?

8        A.   No.

9        Q.   Exhibit 246 has a visit date of

10   19-FEB-2016.   Does this on-site termination report,

11   does this look similar to the on-site termination

12   visit reports you reviewed prior to today?

13           MS. TABACOPOULOS:   Objection, vague and

14   ambiguous, overbroad.

15           THE WITNESS:   This is similar to a

16   termination visit report that we have.

17   BY MR. KEEGAN:

18       Q.   During your deposition today you've set

19   forth some of the metrics that -- I think you fully

20   testified about the metrics that CRA's and CMA's --

21   that applies to CRA's and CMA's that directly report

22   to you.   Do you recall that testimony?

23           MS. TABACOPOULOS:   Objection, vague.

24           THE WITNESS:   Do you mean specific about

25   which one thing I said?

Page 173

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    when you worked as a clinical trial specialist, did

2    you record the times that you took lunch breaks,

3    meal breaks?

4            MS. TABACOPOULOS:  Objection, outside the

5    scope, lacks relevance, overbroad.  Lacks

6    foundation.

7            THE WITNESS:  No.

8    BY MR. KEEGAN:

9        Q.   And when you worked as a Clinical

10   Monitoring Associate 2, did you record the times

11   that you took meal breaks?

12       A.   No.

13       Q.   When you worked as a Senior Clinical

14   Monitoring Associate, did you record the times that

15   you took meal breaks?

16       A.   No.

17       Q.   Was there a way to record meal breaks in

18   Parexel's time system when you worked as a Clinical

19   Monitoring Associate 2?

20       A.   No.

21       Q.   And when you worked as a Senior Clinical

22   Monitoring Associate, was there a way to record meal

23   breaks in Parexel's time system?

24       A.   No.

25           MR. KEEGAN:  Let's go off the record.

Page 178

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
 1              (Recess taken).

 2              MR. KEEGAN:  Back on the record.

 3    BY MR. KEEGAN:

 4         Q.   You understand you're still under oath?

 5         A.   Yes.

 6              MR. KEEGAN:  I'm handing a copy of a

 7    document to the court reporter and I asked her to

 8    mark it as Exhibit 247.  It's a 7-page document that

 9    appears to be on Miss Vibar's Linked In profile.

10              (The document referred to was marked

11    by the reporter as Exhibit 247 for identification

12    and is attached hereto).

13    BY MR. KEEGAN:

14         Q.   I'll represent that Exhibit 247 was printed

15    from the Internet on March 13, 2018, as indicated in

16    the upper left-hand corner.  My question is do you

17    recognize Exhibit 247 as your Linked In profile as

18    of March 13, 2018?

19         A.   Yes.

20         Q.   And the information on your Linked In

21    profile, did you write all the information on the

22    Linked In profile, or did you have somebody do it

23    for you?

24         A.   I did it.

25         Q.   So the experience section, that's a part
```

Page 179

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1    that you wrote?

2         A.   Correct.

3         Q.   And that information is true and accurate;

4    is that correct?  You attempted to be truthful and

5    accurate in setting forth that information, correct?

6         A.   Correct.

7         Q.   Off the record we attempted to meet and

8    confer on the questions where I asked you to

9    identify the persons and names that directly report

10   to you during the time that you were a line manager,

11   and I met and conferred with Parexel's counsel, and

12   my understanding from that is you're going to

13   continue not to reveal the names of the persons that

14   directly reported to you and rely on Parexel

15   counsel's instruction to you not to answer, correct?

16        A.   Correct.

17        Q.   Also you indicated today during your

18   deposition testimony that you have not signed a

19   declaration under oath, under the penalty of

20   perjury, regarding your experience at Parexel thus

21   far, and if in the future you do in fact sign a

22   sworn statement, I'll move to reopen your deposition

23   to cross-examine you on any statement therein, and

24   because you're refusing to answer questions today,

25   I'll bring that up with the judge and you may be

Page 180