19. I am providing this declaration freely and voluntarily. I was advised before meeting with PAREXEL's attorneys that I could choose whether to participate in the interview, and voluntarily chose to participate. PAREXEL's attorneys have told me that I do not have to provide this declaration and that if I choose to do so or not to do so, the decision will not affect my employment. I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate. I understand that this declaration may be used by PAREXEL in *Schoulee Cones v. PAREXEL International Corporation,* Case No. 3:16-cv-03084-L-BGS (U.S. District Court, Southern District of California), a case regarding whether PAREXEL correctly classified the Clinical Research Associate I, Clinical Research Associate II, Senior Clinical Research Associates, Clinical Monitoring Associate I, Clinical Monitoring Associate II, and Senior Clinical Monitoring Associate positions as exempt from overtime. PAREXEL may use this declaration to argue that a class should not be certified. I understand I am a potential class member in the lawsuit.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 20 day of December 2017, at San Diego, California.

Jennifer Pathak

SEYFARTH SHAW LLP
Diana Tabacopoulos (SBN 128238)
dtabacopoulos@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

SEYFARTH SHAW LLP
Michael W. Kopp (SBN 206385)
mkopp@seyfarth.com
400 Capitol Mall, Suite 2350
Sacramento, California 95814-4428
Telephone: (916) 448-0159
Facsimile: (916) 558-4839

Attorneys for Defendants
PAREXEL INTERNATIONAL CORPORATION,
PAREXEL INTERNATIONAL LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SCHOULEE CONES, an individual, on behalf of herself and all others similarly situated,

Plaintiffs,

v.

PAREXEL INTERNATIONAL CORPORATION, a Massachusetts corporation licensed to do business in the State of California, PAREXEL INTERNATIONAL, LLC, a Massachusetts limited liability corporation licensed to do business in the State of California

Defendants.

Case No. 3:16-cv-03084-L-BGS

**DECLARATION OF LAURIE RICHARD**

SAC Filed: 9/11/17

I, Laurie Richard, declare:

1. I am over eighteen years old. The following facts are based on my own personal knowledge and, if called as a witness, I could competently testify to them.

2. I began my employment at PAREXEL International LLC ("PAREXEL") in March 2012 as a Clinical Research Associate II ("CRA II"). With the exception of approximately 8 months in 2015 in which I left my position to care for my mother, I have worked for PAREXEL since 2012. In approximately the Fall of 2013, I was promoted to the position of Senior CRA, which is the position I held through December 31, 2017. As of January 1, 2018, I hold the position of Senior Clinical Site Manager.

3. Prior to my employment at PAREXEL I had extensive experience in the field of clinical research, as well as a life sciences educational background. I received my Bachelor of Science degree in biology in 1984, with a minor in chemistry. This educational background has allowed me to work in a clinical research setting with a greater confidence and understanding of the scientific concepts and terminology used in this field. After graduating, I worked in a laboratory environment until approximately 1991. This professional background also provided valuable experience in scientific research that I have drawn from in moving to the field of clinical research. From approximately 1991 I have worked in the field of clinical research in positions comparable to a CRA.

4. I have always worked "decentralized" in my position as a Senior CRA with PAREXEL, which means that I do not work from a PAREXEL office. I am either working at the clinical sites I manage, or working from my home in Ramona, California. It is rare that I would go into PAREXEL's offices in San Diego, California, which is close to an hour or more away. I would estimate that I go in to the San Diego office roughly 2-3 times per year, and it is my choice to do so. I will do this, for example, to meet with and catch up with my line manager for coffee.

5. As a CRA, my primary responsibilities are to evaluate patient medical records, including for data integrity, trends, patient safety and possible fraud, to evaluate sites for regulatory compliance and to discern whether there are any patterns of noncompliance, to evaluate medical sites for potential qualification, to train the sites to initiate the study, and to problem solve and work with sites to promote the site's successful performance. The clinical studies I have worked on have involved different therapeutic areas, such as dermatology, ophthalmology, diabetes, and oncology. Even within the same therapeutic areas, each study is unique, with different timing needs, and complexity, such as enrollment

criteria, and unique study protocols.

6. My work as a Senior CRA differs from the work I did as a CRA II, particularly in terms of the complexity of the studies and therapeutic areas of the studies on which I am working. For example, as a Senior CRA, I am working on oncology studies that are incredibly complex, in terms of the number of adverse events patients are experiencing, the complexity of the patient medical records, the number of concurrent medications the patient is receiving as part of the study and taking outside of the study which must be monitored, the patient/subject enrollment criteria, and the study protocol.

7. I recently completed a pediatric oncology study, involving children with tumors and active brain lesions, where the study was simultaneously testing the efficacy of two drugs for the same pharmaceutical company. The protocol was more complex, patients were often terminally ill, with extensive medical records, and the testing involved multiple monitoring of blood levels, lesion measurements and other indicators of the patient condition and efficacy of the investigational product (drug). In this type of oncology study, I have seen patients on up to 20 different medications. In contrast, on an ophthalmology study I worked on, the sickest patient I saw had diabetes and was on six medications. In addition, in oncology studies, there are more adverse events to evaluate due to the patient's condition, and the evaluation of those events is more complex, with a scaled grading of the adverse event. For example, if the patient has a sore throat, leg pain, stomach or muscle pain, that must be graded on a scale. When I am monitoring patient records for trends, data integrity, patient safety and fraud, the complexity and amount of data I am critically evaluating is generally higher on oncology studies than on non-oncology studies. Cancer patients in oncology studies are sicker, with more complicated medical histories, which also makes evaluating medical history for screening for enrollment in the study more complex. In contrast, on an eczema study I previously worked on, most of the patients enrolling were relatively healthy, with fewer medications, fewer adverse events due to their health condition, and a comparatively less complicated protocol.

8. Although there are cases where a very sharp CRA I or CRA II might be assigned a more complicated oncology study, that is less common, and they are typically assigned less complicated studies and therapeutic areas. I have found that the challenges and type of work and studies I have

worked on as a Senior CRA is significantly different than what I worked on as a CRA II.

9. My actual job duties vary day-to-day depending on a number of factors, including the type of studies I am working on, the stage of the study, and the particular needs of the sites I am working with. For example, I have not performed a site initiation or a site qualification visit for over a year, because my studies are currently in a monitoring phase. In contrast, in 2014, I performed a number of site qualification visits, followed by site initiation visits when I was not working on studies in a monitoring phase.

