SEYFARTH SHAW LLP
Diana Tabacopoulos (SBN 128238)
dtabacopoulos@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:   (310) 277-7200
Facsimile:    (310) 201-5219

SEYFARTH SHAW LLP
Michael W. Kopp
mkopp@seyfarth.com
400 Capitol Mall, Suite 2350
Sacramento, California 95814-4428
Telephone:   (916) 448-0159
Facsimile:    (916) 558-4839

Attorneys for Defendants
PAREXEL INTERNATIONAL CORPORATION
and PAREXEL INTERNATIONAL, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCHOULEE CONES, an individual, and DEXTER PASIS, an individual, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>      v.<br><br>PAREXEL INTERNATIONAL CORPORATION, a Massachusetts corporation licensed to do business in the State of California; and PAREXEL INTERNATIONAL, LLC, a Massachusetts limited liability company licensed to do business in the State of California,<br><br>            Defendants. | Case No. 3:16-cv-03084-L-BGS<br><br>**DEFENDANTS' OPPOSITION TO MOTION FOR CONDITIONAL AND CLASS CERTIFICATION**<br><br>Date:       May 14, 2018 (Continued with no new date assigned)<br><br>Judge:      Hon. M. James Lorenz<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY COURT** |

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

STATEMENT OF FACTS ....................................................................................3

I.  PAREXEL DEPENDS ON THE CRITICAL THINKING AND JUDGMENT CRAS AND CMAS EXERCISE AND RECRUITS AND COMPENSATES THEM ACCORDINGLY.............................................................3

II.  CRA DUTIES VARY DEPENDING UPON THE STUDY SCOPE, THERAPEUTIC AREA, STUDY PHASE, SITE QUALITY, AND PARTICULAR SITE CHALLENGES. ..........................................................4

    A.  Trial Site Qualification Requires the CRA to Critically Evaluate and Assess the Site for Participation in the Study. ....................................4

    B.  Trial Site Initiation Requires the CRA to Strategically Plan for Training the Site, to Evaluate Site Comprehension, and to Evaluate the Site's Preparedness to Enroll Patients and Receive the Study Drug.........5

    C.  On-Site Monitoring Requires CRAs to Evaluate and Problem Solve Issues on Patient Medical Records, Regulatory Compliance, Data Quality and Integrity and Patient Recruitment. ....................................6

    D.  CRAs Assess and Resolve Open Issues At Site Termination Visits. .............9

    E.  CMAs Perform a Different Scope of Duties Than CRAs, and Exercise Judgment and Discretion In Performing Various Monitoring Duties.............9

    F.  The Type and Number of Clinical Trials and Sites Managed by CRAs and CMAs Varies and Impacts the Exercise of Discretion..........................11

    G.  SOPs Provide A High-Level Framework on the Management of Clinical Trials But Do Not Dictate Substantive Assessments, Evaluations, and the Strategic Problem Solving Conducted by CRAs and CMAs.......................................................................................12

    H.  CRAs and CMAs are Expected to, and Do, Perform Independently...........13

LEGAL ARGUMENT........................................................................................14

I.  RULE 23 IS NOT A PLEADING STANDARD, AND PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF PROVING ALL OF THE RULE 23 REQUIREMENTS ....................................................................................14

    A.  Neither Cones nor Pasis is Typical or Adequate..........................................14

    B.  Plaintiffs Have Not Shown Common Questions Predominate, and Analysis of the Administrative Exemption Requires Individualized Inquiries as to the Work Actually Performed By CRAs and CMAs. ..........16

    C.  Plaintiffs Fail to Demonstrate the Superiority of Class Treatment...............20

i

|   | D. | Plaintiffs Fail to Demonstrate a Class Trial Would be Manageable and There Is No Foundation for Representative Evidence | 20 |

| II. | | A COLLECTIVE ACTION SHOULD NOT BE CERTIFIED BECAUSE PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN | 21 |
|   | A. | Plaintiffs Cite the Wrong Standard: Class Certification Discovery Has Closed, and A Stricter Second-Step Analysis Applies. | 22 |
|   | B. | Even if the First Step Analysis Were Applied-Notwithstanding the Completion of Substantial Discovery - Plaintiffs' Submission Fails to Support Conditional Certification of a Nationwide Collective | 24 |
|   | C. | Analysis of the Administrative and Highly-Compensated Exemptions Requires Further Individualized Inquiries | 25 |

| III. | | PLAINTIFFS' EXPERT DECLARATIONS MUST BE STRICKEN | 26 |
|   | A. | Gortler's Declaration Must Be Excluded Because He Opines On Matters That Are Irrelevant to Class Certification and Not Proper For Expert Testimony, and Otherwise Does Not Qualify As An Expert | 26 |
|   | B. | Cohen's Testimony Must Be Excluded Because He Possesses No Specialized Knowledge That Would Assist the Trier of Fact, His Opinions Are Not Based on Any Reliable or Sufficient Facts or Data, And Are Irrelevant To Any Issue Material To Class Certification | 29 |

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Inter-Con Sec. Systems, Inc.*,
   242 F.R.D. 530 (N.D. Cal. 2007)...................................................................24

*Barker v. U.S. Bancorp.*,
   2017 WL 2620676 (S.D. Cal. June 16, 2017) ...............................................17

*Brown v. Barnes and Noble, Inc.*,
   252 F. Supp. 3d 255 (S.D.N.Y. 2017) ...........................................................24

*Cruz v. Dollar Tree Stores, Inc.*,
   2011 WL 2682967 (N.D. Cal. Jul. 8, 2011) .............................................20, 21

*Davis v. Soc. Serv. Coordinators, Inc.*,
   2012 WL 5361746 (E.D. Cal. 2012)...............................................................22

*Encino Motorcars, LLC v. Navarro*,
   138 S.Ct. 1134 (2018)....................................................................................23

*Greenly v. Sara Lee Corp.*,
   2008 WL 1925230 (E.D. Cal. April 30, 2008) ..............................................18

*Jenkins v. TJX Cos. Inc.*,
   853 F. Supp. 2d 317 (E.D.N.Y. 2012) ...........................................................25

*Jimenez v. Domino's Pizza, Inc.*,
   238 F.R.D. 241 (C.D. Cal. 2006).............................................................……20

*Jovel v. Boiron*,
   2014 WL 1027874 (C.D., Cal. Feb. 27, 2014) ..............................................16

*Kennedy v. Commonwealth Edison Co.*,
   410 F.3d 365 (7th Cir. 2005) ....................................................................18, 19

*Khan v. Airport Management Services, LLC*,
   2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011)...............................................25

*Kline v. Wolf*,
   702 F.2d 400 (2d Cir. 1983) ..........................................................................15

iii

*Kress v. PricewasterhouseCoopers, LLC*,
    263 F.R.D. 623 ................................................................................................ 24

*Labou v. Cellco Partnership*,
    2014 WL 824225 (E.D. Cal. Mar. 3, 2014) .................................................... 14

*Lanzarone v. Guardsmark Holdings, Inc.*,
    2006 WL 4393465 (C.D. Cal. Sept. 7, 2006) ................................................ 20

*Leuthold v. Destination America, Inc.*,
    224 F.R.D. 462 (N.D. Cal. 2004) ................................................................... 24

*Marlo v. United Parcel Serv., Inc.*,
    251 F.R.D. 476 (C.D. Cal. 2008), aff'd, 639 F.3d 942 (9th Cir. 2011) ......... 21

*Marlo v. United Parcel Serv., Inc.*,
    639 F.3d 942 (9th Cir. 2011) ......................................................... 14, 17, 21

*McAllister v. TransAmerica Occidental Life Ins. Co.*,
    325 F.3d 997 (8th Cir. 2003) ......................................................................... 18

*Pfohl v. Farmers Ins. Group*,
    2004 WL 554834 (C.D. Cal. 2004) .......................................................... 22, 23

*Pryor v. Aerotek Sci., LLC*,
    278 F.R.D. 516 (C.D. Cal. 2011) ................................................................... 15

*Rix v. Lockheed Martin Corp.*,
    2011 WL 890744 (S.D. Cal. Mar. 14, 2011) ................................................. 18

*Scott v. N.Y. City Dist. Council of Carpenters Pension Plan*,
    224 F.R.D. 353 (S.D.N.Y. 2004) ................................................................... 15

*Silverman v. SmithKline Beecham Corp.*,
    2007 WL 6344674 (C.D. Cal. 2007) .............................................................. 24

*Smith v. Red Robin*,
    2017 WL 1198907 (S.D. Cal. Mar. 31, 2017) ......................................... 14, 17

*Trinh v. JP Morgan Chase & Co.*,
    2008 WL 1860161 (S.D. Cal. Apr. 22, 2008) ............................................... 24

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009) ......................................................................... 17

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................ 14

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009) ................................................................. 17

*In re Wells Fargo Home Mortgage Overtime Pay Litig.*,
   268 F.R.D. 604 (N.D. Cal. 2010) ........................................................... 21

*Wynn v. National Broadcasting Co., Inc.*,
   234 F.Supp.2d 1067 (C.D. Cal. 2002) .................................................... 22

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ................................................................ 20

**State Cases**

*Brinker v. Superior Court*,
   53 Cal.4th 1040 (2012) .................................................................... 16, 20

*Dunbar v. Albertson's, Inc.*,
   141 Cal.App.4th 1422 (2006) ................................................................. 17

*Ramirez v. Yosemite Water Co.*,
   20 Cal. 4th 785 (1999) ...................................................................... 15, 17

**Federal Statutes**

FLSA .................................................................................................. 4, 23, 25

**Rules**

Fed. R. Civ. P. 23 ........................................................................... 14, 18, 23

Fed. R. Civ. P. 23(a) ............................................................................... 14

Fed. R. Civ. P. 23(b) ............................................................................... 14

Fed. R. Civ. P. 23(b)(3) ........................................................................... 14

**Regulations**

29 C.F.R. § 541.601(c) ....................................................................... 25, 26

29 C.F.R § 541.701 .................................................................................. 26

v

Wage Order 4-2001(1)(B)(1)(e) ........................................................................ 17

**Other Authorities**

Internal Revenue Code ..................................................................................... 19

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

**INTRODUCTION**

PAREXEL provides clinical research services to companies ("Sponsors") seeking to bring new medical treatments to the public. Sponsors hire PAREXEL to evaluate, train, and supervise clinical trial sites (doctor offices, clinics, hospitals and universities) that conduct trials of new medications and devices. Sponsors use data from these sites to support applications for the approval of new medical therapies. PAREXEL utilizes six different job positions[1] with various critical, and often exclusive, responsibilities for evaluating and ensuring the trial site's compliance with patient safety, medical and other data integrity, and regulatory requirements. The exercise of continuous judgment in conducting these important duties is essential for protecting patient safety and avoiding audits or the denial of drug applications, which could negate years of research.