10. Similarly, how I decide to plan and prioritize my day depends on the challenges and issues I am identifying at my sites and the site staff I am working with. At most sites, my primary contact with whom I am communicating is the study coordinator. This is not always the case, and at some sites I am working with the data coordinator at the site. Not all sites are the same, and many have unique challenges. For example, I have study coordinators who are in different "seasons" in life, with different comfort levels with technology. I have to adjust my approach and how I strategize with the site to achieve compliance in different ways with these conditions in mind. For example, with one site that I worked with, I had a study coordinator who was less comfortable with technology, and would not use trackers and spreadsheets - which are optimal in managing adverse events and CT/MRI (scan) results, ensuring that the patient data is attributable, and that the Principal Investigator ("PI") is reviewing the patient information and exercising proper oversight. I found a solution, which addressed the study coordinator's technological comfort level but also protected the study integrity, by identifying a compromise where we worked with the study coordinator to develop a one-page summary sheet to include CT or MRI tumor measurement results that would normally have been on the customary Excel table/spreadsheet used at other sites. Some sites also have different levels of competing demands and other studies, which often makes them less responsive to resolving the issues I have identified. I address this by working more closely with the site, scheduling more frequent visits, and maintaining more active communication with the site staff.

11. The personalities and challenges of the site staff varies. Some study coordinators are more cheerful, cooperative and proactive. With other study coordinators, I have to deploy different

communication strategies, in terms of being firm, setting more site visits, and problem solving to assist in resolving site issues. I determine my approach with sites, how to resolve site issues, and how I prioritize those issues.

12. I am making critical decisions and evaluations to protect patient safety, ensure patient rights are protected, improve site performance and ensure data integrity at all stages of the studies I am assigned. For example, during the Qualification stage, I am responsible - as the sole PAREXEL employee visiting the site - for evaluating a site for possible participation in the study. One critical part of that evaluation for qualification concerns the site's capacity to enroll patients. In my experience, although it varies by the type of study and therapeutic area, most PIs are over-optimistic about patient enrollment by a factor of two to four, and I have seen some estimates off by as much as a factor of 10. This is not always the case - for example, on oncology studies I find that many sites are more accurate in their patient enrollment and recruitment projections. I do not take patient enrollment information at face value, and I critically evaluate the patient recruitment plan and projections the site provides. Sometimes the inflated numbers are due to the site's eagerness to participate in the study, and other times it is due to the site's superficial and uncritical or incomplete evaluation of the enrollment needs and requirements. For example, I have had a PI say they can enroll a certain number of patients, but they are not considering the timeline of the study. For example, on a study of extended length (such as 2-years), I will question the PI as to whether his projection is accounting for patients having that type of commitment to the study and remaining in the area for that length of time. This often results in a re-evaluation and a projection that is more in line with the study needs. This type of critical evaluation and questioning allows me to get a better read on the site's capacity, which is important, because enrolling a site that later proves to not have the needed patient enrollment capacity is a waste of resources of the sponsor, PAREXEL and the site.

13. I also modify my site qualification strategy based on the particular site. For example, when a site has done a similar study in the past for the same sponsor, in my experience such sites are usually good sites to qualify for the study, and require less probing examinations for qualification. In contrast, for "newbie" sites that do not have an extensive history in clinical trials, where the PI is excited

and is eager to participate in the study, I will focus more attention on whether the PI truly understands the demands the study will have on his or her staff, and the site's capacity to perform. I do not just interview the PI, but carefully interview other site staff, including the study coordinator, to determine whether the information I am receiving lines up and is credible, or if there is a need for further evaluation. For example, I typically interview the study coordinator regarding patient enrollment before speaking with the PI, and I work to evaluate the cause of any discrepancies. The PI's experience level also influences how deeply I will go in exploring the PI's understanding of good clinical practice and clinical research trials, and their capacity to participate.

14. I am also evaluating the site's competing demands when I perform a qualification visit, and making judgments as to the site's capacity to take on the study. If the PI and study coordinators are not attentive or able to provide time to visit with me on a qualification visit, I need to determine the cause, and whether they are overextended, whether the lack of capacity is temporary, and whether there are solutions, such as adding staff for the study.

15. On qualification visits, I evaluate the site as a whole based on my collective observations, such as the site's capacity for the study, the site's prior experience with the sponsor, prior experience with comparable studies, the quality of the staff who have the time to perform, and whether the site has the necessary equipment and support to meet study requirements.

16. Following qualification, I work to initiate the site for active participation in the study. I do this by planning and conducting the Site Initiation visit, which is when I am primarily working with the site staff to educate them on how to conduct the study according to the sponsor-approved monitoring plan. I use different strategies for conducting a site initiation visit based on the type of study, the experience of the site, and the time the site staff are able to provide. For example, if the PI indicates they have only limited time, I will compress my presentation, and hit the critical highlights so that I am providing the key information, such as the study objectives, the overall study design, inclusion and exclusion criteria and various study nuances important to the study sponsor, . I know the high points of the information to provide that will be more critical for the PI to understand in order to conduct the study according to sponsor requirements. With a site that is newer to clinical research, I may need to

spend more time on good clinical practice - whereas that approach would not be effective with a seasoned site. In addition, some staff are more attentive, inquisitive and are more engaged. Other sites have staff that are distracted or more pressed for time. I modify my approach and evaluate whether the staff understands the information, adjust to their availability, and identify whether there are issues or areas that require more attention or time. Based on the staff response, I have to determine how to most effectively educate the sites on the requirements. For example if the site works exclusively with the study's designated electronic data capture system, it would not make sense for me to extensively cover the system, and would be insulting for me to do so. In contrast, if the site is not familiar with the IWRS (Interactive Web Response System) I would spend more time covering this issue and ensuring the staff understand the issues.

17. Currently, and for over the past year, my time is and has been spent monitoring my sites, which involves review of medical records, any compliance or safety issues or trends that I identify and work with the site to resolve, and monitoring of recruitment of patients. One of the most important responsibilities in monitoring sites is to critically evaluate records for integrity, completeness and to evaluate for potential fraud. To do this, I analyze patient medical records to look for inexplicable gaps or trends, or anything that appears to be suspicious. When I notice any issues with the data, I am responsible for evaluating the issue and raising and addressing the issue with site staff.

18. For example, with one site I was monitoring, I noticed an issue with how the site was consenting patients, and noticed questionable consent forms. In this particular study, the consent form required the patient to initial every page of the consent form. In evaluating those records, I noticed that the initials on the forms looked like the study coordinator's handwriting, which suggested to me there may have been fraud on the entries, and that the patient consent process was being rushed or not completed properly. I brought this issue to the attention of both the study coordinator and the principal investigator, and shortly after I did so, the study coordinator was no longer employed at the site.

19. I am the only Company representative who is actually reviewing the patients' records, and the quality of the review of the data for completeness and consistency depends on my assessment

and observations. If that responsibility is not properly performed, that could jeopardize the study or impact patient safety.