This misclassification action was initiated by Schoulee Cones, a former SCRA who is uniquely inadequate to prosecute this action on an individual basis, let alone on a state or nationwide basis. In her fleeting 2-month tenure, she never qualified to perform any of the complex, varied duties expected of SCRAs, never visited a clinical trial site, and was fired following her inability to pass the qualifying exams and substantiate her prior employment.[2] She is not "typical" or "similarly situated" to other CRAs who actually ***qualified for and performed*** the position, and is unable to speak to how they performed their jobs.[3] Cones, a twice-convicted felon, nonetheless seeks approval to mount a sweeping challenge to the exempt status of all three CRA positions, transforming them from generously-compensated salaried positions to hourly, time-tracked positions.

Cones has virtually no support from the putative class and has failed entirely to meet her evidentiary burden. Despite three extensions of the certification motion

---

[1] Clinical Research Associate I ("CRA I"), CRA II, Senior CRA ("SCRA"), Clinical Monitoring Associate I ("CMA I"), CMA II, and Senior CMA. Plaintiffs erroneously assert the positions were "reclassified." Rather in a restructuring, the positions ended, and on January 1, 2018, PAREXEL moved to salaried/exempt Clinical Site Manager and Initiation Clinical Site Manager positions, with different and restructured duties.

[2] Cones Tr. 42:9-12; 248:22-249:2; 290:12-291:9; Moyer ¶¶25-26. (Deposition testimony is attached to the Kopp Declaration). PAREXEL will move for summary judgment on Plaintiffs' individual claims once the Court sets that schedule. (ECF 110)

[3] Cones Tr. 246:13-22; 290:17-291:9.

1

deadline, seventeen months of litigation and discovery and access to hundreds of current and former California CRAs and CMAs, Cones has recruited just **one additional opt-in**, Plaintiff Dexter Pasis, out of a nationwide putative collective of nearly 2,000 employees.

Pasis, another short-term employee, who held only the CMA II position, is the **only** CMA to support Plaintiffs' motion. Recognizing Cones' inadequacy, Pasis now seeks to represent all six positions, despite his admitted wholesale ignorance about his role as a representative, the CRA position, and how other CRAs or CMAs performed their work.[4] In self-authored documents (e.g. resumes), Pasis repeatedly described his CMA duties as **involving judgment.**[5] His attempt to now unwind these admissions via a contradictory declaration cannot support a nationwide collective or a statewide class.

Otherwise, Plaintiffs have only **three** objectionable **form** declarations, despite having the **full** amount of time requested to utilize class contact information.[6]

Plaintiffs attempt to overcome their evidentiary deficit by relying improperly on an "expert" witness to opine on job duties, despite his lack of foundation, and by dumping hundreds of pages of Standard Operating Procedures ("SOP") documents on the Court, claiming they dictate job duties, without any citation, or any explanation how any of them purportedly do so. Human clinical trials are not free-form, and have some structure. Astronauts and nuclear power plant operators likewise utilize SOPs and checklists while performing critical thinking. PAREXEL's **broader collection of declarations** establish the role of these documents and how judgment and discretion is used within and outside

---

[4] Pasis Tr. 79:23-80:2; 119:10-121:2; 125:8-17; 260:3-10. (***I don't know what the [SCRA] position at PAREXEL . . . requir[ed].***") Pasis had knowledge of his 14 sites, but not how CMAs managed the 800 other sites on his study. 147:12-15; 149:1-4.
[5] Pasis claimed he was responsible for "preserving a high performing position while managing 17 study sites," "us[ing] judgement to assess and ensure overall integrity of study implementation," "ascertain[ing] and recommend[ing] appropriate follow-up response to issues at clinical sites," "establish[ing] strong relationships with various types of site staff personalities," "maintain[ing] a positive, results oriented work environment, building partnerships and modeling teamwork, communicating to the team in an open, balanced and objective manner," "manag[ing] sites and protocols across multiple therapeutic areas independently," "support[ing] less experienced staff on project assignments as appropriate." Pasis Tr. 56:15-57:16; 69:21-70:22; 128:15-19; 274:22-275:20, Exs. 7, 14.
[6] *See* Dkt. 75, granting Plaintiffs' request **in full** for a continuance they alleged was necessary to utilize class contact information in support of motion for class certification.

of them in performing these critical positions.[7]

Courts regularly deny conditional and class certification where the plaintiff's evidence consists only of declarations with generalized claims of non-exempt duties, job descriptions, or policies with no context. Courts also commonly deny class treatment of misclassification claims because they require examination of the duties *performed* by the employees. Here, the evidence shows significant variation in the job duties performed by CRAs and CMAs, depending on study type, phase, therapeutic areas, and site quality. Plaintiffs' submission confirms that Cones, Pasis, and their 3 declarants *performed their jobs in a manner at odds* with PAREXEL's expectations and other CRAs and CMAs.

## STATEMENT OF FACTS

### I.   PAREXEL Depends On The Critical Thinking And Judgment CRAs and CMAs Exercise and Recruits and Compensates Them Accordingly.

PAREXEL recruits individuals for the CRA and CMA positions with academic backgrounds in science and experience in clinical research, pharmacology and nursing. For example, SCRA Gruzdeva received her Ph.D. in Molecular Genetics, a Master's in Biology with a Chemistry Major, and a Postdoctoral Master's in Bioscience, and was a Postdoctoral Associate at Weill Medical College of Cornell. (Gruzdeva ¶¶5-8.) SCRA Dellapuca holds a Biochemistry degree, a Master's in Public Health, and is working toward a Ph.D. in neurobiology. (Dellapuca ¶2.) Cynthia Vibar, a CMA II and SCRA, has a degree in Medical Microbiology and performed stem cell work at U.C. San Diego. (Vibar ¶3) CRA II Zughni holds a Master's in Biology. (Zughni ¶4.)[8] This background provides a foundation for the evaluative clinical trial work required of CRAs and CMAs.[9]

---

[7] Plaintiffs filed a baseless motion to strike PAREXEL's declarations and other evidence, which the Court struck.  (ECF 106-4.)  PAREXEL nonetheless provides the factual background that refutes Plaintiffs' arguments and reserves the right to file an opposition to any re-filed motion to strike. *See* Kopp §§ 19-41.

[8] CMA and CRA's varied science backgrounds include Biology, Public Health (Anglin ¶3); Pharmacology, Microbiology (Appiah ¶19), Health Sciences (Ewing ¶6); Biology, Chemistry (Gay ¶7; Lee ¶5; Nichols ¶6; Richard ¶3); Biochemistry (Montieth ¶6); coursework in drug development (Madden ¶3); Molecular Biology (Moser ¶4; Chan ¶3; Endicott ¶4); nursing (Mittense ¶3); coursework toward an M.S. in Clinical Research Administration (Copling ¶4); medical experience (Nichols ¶7; Mittense ¶3; Jusino ¶6).

[9] *See, e.g.*, Appiah ¶19 (pharmacology, microbiology degrees important to her CRA position); Gay ¶7; Mittense ¶3 (nursing enhanced analysis of trends within patient data).

Consistent with the preferred qualifications and the judgment required, PAREXEL highly compensates CRAs and CMAs. Cones' 2014 base salary was $115,000, exclusive of bonuses. (Cones Tr. 244:14-20.) Nearly one third (676 members) of the putative FLSA collective earned over $100,000, qualifying for the Highly Compensated Exemption. (Maddock ¶6.) Like other CROs, PAREXEL classified these as positions exempt.[10]

## II. CRA Duties Vary Depending Upon The Study Scope, Therapeutic Area, Study Phase, Site Quality, and Particular Site Challenges.

Clinical study sites progress through qualification, initiation, maintenance, and termination stages, with CRAs performing distinct duties and making different critical decisions at each stage. CRAs' primary responsibilities are to evaluate sites for potential qualification, train sites to initiate the study, critically evaluate patient medical records, including for data integrity, trends, patient safety and possible fraud, evaluate sites for regulatory compliance and resolve noncompliance, and problem solve to promote sites' performance.[11] The actual duties performed by each CRA vary greatly depending upon numerous factors, such as the stage, type, and complexity of the study and therapeutic area, and the needs of the various sites.[12]

### A. Trial Site Qualification Requires the CRA to Critically Evaluate and Assess the Site for Participation in the Study.

PAREXEL expects CRAs to play a critical role in recommending sites for approval since only they conduct in-person evaluations of the site and PAREXEL relies on their judgment. (Marnell Tr. 275:5-20). CRAs holistically evaluate the staffs'

---

[10] Cantrell, a CMA II, worked for CROs prior to PAREXEL, including Quintiles, INC Research (now Syneos), Novella Clinical, DCRI, Cenduit, and Health Decisions and has "never seen posted nor heard of any [CMA] or [CRA]…position that was not salaried." (Cantrell ¶3.) CRA Copling had "never received hourly pay for performing work as a CRA" for any CRO (Copling ¶4) *See also, e.g.,* Pasis 270:4-271:2; Cox ¶6; Ewing ¶7; Benton ¶3 (classified as salaried/exempt as a CRA at prior CROs).