20. The Termination Visit happens when the site is ending its participation or the study is complete. At termination, I need to ensure that the site satisfies its responsibilities concerning the protection and storage of data, and that they understand their duties going forward. If I determine that any termination requirements have not been met, it is my job to investigate the reasons and take steps to solve the issues.

21. Within each study, there are a number of different sites that participate. Currently I am assigned to one study, an ovarian cancer study, after having just completed an additional study (a pediatric oncology study) a few weeks ago. On my current study, I am managing five sites. In contrast, I have worked on studies where I have had up to ten sites, which I have managed with the support of a Clinical Monitoring Associate, who was not responsible for any on-site duties. That participation of the CMA was the only way that I was able to manage that number of sites simultaneously. Right now, all of my five assigned sites are cancer treatment clinics. In the past, I have worked with sites that have ranged from large regional children's hospitals, to private ophthalmology offices and private dermatology offices. Each site is different, including their experience, attentiveness, technological capabilities, the patient population, the way they chart patients, and their preferred communication styles, and require different approaches from me. More recently, I have not seen a "bad" site in terms of their core competence, but what I have seen on occasions are overworked sites. For example, there are some sites that I manage that are "Johnny on the spot," well-run, and effective in satisfying all study requirements. However, there are other sites that are less responsive, which require more follow-up and guidance from me. In those instances, I must exercise my judgment to evaluate where the site is having issues, what types of issues there are, the cause of those issues, the seriousness of those issues, and how to best prioritize and resolve those issues to bring the site into compliance.

22. My schedule is flexible, and I set my hours of work, which is one of the many aspects of this job that I enjoy. Aside from accommodating the hours that a particular site may be open, which varies by site, my schedule is completely flexible. I do not choose to work a regular, set, 8-5 schedule.

Sometimes I start later, sometimes earlier. On some days, if I have a family event, or I if I have errands or shopping to do and I know that stores will be less crowded during the day, I can adjust my schedule, or complete work in the evening. That is one of the advantages of being a professional and managing my own schedule. When I applied for the job I knew that it was an exempt, salaried position, and I have always understood that my salary covers all my hours worked.

23. I take lunch breaks and rest breaks when I want to, and I understand that I am permitted to do so. No one at PAREXEL has ever told me that I could not take lunch or rest breaks. I work at home, or on site, and set my own schedule.

24. I am providing this declaration freely and voluntarily. I was advised before meeting with PAREXEL's attorneys that I could choose whether to participate in the interview, and voluntarily chose to participate. PAREXEL's attorneys have told me that I do not have to provide this declaration and that if I choose to do so or not to do so, the decision will not affect my employment. I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate. I understand that this declaration may be used by PAREXEL in *Schoulee Cones v. PAREXEL International Corporation,* Case No. 3:16-cv-03084-L-BGS (U.S. District Court, Southern District of California), a case regarding whether PAREXEL correctly classified the Clinical Research Associate I, Clinical Research Associate II, Senior Clinical Research Associate, Clinical Monitoring Associate I, Clinical Monitoring Associate II, and Senior Clinical Monitoring Associate positions as exempt from overtime. PAREXEL may use this declaration to argue that a class should not be certified. I understand I am a potential class member in the lawsuit.

25. I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 09 day of January 2018, at San Diego, California.

LAURIE RICHARD

SEYFARTH SHAW LLP
Diana Tabacopoulos (SBN 128238)
dtabacopoulos@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

SEYFARTH SHAW LLP
Michael W. Kopp (SBN 206385)
mkopp@seyfarth.com
400 Capitol Mall, Suite 2350
Sacramento, California 95814-4428
Telephone: (916) 448-0159
Facsimile: (916) 558-4839

Attorneys for Defendants
PAREXEL INTERNATIONAL CORPORATION,
PAREXEL INTERNATIONAL LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SCHOULEE CONES, an individual, on behalf of herself and all others similarly situated,

Plaintiffs,

v.

PAREXEL INTERNATIONAL CORPORATION, a Massachusetts corporation licensed to do business in the State of California, PAREXEL INTERNATIONAL, LLC, a Massachusetts limited liability corporation licensed to do business in the State of California

Defendants.

Case No. 3:16-cv-03084-L-BGS

**DECLARATION OF LANESHA SANDERS**

SAC Filed: 9/11/17

I, LaNesha Sanders, declare:

1. I am over eighteen years old. The following facts are based on my own personal knowledge and, if called as a witness, I could competently testify to them.

2. I began my employment at PAREXEL International LLC ("PAREXEL") in July 2012 as a Research Operations Assistant, which is a position at PAREXEL that no longer exists. I left that role to become a Clinical Monitoring Associate I ("CMA I") in early 2014, based out of Durham, North Carolina. In November 2015 I became a Clinical Research Associate I ("CRA I"), and after nearly two years in that position, in either June or July 2017 I became a CRA II. I presently work as a Clinical Site Manager II, a role I have held since January 1, 2018.

3. I have a Bachelors in Business Administration and Associate Degrees in Education and Communication. Prior to my employment at PAREXEL I was a teacher, and worked at a facility in Raleigh, North Carolina called Primary Beginnings, which involved educating pre-school children, prior to their kindergarten year. I entered the clinical research field by obtaining the Research Operations Assistant position, which enabled me to get my foot in the door in terms of building professional experience in clinical research. Without this industry experience, it would have been more difficult to assume the CMA I position.

4. As a CMA I, my primary responsibilities were to evaluate the performance and compliance of my assigned clinical trial sites, and to develop solutions where my sites were underperforming. Sponsors (primarily pharmaceutical companies) that are arranging to test new or improved drugs and pharmacological products hire PAREXEL to manage their clinical trials, which are conducted at various clinical trial sites (such as hospitals, clinics, research institutes and individual private physician offices). My job as a CMA was to serve in a collaborative, partnering role with my assigned clinical trial sites to help the site staff identify and resolve issues and problems they encountered in conducting the trials, in terms of quality control, compliance and issues that impacted on patient safety. As a CMA, I would have day-to-day contact with sites on unscheduled calls regarding issues that came up, such as interpreting study protocol for them and the application of that protocol to patients visiting their site, problems with recruiting, problems with data management, and other issues that arose. Primarily I spoke with study coordinators (who are often nurses or other staff who are familiar with the process for clinical trials) and, less often, Principal Investigators (or "PI's," who were the physicians at the site responsible for the clinical trial). CRAs were also working with the sites that I

worked with as a CMA, but I was often times the daily contract for unscheduled calls and issues, because the CRAs were often working remotely at other sites, and unavailable.