[11] DiJohnson ¶9-14; Richard ¶5-21; Mittense ¶3-12; Anglin ¶8-18; Appiah ¶9-21; Benton ¶2-16; Cox ¶11-35; Copling ¶6-16; DellaPuca ¶10-17; Ewing ¶14-26; Gay ¶3, 13-37; Gruzdeva ¶9-24; Howell ¶11-14; Lee ¶10-35; Montieth ¶15, 17-28; Nichols ¶¶12-30; Zughni ¶6-15; Sanders ¶14-20; Zatkovich ¶6-15; Wright ¶12-18; Langley ¶6-12; Endicott Decl. ¶13-18

[12] DiJohnson ¶ Richard ¶6, 9, 11, 17; Mittense ¶8-9; Anglin ¶14, 16; Appiah ¶7; Benton ¶2-16; Copling ¶6-16; Cox ¶11-35; DellaPuca ¶10-17; Ewing ¶14-26; Gay ¶3, 13-37; Gruzdeva ¶9-24; Howell ¶11-14; Lee ¶10-35; Montieth ¶15, 17-28; Nichols ¶12-30; Sanders ¶14-20; Zatkovich ¶6-15; Zughni ¶6-15.

4

credibility, feasibility of patient enrollment projections, the site's competing demands, the PI's (medical doctor) interest in the study, the condition of equipment,[13] and staff research competence.[14] Ineffective site evaluation could have serious consequences, including whether a drug advances in the approval process. (Marnell Tr. 271:4-272:1.)

Cones' allegation that qualification visits are performed solely per SOPs is devoid of personal experience,[15] and is contrary to PAREXEL's expectations, as expressed by its Associate Director of Clinical Operations, who testified that SOPs are only guidelines to be used in the overall evaluation, which will vary by CRA, site and study. (Marnell Tr. 54:13-14; 272:15-273:7.) Cones' allegation is also *dissimilar* to the experiences of other CRAs, who confirm that decision-making is holistic, and not determined solely by SOPs or protocol. (DiJohnson ¶8). For example,  SCRA Nichols stated:

> There is no simple formula in making overall recommendations for a qualification visit. I don't just count up the number of boxes that are checked. I need to look at everything I've observed during the visit and then use my judgment to make the overall recommendation (Nichols ¶22).[16]

Moreover, where the CRA identifies deficiencies, they propose solutions. *See e.g.,* Richard ¶14 (if lack of site capacity, are there solutions, such as additional staffing); Anglin ¶15 (if assessment of patient recruitment revealed concerns, Anglin worked with site "to figure out the site's capabilities and come up with strategies on recruitment.")

### B. Trial Site Initiation Requires the CRA to Strategically Plan for Training the Site, to Evaluate Site Comprehension, and to Evaluate the Site's Preparedness to Enroll Patients and Receive the Study Drug.

Plaintiffs' three duplicate CRA declarations characterize ***verbatim*** their approach to site initiation as being controlled entirely by SOPs, monitoring plans and protocol.

---

[13] Inquiries even as to equipment inform the overall assessment and site competency, *e.g.*, the failure to  "calibrat[e] the equipment at any point suggested to me they were not involved in related clinical research or if they have done clinical research in the past, were not following good clinical practice . . . ." (Mittense ¶10.)

[14] Richard ¶12-15; Mittense ¶10; Anglin ¶14-15; Appiah ¶9-13; Benton ¶8-9; Copling ¶7; Cox ¶19-25; Gay ¶22-27; Howell ¶11; Lee ¶16-21; Montieth ¶23; Nichols ¶21-22; Zatkovich ¶12-13; Zughni ¶7-8; Langley ¶7; Wright ¶ 14.

[15] Cones Tr. 42:9-12; 246:13-22; 248:22-249:2; 290:17-291:9.

[16] *See also,* Richard ¶6; Appiah ¶12; Gay ¶22-27; Zatkovich ¶13 (evaluated site as a whole, the condition of patients, the study coordinator's office condition; factors not on a checklist, but crucial as to whether a "site would be a strong participant for the study.")

5

(Exs. Q, R, S at ¶9.) This is decidedly *not* similar to the larger body of CRAs who perform the position properly. CRA Anglin described how she educates the site on the study by utilizing her judgment, prior to and during the visit, to "determine what material I will emphasize and spend more time on" and by "add[ing] examples based on my personal experience regarding what has worked in the past and what has not." (Anglin ¶16). CRA Nichols addressed "key safety issues," worked on the site recruitment plan, trained the site how to conduct the study, and ensured systems "are up and operational." (Nichols ¶23.) Nichols spent "a lot of time preparing for the initiation visits" to answer questions and build relationships with site staff. (*Id.*)

Evaluating staff comprehension and adjusting the instruction requires judgment and assessment of the site's response. CRA Appiah evaluated whether the staff were attentive, understood the information, had areas raising more questions, and "what areas need more time and focus in my presentation." She also planned her presentation based on prior experience with the needs of the site. (Appiah ¶ 14.)[17]

PAREXEL expects that its CRAs will evaluate whether a site is ready to conduct the study, knows what patients to enroll, and has the right staff performing the right processes. If a CRA misses an issue or gives incorrect advice, then that could impact the remainder of the study. (Marnell Tr. 293:17-295:11); (DiJohnson ¶13; Wright ¶ 15).

### C. On-Site Monitoring Requires CRAs to Evaluate and Problem Solve Issues on Patient Medical Records, Regulatory Compliance, Data Quality and Integrity and Patient Recruitment.

Generally, CRAs spend the majority of their time in the monitoring phase of the study, constantly exercising judgment in evaluating patient data and site performance.[18] Plaintiffs' duplicate declarations (Exs. Q, R, S) either selectively omitted key elements of

---

[17] *See also* Richard ¶16 ("I modify my approach and evaluate whether the staff understands the information, adjust to their availability, and identify whether there are issues or areas that require more attention or time."); Mittense ¶11 (discussing strategy and judgment calls for training site staff at Initiation); (Zatkovich ¶14 (alters his training and focus depending on the site's experience); Anglin ¶16; Appiah ¶14; Benton ¶10; Copling ¶13; Gay ¶29-32; Lee ¶23-25; Montieth ¶24; Sanders ¶20; Zughni ¶9.

[18] Richard ¶17; Anglin ¶9; Benton ¶11; Copling ¶14; Gay ¶33; Gruzdeva ¶11-23; Lee ¶26-33; Montieth ¶15-21, 25-28; Zatkovich ¶6-12; Zughni ¶10-15; Appiah ¶15; Cox ¶27-33; Ewing ¶16-26; Nichols ¶13-18, 26-28; Howell ¶13; DiJohnson ¶11-13; Endicott ¶13.

their responsibilities, or these CRAs' experiences were *not* similar to the experiences of other CRAs. Plaintiffs claim that during monitoring visits they only follow SOPs to conduct rote source data verification ("SDV"), *i.e.*, examining patient medical records for data matches. Although monitoring involves SDV (determining the accuracy of data and devising necessary solutions[19]), Plaintiffs omit the larger *concurrent* responsibility of Source Data Review, which requires the CRA to critically evaluate medical records at large to identify whether they make sense, determine whether the PI is exercising proper oversight,[20] and detect missed potential adverse events and data integrity issues, such as fabrication of study data. (DiJohnson ¶6, 12; Ewing ¶22, Gay ¶33, 36; Gruzdeva ¶11-16; Howell ¶13-14; Lee ¶10, 11.) CRA Richard explained, "one of the most important responsibilities in monitoring sites is to critically evaluate records for integrity, completeness and to evaluate for potential fraud." (Richard ¶17.) Richard "analyze[d] patient medical records to look for inexplicable gaps or trends, or anything that appears to be suspicious." (*Id.*) When she "notice[d] any issues with the data, [she was] responsible for evaluating the issues and raising and addressing the issue with site staff." (*Id.*)

CRA Mittense likewise confirmed that she "determined whether the [patient] data made sense ***holistically***, or whether there was something in the larger context that raised questions about the validity of the data," and, unlike Plaintiffs' boilerplate declarations, offered specific examples of those evaluations. (Mittense ¶6.) This included instances where blood pressure readings read in isolation were fine, but assessed ***holistically across the study*** were suspiciously consistent. Mittense investigated the cause, and determined "it was not a data fraud issue (for example, fabricated patient data)," but an equipment calibration issue. A CRA performing only SDV would miss the issue identified by this type of holistic trend assessment and evaluation. (*Id.*)

On another study, Mittense noted that a site had fabricated patient data, but worked with the site to investigate and identify the actual data. Evaluating data "to ensure the site

---

[19] PAREXEL expects CRAs to *resolve* SDV issues. (Marnell Tr. 288:11-290:12.)
[20] Evaluation of PI oversight of the study involves assessing the level of delegation of tasks and sufficiency of supervision. *See, e.g.,* Copling ¶14; Ewing ¶18; Howell ¶14.

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

is providing actual, valid study data is critically important to the study validity, and therefore, ultimately, the safety of the drug." (Mittense ¶6.) Mittense "assessed the entire chart in context to determine whether the site had missed any critical trends or unusual deviations," such as were "there any changes in vital signs, such as historical blood pressure reading that was unusually changed on a particular visit?" (*Id.* at ¶5.)

CRAs, as the only PAREXEL representative reviewing the site's patients' records, confirm the important patient safety aspect of critically assessing medical records for trends, PI oversight and inexplicable or suspicious data. SCRA Gruzdeva explained, "[b]ecause patient safety is so important, I always want to make sure that the source documents explain what is truly going on with the patient. In that connection, when I review patient medical records, I always try to detect patterns and anomalies in the data." (Gruzdeva ¶14.) She presents those anomalies and concerns to the PI and site staff, including concerns of potential undetected adverse events. (*Id.* at ¶¶13, 14.) CRA Cox also utilized a holistic and judgment-driven approach to on-site monitoring and patient medical record evaluations:

> When I detect errors or inconsistencies in the data, I use my problem solving skills to try to ***understand what led to the data error***. I don't look at errors individually; I look at them in the ***context of everything that is happening at the site to understand what is going on***. I ask myself: Is it simply a typo, or are there more systemic issues present? Is it one person doing something wrong, or is it the entire site? Do the ***errors reflect a lack of understanding by the doctors and nurses involved as to the trial requirements? Does the site need to collect more information from the patient***? My response to the data error will be guided by the answers to these questions and others. I will ***use my judgment as to whether and to what extent retraining is needed at the site to maintain data integrity going forward***. (Cox ¶12.)  (emphasis added).