5. In my CMA role it was important that I was knowledgeable of the protocols of the various studies on which I was working and capable of analyzing the application of those protocols to live patient visits, so that I could answer questions from the site staff regarding the interpretation and application of those protocols when they had a patient in their office for a clinical trial visit. Protocols are guidelines developed by the sponsor as to how to administer the clinical trial, such as the dosing of patients, lab work, and other steps in administering the clinical trial. Sites often called me on patient visit days, and I would help them evaluate, interpret and apply the protocols as to issues such as lab work, prohibited concurrent medications, and how to deal with use of prohibited medication.

6. My work on daily basis varied as a CMA, depending on what I prioritized as the most important issues for the day, any difficulties the sites were having, and the types of studies to which I was assigned. Although I would speak biweekly with my sites on a scheduled basis about what was going on with the site, as mentioned above, I would also be available at any time for inbound calls with spur-of-the moment inquiries that required quick resolution. The number of calls would vary per day, and the incoming calls were never consistent, in terms of the issues raised or number of calls.

7. As a CMA I worked on studies in a broad range of therapeutic areas, including oncology, asthma, and Chronic Obstructive Pulmonary Disease (“COPD”). These studies were of varying levels of complexity. For example, the oncology study involves patients with much more complicated medical histories, more dire health conditions, generally more complicated concurrent mediations. In contrast, an asthma study involves a healthier patient population, with less complicated histories and study protocols. As a CMA, most of my time was spent monitoring and evaluating my sites, problem solving with my assigned sites when they were out of compliance with study requirements, working with them to improve their performance, and assiting them in interpreting and applying patient safety-oriented study protocol.

8. As a CMA I, my first study was an oncology study. The number of sites I was assigned to manage varied, but I believe I was managing up to twenty or more sites on the oncology study. During

that time, I was assigned to one study, although later in my career at PAREXEL I was assigned multiple studies concurrently. When I joined the oncology study, the sites were already out of "start-up" which is the period of time in which the site is moving from qualifying for the study to being initiated to receive patients and the drug (the Investigational Product, or "IP"). My sites were in the "maintenance" phase, which is when patients are actually enrolled and receiving the IP as treatment. I know that many other CMAs I worked with worked on studies that were in start-up and maintenance. My experience was different as a CMA - I only worked on studies that were in maintenance, and not in start-up.

9. I have never thought of my job as an "hourly" job. It is a highly demanding job that requires a great deal of critical evaluation and judgment calls (often on the spot) to properly perform.

10. As a CMA I worked with many different types of sites. Those ranged from independent physician offices, to larger hospitals. When I later moved to a CRA position, I worked with physician offices and hospitals, but also worked with Universities. The staff at the sites had a large impact on how I would work with them. Not every site (or the staff at those sites) was as responsive as I would like them to be. I found that some sites took more coaxing and calls to get a response and to motivate them to move forward on closing out issues (such as increasing patient enrollment, uploading data, retraining staff and other needed action). When I was a CMA, I had some sites that were ready for every scheduled call and were on top of things; these were often my more experienced sites. I also worked with some less experienced sites, or sites that were busier, and I would adjust my approach accordingly. In other words, I needed to make strategic decisions on what sites I focused on, the level of follow up, and what items were the highest priority to address.

11. As a CMA and a CRA it was important that I build a solid relationship with the site staff. I would accomplish that in a different manner in these different roles, and also based on the personalities and preferences of the site staff. For example, as a CRA, I had the opportunity to work in person and on site with the site staff. I would find in my in person visits, that different site staff would have different capabilities in terms of absorbing information. Some staff would understand when I was reviewing the electronic data capture (EDC) system, or reviewing protocol for patient visits, and other staff would need more time to understand. It was my job to evaluate their comprehension and to make sure they did

understand. Sometimes the study coordinators got it right away, others required more instruction. As a CMA my interactions were remote rather than in person, and I would adopt my communications to the site preferences. Some sites preferred email, others preferred calls, and some sites required more follow up and monitoring. In addition, I would have to evaluate what pressures or motivations I needed to apply to get sites into compliance. I know some CRAs and CMAs will sometimes involve PI's if the study coordinator is not being responsive, because the PI is the study coordinator's boss. I have never felt I needed to use that option with my sites - and felt it would only harm my relationship with the study coordinator. Instead, I would work collaboratively with study coordinators to see what could be done to resolve issues at the site.

12. One issue that I worked with sites on as both a CMA and CRA involved patient recruitment. As part of the qualification process, generally a site would make a commitment to screen and randomize a certain number of patients. I had instances where the study had progressed, but the site was not hitting their patient recruitment projections. In those instances I would try to work with the site to figure out the best approach to addressing that problem. For some sites, I discussed advertising, in papers, radio or online to help with recruitment. I also tried to explore and understand why they were having difficulty recruiting. In other words, was it a problem with the patient database, not getting referrals from doctors, were their patients on other competing studies, and options for resolving those issues. For example, I worked on an asthma study, which had a lot of subjects who were also in other studies. When it came time for the PAREXEL-managed study to start, the sites had subjects on other studies that interfered with recruitment. I worked with them to get the subjects through a "washout time" so they could clear into the PAREXEL-managed study, and this enabled the sites to keep their recruitment commitment. This is of critical importance, because sites that do not enroll patients, or too few patients end up costing the sponsor without generating a return in terms of data.

13. As a CMA, I worked in the office the entire time, and worked exclusively in the maintenance study phase. In contrast, as a CRA I moved into a decentralized (remote) position at the end of 2016, and would only go into the office every once in a while. As a CRA, I also performed new types of duties I had not performed as a CMA, including Qualification Visits, Site Initiation Visits, *on*

*site* Monitoring Visits, and Termination Visits. I worked independently as a CRA and CMA. As a CRA, my supervisor was also decentralized, and worked in Texas. I spoke with her every couple of weeks on a set schedule for 30 minutes to an hour. And there were times in between those scheduled calls that I arranged an impromptu call. I set my own schedule, prioritized issues I was dealing with, and independently problem solved with my sites. But the position also hade a lifeline - in other words, if I needed my manager, she was there to bounce ideas off of.

14. As a CRA, my primary responsibilities were patient safety and data integrity. In contrast to my time as a CMA where I was working off site, as a CRA, I travelled to my sites to work in person with site staff and to review medical records. Part of my record review involved making sure that the site was accurately entering the source medical records (and if they were not, to figure out why not and what the problem was). A larger part of my job was reviewing the records to ensure that the data was not fraudulent (for example that the data made sense, it was not too "clean," that signatures matched), and to identify any trends in the data the site had missed.

15. In addition to working with my more long-term assigned sites as a CRA, I would also peform "SWAT visits," which were mostly qualification visits to sites where I would drop into a study for a short period of time. I have performed SWAT visits on a hearing loss study, a dermatology study, and COPD studies. The vast majority of my SWAT visits were qualification visits, although for the dermatology study I also performed a site initiation SWAT visit.