In sum, the mechanical review abstractly described in Plaintiffs' declarations is not similar to the experiences reported by the greater numbers of CRAs, nor an approach that PAREXEL accepts. There are significant risks if a CRA misses a safety or compliance issue. (Marnell Tr. 294:5-10.) PAREXEL expects that CRAs will not only competently review medical records for trends across and within subjects, but also review any available source documents, *regardless of what is called for in the monitoring plan or protocol,* for any trends or inconsistencies so that CRAs have a complete, holistic

8

understanding of the study. (*Id.* 281-15-282:14; 283:3-23, 286:17-287:12.); DiJohnson ¶11; Wright ¶16-17.

### D. CRAs Assess and Resolve Open Issues At Site Termination Visits.

A termination visit occurs when a site is ending its participation in the study, either individually or as part of a broader conclusion of the study across multiple sites. (Richard ¶20.) A small percentage of a CRA's time is spent performing Termination Visits, and, unlike Monitoring Visits, they generally are not a continuing activity.[21]

Prior to the Termination Visit, the CRA needs to assess if the site is ready for termination, or if any open issues are substantial enough to delay site termination. (Gay ¶ 37.) The complexity of these visits vary depending on the "nature of the site and study." (Lee ¶35; DiJohnson ¶14.) For example, where the "site never enrolled patients, there will be less to do, since the site never performed the trial." (Cox ¶35.) When issues arise at termination, the CRA must investigate/resolve them. (Benton ¶14; Anglin ¶17.)

### E. CMAs Perform a Different Scope of Duties Than CRAs, and Exercise Judgment and Discretion In Performing Various Monitoring Duties.

Based *solely* on Pasis' shifting descriptions of the CMA position, Plaintiffs incorrectly characterize the CMA position as an "in house" equivalent to the "travelling" CRA position, ignoring that CMAs do not (with few exceptions) perform *a large scope of work performed by CRAs*, including Qualification, Initiation, On-Site Monitoring, Termination Visits, and review of patient medical records, which are held on site. (Cantrell ¶10; Moser ¶11, Madden ¶7; Sanders ¶¶13,14; Bornemann ¶17; Wright ¶12.)

CMA positions perform a different scope of work, serving as an ongoing site resource, using judgment to strategically assist with site startup and remote monitoring.[22]

#### 1. CMAs Exercise Discretion and Judgment In Managing Site Start Up to Qualify to Enroll Patients and Receive the Study Drug.

Many CMAs are assigned the responsibility of strategically assisting qualified sites

---

[21] CRA Nichols had no upcoming termination visits and generally spent no more than 10% of her time of this visits. (Nichols ¶30.); Copling ¶7 (never had a termination visit).
[22] Jusino ¶ 10-21; Madden ¶6-22; Moser ¶7-17; Pathak ¶4-15; Sanders ¶4-13; Vibar ¶7-9,14; Weaver ¶3, 10-22; Bamgbose ¶7-12; Bazemore ¶11-28; Bornemann ¶ 9-17; Cantrell ¶6-14; Chan ¶5-14; Endicott ¶6-12; DiJohnson ¶16-17; Wright ¶12-13.

in moving to the initiation phase, where the site is authorized to enroll patients and receive the study drug. (*See, e.g.,* Bornemann ¶6; Madden ¶9; Cantrell ¶7; Bamgbose ¶6; Chan ¶7-8; )  Not all CMAs perform this work, and some perform a modified scope of this work. (Sanders ¶8; Moser ¶10.) CMAs who do this work, engage in problem solving to strategically progress multiple sites toward initiation. CMA Bornemann explained this is "fast paced" work with multiple sites to evaluate and ensure that they had the appropriate staff, training, Internal Review Board approval, and if the site was not progressing, identifying the reason for the deficiency and the best course for resolving the issue. (Bornemann ¶6.) *See* Madden ¶9 (startup requires "the management of many different timelines and site-specific needs and delays.") CMA Cantrell explained that during startup he evaluated the site's comprehension of FDA requirements and need for guidance with regulatory documentation for site initiation. (Cantrell ¶7.) He also assessed staff knowledge, "their clinical research experience, and assess[ed] their willingness to help," factoring in variables such as potential sources of delays. (*Id.* ¶8) He "strategically focus[ed] on the sites [he] judged to be most capable of an early initiation." (*Id.*)

### 2. CMAs Exercise Continuous Discretion and Judgment In Remotely Monitoring Clinical Trial Sites.

The site monitoring CMAs perform is substantially different than that of CRAs. CMAs often work on a daily basis with sites via planned and unplanned calls to solve a variety of site issues, unlike the CRAs who conduct various scheduled onsite visits that involved qualification, initiation, and evaluation of medical record evaluations. (Cantrell ¶10; Bornemann ¶17; Madden ¶7; Moser ¶11; Montieth ¶4; Pathak ¶9; Wright ¶12.)

Cantrell explained that "as a CMA, a substantial portion of my duties involved identifying trends and patterns," and "[w]hen sites were repeatedly making mistakes, my job was to figure out why and to resolve the issue." (Cantrell ¶12.) In addition, Cantrell's job "involves responding to the tough questions that the sites are raising to my attention for evaluation and input." "They are contacting me ***regarding undefined areas or issues, where they have some confusion, and are expecting me to provide a resolution.***" (*Id.*

10

11.) *See also* Madden ¶15 (noting the problem solving and evaluative aspect of site monitoring: "For example, if there was an incorrect administration of drug dosage, or lab procedures, was that issue site specific, was there a retraining need, was there confusion about the protocol, and was this something that other sites should be alerted to?")

CMAs also perform ongoing work on patient recruiting strategies. "[M]y responsibility was to help them figure out strategies for increasing enrollment":

> [W]ere they evaluating each patient that came in for eligibility, regardless of the reason for the office visit?  For sites that had advertising budgets, I would check to see if they were effectively utilizing it, as well as confirm the appropriate use and distribution of provided recruitment materials. . . I would help the site look at every appropriate possible way to identify patients in hopes of increasing enrollment.

(Moser ¶ 14); Sanders ¶12 (problem-solving on recruiting: "In other words, was it a problem with the patient database, not getting referrals from doctors, were their patients in competing studies, and options for resolving those issues."); Endicott ¶ 8-12.

Contrary to how Pasis (the ***sole*** CMA supporting this case) has re-cast his PAREXEL experience, PAREXEL expects its CMAs to be in direct contact with sites, resolving issues on a continuous basis. A CMA's failure to do so could have significant ramifications. For example, the failure to properly advise a site that is relocating about study documentation and continued participation in the study, or the failure to provide appropriate advice on protocol compliance and the treatment of subjects, can result in the elimination of the site or subject from the study. (Marnell Tr. 278:9-279:3; 279:6-25.)

## F.    The Type and Number of Clinical Trials and Sites Managed by CRAs and CMAs Varies and Impacts the Exercise of Discretion

CRAs and CMAs continuously use judgment to assess site capacity, experience, competing demands, personalities, and to motivate and strategically communicate with site staff to improve performance. This requires calibrating the solutions and communication to the site staff's needs. For example, CRA Richard explained that she has worked with study coordinators in different "seasons of life" with different comfort levels with technology, requiring problem-solving to craft tailored solutions for the study coordinator. (Richard ¶10.) Sites vary from large research institutions to research-naïve

physician offices. *See id.* at ¶21 ("Each site is different, including their experience, attentiveness, technological capabilities, the patient population, the way they chart patients, and their preferred communication styles.").[23] Pasis admitted these variations impact how CMAs manage different sites. Pasis Tr. 101:24-102:2; 278:8-279:8.

### G. SOPs Provide A High-Level Framework on the Management of Clinical Trials But Do Not Dictate Substantive Assessments, Evaluations, and the Strategic Problem Solving Conducted by CRAs and CMAs.

Plaintiffs' three declarants all invoke SOPs and templates as controlling, but give no explanation as to how they eliminate the need for CRAs and CMAs to continuously rely on critical thinking. Successful CRAs/CMAs apply "sound judgment and experience, to a wide variety of issues that can arise during a study and [must]. . . also be able to resolve the myriad of issues that arise and are not addressed by SOPs or protocol." (Vibar ¶10.) CRAs and CMAs confirmed that SOPs, although they identify a high level framework and assign responsibility for duties, do not eliminate the need for assessment and problem solving. SOPs "provide general guidance, house templates/forms required for various processes, and define who is responsible for tasks in a process, but they are not designed or intended to be detailed enough to define what assessments are required to effectively manage your sites with regard to study specific conduct." (Moser ¶16); Cantrell ¶11 ("PAREXEL has SOPs and templates that provide some process guidance, but I am not consulting these SOPs on a daily basis in conducting my job."); Benton ¶11 ("There is no simple checklist I can rely on when I am reviewing medical records."); Gruzdeva ¶9 ("There are many grey zones and challenges that are not addressed by these materials (SOPs) that require CMAs and CRAs to continuously rely on experience,

---

[23] Madden ¶14 ("Sites also varied in terms of responsiveness, their pro-activeness, and the types of communications that would be most effective."). CRAs and CMAs have to make strategic decisions on how to motivate noncompliant sites while preserving relationships. Sanders ¶11 (Some CRAs/CMAs will involve PIs if the site staff is not responsive; "I have never felt I needed to use that option with my sites - and felt it would only harm my relationship with the study coordinator."); DiJohnson ¶ 12 ("High enrolling sites can be more of a challenge based on the volume of medical records that have to be assessed for missed adverse events, trends, unexplained variations in patient readings . . . But I had sites with as low as two enrolled patients that were very research naïve, not cooperative, and created a lot of issues for repeated resolution by me.")

judgment and critical thinking in performing this job.")[24] Pasis also admitted that he looked to "experts" or "advanced CMAs" for guidance on different issues recognizing there are "several ways [to] . . . approach. . . an issue." Pasis Tr. 284:9-286:25. PAREXEL expects its employees not to rely solely on SOPs. Rather, CRAs and CMAs are expected to interpret and apply policies and procedures *without* prior approval, recognize their limitations and the variation in each trial and site, and use their experience, training and education to understand regulations and ensure that sites maintain patient safety, data integrity, and regulatory compliance. (Marnell Tr. 268:12-270:6.)[25] In short, Plaintiffs provide no evidence that SOPs or any policy documents inhibit judgment or discretion in performing each trial phase or that they establish any means of class-wide proof.