16. My work changed when I promoted to the CRA II position, as compared to the work I did as a CRA I, in that I mentored CRA I employees. I did not mentor CRA I employees when I myself was a CRA I. New CRA I's came out to shadow me on visits to sites to observe how I worked with the site staff and addressed issues. I also served as a mentor on an ongoing basis as a CRA II>

17. Similarly, how I decided to plan and prioritize my day as a CRA and CMA depended on the challenges and issues I identified at my sites and the site staff I was working with.

18. I made important determinations to protect patient safety, site performance, and ensure data integrity at all stages of the studies I was assigned as a CRA. At the qualification stage, I was responsible - as the only PAREXEL employee visiting the site - to evaluate the site for enrollment in the

study. This involved a comprehensive evaluation of the site. One aspect of the sites I evaluated was whether they would have the capacity to take on a new study. For example, I went to one site for an asthma study, which I had scheduled and set in advance for a specific time. During the visit, I was attempting to go through an overview of the protocol with the site, and I noticed that the study coordinator was going in and out of room, and the PI was coming in to interrupt her every five minutes, even though this was a prescheduled visit. This caused me to wonder if the site would even have time to do a study given the demands staff distractions. I explored the issue further to find out if it was an everyday occurrence, or how the office generally operates. The study coordinator explained that for the day they had only two scheduled patients, but had a lot of unscheduled patients come in which caused the interruptions. I also sat down and spoke with PI - who confirmed the level of visits was a rare day for them. I found it was helpful for me to have performed that further examination and evaluation to determine the site's capacity to take on the trial.

19. Another aspect of the site that I evaluated was the ability to recruit patients. For example, as a CRA, I conducted qualification visits on a hearing loss study. The enrollment criteria for patients was really limited on that study, and involved a rare occurrence. Specifically, a patient experiencing a hearing loss out of one ear would need to seek medical help within 96 hours, or otherwise would not be qualified to enroll. Some PIs were estimating higher recruiting numbers, which sent up a huge red flag to me. There was such a small window to get into the study, that the numbers did not seem realistic. Part of this process is figuring out what the site is basing the numbers on, and evaluating whether that is credible or realistic, and how that impacts whether the site should be qualified.

20. Following qualification, as a CRA, I worked to initiate the site to enroll patients, which is part of the Site Initiation Visit (SIV). I considered the SIV to be a foundational visit - which set the tone for the relationship going forward. After the site was qualified, it was my responsibility to educate the site staff on the study protocol and the PI's responsibilities. This required me to be responsive to the site staff, and make sure that I was comfortable that the site was understanding the material. If there were areas where the site staff had more questions, I would spend more time making sure they understood those topics. This was a critical visit, because if I was not engaged and evaluating the staff response,

that could mean mistakes in the study going forward, or a need for more retraining down the line. You have to be on your toes on SIVs, because you are dealing with experienced doctors and study coordinators, and are expected to be knowledgeable and responsive to their questions, which you do not know in advance. It is a way to gain credibility with the site and to help them going forward.

21. I generally set my hours of work, both as a CMA and CRA, and my schedule was flexible, which was something I enjoyed as a CRA and CMA. I did have core hours - from 9 a.m. to 3, but my schedule before and after that time was up to me. For example, as a CRA, when I travelled on a Monday to a site and came back on Wednesday night, I would sometimes elect to have shorter office hours on Thursday. I preferred the flexibility. Also, I am on the East Coast, and I have sites that are behind me in time zone, which gives me more flexibility. In addition, if I have personal errands that come up - my position is a professional position and not a time-clock-punch position. I can attend to those errands and make up the time when I choose. For example, my son had a school meeting I needed to attend at 2:45. I did not need to seek permission - I simply attended the meeting. This flexibility is a huge "pro" of the position. As a CMA and CRA, I did not want to work on an hourly, time clock basis.

22. I took lunch breaks and rest breaks as a CMA and CRA, and no one ever told me I could not take breaks. My schedule was mine to make and control.

23. I am providing this declaration freely and voluntarily. I was advised before meeting with PAREXEL's attorneys that I could choose whether to participate in the interview, and voluntarily chose to participate. PAREXEL's attorneys have told me that I do not have to provide this declaration and that if I choose to do so or not to do so, the decision will not affect my employment. I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate. I understand that this declaration may be used by PAREXEL in *Schoulee Cones v. PAREXEL International Corporation,* Case No. 3:16-cv-03084-L-BGS (U.S. District Court, Southern District of California), a case regarding whether PAREXEL correctly classified the Clinical Research Associate I, Clinical Research Associate II, Senior Clinical Research Associate, Clinical Monitoring Associate I, Clinical Monitoring Associate II, and Senior Clinical Monitoring Associate positions as exempt from overtime. PAREXEL may use this declaration to argue that a class should not be certified.

I understand I am a potential class member in the lawsuit.

24. I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 27th day of April 2018, in Durham, North Carolina

LaNesha Sanders

SEYFARTH SHAW LLP
Diana Tabacopoulos (SBN 128238)
dtabacopoulos@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

SEYFARTH SHAW LLP
Michael W. Kopp (SBN 206385)
mkopp@seyfarth.com
400 Capitol Mall, Suite 2350
Sacramento, California 95814-4428
Telephone: (916) 448-0159
Facsimile: (916) 558-4839

Attorneys for Defendants
PAREXEL INTERNATIONAL CORPORATION,
PAREXEL INTERNATIONAL LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SCHOULEE CONES, an individual, on behalf of herself and all others similarly situated,

Plaintiffs,

v.

PAREXEL INTERNATIONAL CORPORATION, a Massachusetts corporation licensed to do business in the State of California, PAREXEL INTERNATIONAL, LLC, a Massachusetts limited liability corporation licensed to do business in the State of California

Defendants.

Case No. 3:16-cv-03084-L-BGS

**DECLARATION OF CYNTHIA VIBAR**

I, Cynthia Vibar, declare:

1. I am over eighteen years old. The following facts are based on my own personal knowledge and, if called as a witness, I could competently testify to them.

2. I am providing this declaration freely and voluntarily. I was advised before speaking with PAREXEL's attorneys that I could choose whether to participate in the interview, and voluntarily chose to participate. PAREXEL's attorneys have told me that I do not have to provide this declaration and that if I choose to do so or not to do so, the decision will not affect my employment. I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate. I understand that this declaration may be used by PAREXEL in *Schoulee Cones v. PAREXEL International Corporation,* Case No. 3:16-cv-03084-L-BGS (U.S. District Court, Southern District of California), a case regarding whether PAREXEL correctly classified the Clinical Research Associate I, Clinical Research Associate II, Senior Clinical Research Associates, Clinical Monitoring Associate I, Clinical Monitoring Associate II, and Senior Clinical Monitoring Associate positions as exempt from overtime. PAREXEL may use this declaration to argue that a class should not be certified. I understand I am a potential class member in the lawsuit.