## H.   CRAs and CMAs are Expected to, and Do, Perform Independently

CRAs generally work alone from their home or from a study site, are expected to make assessments and problem solve independently, and have only infrequent contact with line managers. Wright ¶4-11 (CMAs and CRAs performed independently); Anglin ¶7 (30 minute call with supervisor once every 2 weeks); Appiah ¶5 (one 15 minute call every 2 weeks); Benton ¶15 (manager expects her to work independently, has one 30-45 minute call every 2 weeks); Copling ¶5 ("I work independently, and I am not in frequent contact [with my line manager]."); Nichols ¶11 (" [I] set my work schedule

---

[24] Karen Chu Tr. at 15:11-20; 134:25-135:22; 181:9; 232:24-236:12 (Chu is the Corporate Vice President, Clinical Research Services, and confirmed CRAs and CMAs interpret SOPs, and monitoring plans are just a framework that can change depending on the sponsor and study); Wright ¶18 (SOPs identify processes, but actual assessments are not directed by SOPs); DiJohnson ¶7-8; Endicott ¶ 14; Langley ¶ 9-13.

[25] Plaintiffs incorrectly assert CRAs and CMAs received the "same" initial training, *see* Pasis Tr. 97:25-98:11 (***CMAs receive different initial training than CRAs***) and Plaintiffs fail to identify how this bears on the actual duties performed. (Mtn. at 6:19.) Jamie Langley, the Training Business Partner at PAREXEL, testified that the training programs varied over time, by prior experience level, and role (CMA or CRA). (Langley Tr. at 23:10-17; 24:18-25:11; 51:3-52:9). Marnell confirmed that further training depends on an employee's experience, needs, recommendations of management, and personal interests. Marnell Tr. at 206:20-207:15. Initial training covers PAREXEL systems, principles of ICH/GCP (a general ethical framework for clinical research) and SOPs, which identified an overarching structure to site monitoring, ***but does not (and was not intended to) define the critical thinking and judgment required of CRAs and CRAs.***  Langley Dec ¶¶4-14.

DEFENDANTS' OPPOSITION TO  MOTION FOR CLASS CERTIFICATION

and…prioritize which tasks to do when, and …revise my schedule and priorities when new issues arise.") CMAs also attested their position is independent, with infrequent manager contact. Madden ¶23 (manager not "monitoring my schedule and work assignments."); Cantrell ¶(met with manager twice a month for less than an hour.)

## LEGAL ARGUMENT

### I. Rule 23 Is Not A Pleading Standard, And Plaintiffs Have Failed to Meet Their Burden of Proving All of the Rule 23 Requirements

The "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Plaintiffs must provide ***evidentiary proof*** of compliance with the four prerequisites of Rule 23(a), and at least one of the requirements of Rule 23(b). *See* Fed. R. Civ. P. 23(b)(3) (proof that issues common to the class predominate and that a class action is the superior means of adjudicating their claims). Plaintiffs must "prove misclassification on a ***class-wide basis***" or, at a minimum, "that misclassification was the ***rule*** rather than the exception." *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011). Plaintiffs fail to meet this burden.[26]

### A. Neither Cones nor Pasis is Typical or Adequate.

Rule 23 requires that class representatives demonstrate that their claims are typical of the class claims and that they are adequate. *Labou v. Cellco Partnership,* 2014 WL 824225, at *2, 5 (E.D. Cal. Mar. 3, 2014) ("Plaintiff bears the burden of showing she is an adequate representative.") If a representative's claim is atypical, then he is likely an inadequate representative. *Dukes*, 564 U.S. at 349, n.5 (typicality "tend[s] to merge with the adequacy-of-representation requirement…") In assessing adequacy the district court may consider all available additional circumstances and facts of a case.[27]

---

[26] "Frequently the 'rigorous analysis' [required by the court in determining whether Rule 23 prerequisites have been met] will entail some overlap with the merits . . ." *Smith v. Red Robin*, 2017 WL 1198907, at *2 (S.D. Cal. Mar. 31, 2017) (citations omitted).
[27] Courts look to factors such as "honesty, conscientiousness, and other affirmative personal qualities, as well as knowledge or understanding concerning what the suit is about. 7A Charles Alan Wright, Arthur R. Miller, Fed. Pract. and Pro. § 1766 (2005 ed.)

Cones is neither typical nor adequate because she has ***never actually worked*** in the CRA position(s) she purports to represent, nor observed other PAREXEL employees work in the CRA positions, and is subject to unique defenses. *Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 802 (1999) (employee cannot avoid the exemption through his or her failure to perform position). By these admissions Cones is incapable of speaking to the execution of the position. Cones has supplied her name only, with no capacity to supply ***evidence*** as to an individual claim of misclassification, let alone a class claim. And, while Cones testified she was representing only the *SCRA* position because it is different from and requires experience that a "regular" CRA would not have (Cones Tr. 34:10-35:20; 63:11-23), she now claims in her declaration that she is representing all three CRA positions. Notwithstanding her changed testimony, she offers no explanation as to how she can represent the SCRA position, let alone the other two. *See Pryor v. Aerotek Sci., LLC,* 278 F.R.D. 516, 529 (C.D. Cal. 2011) (Representative inadequate who has no "role in the case beyond that of furnishing their names as plaintiffs").

Pasis does not understand his duty as a class representative or the nature of the action he filed, and for these reasons alone is inadequate. (Pasis Tr. 14:19-19:21; 207:10-13; 324:15-325:11.) *Scott v. N.Y. City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004) (representative inadequate who did not know what a class representative was, nature of the litigation or whether it was a class action).

Both Pasis and Cones (a twice convicted felon with a protracted history of probation revocations (Req. Jud. Notice, Exs. A-I)) lack honesty, and for these reasons as well are inadequate. *Kline v. Wolf*, 702 F.2d 400, 402-03 (2d Cir. 1983) (courts may consider the trustworthiness of the named plaintiff.) First, both testified inconsistently under oath on material issues. Cones alleged that her medical condition was ***imminently terminal*** in a suit against her insurer and on a "Go Fund Me" page (Dkt., Ex. 73-3, Exs. 1-4; 73-1, Ex. A ), but contends in *this* action that her health presents no obstacle to litigating this case for the next two to three years. (Cones Tr. 304:13-15.) Pasis testified that the multiple resumes and cover letters he submitted to employers accurately reflected

15

his job duties, but his declaration here denies he ever used independent judgment (and tellingly, he has not been able to find another CMA who feels likewise.) *See, e.g., Jovel v. Boiron*, 2014 WL 1027874, at *2-5 (C.D., Cal. Feb. 27, 2014) (class representative inadequate who gave inconsistent deposition testimony on a material issue.) Pasis also admitted he ***falsely inflated*** his PAREXEL salary when, while still at PAREXEL, he applied to his current employer, Samumed (Pasis Tr. 46:9-50:2; 267:12-269:9; 307:15-19; Exs. 3, 13). This material falsification was not a math error after he resigned, but rather an admitted misrepresentation made during his PAREXEL employment. (Pasis Tr. At 47:5-49:20.) For all of these reasons, Plaintiffs are inadequate representatives.

**B.    Plaintiffs Have Not Shown Common Questions Predominate, and Analysis of the Administrative Exemption Requires Individualized Inquiries as to the Work *Actually Performed* By CRAs and CMAs.**

Plaintiffs identify "common questions" that are merely abstract, high-level inquiries unaccompanied by any *evidence* that would provide a common means of *answering* the questions. For example, Plaintiffs simply assert common questions predominate as to the meal and rest claims. *Brinker v. Superior Court*, 53 Cal.4th 1040, 1041 (2012) establishes liability for meal and rest breaks only if the employee is not provided the *opportunity* to take these breaks; not simply because a meal break was not *recorded. Id.* at 1040. Plaintiffs have no evidence of a company-wide policy prohibiting CMAs or CRAs from taking meal or rest breaks, and PAREXEL's written policy *authorizes and permits such breaks*, which was confirmed by Pasis and a multitude of California CRAs and CMAs. [28]

Similarly Plaintiffs contend "[w]hether PAREXEL properly classified . . . the

---

[28]Pasis knew of PAREXEL's meal and rest policy and no one prevented him from taking meal and rest breaks. Pasis Tr. 225:12-20, Ex. 11; Cones was unaware whether other CRA took meal or rest breaks and she occasionally took them. Cones Tr. at 263:15-20; 264:13-265:1. California CRAs/CMAs confirm they were able take breaks as they pleased according to the policy authorizing such breaks. *See*, e.g., Appiah ¶23; Cox ¶37; Gruzdeva ¶26; Nichols ¶32; Pathak ¶18; Richard ¶23; Vibar ¶16. All of these declarants are part of the California subclass, and all but one opted out of the *Belaire* process.

1  California Sub-Class as exempt  . . .” is a common question warranting certification.[29] If

2  that were so, *every* misclassification case would present "common questions." The Ninth

3  Circuit has repeatedly rejected this argument. *Marlo v. United Parcel Svc., Inc.*, 639 F.3d

4  942, 948 (9th Cir. 2011) ("policy" classifying [managers] as exempt from overtime-pay

5  requirements does not necessarily establish that [managers] were misclassified, because

6  the policy may have accurately classified some employees and misclassified others"); *In*

7  *re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009)

8  (reversing certification based on the uniform classification of the position as exempt).[30]

9      Plaintiffs fail to address the critical inquiry to California's administrative

10  exemption - *i.e.,* whether there is common evidence to resolve whether CRAs or CMAs

11  are "primarily engaged" in exempt work. This is a fact-intensive individualized inquiry

12  that requires determining how much of an employee's work ***actually performed*** is

13  exempt. Wage Order 4-2001(1)(B)(1)(e); *Ramirez*, 20 Cal. 4th 802. "[T]he Court must

14  determine whether any given class members (or all the class members) spend more than

15  50% of their time on [exempt] tasks in any given workweek ... . [E]mployees['] exempt

16  or non-exempt status can vary on a week by week basis." *Dunbar v. Albertson's, Inc*.,

17  141 Cal.App.4th 1422, 1426 (2006). Plaintiffs fail to show how the manner in which

18  CMAs and CRAs spend their workdays ***can be determined on common proof***.

19      For this reason, courts routinely deny certification of misclassification claims

20  because the individualized and fact-intensive application of the exemption. *E.g.*, *Marlo*,

21  639 F.3d 942*; Vinole*, 571 F.3d at 947 (affirming denial of class certification in

22  misclassification case where the manner of performance of jobs varied).[31]

---

[29] Plaintiffs' citation to the purported "admissions" in PAREXEL's answer that allegedly satisfy Plaintiff's burden to establish commonality likewise consist of high level admissions such as the positions were classified as exempt and not paid overtime.