3. I received my Bachelors of Science with an emphasis in Medical Microbiology from the University of California, Davis in 2005. After college I did stem cell work at the University of California San Diego Medical Center and prior to that conducted quality control at Caltag, later acquired by Invitrogen.

4. I have been employed as a Manager, Clinical Operations for PAREXEL since November 2017. Prior to that time, I worked for PAREXEL as an Associate Manager, Clinical Operations starting in December 2015. As both a Manager and an Associate Manager, my responsibilities have included management and oversight of Clinical Research Associates (CRAs) and Clinical Monitoring Associates (CMAs.) During the period December 2015 to December 2017, I served as a "line manager" to approximately 24 CRAs and CMAs.

5. I began my career with PAREXEL in August 2007, when I joined the company as a Clinical Research Assistant, and have held various positions since that time, including the position of Clinical Research Associate. During the period that is relevant to the Cones lawsuit, I held the position of Clinical Monitoring Associate II (CMA II) from August 2012 to May 2015. Thereafter, I was a Senior Clinical Monitoring Associate (Senior CMA) from May 2015 until December 2015.

6. During part of my tenure as a CMA II and Senior CMA, I was a "decentralized" (from home) employee I had meetings with my manager approximately once every two to four weeks for approximately thirty minutes. We generally discussed any outstanding study issues, metrics, and career development. As a manager during the period December 2015-December 2017, I maintained approximately the same meeting schedule with the CMAs and CRAs whom I managed, although I met more frequently with those who were new to the position than more experienced staff, however experienced staff could request more frequent meetings with me as they needed to.

7. As both a CMA II and Senior CMA, I worked independently to perform remote clinical monitoring duties and visits. I utilized my judgment and discretion in deciding the priority of study deliverables and issue management. On a daily basis, I would make a determination as to which issues were the most pressing to resolve and generally address those first, with a primary focus on patient safety issues, followed by issues regarding data integrity and regulatory compliance. As I did, the CMAs whom I managed also worked independently to prioritize and manage their schedules, identify and address compliance and other sites issues, and otherwise perform their job duties.

8. As both a CMA II and Senior CMA, my duties were to manage my study sites as the primary contact with the sites as they conducted the study. To do so, I built relationships with site staff. I made every effort early on during the study to figure out how best to interact with the study staff because I knew that a good working relationship would help achieve our primary goals of patient safety, regulatory compliance and data integrity.

9. As a CMA II and Senior CMA, I primarily conducted remote monitoring visits, meaning that, unlike a CRA, I did not visit sites in person. It was my responsibility through these visits to monitor the sites' regulatory and other compliance with study standards, and craft solutions to address performance or compliance issues that arose during the course of the study, with the end goal of ensuring that the rights and safety of the study subjects was protected, that the sites were maintaining quality data and conducting the study in compliance with the proper protocol, study requirements, and all applicable regulations. In order to make such determinations, I had to think critically and holistically about the data and issues that I reviewed, be able to understand and interpret the study protocol, standard operating procedures (SOPs), and applicable regulations. I also needed to think proactively how a single issue at a site could trigger a host of problems in the future and how to prevent any adverse impacts to patients or the study.

10. Contrary to what I believe to be the allegations in this lawsuit, the job duties of a CMA and CRA are not dictated by SOPs, protocols, regulations, or checklists. Those rules and regulations are of vital importance and form the backbone of a clinical study, but they do not encompass the myriad of challenges and questions that arise at different sites during actual clinical trials. As a manager, I believe that the best and most successful CMAs and CRAs will understand the applicable rules and regulations and be able to apply them, using sound judgment and experience, to a wide variety of issues that can arise during a study and also be able to resolve the myriad of issues that arise and are not addressed by SOPs or protocol.

11. I found that, along with the extensive training that PAREXEL provides, my background in biology allowed me to successfully address study site issues that cannot be resolved entirely by reference to a protocol or other documentation. As a CMA, I spent the majority of my time critically and thoughtfully reviewing data and study issues in order to make the best decisions and recommendations. My assessments were not black and white, and oftentimes, there was no one correct answer. In fact, it is probable and

likely that two different CMAs or CRAs can analyze an issue and come to different conclusions despite protocol, SOPs and other such documents.

12. As a CMA, I was often the first person that the site would contact at PAREXEL to figure out solutions to problems, and I was also responsible for working to detect and resolve any deficiencies, anomalies or potential fraud at a site. If I missed issues, or rendered incorrect advice, it could adversely affect the study as a whole, disqualify a site (which would also adversely affect a study), and even worse, affect patient safety.

13. As discussed above, my primary responsibility as a CMA was to resolve issues that arose at the study sites. The sites relied on me for answers, and often answers were needed immediately. It was my job to troubleshoot, problem solve and think critically how I could help a site, and I resolved the vast majority of site issues on my own without escalation to the Medical Monitor or Clinical Operations Lead. However, I was responsible for determining when it is necessary to refer a compliance issue or medical issue to the medical monitor or Clinical Operations Lead. In those instances I would not simply feed the Medical Monitor or Clinical Operations Lead the facts, but instead would include a proposed solution. I have the same expectation for the CMAs who I now manage; their job is to timely resolve problems; not simply escalate issues to others.

14. Not all study sites are alike or have the same experience with clinical studies. Accordingly, as a CMA, it was also my responsibility to evaluate whether the site staff was trained and properly performing the study. If that wasn't happening, I was responsible on many occasions for determining and providing necessary re-training. When I undertook such responsibilities, I tried to approach staff in what I determined to be the most productive way I could. I did this by assessing the strengths, weaknesses and personalities of the staff. I also found that being proactive with motivating and training the staff was later beneficial to the operation of the study.

15. As a CMA and CRA, I understood that my salary covers all of the hours that I worked.

16. I am familiar with PAREXEL's written meal and rest policy for exempt employees. As a CMA (and as a CRA) I understood that I was able to determine when to take rest breaks and when to eat lunch. I have never heard of any CMA or CRA complaining that they were not allowed take a meal or rest period, including one of the plaintiffs, Dexter Pasis, during the few months that I served as his line manager.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this first day of May 2018, at San Diego, California.