[30] *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946-47 (9th Cir. 2009) (abuse of discretion to reply on "internal uniform exemption policy to the near exclusion of other factors relevant to the predominance inquiry").

[31] *Accord, Smith*, 2017 WL 1198907, *3 (Plaintiffs fail to demonstrate a common answer to whether putative class members spent more than 50% of their time engaged in nonexempt tasks.); *Barker v. U.S. Bancorp.*, 2017 WL 2620676, at *3 (S.D. Cal. June 16, 2017) ("Of the five common questions Plaintiffs argue predominate the question at the crux of this case—"Whether IBMs spent over 50% of their time during a workweek

In attempting to overcome the need for an individualized inquiry, Plaintiffs offer as "substantial evidence" of commonality the mere assertion that: "Plaintiffs have met this Rule 23 requirement because they challenge uniform policies and systemic practices that apply to the employee sub-class." (Mtn. at 18:24-25.) There is no description of documents or citation to the record,[32] no explanation as to the substance of SOPs or company documents, to what percentage and types of job duties they apply, whether the SOPs dictate outcomes, or any substantive discussion other than invoking the talisman of an SOP. This in no way satisfies Plaintiffs' burden. Employers operating in complex fields with patient safety risks are not required to abstain from developing processes. Scientists, surgeons, attorneys, and industrial security representatives for military contractors are required to follow a certain degree of protocol. *Rix v. Lockheed Martin Corp.*, 2011 WL 890744, *8 (S.D. Cal. Mar. 14, 2011) (denying certification of Industrial Security Representatives for military contractor; uniform guidelines were "not policies that provide insight as to how each [class member] actually spends his or her time")[33]

Plaintiffs' reliance on SOPs to establish the putative class operated subject to defined processes is misplaced and contrary to the evidence. Courts have rejected this argument as punishing complex fields where the demands for the exercise of judgment and the consequences of poor decision-making are actually *higher*. No one would expect a human clinical trial to be completely freelanced without any regulation. In *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365 (7th Cir. 2005), the court considered exempt status of nuclear power plant employees, and rejected the argument that regulations and procedures precluded judgment:

The plaintiffs make the general argument that because a nuclear power plant is an

---

performing tasks deemed nonexempt" [requires an individualized inquiry into how each IBM spent her time while working for USB.")
[32] Plaintiffs dump thousands of pages of documents with no foundation, citation, or explanation of the bearing of the records on putative class members. *See, e.g., Greenly v. Sara Lee Corp.*, 2008 WL 1925230, *22 fn. 26 (E.D. Cal. April 30, 2008) ("judiciary's job is not to sift through scattered papers in order to manufacture arguments for parties.").
[33] See *McAllister*, 325 F.3d 997, 1001 (8th Cir. 2003) ("Just because McAllister was required to follow detailed manuals does not mean she did not exercise discretion and independent judgment.")

exceedingly regulated workplace - as they put it, "procedure driven, routine, and strictly controlled" -- there was no room for any of the plaintiffs to exercise independent judgment. We disagree. Taken to its logical limit, such a blanket rule would prevent any employee at ComEd from falling under the exemption . . . . While the plaintiffs' discretion may be channeled by the regulations that apply to this industry, that does not mean ComEd employees do not exercise independent judgment. Certainly no one would contend a tax lawyer does not exercise discretion or independent judgment just because the Internal Revenue Code contains a highly regimented set of rules. *Id.* at 374-75.

To the extent that Plaintiffs and the three CRA declarations are to convey that SOPs and company forms (somehow) deprived them of discretion (as to undefined decision-making), other CRAs and CMAs testified that SOPs housed templates and provided guidelines, but did not dictate their substantive work, and they "are not designed or intended to be detailed enough to define what assessments are required to effectively manage your sites with regard to study specific conduct." (Moser ¶16).[34] For example, SOPs or monitoring plans identify certain site equipment and documentation to review, but do not dictate the CRA's evaluation/conclusions of the credibility of site staff responses, the reasonableness of recruitment projections, or assessment of competing demands on the site. Two different CMAs or CRAs can analyze an issue and come to different conclusions despite protocol, SOPs and other such documents." (Vibar ¶11.) In contrast to Plaintiffs' conclusory submissions, Defendants' declarations reveal sharp contrasts in CRA performance of job duties such as evaluating sites for qualification, educating sites for initiation, evaluating medical records for trends and patient safety, strategizing with sites to correct regulatory compliance, problem solving the failure to adequately recruit patients, and determining when to retrain sites.[35]

Plaintiffs claim they had no discretion when performing their duties, but as shown by Defendants' declarations, many CRAs and CMAs testified that they continuously exercise judgment and discretion in performing the vast majority of their daily duties.[36]

---

[34] Bamgbose ¶9; Benton ¶11; Bornemann ¶4-5; Cantrell ¶11; Copling ¶11; Ewing ¶24; Gay ¶33, 36; Howell ¶9; Lee ¶19, 23, 28; DiJohnson ¶ 6-8; Langley ¶8-10; Endicott ¶14.
[35] Plaintiffs have presented no evidence as to the CMA position, aside from Pasis' contradictory declaration, which is contrary to his resume representations and testimony.
[36] Richard ¶12; Mittense ¶4-7; Anglin ¶10; Appiah ¶9; Benton ¶7; Copling ¶8; Cox ¶11; DellaPuca ¶9; Ewing ¶16; Gay ¶16-20; Gruzdeva ¶9-24; Howell ¶10-14; Lee ¶10-35; Montieth ¶15, 17-28; Nichols ¶12-30; Sanders ¶14; Zatkovich ¶6-15; Zughni ¶6-15;

19

### C.   Plaintiffs Fail to Demonstrate the Superiority of Class Treatment

Plaintiffs must demonstrate a class action is *superior* to other resolution methods. "[I]f each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action *is not 'superior*.'" *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001). Individual issues predominate here, as each CRA and CMA (and related defense witness) would need to testify about the actual duties performed, negating the superiority of a class action. Alternatives exist, and CRAs and CMAs could individually pursue claims in a fee-eligible claim or in an expedited "*Berman*" hearing. *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 253 (C.D. Cal. 2006) (separate suits and administrative claims are "viable alternatives"). Individual claims here are potentially significant for these highly paid positions, and truly aggrieved CRAs and CMAs, if any, would have incentives to pursue individual claims. *Lanzarone v. Guardsmark Holdings, Inc.*, 2006 WL 4393465, at *5 (C.D. Cal. Sept. 7, 2006) (the average successful Berman hearing yields $500; "even *relatively small claims* will not necessarily . . . be forsaken absent class certification"). With these alternatives, Plaintiffs fail to show that class treatment is superior.

### D.   Plaintiffs Fail to Demonstrate a Class Trial Would be Manageable and There Is No Foundation for Representative Evidence

Plaintiffs must "demonstrate[e]" a "realistic" class trial plan. *Zinser*, 253 F.3d at 1189. There is no predominance if "the case, if tried, would present intractable management problems." *Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967, at *3 (N.D. Cal. Jul. 8, 2011). Plaintiffs offer *no trial plan* for the claims of 261 employees, and simply claim that "the size of the proposed class (several hundred) is manageable." (Mtn. 25:13). This empty proclamation fails to meet their burden. Representative testimony may not be used to sidestep individualized liability evidence in misclassification cases:

> [T]he Court cannot *conceive how the overtime exemption will be presented to the jury as a common issue for class-wide adjudication*, as opposed to a number of individualized inquiries. There is a significant risk that the trial would become an

Madden ¶6-22; Moser ¶7-17; Pathak ¶4-15; Sanders ¶4-13; Vibar ¶7-14; Weaver ¶3, 10-22; Bamgbose ¶7-12; Bazemore ¶11-28; Bornemann ¶9-17; Cantrell ¶6-14; Chan ¶5-13.

unmanageable set of mini-trials on the particular individuals presented as witnesses.

*Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 486 (C.D. Cal. 2008), aff'd, 639 F.3d 942 (9th Cir. 2011); *see also Cruz*, 2011 WL 2682967, at *5, 8 ("*Marlo* affirms the impropriety of relying on representative testimony where plaintiffs have provided no reliable means of extrapolating that testimony to the class as a whole," misclassification cases uniquely individualized). Representative evidence is not permitted to establish "[a] class of employees was exempt from the overtime laws' coverage":

> In fact, the court has been unable to locate any case in which a court permitted a plaintiff to establish the non-exempt status of class members . . . through statistical evidence or representative testimony.

*In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 268 F.R.D. 604, 612 (N.D. Cal. 2010). The divergence of testimony between Plaintiffs' declarants and Defendants declarants further demonstrates that representative testimony would not be appropriate.

With no evidence to show common questions predominate or a class trial would be manageable, Plaintiffs submit an expert declaration from David Gortler, to "opine on Defendants' exemption defense." This is improper, as is any opinion from Gortler on CRA/CMA job duties. Similarly, Plaintiffs' other "expert," Malcolm Cohen, fails to articulate any reliable means of calculating Plaintiffs' and the putative class' damages. *See* page 29, *infra.*

## II.   A Collective Action Should Not be Certified Because Plaintiffs Have Failed to Meet Their Burden

After 17 months of litigating the action, 3 extensions on their motion deadline, the close of class certification discovery, and post-*Belaire* access to 215 California CRAs and CMAs (46 individuals opted out of having their contact information disclosed), Plaintiffs fall miles short of meeting their burden for certification of a nationwide collective. Plaintiffs provide only *three* near carbon copy CRA declarations[37] containing generic statements about their job duties and "SOPs," and submit *no evidence regarding the*

---

[37] The Cones CRA declaration is of no evidentiary value, as she admitted she never qualified to perform the position and lacks foundation to speak to its duties.