[signature]
Cynthia Vibar

SEYFARTH SHAW LLP
Diana Tabacopoulos (SBN 128238)
dtabacopoulos@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

SEYFARTH SHAW LLP
Michael W. Kopp (SBN 206385)
mkopp@seyfarth.com
400 Capitol Mall, Suite 2350
Sacramento, California 95814-4428
Telephone: (916) 448-0159
Facsimile: (916) 558-4839

Attorneys for Defendants
PAREXEL INTERNATIONAL CORPORATION,
PAREXEL INTERNATIONAL LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SCHOULEE CONES, an individual, on behalf of herself and all others similarly situated,

Plaintiffs,

v.

PAREXEL INTERNATIONAL CORPORATION, a Massachusetts corporation licensed to do business in the State of California, PAREXEL INTERNATIONAL, LLC, a Massachusetts limited liability corporation licensed to do business in the State of California

Defendants.

Case No. 3:16-cv-03084-L-BGS

**DECLARATION OF HANNAH WEAVER**

SAC Filed: 9/11/17

I, HANNAH WEAVER, declare:

1. I am over eighteen years old. The following facts are based on my own personal knowledge and, if called as a witness, I could competently testify to them.

2. I first started working for PAREXEL International in July 2014 as a contractor. I was hired into a permanent position around February 2015 as a Clinical Monitoring Associate ("CMA") II. Approximately one year later I was promoted to the position of Senior CMA. I held that position until January 2018, when I transitioned into a new position--Senior Clinical Site Manager. This declaration concerns my time that I worked at PAREXEL as a CMA II and Senior CMA.

3. As a CMA, I was responsible primarily for establishing and maintaining regular and productive oversight of all the sites I covered. This meant establishing the necessary contacts with my sites so that I could monitor their progress on clinical trials, make sure they were addressing all open queries and issues that came up during the trial, and help them resolve those issues in a timely manner. It also meant establishing a relationship with the sites so that they knew that I was a resource who could address any questions they might have about trial requirements and somebody they could and should turn to if an issue arose. My goal as a CMA was always to assist the sites in any way I could.

4. As a Senior CMA I was assigned to a study addressing Type II Diabetes, and oversaw approximately 12 to 15 sites on this study. I have previously been assigned to a breast cancer study where I oversaw approximately 12 to 15 sites.

5. The CMA II and Senior CMA generally perform the same work, however, a Senior CMA has a higher profile within the company and will get assigned to more complex studies and may be asked to take on additional tasks and responsibilities such as mentoring.

6. Before working at PAREXEL I worked at another clinical research organization ("CRO"). When I first started at this CRO, I took and completed a three-month long intensive training program in clinical research. I then worked there for two more years doing work similar to that of a CMA at PAREXEL. Before PAREXEL, I also worked in several other research positions, however, the research was academic or occupational in nature, not clinical.

7. My work experience and training prior to coming to PAREXEL definitely helped prepare me for my work as a CMA at PAREXEL. Clinical research is a complex field, and to perform it properly, one has to keep track of many moving parts, all the while ensuring that a study remains in compliance with numerous regulatory requirements. One cannot do the work of a CMA without

understanding the operations and goals of a clinical trial. A CMA must know how to multitask and how to prioritize and re-prioritize his or her work.

8. For most of my time as a CMA at PAREXEL, I worked as a decentralized employee out of my home office in the Raleigh/Durham area of North Carolina. I worked out of the PAREXEL office in Durham, North Carolina for only my first six months as a CMA. I always worked very independently as a CMA, meaning that nobody directed my work each day or held my hand as I performed my job. It was my responsibility to manage and adjust my schedule and prioritize my tasks so that I timely got everything done that needed to get done and addressed high priority issues as they emerged. This is not to say, of course, that PAREXEL personnel were not there to provide me with support if I needed it. They certainly were.

9. Angela Beaver has been my Line Manager for the past two years, including while I was a Senior CMA. She is also a decentralized employee. I appreciate Angela's management style. She does not micro-manage me, nor does she need to. I expect that she would likely follow up with CMAs who were delinquent in submitting reports or taking training, but that was never an issue for me. Angela is very supportive. When I was a CMA, we had scheduled calls every other week that lasted between 30 minutes and an hour during which we discussed upcoming trainings, office events, and career development. We also discussed any issues I had with my sites and whether PAREXEL could provide any additional resources to help with these issues. In addition to these calls, I met Angela about once a quarter at PAREXEL's "Connection Spot" events. These events are held quarterly in the Raleigh/Durham office, and the Company provides training, shares information and updates about the company, and gives PAREXEL employees an opportunity to meet one another.

10. I constantly used my judgment and problem solving skills as a CMA. There are always issues arising during a clinical trial that require me to use my judgment and problem-solving skills to address the issue and to minimize the issue's impact on the trial. As discussed below, what I do in response to an issue varies depending on a number of factors, including the seriousness of the issue and my understanding of the site.

11. I have worked with several sites that are notoriously non-responsive. They are continuously not resolving queries in a timely manner, not entering data on time, and not completing training in a timely manner. All of this can jeopardize the study. With these sites, I constantly used problem solving strategies and different tactics to get the sites in compliance with the study requirements. If it is a staffing issue or a matter of lack of resources, I have worked with sites to develop a specific plan as to who at the site will perform each task, so that each individual at the site may be held accountable for their own responsibilities. If I was not successful working with just the coordinator, I would raise the compliance issues with the doctor directly. If I am unable to get the site on track on my own, I have used my judgment to escalate the issue to my manager to comply.

12. It was an essential component of my job as a CMA to identify trends in overall site compliance. By identifying trends in compliance issues, it helped me identify the source of a site's problems. There are lots of potential sources of issues at a site: a lack of resources; a lack of time; work on a competing study; poor procedures in place. As a CMA, I aimed to work with the site always to pinpoint the specific issue contributing to the compliance issues and then worked with them to resolve it.

13. An open and productive line of communications was the most effective tool in increasing and improving compliance at the sites I monitored. To establish this line of communications, I used different communications strategies that varied depending on the site. I always tried to mirror the communication style of my contacts at the site, which I found was effective in building rapport. So if the site coordinator was direct and no nonsense, I would be direct and no nonsense. If the coordinator preferred a bit of chit chat, I would chat with her about her family. In my experience, building a friendly professional relationship with a site is the best way to get them to be responsive to me. But when an issue arose, I did not hesitate to be direct, because my responsibility is to ensure compliance. To be effective I needed to be willing to be tough. If I didn't hold sites accountable for their non-compliance on a study, they could have continued to have issues, which could threaten the viability of a study and perhaps lead to issues of patient safety.

14. It was also my responsibility as a CMA to use my judgment to assess whether a site needed additional training as well as how and the form in which to provide such training. If I saw

repeated errors, for example, or serious deviations from the protocol, I retrained staff on the entire process giving rise to the errors and took additional time to continue to reinforce those procedures going forward. For certain other less serious errors, for example, I just had a conversation with the site coordinator.