DEFENDANTS' OPPOSITION TO  MOTION FOR CLASS CERTIFICATION

1
2
3
4

***CMA position*** - other than Pasis's declaration - which ignores and contradicts his deposition admissions. PAREXEL's declarations show a more complete picture of the actual, varied job duties and the continuous judgment exercised by CRAs and CMAs, and confirm the Plaintiffs' 3 declarants are ***not*** similarly situated to other CRAs/CMAs.

5
6

### A.   Plaintiffs Cite the Wrong Standard: Class Certification Discovery Has Closed, and A Stricter Second-Step Analysis Applies.

7
8
9
10

Courts use a two-tiered approach - lenient at the inception of discovery, but, after substantial class certification discovery, hold plaintiffs to the stricter burden to support conditional certification. Here, after the conclusion of class certification discovery, Plaintiffs improperly seek to use the first-stage standard. In any event, Plaintiffs satisfy neither standard.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

First, the lenient standard applies at the outset, *prior to substantial discovery*, when there is minimal evidence. *See Wynn v. National Broadcasting Co., Inc.*, 234 F.Supp.2d 1067, 1082 (C.D. Cal. 2002) (first stage test is lenient "[d]ue to the ***minimal*** evidence at the court's disposal"). Here, the Court should apply the stricter second-stage test. *See Pfohl v. Farmers Ins. Group*, 2004 WL 554834, at *3 (C.D. Cal. 2004) (second stage analysis applies where class certification discovery had occurred); *Davis v. Soc. Serv. Coordinators, Inc.*, 2012 WL 5361746, at *8 (E.D. Cal. 2012)(second stage stricter standard applies after substantial discovery). The parties have completed **nine** depositions, **10** sets of written discovery, PAREXEL produced over 13,000 pages of documents (Kopp ¶¶ 10-13), and class certification discovery closed on April 12, 2018 (See Dkt. 19).[38] It is improper (and inexplicable) to invoke the lenient standard, and is a tacit admission that Plaintiffs were unable to develop a case for certification within 17 months of discovery. *Pfohl*, at *3 (where "discovery has been undertaken relating to the issues of certification of this action" the "Court can proceed to the second determination.")

27
28

---

[38] Plaintiffs argue that discovery was bifurcated as to class certification and merits, but offer no explanation as to why they are entitled to a lenient first step analysis when *class certification discovery is complete*. Plaintiffs were allowed the full range of discovery to attempt to support their case for class certification.

Second, the class certification *motion* deadline has passed as well. Plaintiffs filed a Rule 23 certification motion, yet ask the Court to indulge the fiction that class discovery is somehow only at its inception as to the FLSA claims.

Third, Plaintiffs claim they received contact information for *only* 215 California class members, and need the *full* national contact list. Plaintiffs are not entitled to a "national contact list" in an FLSA action. Plaintiffs stipulated to the *Belaire* process providing access to hundreds of putative class members, yet netted only **3** declarations with *no opt ins* from this outreach. (Dkt. 56.) There is no reason to believe that nationally Plaintiffs will yield proportionally different results beyond their meager returns to date.

Fourth, Plaintiffs attempt to blame their poor evidentiary showing on PAREXEL's "delay tactics" by citing to their briefing submitted in support of their third request for a continuance.[39] These continuing attempts to shift blame to PAREXEL have already been addressed and rejected by the Court. *See* Dkt. 75, p. 2:23-3:3 (no delay by PAREXEL).[40]

Plaintiffs cannot satisfy their rigorous burden to show that conditional certification is appropriate under either the first or second-stage analysis. At the second stage, courts examine (1) whether there are disparate factual and employment settings among the individual plaintiffs; (2) defenses available to the defendant factually individualized to each plaintiff; and (3) the fairness and procedural considerations that would make certification improper. *See Pfohl,* 2004 WL 554834, at *2. As discussed above, the evidence shows significant variation in the job duties performed by CRAs and CMAs, depending on study type, study phase, therapeutic areas, and assigned site qualities. Plaintiffs' submission only confirms - at most - that Cones, Pasis, and their three

---

[39] Plaintiffs misattribute the absence of opt ins to delay or a need for even more access. To the contrary, testimony confirms CRAs/CMAs do not want the relief Plaintiffs' seek and prefer not to be hourly. Anglin ¶19; Benton ¶17-18; Bornemann ¶18-19; Cantrell ¶16; Ewing ¶27; Lee ¶38; Madden ¶25; Mittense ¶14; Weaver ¶26; Zatkovich ¶17.
[40] Plaintiffs have also sought indulgence on their poor showing by incorrectly arguing that exemptions are narrowly construed. The Supreme Court has rejected the argument. *Encino Motorcars, LLC v. Navarro,* 138 S.Ct. 1134, 1142 (2018) (FLSA "gives no ... indication" its "exemptions should be construed narrowly" and there is therefore "no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation - exemptions are as much a part of the FLSA's purpose as the overtime pay requirements.")

DEFENDANTS' OPPOSITION TO  MOTION FOR CLASS CERTIFICATION

47420649v.1                                                                                    3:16-cv-03084-L-BGS

declarants *performed their positions in a manner completely at odds* with PAREXEL's expectations and the majority of CRAs and CMAs. As discussed below, Plaintiffs fail even the more lenient first step standard.

### B. Even if the First Step Analysis Were Applied-Notwithstanding the Completion of Substantial Discovery - Plaintiffs' Submission Fails to Support Conditional Certification of a Nationwide Collective

The first-step analysis considers whether the proposed class should be given notice and requires plaintiff provide evidence (1) there are a number of employees similarly situated, (2) who desire to opt in. *Adams v. Inter-Con Sec. Systems, Inc.*, 242 F.R.D. 530, 536 (N.D. Cal. 2007), citing *Leuthold v. Destination America, Inc*., 224 F.R.D. 462, 467 (N.D. Cal. 2004). Plaintiffs must provide *sufficient evidence* to support certification, beyond allegations in the complaint. *Silverman v. SmithKline Beecham Corp*., 2007 WL 6344674, at *2 (C.D. Cal. 2007) ("[a] standard requiring no more than mere allegations would render conditional certification not only lenient but virtually automatic;" therefore, court "will require actual evidence *showing that there are a number of employees who are [1] similarly situated and [2] who may desire to opt-in*")

Courts deny conditional certification where the plaintiffs' evidence consists only of cookie-cutter declarations containing generalized claims of non-exempt duties, and empty references to policies and job descriptions. Certification is not proper where, as here, liability turns on an individualized analysis of how CRAs and CMAs exercise the requisite discretion and judgment, and evidence shows significant factual disparities in the job duties they performed. *Brown v. Barnes and Noble, Inc.*, 252 F. Supp. 3d 255, 268 (S.D.N.Y. 2017) (denying conditional certification in misclassification); *Trinh v. JP Morgan Chase & Co*., 2008 WL 1860161, at *4 (S.D. Cal. Apr. 22, 2008) (denying conditional certification where plaintiffs did not show how they would use common evidence to prove each class member fell outside exemptions). Plaintiffs must establish more than exempt salary and common job descriptions and corporate policies - those conditions are present in essentially any workplace. *Kress v. PricewasterhouseCoopers, LLC*, 263 F.R.D. 623, 629-630 (conditional certification "solely" on "uniform

24

classification decision" is improper); *Jenkins v. TJX Cos. Inc*., 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012) (same); *See Khan v. Airport Management Services, LLC*, 2011 WL 5597371, at *4 (S.D.N.Y. Nov. 16, 2011) ("'insufficient to show . . . proposed class operated under the same job description.'").

Even if the first-step analysis applies, Plaintiffs fail to meet this standard as they cannot show that they are similarly situated to the putative collective. While Plaintiffs propose sending notice to almost *2,000* individuals, they submitted only form declarations from *three* CRAs. Plaintiffs provide **no evidence regarding whether CMAs are similarly situated** as they offer no testimony from **any CMA** to compare against Pasis' testimony. As noted above, Plaintiff Pasis and Cones are not similarly situated to other CMAs and CRAs, respectively. Cones never performed the duties of the SCRA position, and is not similarly-situated to employees who actually performed the position, and Pasis admitted he looked to "advanced" CMAs for guidance and knows nothing about other CMCs or CRAs. Plaintiffs fail to present a single declaration from **any** CMA regarding their experience in that role, and the three CRA declarations they submitted are contrary to the dozens of declarations Defendants submitted in which CRAs and CMAs discussed in detail their job duties and expectations and that the primary part of their job is to engage in exempt duties. In sum, even if the more lenient first-tier analysis applies, it is clear that Plaintiffs fall far short of their burden to show that conditional certification of the FLSA class is appropriate.

### C.   Analysis of the Administrative and Highly-Compensated Exemptions Requires Further Individualized Inquiries

The Highly Compensated Employee (HCE) exemption raises more individualized inquiries.[41] "[A] high level of compensation is a ***strong indicator*** of an employee's exempt status." 29 C.F.R. § 541.601(c). Employees "with (1) total annual compensation of at least $100,000 is deemed exempt…if (2) the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an … administrative

---

[41] 676 members of the putative collective salaries exceeded $100,000. (Maddock ¶6.)

… employee[.]." *Id*.[42] Plaintiffs fail to prove that the HCE inquiry of whether CRAs and CMAs "customarily and regularly" engage in exempt duties is susceptible to common proof. In sum, Plaintiffs' motion should be denied, as Plaintiffs fail to meet their burden to show that Plaintiffs are similarly situated to the proposed class; the evidence shows Plaintiffs are outliers; and Plaintiffs fail to show any putative class interest in the action.

## III. Plaintiffs' Expert Declarations Must Be Stricken

To be admissible, an expert opinion must be reliable, sound, and relevant to determining a Rule 23 requirement. *Pedroza v. PetSmart, Inc.*, 2013 WL 1490667, at *3 (C.D. Cal. 2013). The declarations of Plaintiffs' experts, David Gortler and Malcolm Cohen, must be stricken because they fail entirely to meet this standard, and neither qualifies as an expert under Rule 702. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (approved application of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) to expert testimony presented in support of or in opposition to class certification); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 541 (C.D. Cal. 2012). Plaintiffs clearly have failed to meet their burden of establishing the requirements of Federal Rule of Evidence 702. *Cholakyan*, 281 F.R.D. at 543. *See also Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001)(expert testimony must "relate to scientific, technical, or other specialized knowledge," and not include "unsupported speculation and subjective belief.")