15. The amount of time I spent addressing issues or problems varied from study to study. This is because some studies, such as the Type II Diabetes study, are more complex, with more moving parts, more required equipment, more required patient visits, and more steps in the protocol. As a result, there were more opportunities for a site to make an error or to fall out of compliance with the protocol. This also means that there were more items for me to monitor and more opportunities for me to respond to these compliance issues and to use my judgment and problem solving skills to respond to them. By comparison, the breast cancer study I worked on was far more straightforward than the Diabetes study.

16. The amount of time I spend addressing issues or problems also varied from site to site. Some sites are extremely organized and always make it their practice to follow the protocol to a tee. At these sites, I rarely encounter deviations from the protocol. Other sites are constantly strapped for time, are less organized and frequently make mistakes. At these sites, I am regularly retraining staff and working with them to develop strategies to get them and to keep them in compliance.

17. As a CMA, I was intensely involved in the start-up activities for the Type II Diabetes study. Because this study had so many requirements that needed to be met before a site could be ready for initiation, PAREXEL CMAs such as myself partnered with each site over a period of months to prepare them for initiation. There were a host of requirements that each site needed to meet, including ensuring that all relevant systems were registered and updated, making sure that all of the correct personnel had access to the right systems, getting site personnel trained on the systems and protocol, and ensuring that all contracts were finalized and executed, that budgets were set, and that all regulatory and training documents were correct and available and on site. During this time period--which was the most demanding and the busiest time of my career at PAREXEL--I was in constant contact with each site, on an almost daily basis.

18. Each site was also under a strict deadline to be ready for initiation, so I needed to use my judgment to decide which tasks and sites required my focus so that I could keep each site on track to meet the initiation deadline. I also had to balance the sponsor's deadlines against each site's own internal deadlines. For example, certain sites needed to first obtain approval for the study from their institutional review board which could require us to postpone certain initiation steps until that occurred. As a result, my schedule and the work I performed were constantly in flux, as I needed to be flexible enough to reprioritize my work each day so that I could keep each site on deadline.

19. During this phase, I constantly used my judgment and problem solving skills to keep each site's progression towards initiation consistent with the trial requirements and on track with the schedule. I needed to use my judgment as to which sites needed more guidance and reminders, which needed hand-holding throughout the process, and which were more self-sufficient. I constantly needed to problem solve and to make adjustments to my daily tasks throughout this time period to ensure that everything got done in a timely fashion.

20. There was significant variation from site to site in the amount of time, effort, and problems that arose in getting them initiated for this study. Some sites were able to provide what was required of them on time and correct the first time. Other sites completed the requirements much more slowly and needed me to constantly check in, remind, and retrain them regarding the initiation requirements. I also spent significantly more time reviewing the required documentation for these sites, as they were more prone to mistakes.

21. Most of my time as a CMA at PAREXEL was spent monitoring clinical trial sites, which I did remotely by phone. What was discussed on each call varied depending on the status of the site. As CMAs, we regularly ran several reports for each site, which provided information regarding whether a site had open queries, missing or late data, missing aspects of their required reports, missing training, or other open issues that were brought to my attention by the site or the CRA. I also was kept apprised as to changes in a site's staffing. To keep my sites in compliance, I needed to address each of these unique issues on every call, and the specific issues that existed at each site dictated how I would respond. For example, if there was a change in staffing at a site or a switch in responsibilities among staff, I would

need to focus the call on making sure that each person was trained on each of his or her relevant responsibilities and that each staff member had access to the appropriate systems.

22. While the SOPs contain checklists that can be used in conjunction with a monitoring call, by no means would I use a checklist as my talking points for a monitoring call. Rather, I knew what needed to be discussed and addressed with each site based on the issues that came up in the reports or that were revealed to me by the site itself or from the CRA. The checklist was there only as a reminder of topics I should cover on a call.

23. I plan my own schedule and set my own work hours. The number of hours I work each week varies, however, I rarely ever work more than 40 hours in a week. Sometimes I will start my day around 7 or 8 a.m., and then work approximately an eight hour day. Other times, I will start at 9 a.m. PAREXEL gives me the flexibility to do my work on my own schedule so long as my manager is aware of when I am and am not available.

24. I understand that my salary covers all of my hours, regardless of the number of hours I work each week.

25. Because I set my own schedule, I decide when to take my rest or meal breaks during the day. I understand that PAREXEL's policy permits me to take a meal and two rest breaks during the day.

26. I like being a salaried employee because it gives me the flexibility to juggle my work and personal life. It would be far harder to keep track of my time if I had to keep track of my activity every hour of the day.

27. I am providing this declaration freely and voluntarily. I was advised before meeting with PAREXEL's attorneys that I could choose whether to participate in the interview, and voluntarily chose to participate. PAREXEL's attorneys have told me that I do not have to provide this declaration and that if I choose to do so or not to do so, the decision will not affect my employment. I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate. I understand that this declaration may be used by PAREXEL in *Schoulee Cones v. PAREXEL International Corporation,* Case No. 3:16-cv-03084-L-BGS (U.S. District Court, Southern District of California), a case regarding whether PAREXEL correctly classified the Clinical Research

Associate I, Clinical Research Associate II, Senior Clinical Research Associate, Clinical Monitoring Associate I, Clinical Monitoring Associate II, and Senior Clinical Monitoring Associate positions as exempt from overtime. PAREXEL may use this declaration to argue that a class should not be certified. I understand I am a potential class member in the lawsuit.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 16th day of May 2018, at Durham, North Carolina.

HANNAH WEAVER

SEYFARTH SHAW LLP
Diana Tabacopoulos (SBN 128238)
dtabacopoulos@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

SEYFARTH SHAW LLP
Michael W. Kopp (SBN 206385)
mkopp@seyfarth.com
400 Capitol Mall, Suite 2350
Sacramento, California 95814-4428
Telephone: (916) 448-0159
Facsimile: (916) 558-4839

Attorneys for Defendants
PAREXEL INTERNATIONAL CORPORATION,
PAREXEL INTERNATIONAL LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCHOULEE CONES, an individual, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PAREXEL INTERNATIONAL CORPORATION, a Massachusetts corporation licensed to do business in the State of California, PAREXEL INTERNATIONAL, LLC, a Massachusetts limited liability corporation licensed to do business in the State of California<br><br>Defendants. | Case No. 3:16-cv-03084-L-BGS<br><br>**DECLARATION OF JASON ZATKOVICH**<br><br>SAC Filed: 9/11/17 |

I, Jason Zaktovich, declare:

1. I am over eighteen years old. The following facts are based on my own personal knowledge and, if called as a witness, I could competently testify to them.