### A.   Gortler's Declaration Must Be Excluded Because He Opines On Matters That Are Irrelevant to Class Certification and Not Proper For Expert Testimony, and Otherwise Does Not Qualify As An Expert

Expert testimony is improper where the expert offers legal conclusions or opines on legal issues. *See e.g., Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996); *Dairy America, Inc. v. New York Marine and Gen. Ins. Co.*, 2009 WL 2184547, 4-5 (E.D. Cal. 2009) (Legal conclusions do not properly assist the trier of fact to understand the evidence or determine a fact in issue and are not admissible.")

---

[42] The phrase "customarily and regularly" means "a frequency that must be greater than occasional but which, of course, may be less than constant."  29 C.F.R § 541.701.

26

Plaintiffs contend that Gortler is qualified to opine on PAREXEL's "exemption defense, *i.e.* whether CRAs and CMAs exercise discretion and independent judgment with regards to matters of significance." (Mot. 8:12-15; see also 2:24-27; 8:26-9:3.) Gortler's declaration does not contain such an opinion and he instead appears to opine (improperly and without foundation) only about the CRA and CMA job duties, ostensibly to fill the evidentiary vacuum that accompanied Plaintiffs' Motion. Nonetheless, Plaintiffs cannot use Gortler's declaration to displace the trier of fact's role, and Gortler, by his own admissions, is grossly unqualified to do so. See *Williams v. Lockheed Martin Corp., 2011 WL 2200631*, at *15 (S.D. Cal. 2011) (expert report on misclassification issues stricken because it contained legal conclusions to be decided by the Court.)

First, Gortler admits he lacks specialized knowledge that would permit him to opine on how and when CRAs and CMAs engaged in exempt duties (the relevant inquiries in a misclassification case). *See Casida v. Sears Holdings Corp.*, 2012 WL 3260423, at *28 (E.D. Cal. 2012); *Sinohui v. CEC Entertainment, Inc.*, 2016 WL 3475321, at *6 (C.D. Cal. 2016); *Marlo v. United Parcel Service, Inc.*, 639 F.3d 942, 948 (9th Cir. 2011). Gortler is a pharmacist, and never has worked at PAREXEL or any other clinical research organization (Gortler Tr. 30:23-31:5, 31:7-23, 84:23-85:5), has no knowledge and has not personally assessed the actual duties performed by CRAs and CMAs (at PAREXEL or any like clinical organization), let alone how much time they spent performing different tasks. (Gortler Tr. 34:14-16, 52:6-22, 53:7-16, 72:24 - 73:5, 65:1-8, 79:18-23, 83:17-21). At deposition, Gortler testified that he reviewed Plaintiffs' depositions though could not recall Cones' position or any of her duties, and confirmed his ignorance by testifying erroneously that Cones and Pasis supervised CRAs and CMAs. (Gortler Tr. 48:16-52:16) After his deposition, Gortler reneged on his testimony, claiming instead that he had not reviewed either Plaintiff's deposition (Gortler Errata Sheet), meaning he has no knowledge about what duties *Plaintiffs* performed, let alone the rest of the putative class. Although Gortler references the PAREXEL CRA and CMA job descriptions in his declaration, he made no attempt to analyze the job duties or how

27

they were performed, and has no idea about the differences between these positions or the associated compensation. [43] (Gortler Tr. 87:2-20, 76:2-24.)

Second, Gortler's declaration, like that of the expert in *Dobrosky v. Arthur J. Gallagher Service Company, LLC,* 2014 WL 10988092, at \*3 (C.D. Cal. 2014), must be stricken because it fails to address any issues relevant to class certification. *See Dobrosky*, 2014 WL 10988092 at \*3, citing *Ellis*, 657 F.3d at 983 (expert testimony irrelevant where it addressed only whether putative class members exercised independent discretion and judgment, assumed they were doing the same job, but failed to address class certification issues). Gortler's declaration is devoid of any meaningful analysis about the actual job responsibilities and duties performed by Plaintiffs or any CRA or CMA (especially in light of his "corrected" deposition testimony that he has never reviewed either Plaintiff's testimony and thus has no knowledge about the duties they performed), let alone whether Plaintiffs' experiences can be applied class-wide.

Third, Gortler has never been recognized as a wage and hour expert or provided testimony in a misclassification case. (Gortler Tr. 29:3-30:8.) His utter lack of expertise is highlighted by his own admission that he has *no idea* what the Fair Labor Standards Act is, the nature or applicability of "exemptions," or how the terms "discretion" and "independent judgment" are defined. ("Nope. I would not even hazard a guess.") (Gortler Tr. 29:24-30:22.) When asked whether he had ever opined on the exempt and non-exempt duties of any particular position, Gortler responded: "Ma'am, I'm a scientist. I'm a pharmacist and a pharmacologist. That's stuff that's handled by human resources. I don't know much of anything about that." (Gortler Tr. 29:24-30:7). When asked whether he has ever evaluated the exempt status of jobs, Gortler responded that would also be in

---

[43] Gortler made no effort to ascertain the compensation for the PAREXEL CRA and CMA positions (Gortler Tr. 44:14-16), but tried to denigrate these roles by erroneously claiming that CRAs earned a median salary of $38,970 in 2015 while "medical scientists" earned in excess of $100,000 to show that the "people who actually do research beyond check boxes…are paid quite a bit more…almost twice as much a CRAs and CMAs are paid." (See Gortler Dec. ¶ 29, fn. 2, Gortler Tr. 43:19-44:13). Gortler was wholly unaware that approximately *one-third* of the putative class members in this case make $100,000 or more ("It sounds like they're paid pretty well") and that Cones' 2014 starting base salary was $115,000 ("That sounds like a lot of money"). (Gortler Tr. 44:18-46:9)

the purview of human resources "because I'm not really familiar with these terms. I imagine it would be. I don't know." (Gortler Tr. 30:10-14). By his own admissions, Gortler is not qualified to testify as an expert on any matters relevant in this case and has no specialized knowledge that would be helpful to the trier of fact. *Luviano v. Multi Cable, Inc.*, 2017 WL 3017195, at \*9-10 (C.D. Cal. 2017).

Fourth, Gortler's testimony is so fundamentally flawed that it is inadmissible for any purpose, class certification or otherwise, as it is not based on *any* methodology, let alone generally accepted principles. *See Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*, *infra* at 1316 (9th Cir. 1995). His deficiencies are amplified by his failure to review and consider key data relevant to the job duties of CRAs and CMAs. *Akaosugi*, 2012 WL 1029545 at \*2; *see also Arjangrad v. JPMorgan Chase Bank, N.A.*, 2012 WL  1890372, at \*6 (D. Or. 2012) (completeness of materials reviewed goes to admissibility of expert report, not merely to weight of evidence). Gortler speculates that the CRA/CMA positions are technical and clerical in nature based on (1) his limited experience over 13 years ago with "*one or more* clinical research associates" at another company (Pfizer) and at the FDA where he admits he did not interact with CRAs and CMAs (Gortler Tr. 34:2-24; 36:23-25) and (2) a comparison of the CRA/CMA positions with that of a "medical scientist," pointing out selected duties that CRAs and CMAs allegedly do not perform to surmise that they may assist the "medical scientist" in some clerical/technical tasks. (Gortler Decl. ¶¶ 29-37.) There are no facts that would allow a trier of fact to reasonably extend Gortler's prior experience to the actual job duties performed by CRAs and CMAs at PAREXEL and his "experience" is not a reliable methodology upon which his opinions must be based in order to be accepted. *Pedroza*, 2013 WL 1490667 at \*3.

### B. Cohen's Testimony Must Be Excluded Because He Possesses No Specialized Knowledge That Would Assist the Trier of Fact, His Opinions Are Not Based on Any Reliable or Sufficient Facts or Data, And Are Irrelevant To Any Issue Material To Class Certification

Cohen fails to offer any methods that could resolve damages on a class-wide basis or opine on class certification requirements, and his promise to perform future work is

---

DEFENDANTS' OPPOSITION TO  MOTION FOR CLASS CERTIFICATION

insufficient to qualify him as an expert. *See Sirko v. International Business Machines, Corp.*, 2014 WL 4452699, *5; (C.D. Cal. 2014) *Langlands v. JK & T Wings, Inc.*, 2016 WL 4073548, at *4 (E.D. Mich. 2016). (Cohen Decl. ¶ 8; Cohen Tr. 50:3-51:22; 63:19-66:21.)

       Cohen admits repeatedly that the calculations he proposes would reflect "simple arithmetic" and that he would simply assume maximum liability and damages without regard to any defenses.  (Cohen Tr. 33:5-16, 51:24-52:24; 82:16-20; 85:23-86:1; 91:6-11) Cohen's opinions add nothing to this case because they are not based on any specialized knowledge, and the Court, jury, or counsel can just as easily and accurately review the putative class members' timesheets and training records as Cohen suggests, and do basic multiplication to arrive at maximum damages. *Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (expert testimony excluded because it was not based on specialized knowledge, but rather involved basic calculations); *see also Farmasino Pharmaceuticals (Jiangsu) Co., Ltd.*, 2016 WL 7655740, at *5, fn. 8 (C.D. Cal. 2016).

       Cohen's opinions should also be stricken because they are premature and not based on reliable methods or sufficient facts and data.[44] His suggested overtime calculations rely on putative class members' time records, which he assumes to be accurate and complete (he failed to review Plaintiff Cones' transcript where she testified otherwise) (Cohen Tr. 36:24-37:6 ; 40:25-41:9; Cones Tr. 256:19-259:2), and he assumes a meal and rest break violation on each day the putative class worked even though PAREXEL's meal and rest break policy and Plaintiffs' and other employees' testimony nullify such an assumption. Cohen Decl. ¶ 31, 9:23-25; ¶ 38, 10:21-23; Cohen Tr. 51:24-52:22; 54:14-55:12; 57:8-23.) Individualized inquiries would be required to make all of these determinations. Accordingly, Cohen's "methods" fail and the Court should strike Cohen's declaration along with that of Gortler.

DATED:  July 6, 2018

                           By: */s/ Michael W. Kopp*
                             Attorneys for Defendants

---

[44] Cohen does not propose in his declaration any methodology by which he can calculate damages on a class-wide basis or propose the use of representative data.

30