# EXHIBIT B

Dexter Pasis
November 20, 2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SCHOULEE CONES, an individual,
and DEXTER PASIS, an individual,
on behalf of themselves and all
others similarly situated,

        Plaintiffs,

    vs.

Case No.
3:16-cv-03084-L-
BGS

PAREXEL INTERNATIONAL
CORPORATION, a Massachusetts
corporation licensed to do
business in the State of
California; and PAREXEL
INTERNATIONAL, LLC, a
Massachusetts limited liability
company licensed to do business
in the State of California,

        Defendants.

VIDEOTAPED DEPOSITION OF DEXTER PASIS

Monday, November 20, 2017, 10:15 a.m.

1230 Columbia Street, Suite 400

San Diego, California

Reported by:

Harry Alan Palter

CSR No. 7708, Certified LiveNote Reporter

Dexter Pasis
November 20, 2017

```
 1    question?

 2              THE WITNESS:  Yes.

 3              MR. KEEGAN:  I thought it was a little

 4    vague.

 5              Go ahead.                                    10:24:16

 6              THE WITNESS:  Approximately four to six

 7    months.

 8    BY MS. TABACOPOULOS:

 9         Q    Without revealing discussions between

10    your counsel, why did you then decide to become a     10:24:38

11    plaintiff in this lawsuit?

12              MR. KEEGAN:  Objection.  Calls for

13    attorney-client privilege to the extent it would

14    reveal communications between my office or

15    Mr. Hayes' office, I instruct you not to answer.      10:24:52

16              THE WITNESS:  I shall not answer that

17    question.

18    BY MS. TABACOPOULOS:

19         Q    What do you understand your role to be in

20    this litigation?                                       10:25:09

21         A    My role in this litigation is being a

22    plaintiff.

23         Q    What does being a plaintiff in this

24    litigation mean to you?  What is your understanding

25    of that?                                               10:25:31
```

Dexter Pasis
November 20, 2017

```
 1              MR. KEEGAN:  And you can answer to the

 2    extent it's not information I communicated.  But

 3    your general understanding, you can answer.

 4              THE WITNESS:  That I am suing the --

 5    PAREXEL based on the -- based on the -- the lawsuit     10:25:50

 6    that's been -- that's been communicated between me

 7    and my -- my lawyer.

 8    BY MS. TABACOPOULOS:

 9         Q    Do you have an understanding of who

10    you're trying to sue the company on behalf of, with    10:26:12

11    respect to this lawsuit?

12              MR. KEEGAN:  Objection.  Vague.

13              You can answer.

14              THE WITNESS:  Do I understand who I am

15    suing?                                                  10:26:27

16    BY MS. TABACOPOULOS:

17         Q    Let me ask you another question -- a

18    better question.

19              Do you have an understanding on whose

20    behalf you're trying to bring this lawsuit against     10:26:35

21    PAREXEL?

22         A    I don't understand.

23         Q    Do you have an understanding that you're

24    trying to represent other current and former PAREXEL

25    employees in connection with this lawsuit?             10:26:51
```

Dexter Pasis
November 20, 2017

1      A     I -- I don't understand that.  This is
2  primarily -- my understanding -- this is primarily
3  me and -- I don't know that -- that I am
4  representing other clients or lawsuits that are
5  suing PAREXEL.                                          10:27:16
6      Q     And do you understand your role in this
7  lawsuit to be one of a class representative?
8      A     I know the other representative in this
9  lawsuit, but to the extent that that -- that's
10 primarily my understanding.                             10:27:35
11     Q     Okay.  My question is:  Do you understand
12 your role in this lawsuit -- in this lawsuit to be
13 one of a class representative?
14     A     If it's just me and some other
15 representative that I know of and that's considered    10:27:52
16 class lawsuit, then, yes, I understand that.  Beyond
17 that, I don't know if there's any -- there's other
18 clients or -- or lawsuits besides me and another
19 person.
20     Q     Do you know what it means to be a class      10:28:10
21 representative?
22     A     I don't, actually.
23     Q     Have you ever heard the term before?
24     A     I have.  And usually when I hear
25 classes -- several -- among several people within      10:28:26

Dexter Pasis
November 20, 2017

1    the same -- within a group of the same lawsuit.  I'm

2    sorry.

3                MR. KEEGAN:  And, again, within this line

4    of questioning, I instruct you not to answer as to

5    attorney-client privilege.  But to your                          10:28:41

6    understanding outside of our communications, you can

7    answer.

8                MS. TABACOPOULOS:  Well, I think I'm

9    allowed to probe his understanding of the role.

10               MR. KEEGAN:  That -- and he can.  But if          10:28:49

11   his understanding is, you know, going to reveal

12   attorney-client-privileged information, then I

13   instruct him not to answer.

14   BY MS. TABACOPOULOS:

15       Q     Would it be fair to say you understand          10:28:59

16   or -- strike that.

17               Would it be fair to say that you've heard

18   of the term "class representative," but you don't

19   understand what your role is in this lawsuit as a

20   class representative?                                          10:29:09

21               MR. KEEGAN:  Objection.  Argumentative.

22               THE WITNESS:  I don't understand.

23   BY MS. TABACOPOULOS:

24       Q     You don't understand what your role is as

25   a class representative?                                        10:29:16

Dexter Pasis
November 20, 2017

1      A      I don't --

2      Q      Is that your answer?

3      A      Yes.  I don't understand.

4      Q      Okay.  Do you have any understanding,

5   then, of what group of people you're trying to sue          10:29:32

6   on behalf of?

7              MR. KEEGAN:  Objection.  Vague.  And,

8   again, to the extent it calls for attorney-client

9   privilege, I instruct you not to answer.

10             THE WITNESS:  I shall not answer.          10:29:46

11   BY MS. TABACOPOULOS:

12      Q      I think that's a "yes" or "no," as well,

13   without getting into attorney-client.  I'm just

14   asking whether you have any understanding of what

15   group of people you're trying to sue on behalf of in          10:30:22

16   this litigation.

17             MR. KEEGAN:  Well, to the extent it calls

18   for attorney-client privilege, I instruct you not to

19   answer.

20             MS. TABACOPOULOS:  Yeah.  I'm not asking          10:30:34

21   about discussions with you on the subject.  I'm just

22   asking --

23             MR. KEEGAN:  Right.

24             MS. TABACOPOULOS:  -- him if he has an

25   understanding on whose behalf he's trying to pursue          10:30:41

Dexter Pasis
November 20, 2017

1    this litigation.

2              THE WITNESS:  I don't know the exact

3    people that I am pursuing to -- at PAREXEL.

4    BY MS. TABACOPOULOS:

5         Q     Do you have any understanding of what                    10:31:04

6    group of people you're trying to sue on behalf of in

7    this litigation?

8              MR. KEEGAN:  Objection.  Vague.  Asked

9    and answered.

10             THE WITNESS:  I shall not answer.                         10:31:14

11   BY MS. TABACOPOULOS:

12        Q     But you didn't get an instruction from

13   your lawyer not to answer.  So you need to answer

14   the question.  It's a "yes" or "no."  I don't want

15   to know about your attorney-client communications.                 10:31:22

16   I just want to know "yes" or "no":  Do you have any

17   understanding on whose behalf of -- on which

18   employee's behalf you're trying to bring this

19   litigation?

20             MR. KEEGAN:  You can answer.                             10:31:32

21             THE WITNESS:  I do not.

22   BY MS. TABACOPOULOS:

23        Q     Okay.  What did you do to prepare for

24   your deposition today?

25        A     To prepare, I went over my -- my current             10:31:44

Dexter Pasis
November 20, 2017

```
 1            MS. TABACOPOULOS:  -- to cover up what?
 2    Other employer information other than PAREXEL;
 3    correct?
 4            MR. KEEGAN:  Correct.  It was produced to
 5    me.  So I'm not vouching for its authenticity.  But        11:52:02
 6    I did produce it in redacted form.  But he doesn't
 7    recognize it.  He doesn't recognize it.
 8    BY MS. TABACOPOULOS:
 9        Q    Why don't we focus on the unredacted
10    portion of Exhibit 3.  The unredacted portion of         11:52:33
11    Exhibit 3 is your employment history with PAREXEL.
12    Do you see that?
13        A    Yes.
14        Q    Okay.  And your testimony is that all of
15    this handwriting that appears on Exhibit 3 is your        11:52:42
16    handwriting; is that correct?
17        A    I believe so.
18        Q    Do you have any reason to believe that
19.   this is not your handwriting?
20        A    I have no reason to believe.                     11:52:50
21        Q    Okay.  Is all of the information that you
22    conveyed to Samumed on this employment history with
23    PAREXEL honest and accurate?
24            MR. KEEGAN:  Objection.  Vague.  You can
25    answer.                                                    11:53:24
```

Dexter Pasis
November 20, 2017

```
1              THE WITNESS:  Just the starting and the
2    ending annual salary is different from the Offer
3    Letter.
4    BY MS. TABACOPOULOS:
5         Q     When, approximately, did you make            11:53:36
6    application to Samumed for employment?  Was that
7    during your tenure at PAREXEL?
8         A     That's correct.
9         Q     Do you have any reason to believe that
10   you didn't complete the document we've marked as        11:53:49
11   Exhibit 3 during the time you were a PAREXEL
12   employee?
13        A     I -- whatever this is -- whatever
14   presented in Exhibit D [sic] -- if this a part of
15   Samumed's application, I did complete the               11:54:07
16   application during my tenure at PAREXEL.
17        Q     Why did you tell Samumed, then, in your
18   application that you were --'your starting and
19   ending compensation at PAREXEL was $7,000 higher
20   than it actually was?                                   11:54:27
21        A     I don't remember.
22        Q     When you completed this document, did you
23   know that to be a falsification of your compensation
24   information from PAREXEL?
25              MR. KEEGAN:  Objection.  Argumentative.      11:54:43
```

Dexter Pasis ·
November 20, 2017

```
 1    Go ahead.
 2            THE WITNESS:  Yeah.  I don't remember.
 3    BY MS. TABACOPOULOS:
 4        Q    Did you purposefully mislead Samumed
 5    regarding your level of compensation from PAREXEL?       11:54:51
 6            MR. KEEGAN:  Objection.  Argumentative.
 7    Lacks foundation.
 8            THE WITNESS:  Yeah.  I don't remember.
 9    BY MS. TABACOPOULOS:
10        Q    You don't remember whether you purposely    11:55:14
11    mislead Samumed into believing you had a higher
12    salary than you did at PAREXEL?  Is that your
13    testimony?
14        A    Yeah.  Don't remember.
15        Q    Well, you're the one who completed --        11:55:24
16        A    Yes.
17        Q    -- this application --
18        A    Understood.
19        Q    -- correct?
20        A    I'm sorry.                                    11:55:28
21        Q    Do you recall telling Samumed that you
22    were earning $84,000 at a time when you were
23    employed by PAREXEL earning $77,000 on an annualized
24    basis?
25        A    Based on this -- Exhibit B [sic], yes.        11:55:39
```

Dexter Pasis
November 20, 2017

1    It seems like it.

2        Q    So why did you do that?

3            MR. KEEGAN:   Objection.   Lacks

4    foundation.   Calls for speculation.

5            THE WITNESS:   I don't remember.                    11:56:04

6    BY MS. TABACOPOULOS:

7        Q    Your hourly starting and ending rate on

8    the document we've marked as Exhibit 3 is false

9    information; correct?

10           MR. KEEGAN:   Objection.   Argumentative.          11:56:18

11           THE WITNESS:   It looks like it.

12   BY MS. TABACOPOULOS:

13       Q    Did you purposefully mislead Samumed

14   regarding your compensation so that you could

15   advocate for a higher salary there?                        11:56:37

16           MR. KEEGAN:   Objection.   Lacks

17   foundation.   Calls for speculation.   Asked and

18   answered.

19           THE WITNESS:   I'd rather not answer that

20   question.                                                  11:56:54

21           MR. KEEGAN:   Well, if you don't recall,

22   you --

23           THE WITNESS:   I don't remember.

24           MS. TABACOPOULOS:   Well, you're coaching

25   the witness not to recall.   I'm going to have the         11:56:59

Dexter Pasis
November 20, 2017

1    question read back.

2    BY MS. TABACOPOULOS:

3         Q      You have to answer questions today,

4    unless it's a matter of attorney-client privilege.

5    So --                                                        11:57:07

6              MR. KEEGAN:  To the extent he can recall.

7              THE WITNESS:  Yes.

8              MS. TABACOPOULOS:  Well, you're just

9    really wanting to make sure he doesn't remember

10   this, aren't you, Patrick?  That's just not proper,    11:57:14

11   and I would respectfully ask you to refrain from

12   doing that the rest of the day.

13             Go ahead and read the question back,

14   please.

15             (Record read by the reporter as follows:)    11:57:32

16             "QUESTION:  Your hourly

17             starting and ending rate on the

18             document we've marked as

19             Exhibit 3 is false information;

20             correct?"                                     11:57:36

21             THE WITNESS:  It does seem like it.

22   BY MS. TABACOPOULOS:

23        Q      And sitting here today, you're telling me

24   you don't know why you falsified that information;

25   is that correct?                                        11:57:43

Dexter Pasis
November 20, 2017

1    A    Seems accurate.

2    Q    Is your job title accurate?

3    A    It should be CMA II, but it's also
4  synonymous as being an in-house CRA.

5    Q    And who deems that synonymous?                    12:04:21

6    A    Well, as well as being called a "CMA II,"
7  within the company, it -- you are also called an
8  "in-house CRA."

9    Q    But that was not your official job title.
10  Your official job title was CMA II; correct?          12:04:51

11    A    Yes.

12    Q    Is there a reason why you didn't put your
13  official job title on there?

14    A    No reason.

15    Q    So you submitted a resume to Samumed;           12:04:59
16  correct?

17    A    Correct.

18    Q    And did you make every effort to be
19  accurate and honest with respect to the resume you
20  submitted to Samumed?                                 12:05:17

21    A    I believe so.

22    Q    And how do you -- how do you go about
23  preparing resumes?  Do you prepare them so that you
24  are conveying to the -- your prospective employer
25  what it is you're actually doing at the company?      12:05:47

Dexter Pasis
November 20, 2017

1       A       Sure.  Yes.

2       Q       Is that important to you?

3       A       I think -- I think it's important, yes.

4               MS. TABACOPOULOS:  Mark that as 4,

5       please.                                                    12:06:32

6               (Exhibit 4 marked)

7       BY MS. TABACOPOULOS:

8       Q       Please take a moment to look at Exhibit 4

9       and let me know if it's a true and correct copy of

10      the resume you submitted to Samumed.                      12:06:43

11      A       (Examining document) This seems like the

12      CV that I had at the time of my tenure at PAREXEL.

13      Q       Do you recognize this as a true and

14      correct copy of the resume that you submitted to

15      Samumed?                                                  12:07:24

16      A       Yes, I do recognize.

17      Q       Did there come a time when you submitted

18      another resume to Samumed?

19      A       For the same position -- for the CMA II?

20      I may have.  I don't remember.                            12:07:44

21      Q       The reason I'm asking is that multiple

22      copies were produced --

23      A       Of my CV?

24      Q       -- by your counsel -- yeah.  So here is

25      the second version.                                       12:08:00

Dexter Pasis
November 20, 2017

1   BY MS. TABACOPOULOS:

2       Q     Do you routinely keep copies of

3   correspondence that you send to prospective

4   employers?

5       A     No, not necessarily.                          12:23:13

6       Q     Why don't we direct your attention back

7   to Exhibit 4.

8             MR. KEEGAN:   Exhibit 4, the resume.

9             THE WITNESS:  Oh.

10  BY MS. TABACOPOULOS:                                     12:24:00

11      Q     So you would agree that there's no

12  substantive difference between Exhibits 4 and 5;

13  they're just configured differently; correct?

14      A     It seems like it.

15      Q     Okay.  And was that because you submitted   12:24:10

16  this a second time or do you know the reason why

17  they're configured differently and were produced

18  that way from Samumed?

19      A     I -- I have no clue.

20      Q     All right.  Okay.                             12:24:24

21            So the professional experience that you

22  have bullet point listed under PAREXEL -- I believe

23  you testified previously that that accurately and

24  honestly represents your job duties and experience

25  at PAREXEL; is that correct?                             12:24:54

Dexter Pasis
November 20, 2017

1          A      I believe so, yes.

2          Q      How did you go about denoting what it was

3     that you were doing at PAREXEL?

4                 MR. KEEGAN:  In the resume?

5                 MS. TABACOPOULOS:  Hmm-hmm.                    12:25:14

6                 MR. KEEGAN:  Do you understand the

7     question?

8                 THE WITNESS:  I denoted each bullet point

9     based on, you know, my job responsibilities as a --

10    as a CMA -- so when I was there.                           12:25:36

11    BY MS. TABACOPOULOS:

12         Q      Okay.  So the bullet points that you've

13    listed here on Exhibit 4 is a fair and accurate

14    representation of what you did when you were a CMA

15    II at PAREXEL; is that correct?                            12:25:53

16         A      Yes.  That's correct.

17         Q      So, in other words, you were conveying to

18    Samumed that you had professional experience

19    performing all of the -- the job duties that are

20    listed on your resume?                                     12:26:13

21         A      As part of my -- yeah, as part of my job

22    responsibilities for that role, yes.

23         Q      Okay.  How many sites did you manage when

24    you were at PAREXEL?

25         A      I don't quite remember.  I -- I do -- and    12:26:37

U.S. Legal Support | www.uslegalsupport.com          70

Dexter Pasis
November 20, 2017

```
 1        A     If it was instructed in the protocol, and

 2   detailed in the protocol, then we'd use that as

 3   basis for our judgment.

 4        Q     Any other assessments that you did?

 5              MR. KEEGAN:  Objection.  Vague.                12:37:35

 6   Overbroad.

 7              THE WITNESS:  Specify --

 8   BY MS. TABACOPOULOS:

 9        Q     I'm using your terminology.

10              MR. KEEGAN:  Well, it's a very broad           12:37:44

11   question.  Objection.  Vague as to what study, what

12   period of time.  Lacks foundation.  Assumes facts

13   not in evidence.

14   BY MS. TABACOPOULOS:

15        Q     You worked on the online study when you       12:38:13

16   were at PAREXEL; correct?

17        A     That's correct.

18        Q     And it was either quality of the

19   cardiovascular study or the venous thrombosis;

20   correct?  Why don't we just call it the

21   "cardiovascular study" for the record.

22        A     Sure.

23        Q     Okay.  And when you came on board and

24   started to work on the study, it was already

25   underway; correct?                                       12:38:32
```

Dexter Pasis
November 20, 2017

```
 1       A     Yes.  It was -- it was in a phase where

 2   it was just maintenance.  However, the -- that

 3   cardiovascular study was a very hard and grueling

 4   study.  So there was still efforts when I came on,

 5   even though the study was already ongoing, that the       12:38:49

 6   study was consistently trying to bring on more

 7   sites.

 8       Q     Were you involved in any kind of

 9   site-initiation activities with this particular

10   study?                                                    12:39:06

11       A     I was involved in a lot of the

12   feasibility where we would reach out to potential

13   sites.

14       Q     Were you involved in any other phase,

15   other than monitoring and reaching out regarding          12:39:21

16   feasibility?

17       A     Again, as mentioned, this -- this study

18   was in maintenance phase, so it was more or less

19   maintaining communication based on the CMP.

20       Q     How many times did you reach out               12:39:38

21   regarding feasibility?

22       A     Well, that was in the beginning of my

23   tenure.  So I don't remember how much time I had put

24   into that feasibility effort.

25       Q     And what do you mean when you say a             12:39:59
```

Dexter Pasis
November 20, 2017

```
 1              A F T E R N O O N   S E S S I O N

 2                    Commenced at 1:57 P.M.

 3

 4              THE VIDEOGRAPHER:  We are back on the

 5    record at 1:57 P.M.                                    13:57:43

 6

 7                    EXAMINATION (Resumed)

 8    BY MS. TABACOPOULOS:

 9         Q     Are you able to continue with us and give

10    us your best testimony?                                13:57:53

11         A     Yes.

12         Q     Are you aware of any reason why you would

13    not be able to do that?

14         A     There's no reason.

15         Q     You started your employment with PAREXEL    13:58:05

16    on May 4th, 2015; is that correct?

17         A     That's correct.

18         Q     And you ended your employment with

19    PAREXEL in early July of 2016; correct?

20         A     That seems about right.  Correct.           13:58:27

21         Q     When you started with PAREXEL, you spent

22    the first, what, couple weeks in training; is that

23    right?

24         A     That's correct.

25         Q     Can you describe the training that you      13:58:39
```

1   undertook?

2        A     Well, all new employees traveled to

3   PAREXEL's headquarters in North Carolina.  And it

4   was a two-week onboarding program, went over -- and

5   my class -- most of which were sort of new to the          13:59:05

6   role, whether it had been a CMA or on the field

7   CRA -- so it was a mixture of roles, different

8   levels.

9            And within a certain amount of time, we

10  were segregated from the on the field CRAs because         13:59:27

11  they had different training and where the -- all the

12  in-house folks had a separate training with a

13  different trainer and went over really what the role

14  was -- expectations, regulations.

15           Company as a whole went over different            13:59:53

16  scenarios based on experiences from other CRAs, or

17  from the trainers, did some role playing and did a

18  couple of -- we were also -- I don't want to say,

19  "tested," but we were given different types of

20  scenarios that we would then -- if I remember              14:00:22

21  correctly -- provide solutions using, you know,

22  the -- CTMS system that PAREXEL uses and documented,

23  you know, the -- the issue, whatever it may be --

24  conversation that you would have to any particular

25  site staff.                                                14:00:52

Dexter Pasis
November 20, 2017

```
 1        Q      Can you give me some examples?
 2               MR. KEEGAN:  As far as training or --
 3    BY MS. TABACOPOULOS:
 4        Q      Well, what he meant by that.  You know --
 5               MR. KEEGAN:  Well, we're talking about          14:04:33
 6    the training; right?  Objection.  Vague and
 7    ambiguous.
 8               THE WITNESS:  A PI not performing as
 9    delegated per the delegation of authority and
10    responsibility log -- DOA -- or DOR.                      14:04:47
11    BY MS. TABACOPOULOS:
12        Q      Anything else?
13        A      Combative study coordinator, not wanting
14    to do with what the protocol says or -- and usually,
15    if -- those types of scenarios are continuous, we        14:05:07
16    certainly do want to escalate that and get further
17    guidance from project management, provide more of --
18    if it was dealt with a safety query or issue, we
19    would then reach out to -- to the medical monitor
20    for advice or for a more expert decision in how to       14:05:29
21    proceed.  There's several things that could be
22    particular for one site that may be different from,
23    you know, all other sites, but --
24        Q      Right.  There are a multitude of unique
25    issues that could occur on one side that you might       14:05:53
```

Dexter Pasis
November 20, 2017

1    not see on another site.  Is that fair to say?

2        A       Absolutely.

3        Q       So you were charged, though, with the

4    responsibility given your level of professionalism

5    of ascertaining whether there was a safety issue or                    14:06:04

6    a PI issue or an FC issue at the site and making a

7    recommendation to the -- to either project

8    management or medical monitor; is that correct?

9             MR. KEEGAN:  Objection.  Lacks

10   foundation.  Assumes facts not in evidence.                            14:06:20

11   Misstates his prior testimony.

12            THE WITNESS:  We would escalate as

13   appropriate.

14   BY MS. TABACOPOULOS:

15       Q       You would make a decision if it's                          14:06:28

16   appropriate to escalate it or whether you could

17   handle it yourself with your site that you were

18   managing; is that right?

19            MR. KEEGAN:  Objection.  Misstates his

20   former testimony.  Assumes facts not in evidence.                      14:06:38

21   Lacks foundation.

22   BY MS. TABACOPOULOS:

23       Q       You can answer.

24       A       As appropriate.  We would escalate.

25       Q       But was it up to your judgment to decide                   14:06:52

Dexter Pasis
November 20, 2017

```
 1   or do you not know?
 2        A     I'm sure there were.  I just don't know
 3   the exact number or approximate number of that --
 4   how many studies PAREXEL was involved.  They are a
 5   CRO, so I'm sure there was a lot of business          14:28:19
 6   development studies being signed onto the study that
 7   I'm not privy about.  And so I was more on the
 8   production side, you know, being assigned to that
 9   one study.
10        Q     So would it be fair to say you have no     14:28:40
11   personal knowledge about any other study that was
12   conducted at PAREXEL during the time that you worked
13   there?
14        A     No.  --
15             MR. KEEGAN:  Other than the ones he was     14:28:51
16   assigned to?
17             MS. TABACOPOULOS:  Other than the one he
18   was assigned to.  He was assigned to one study.
19             MR. KEEGAN:  Right.
20   BY MS. TABACOPOULOS:                                  14:28:57
21        Q     Right?
22        A     Correct.
23        Q     Why don't we start over given the
24   objection:  Would it be fair to say you have no
25   personal knowledge about any other study that was    14:29:03
```

 1    conducted at PAREXEL during the time that you worked

 2    there, other than the study that you were assigned

 3    to?

 4        A     If I can remember, I wouldn't have any

 5    recollection or memory of any other study that I          14:29:16

 6    would have been involved in.

 7        Q     So would it have been also fair to say

 8    that you have no personal knowledge of how other

 9    CRAs or CMAs performed their work on the other

10    studies that were being conducted by PAREXEL, either     14:29:38

11    during the time that you worked there or since

12    December of 2012?

13             MR. KEEGAN:  Objection.  Lacks

14    foundation.  Calls for a legal conclusion.  Assumes

15    facts not in evidence.                                    14:29:54

16             THE WITNESS:  I was primarily focused on,

17    you know, my involvement in the -- in the Mariner

18    study.  So if --

19    BY MS. TABACOPOULOS:

20        Q     Apart from --                                   14:30:10

21        A     -- there was a chance -- I'm sorry.

22        Q     -- the cardiovascular study?

23             MR. KEEGAN:  Finish.

24             THE WITNESS:  Yeah.  If there was a

25    chance that another CMA or CRA had some -- said          14:30:18

 1   something that was study-specific, probably.  I just

 2   don't remember.

 3   BY MS. TABACOPOULOS:

 4        Q     I'm going to have the question read back.

 5   It was a long question.  So if you could focus on                    14:30:41

 6   it.  I think it calls for a "yes" or "no," but --

 7        A     Okay.

 8              (Record read by the reporter as follows:)

 9                   "QUESTION:  So would it

10              have been also fair to say that

11              you have no personal knowledge

12              of how other CRAs or CMAs

13              performed their work on the

14              other studies that were being

15              conducted by PAREXEL, either

16              during the time that you worked

17              there or since December of

18              2012?"

19              THE REPORTER:  Objections noted.

20                   "QUESTION:  Apart from the

21              cardiovascular study?"

22              MR. KEEGAN:  Objection.

23              THE WITNESS:  Again, it -- it may have

24   been that a colleague within the same role mentioned

25   what they were doing at -- in their particular              14:31:27

Dexter Pasis
November 20, 2017

1      A     I don't remember.

2      Q     Was it halfway through your tenure?

3   Three-quarters?  Do you remember?

4      A     I -- I don't remember, but it may have

5   been maybe three-quarters of my tenure I was in the          14:36:23

6   office.  And then transitioned into working from

7   home.

8      Q     And there were other CMAs -- certainly

9   CRAs -- that did not work in the office; correct?

10     A     That's correct.                                     14:36:44

11     Q     So you would have no knowledge about what

12  duties they were performing on a weekly or daily

13  basis; is that right?

14     A     Right.

15           MR. KEEGAN:  Objection.                             14:36:52

16           THE WITNESS:  I don't know what they

17  perform, as far as study-specific responsibilities.

18  BY MS. TABACOPOULOS:

19     Q     Did you submit the -- strike that.

20           Did you apply for the PAREXEL job before            14:37:12

21  you applied for Samumed or vice versa?

22     A     Before.

23     Q     The PAREXEL job came first?

24     A     Yes.

25     Q     Did you -- what did you do to apply?              14:37:24

Dexter Pasis
November 20, 2017

1    BY MS. TABACOPOULOS:

2       Q       -- in connection with wanting to secure

3    other jobs at the company?

4              MR. KEEGAN:  Objection.  Lacks

5    foundation.  Assumes facts not in evidence.                    14:48:44

6              THE WITNESS:  I just don't remember.

7    BY MS. TABACOPOULOS:

8       Q      When did you prepare Exhibit 7,

9    approximately?

10      A       If I remember correctly, as part of           14:48:56

11   requirements, we needed to sort of prepare a

12   PAREXEL-specific CV so they had it on record, I

13   guess, for HR -- I don't remember.  But according to

14   the version here, it's May 20, 2015.

15      Q      Okay.  As with the CVs that you submitted       14:49:40

16   to Samumed, did you make every effort to be accurate

17   and truthful in documenting your professional

18   experience in Exhibit 7?

19      A      Yes.

20      Q      What is Association of Clinical Research        14:50:01

21   Professionals?

22      A      ACRP is an association where clinical

23   research professionals -- whether it be on the

24   sponsor side, CRO side, or clinical research

25   sites -- attend.  Usually, there are important         14:50:29

Dexter Pasis
November 20, 2017

1    site issues for --
2            MR. KEEGAN:  Objection.  Assumes facts
3    not in evidence.  Lacks foundation.  Calls for --
4    it's an incomplete hypothetical.  Go ahead.
5            THE WITNESS:  Only within my study.  So          15:17:14
6    there was other CMAs and CRAs involved in my study.
7    Again, I wasn't privy to specifics or details from
8    other CRAs and CMAs working on other studies.  It
9    may have been discussed, but I just simply don't
10   remember.                                                15:17:36
11   BY MS. TABACOPOULOS:
12       Q    Well, there were some 800 sites in your
13   study.  You were only doing, you said, 12 to 14 of
14   them?
15       A    Yes.                                            15:17:45
16       Q    Would it be fair to say you don't know
17   what the CMAs and CRAs were doing on the other
18   700-something study sites that were under your
19   cardiovascular study?
20           MR. KEEGAN:  Objection.  Misstates his          15:17:57
21   testimony.  Lacks foundation.  Assumes facts not in
22   evidence.
23           THE WITNESS:  Only sites that were in
24   U.S. and Canada.
25   ///

Dexter Pasis
November 20, 2017

1      Q      Sitting here today, do you remember

2   anything about the way any other CMA managed a site

3   on a cardiovascular study that you did?

4      A      I do not.

5      Q      Can you tell me how you went about                    15:19:58

6   recognizing out-of-scope activities on your studies.

7            MR. KEEGAN:  Objection.  Vague,

8   ambiguous.

9            MS. TABACOPOULOS:  Strike that.

10   BY MS. TABACOPOULOS:                                             15:20:10

11      Q      Can you describe for me how you went

12   about recognizing out-of-scope activities on the

13   sites that you managed?

14            MR. KEEGAN:  Objection as to

15   "out-of-scope activities."                                      15:20:22

16            MS. TABACOPOULOS:  I'm using it in the

17   same sense he does on his resume.

18            MR. KEEGAN:  Lacks foundation.

19            Go ahead.

20            THE WITNESS:  I don't remember what "out              15:20:36

21   of scope" is defined as.  Having -- I'm just

22   throwing myself in the dark here.  Just maintaining

23   weekly communication or just responding back to

24   e-mails as being out of scope.  That's not really

25   necessarily part of the protocol itself, per se, but          15:21:10

Dexter Pasis
November 20, 2017

1    representative in this litigation, that your

2    adequacy to serve as a class representative will be

3    made public information?

4              MR. KEEGAN:  Objection.  Calls for

5    attorney-client privilege.  Instruct the witness not          17:04:01

6    to answer.

7              THE WITNESS:  I shall not answer that

8    question.

9    BY MS. TABACOPOULOS:

10        Q     Do you have an understanding that the              17:04:11

11   lawsuit you filed is public information?

12        A     I actually don't know I have that

13   understanding.

14        Q     Do you have an understanding as part of

15   the process of testing your adequacy to serve as a           17:04:30

16   class representative, part of that process involves

17   evaluating whether you're truthful?

18        A     Well, I understand me being under oath,

19   yes.

20        Q     Okay.  My question is different from              17:04:52

21   being under oath.  I'm asking you whether you

22   understand that part of the process of being a class

23   representative is undergoing scrutiny to determine

24   whether or not you are a truthful individual and,

25   therefore, adequate to represent the class.                  17:05:13

Dexter Pasis
November 20, 2017

1  from taking your lunch; is that correct?

2           MR. KEEGAN:  Objection.  Vague,

3  ambiguous, overbroad.

4           THE WITNESS:  I didn't have my line

5  manager, you know, tell me to take my lunch at a      17:50:24

6  certain time, if that -- if that's what you're

7  alluding to.  So, you know, based on my schedule

8  that day, you know, it really depended on whether or

9  not I was going to, you know, take lunch or not.

10  So --                                                17:50:51

11  BY MS. TABACOPOULOS:

12      Q    Did you have an understanding based on

13  PAREXEL's written policies that you were entitled to

14  take a 30-minute meal period every day if you wanted .

15  to?                                                  17:51:05

16           MR. KEEGAN:  Objection.  Lacks

17  foundation.

18           THE WITNESS:  Well, based on policy

19  and -- from what I understand, yes.  Previous work

20  experience.  Typically, to get a lunch period.       17:51:14

21  BY MS. TABACOPOULOS:

22      Q    And did you typically take your lunch

23  period at PAREXEL with other employees in the lunch

24  room down at the San Diego facility?

25      A    Few occasions.                              17:51:29

Dexter Pasis
November 20, 2017

```
 1       Q     What do you mean?

 2       A     But I was usually at my desk -- or if I

 3   was working remotely by myself and had my own sort

 4   of -- if I did do lunch, had my own lunch schedule.

 5   I found myself, you know, just being -- being by           17:51:55

 6   myself most of the time.

 7       Q     Would it be fair to say that nobody from

 8   PAREXEL ever prevented you from taking at least a

 9   30-minute meal period each day in whatever form or

10   fashion you so chose?                                       17:52:22

11             MR. KEEGAN:  Objection.  Argumentative.

12   BY MS. TABACOPOULOS:

13       Q     Whether it was at your desk or leaving

14   the premises or otherwise?

15             MR. KEEGAN:  Objection.  Lacks                    17:52:29

16   foundation.  Assumes facts not in evidence.

17   Misstates his testimony.

18             THE WITNESS:  I was never coerced, if --

19   or told to, you know, take my lunch.

20   BY MS. TABACOPOULOS:                                        17:52:48

21       Q     The question was whether anybody ever

22   prevented you from taking -- and I'll have it read

23   back.

24             (Record read by the reporter as follows:)

25                 "QUESTION:  Would it be
```

Dexter Faris
November 20, 2017

```
 1              fair to say that nobody from

 2              PAREXEL ever prevented you from

 3              taking at least a 30-minute

 4              meal period each day in

 5              whatever form or fashion you so

 6              chose?

 7               Objection noted.

 8                   "Whether it was at your

 9              desk or leaving the premises or

10              otherwise?"                          17:53:14

11         THE WITNESS:  Yeah.  I -- no one, again,

12   told me to -- or instructed me to take lunches.  But

13   sorry, it's getting late.  Sorry.

14   BY MS. TABACOPOULOS:

15      Q     Would it be a fair statement to say that   17:53:41

16   nobody at PAREXEL ever prevented you from taking a

17   meal period whenever you wanted to and whenever you

18   wanted to?

19      A     Nobody at PAREXEL prevented me from

20   taking a meal period.                          17:53:55

21      Q     What about rest breaks?  Did you have an

22   understanding from the policy that you were entitled

23   to two rest breaks a day?

24      A     I don't remember if there was a policy,

25   as I didn't typically take rest breaks.        17:54:09
```

Dexter Pasis        *Exhibit No.:*
20 November 2017      3
*Pasis & Pasis, California Civil No. 3702*



## Employment History

List all present and past employment starting with your most recent employer (attach additional page(s) if necessary.)

Company: ___PAREVEL___          Supervisor: ___Cynthia Vicur___

Address: ___9970 Pacific Heights Blvd. #500, San Diego, CA 92121___

Job Title: ___In-house CPA II___   ☐ Hourly Rate   ___$84K___   ___$84K___
                                                   *Starting*        *Ending*
                          ☑ Annual Salary
From: ___05/15___ To: ___Present___   Reason for Leaving: ___Presently employed___

2

CONFIDENTIAL

SAM00328



## Employment History

List all present and past employment starting with your most recent employer (attach additional page(s) if necessary.)

Company: PAYEYEL          Supervisor: Cynthia Vipar

Address: 9920 Pacific Heights Blvd. #506, San Diego, CA 92121

Job Title: In-house CPAII      ☐ Hourly Rate   $84K *Starting*    $84K *Ending*

                              ☑ Annual Salary

From: 05/15 To: Present    Reason for Leaving: Presently employed

2

CONFIDENTIAL

Dexter Pasis
20 November 2017
Henry A. Pelino, California CSR No. 7769

PAREXEL International

Curriculum Vitae

# CURRICULUM VITAE

**NAME:** Dexter Pasis

**JOB TITLE:** Clinical Monitoring Associate II

## SUMMARY OF EXPERIENCE:

An experienced CRA that conducted investigational site selection, initiation, periodic, and termination visits. Has served as a liaison between the sponsor and the investigator, participated in project and sponsor team meetings, and monitored clinical sites. Gained valuable experience in performing audits and site inspections while being a QA compliance auditor. Able to conduct inspections to verify source documentation to case report forms and reconcile drug accountability as an auditor.   Been able to achieve 10 years of industry experience overall.

## THERAPEUTIC AREA EXPERTISE:

Significant experience in Oncology.

| Indication | Phase | # Patients | # Sites | Countries | Services Involved |
|---|---|---|---|---|---|
| Pancreatic Cancer | III | 220 | 16 | USA | Monitoring |
| Bladder Cancer | II | 154 | 12 | USA | Monitoring |
| Traumatic Brain Injury | III | 125 | 25 | USA | Unblinded monitoring |
| Obesity | III | 750 | 45 | USA, CAN | QA Auditing |

## PROFESSIONAL EXPERIENCE:

### Clinical Monitoring Associate II, PAREXEL, San Diego, CA
May 2015 - Present

- Act as PAREXEL's remote contact with assigned clinical sites, use judgment to assess and ensure overall integrity of study implementation and adherence to study protocol at clinical sites
- Prepare and collect high quality site documents, such as essential regulatory documents (SRP)
- Compile SRP for review and approval
- Submit and follow-up with site on Clinical Site Agreement (including budget), Anti-Bribery Law (ABL) Survey (if not available), and site specific Informed Consent Form (ICF)
- Collaborate and involve Clinical Trial Specialists (CTS) on CSA (including budget) and site specific ICF negotiations as required
- Collect site specific documents for IRB, Ethics Committee (EC), and Regulatory Affairs (RA) as required
- Provide prepared EC package to Principal Investigator for submission and follow up to secure approval where required
- Demonstrate thorough understanding of the various tasks related to study start-up, initiation, ongoing monitoring, processing, and lock
- Support site with access to relevant study systems and ensure sites are compliant with project specific training requirements

TP-HR-WW-002-05
Effective Date: 26 Jun 13
Related to: SOP-HR-WW-001

CV Version Date: 20 May 2015
Dexter Pasis
Page 1 of 3

PAR000033

PAREXEL International

Curriculum Vitae

- Ascertain and recommend appropriate follow-up response to issues at clinical sites including potential deficiencies in documentation, communication, and the need for additional training
- Configure and distribute study documents to site with support of Research Operations Assistant (ROA), including configuration of Investigator Site Files
- Conduct general site contacts in accordance with the study specific Monitoring Plan
- Maintain a positive, results oriented work environment, building partnerships and modeling teamwork, communicating to the team in an open, balanced, and objective manner
- Manage sites and protocols across multiple therapeutic areas independently
- Support less experienced staff on project assignments as appropriate
- Recognize out of scope activities and communicate to Project Leader
- Recognize impact of issues/delays/changes on study timelines and communicate to Project Leader
- Participate in internal audits and client meetings with support
- Require minimal supervision by Manager

**Clinical Research Associate I, CATO Research, San Diego, CA**
January 2013 – April 2015
- Conducted investigational site selection, initiation, periodic, and termination visits.
- Traveled to investigational sites to ensure the following: that the rights and well-being of human subjects are protected; that the reported trial data are complete, accurate, and verifiable per source documents; and that the trial is conducted in compliance with the currently approved protocol, Good Clinical Practice (GCP), International Conference on Harmonisation (ICH) E6 guidelines, standard operating procedures (SOPs), and applicable regulations.
- Verified proper storage conditions, accountability, and disposition of the investigational products
- Periodically maintained the investigator study files
- Ensured sites were accurately recording and reporting adverse events and serious adverse events.
- Manage clinical trials including study budget management, financial tracking and control

**Compliance Specialist/Document Quality Reviewer, CATO Research, San Diego, CA**
January 2011 - April 2015
- Conduct quality reviews of several types of submission-ready documents to include protocols, Investigational Brochures, Clinical Study Reports, Summary of Clinical Efficacy, Summary of Clinical Safety, Periodic Safety Reports, various briefing documents, assessment reports, Response to Questions, PK reports, clinical overviews, Common Technical Documents, Pharmacovigilance plans, Risk Management Plans, Risk Evaluation and Management Strategy, IND submissions, etc.
- Perform clinical on-site monitoring activities (drive patient recruitment, source data verification, drug accountability, data collection)
- Work independently to thoroughly review, resolve, interpret, and analyze submission-ready documents against source (Tables, Figures, and Listings).
- Constant communication with medical writers was maintained throughout the review and resolution of findings.

**Quality Assurance Compliance Auditor II, Arena Pharmaceuticals, San Diego, CA**
October 2009 - January 2011
**Quality Assurance Compliance Auditor I, Arena Pharmaceuticals, San Diego, CA**
September 2007 – October 2009

TP-HR-WW-002-05
Effective Date: 26 Jun 13
Related to: SOP-HR-WW-001

CV Version Date: 20 May 2015
Dexter Pasis
Page 2 of 3

PAR000034

PAREXEL International

Curriculum Vitae

- Performed external audits of contract research organization sites for GLP compliance, including animal toxicology, analytical chemistry, and bioanalytical facilities. Perform clinical on-site monitoring activities (drive patient recruitment, source data verification, drug accountability, data collection)
- Reviewed documents associated with regulatory submissions, and wrote reports for all GLP and GCP audit-related activities, updating associated logs as necessary.
- Assisted in analyzing and performing audits of GLP final reports (e.g., final toxicology study reports, dose formulation reports and method validations, bioanalytical reports and method validations, toxicokinetic reports) for its data and content.
- Help plan and schedule work activities for the Quality Assurance Compliance Group, forecasting staff and equipment needs to ensure deadlines were consistently met.
- Ensured maintenance of the Archives and GLP Master Schedule.
- Assisted in creating and the revision of External and Internal GxP Auditing procedures and SOPs.
- Provided training related to compliance and GLP activities on a as needed basis.

**Research Associate/Production Chemist, Illumina, San Diego, CA**
October 2006 - September 2007
- Implemented manufacturing procedures to formulate and produce biochemical reagents.
- Identified process discrepancies, resolved technical issues, and improved procedures.
- Was responsible for quality control of reagents (including data analysis) and inventory control of reagents using an inventory system.
- Maintained general laboratory organization and availability of laboratory supplies.
- Performed routine testing and calibration of some laboratory equipment.

**Research Associate, Ichor Medical Systems, San Diego, CA**
August 2005 - October 2006
- Involved in various laboratory duties, including quantitative polymerase chain reaction (qPCR), gel electrophoresis, DNA isolation (rabbits, rat mice, and human blood), tissue culture, maintained cell lines, enzyme-linked immunosorbent assay (ELISA) (sandwich and antibody titer), UV plate reader, serial dilutions, and solution and buffer preparation.
- Performed quantitative analysis of electroporation technology.

**EDUCATION:**

San Diego State University, San Diego, CA, B.Sc. in Cell and Molecular Biology, 2004

**LANGUAGE SKILLS:**

English: fluent

**PROFESSIONAL ASSOCIATIONS:**

Association of Clinical Research Professionals

TP-HR-WW-002-05
Effective Date:  26 Jun 13
Related to:  SOP-HR-WW-001

CV Version Date: 20 May 2015
Dexter Pasis
Page 3 of 3

PAR000035

Dexter Pasis
20 November 2017
Harry A. Pasis, California CSR No. 7766

Exhibit No.:
11

## PAREXEL MEAL AND REST PERIOD POLICY

> **POLICY:** The Company's policy is to allow employees to take meal and rest periods. The purpose of this Policy is to detail the Company's meal and rest period rules for employees. This Policy applies to all employees except those who work in the state of California, who should refer to the Company's California Meal Period and Rest Break Policy.

### I.   DEFINITIONS USED IN THIS POLICY:

**Non-Exempt Employee:** The term "non-exempt employee" refers to employees classified by the Company in accordance with state and federal law as eligible to receive overtime compensation as provided under applicable law.

**Exempt Employee:** The term "exempt employee" refers to employees classified by the Company in accordance with state and federal law as exempt from the overtime provisions of applicable law.

**Rest Period:** A "rest period" is a 10-minute period during which a non-exempt employee is relieved of all duties. When taken, rest periods are counted as hours worked and are paid.

**Meal Period:** A "meal period" is a period of at least 30 minutes during which an employee is relieved of all work duties. Normally, the employee eats a meal during this period. When taken, meal periods are not counted as hours worked for non-exempt employees and, accordingly, are not paid.

### II.   REST PERIOD POLICY FOR NON-EXEMPT EMPLOYEES:

A.   Non-exempt employees are authorized and permitted to take one 10-minute rest period for every four hours worked or major portion thereof (i.e., more than two hours).

B.   A rest period need not be authorized or permitted for non-exempt employees whose total daily work time is less than 3.5 hours.

C.   Rest periods must be counted as hours worked and, insofar as practicable, be in the middle of each work period. The Company will make a good faith effort to authorize and permit rest periods in the middle of each work period.

D.   Rest periods may not be accumulated, used to leave work early, or used to extend a meal period.

### III.   MEAL PERIOD POLICY FOR NON-EXEMPT EMPLOYEES:

A.   Non-exempt employees who work a period of more than 5 hours are authorized and permitted to take an off-duty meal period of at least 30 consecutive minutes. Employees who work a period of more than 10 hours are authorized and permitted to take a second off-duty meal period of at least 30 consecutive minutes. For employees working in Massachusetts, this meal break is required to

Rev. 24May2013

## MEAL AND REST PERIOD POLICY

be taken unless the Company has an authorized meal break waiver form on file. Please contact Human Resources for information on meal break waivers.

B.   Non-exempt employees must record their time out at the beginning of a meal period and back in at the end of the meal period. Non-exempt employees may not perform any work while clocked out for a meal period. See the Company's *Timekeeping and Overtime Policy* for more information on the requirement that non-exempt employees accurately record all work time and meal periods.

## IV.   MEAL AND REST PERIOD POLICY FOR EXEMPT EMPLOYEES:

A.   Exempt employees may take rest periods as may be necessary during their work day on the same schedule as non-exempt employees. Rest periods shall be taken at such times that do not interfere with scheduled meetings and other work commitments.

B.   Exempt employees who work a period of more than 5 hours are authorized and permitted to take an off-duty meal period of at least 30 consecutive minutes. Employees who work a period of more than 10 hours are authorized and permitted to take a second off-duty meal period of at least 30 consecutive minutes. Meal periods shall be taken at such times that do not interfere with scheduled meetings and other work commitments.

## V.   COMPANY RESPONSIBILITY UNDER REST AND MEAL PERIOD POLICY:

A.   Managers must ensure that their direct reports are aware of and adhere to this Policy.

B.   No manager or Human Resources personnel shall impede or discourage employees from timely taking meal periods provided under this Policy. Company employees are prohibited from coercing, incentivizing, or otherwise encouraging employees not to timely take meal periods.

**Page 2 of 2**

Rev. 24May2013

PAR001095

# PAREXEL

## CALIFORNIA MEAL PERIOD AND REST BREAK POLICY

### Meal Periods

Non-exempt employees who work more than five hours in a workday are provided with a 30-minute, off duty unpaid meal period by the end of their fifth hour of work, unless the employee works six hours or less in a workday and the employee and the Company voluntarily agree to waive the meal period. Employees should begin their meal periods by no later than the end of their fifth hour of work. Employees are relieved of all work duties during the meal period, and are free to use their meal period time for whatever purpose they desire.

Non-exempt employees who work more than 10 hours in a workday are provided with a second 30-minute off-duty, unpaid meal period. However, if an employee works more than 10 hours in a day, but not more than 12 hours, then the employee and the Company can agree to waive the second meal period.

Each non-exempt employee is required to record accurately the time they begin and end each meal period. Non-exempt employees must not perform any work "off the clock" during meal periods. Any time spent performing work during a meal period must be reflected on the employee's time record. Employees should not work through their meal periods in order to arrive late or leave work early.

If you are not provided with a meal period as required by this policy, or anyone directs or encourages you to skip your meal period, then you must contact Human Resources immediately. You may do so without fear of retaliation, which Company policy prohibits.

The Company will assume that you have been provided with your meal periods as set forth in this policy unless you notify Human Resources of a problem. If you report (1) working during your meal period, (2) returning to work prior to the end of your meal period, (3) being denied a meal period, or (4) being required to delay your meal period until after the end of your fifth hour of work, then you will be paid in accordance with applicable law.

If you have any questions or concerns about this policy or your meal period entitlements, please contact Human Resources immediately.

### Rest Breaks

Non-exempt employees are authorized and permitted to take one 10 minute paid rest break for every four hours worked or major portion thereof. Rest breaks should be taken as close to the middle of each four-hour work period as practicable. The Company encourages employees to take all authorized rest breaks each workday. If you work more than six hours in a day, then you are authorized and permitted to take two paid rest breaks each day. If you work six hours or fewer, then you are authorized and permitted to take one paid rest break each day. If you work

Rev.15October2012-LRM

more than 10 hours in a day, then you are authorized and permitted to take an additional rest break. Employees working fewer than three and one-half hours in a day are not entitled to a rest break. Employees should not add their rest breaks to their meal periods as a means of taking longer meal periods. Employees also should not work through their rest breaks in order to arrive late or leave work early.

If you are not authorized and permitted to take a rest break as required by this policy, or anyone directs or encourages you to skip your rest breaks, then you must contact Human Resources immediately. You may do so without fear of retaliation, which Company policy prohibits. The Company will assume that you have been provided with your rest breaks as set forth in this policy unless you notify Human Resources of a problem.

If you have any questions or concerns about this policy or your rest break entitlements, please contact Human Resources immediately.

PAR001097

## TIMEKEEPING AND OVERTIME POLICY

> **POLICY:** Accurately recording time worked is the responsibility of every non-exempt (i.e., overtime-eligible) employee. All non-exempt employees must accurately record the time they begin and end their workday, each meal period, and any departure from work for personal reasons. It is the Company's policy to maintain accurate records of hours worked by non-exempt employees, to communicate clearly with all employees regarding working hours and pay, and to comply with all applicable state and federal wage-hour laws.

I.   **DEFINITIONS USED IN THIS POLICY:**

**Exempt Employee:** The term "exempt employee" refers to employees classified by the Company in accordance with state and federal law as exempt from the overtime provisions of applicable law.

**Hours Worked:** The term "hours worked" refers to time spent performing work or engaged in work-related activities. It does not include hours away from work due to vacation, sickness, or holiday, even when this time away from work is compensated.

**Non-Exempt Employee:** The term "non-exempt employee" refers to employees classified by the Company in accordance with state and federal law as eligible to receive overtime compensation as provided under applicable law.

**Pay Period:** The term "pay period" refers to the period of time paid by the company in a single check. For some employees who are paid biweekly, this is a 14-day period established by the Company that covers two consecutive workweeks, with paydays on alternating Fridays. There are 26 pay periods in a calendar year for those paid bi-weekly. Other employees are paid semi-monthly on the 15th and last day of the month. If the regularly scheduled pay date falls on a Sunday or holiday, then the payday is the last workday preceding the regularly scheduled payday. There are 24 pay periods in a calendar year for those paid semi-monthly.

**Workday:** The term "workday" means the period between the times on any particular day when an employee begins his or her principal work activity and ends his or her principal work activity or activities.

**Workweek:** The "workweek" is a fixed and regularly-recurring period of 168 hours (i.e., 7 consecutive 24-hour periods), starting with the same calendar day each week. The Company's workweek is defined as Saturday through Friday.

II.   **TIMEKEEPING POLICY FOR NON-EXEMPT EMPLOYEES:**

A.   Employees classified by the Company as non-exempt will be paid for all hours worked. Non-exempt employees must accurately record all hours worked. Employees should never record their time out (clock out) and continue working, and should never start work before recording their time in (clock in). It is the employee's responsibility to notify Human Resources if anyone requests that they violate this Policy, as well as to record any hours worked "off the clock,"

PAR001098

including any time worked at home.  For example, if a non-exempt employee is called at home to discuss work-related matters over the phone, this time is hours worked and must be recorded.  Non-exempt employees are not required or expected to perform work outside of their regularly scheduled work hours, for example such as checking e-mail or voicemail messages at home, whether in the morning before the start of the work day, or in the evenings after the end of the work day.

B.    The Company will establish a "workweek" for all employees.  The Company's workweek currently is Saturday through Friday. Employees must **accurately record and report all hours worked** so that they may be properly paid for their work. Employees must not perform work for the Company that they do not record or while they are clocked out—working "off the clock" is prohibited.  In furtherance of these requirements, the following rules apply:

1.    Employees must accurately record the actual start and end time of each work period, each meal period, and any departure from work for personal (i.e., non-work-related) reasons.  See the Company's applicable *Meal and Rest Period Policy* for the state in which you work for more information regarding meal and rest periods, including the requirement that employees clock out when their meal break starts and clock back in when their meal break ends.

2.    Once fully implemented, non-exempt employees will record their time by use of the TimeForce time clock system.  See the instructions and training materials for more information about the TimeForce system.

3.    Employees must electronically post their time sheets to their immediate manager.  Managers must approve the time sheets in the system.

4.    All hours worked should be accounted for on any given day of the week (including all weekday and weekend hours worked) regardless of the timekeeping system being used.

5.    It is each employee's responsibility to approve his or her time records to certify the accuracy of all time recorded.

6.    If an employee incorrectly enters information in any timekeeping system (including the failure to make a time entry on a particular day) and is unable to correct it within the system, he or she should notify his or her manager immediately.  The employee must provide the manager and payroll with a completed *Time Correction Form* on which the employee describes the issue and requests the change to be made.  As detailed in Section II below, changes to time records may not be made without such written authorization from the employee.

7.    Employees who report to work at different locations generally will begin the shift when they arrive at the first location and will end the shift when

Rev. 27May2014

PAR001099

they depart the last location. However, there may be exceptions to this Policy that require the shift to begin or end at an earlier or later time. Please see the Company's *Travel Time Policy* for more information on this topic.

C.     Employees may not record time worked or clock in or out on behalf of other employees, nor may they ask other employees to record their time or clock in or out for them. **Falsification of an employee's time records in this manner or any other manner is a serious offense** which may result in disciplinary action, up to and including termination of employment.

D.     Travel time to and from an employee's home is not considered hours worked, as it is normal commute time. If an employee is required to travel between worksites (for example, from the Company to a customer location or from one Company location to another) during the employee's workday, such travel time is "hours worked" and the employee will be compensated for the time. Please see the Company's *Travel Time Policy* for more information on this topic.

E.     In addition to recording their hours worked, non-exempt employees must also record their hours in the Company's project accounting system known as T.I.M.E. for the purpose of the Company's work allocation reporting and charging against client and internal projects. See your manager if there are any questions regarding your use of the T.I.M.E. system. Your hours worked for pay purposes will be calculated based on the time entered in the TimeForce system, or if you have not yet transitioned to the TimeForce system, on your applicable timekeeping system.

F.     Non-exempt employees will be office-based unless there is an exception granted by the Corporate Vice President of Human Resources.

G.     Any employee who fails to adhere to the timekeeping policies herein may be subject to disciplinary action, up to and including termination of employment. You should contact Human Resources if you have any questions regarding any of these requirements.

## III.    OVERTIME POLICY FOR NON-EXEMPT EMPLOYEES:

A.     Overtime compensation is paid to all non-exempt employees in accordance with federal and state laws. Exempt employees are not eligible for overtime pay. If a non-exempt employee works overtime hours, the employee will be paid the applicable overtime rate. Employees may be paid different rates of pay for different types of hours worked.

Rev. 27May2014

PAR001100

B.   When operating requirements or other needs cannot be met during regular working hours, employees may be required to work overtime hours. When possible, advance notification of these mandatory assignments will be provided. However, overtime will be paid with or without notification.

C.   Overtime work for non-exempt employees must always be approved by management before it is performed.  Non-exempt employees who work overtime without receiving prior authorization from the manager may be subject to disciplinary action, up to and including termination of employment.

D.   Non-exempt employees will be paid overtime at a rate of one and one-half times the employee's regular rate of pay for all hours worked in excess of 40 in a workweek, unless otherwise specified by state law.  In particular, non-exempt employees in the following states will be paid overtime as follows:

California:

One and one-half times the employee's regular rate of pay for all hours worked in excess of eight hours, up to and including 12 hours, in one workday, all hours worked in excess of 40 in a workweek, and for the first eight hours worked on the seventh consecutive day of work in a workweek.

Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday, and for all hours worked in excess of eight hours on the seventh consecutive day of work in a workweek.

There will be no "pyramiding" of overtime.  Hours worked that result in the payment of a daily overtime premium will not also be counted toward a weekly overtime premium.

Colorado:

One and one-half times the employee's regular rate of pay for all hours worked in excess of 12 hours in one workday or 12 consecutive hours in the workday (excluding duty free meal periods), and all hours worked in excess of 40 in a workweek.

There will be no "pyramiding" of overtime.  Hours worked that result in the payment of a daily overtime premium will not also be counted toward a weekly overtime premium.

Rhode Island:

One and one-half times the employee's regular rate of pay for all hours worked in excess of 40 in a workweek, and for non-exempt employees not in certain sales

Rev. 27May2014

PAR001101

and customer service related positions, all hours worked on Sundays and certain holidays.

E.    As required by law, overtime pay is based on actual hours worked. Time off for sick, vacation, holiday, personal time or any leave of absence will not be considered hours worked for purposes of performing overtime calculations. For purposes of calculating overtime, the workweek is defined as Saturday through Friday.

## IV.   EXEMPT EMPLOYEE TIMEKEEPING AND OVERTIME POLICY:

A.    Exempt employees are paid in an amount and on a basis that is intended to fully compensate them for all hours worked each workweek, regardless of the number of hours actually worked. Responsibilities associated with these positions frequently require extended work schedules. There is no legal requirement to pay overtime compensation to an exempt employee who works beyond his/her schedule.

B.    Exempt employees generally must record their actual work hours in the Company's project accounting system known as T.I.M.E. for the Company's work allocation reporting and charging against client and internal projects. See your manager if there are any questions regarding your use of the T.I.M.E. system.

## V.    MANAGER RESPONSIBILITIES:

A.    Managers are responsible for reviewing and approving their direct reports' time records prior to sending them to Payroll for processing. They are also responsible for ensuring that all payroll-related forms and documentation are sent to Payroll, where they will be maintained as part of the employee's payroll record.

B.    Managers may not make changes to employee time records without the employee's written authorization and approval by Payroll. If an employee makes an oral request for a change to his or her time records, the manager should make a notation in the system that a change is required and have the employee complete a written authorization for the change using the *Time Correction Form* and submit it to Payroll.

C.    For any changes to be made to an employee's time record, a copy of the employee's written authorization must be sent to and maintained by Payroll. Such written authorization should be provided using the Company's *Time Correction Form.*

D.    Managers must comply with all instructions from Human Resources and Payroll regarding maintenance and storage of payroll-related forms and documentation.

Rev. 27May2014

PAR001102

Dexter Pasis
November 20, 2017

REPORTER'S CERTIFICATE

1
2
3          I, Harry A. Palter, CSR No. 7708, California
4    Certified Shorthand Reporter, certify:
5          That the foregoing proceedings were taken
6    before me at the time and place therein set forth, at
7    which time the witness was put under oath by me;
8          That the testimony of the witness, the
9    questions propounded, and all objections and statements
10   made at the time of the examination were recorded
11   stenographically by me and were thereafter transcribed;
12         That a review of the transcript by the
13   deponent was requested; that the foregoing is a true and
14   correct transcript of my shorthand notes so taken.
15         I further certify that I am neither counsel
16   for, nor related to, any party to said proceedings, nor
17   in any way interested in the outcome thereof,
18   financially or otherwise.
19         I declare under penalty of perjury under the
20   laws of the State of California that the foregoing is
21   true and correct.
22   Dated: 11.27.2017
23
24
0 25  ──────────────────────────────
     HARRY ALAN PALTER, CSR No. 7708

18:24:5

Dexter Pasis Volume II
March 01, 2018

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SCHOULEE CONES, an individual,)   CASE NO.
and DEXTER PASIS, an          )   3:16-cv-03084-L-BGS
individual, on behalf of      )
themselves and all others     )
similarly situated,           )
                              )
          Plaintiff,          )
                              )
vs.                           )
                              )
PAREXEL INTERNATIONAL         )
CORPORATION; a Massachusetts  )
corporation licensed to do    )
business in the State of      )
California; and PAREXEL       )
INTERNATIONAL, LLC, a         )
Massachusetts limited         )
liability company licensed to )
do business in the State of   )
California,                   )
                              )
          Defendants.         )
_____)

DEPOSITION OF DEXTER PASIS

VOLUME II, PAGES 246 THROUGH 331

Taken Thursday, March 1, 2018

At 11:01 A.M.

At 2029 Century Park East, Suite 3500

Los Angeles, California

Reported by:  DONNA J. RUDOLPH, RPR, CA. CSR NO.
9652, NV. CCR NO. 420

Dexter Pasis Volume II
March 01, 2018

1    someone to be more in office and having more of a

2    in-house role.

3        Q    Was -- to your knowledge, is there a

4    substantive difference between what a senior CRA at

5    Parexel would do, if you know, versus what a senior

6    CRA at Samumed was tasked with doing other than

7    where they did it?

8        A    I can't compare the two because I -- I

9    don't know what the -- the senior CRA position

10   actually was requiring at the -- at Parexel.  All I

11   know is, you know, at the time that I was applying

12   for it, again, it was more in-house, less travel,

13   and required, you know, me being sort of a -- a --

14   having a senior role, you know -- you know in the

15   office.

16       Q    At the November 20th, 2017, session of

17   your deposition, there were a series of questions

18   that you refused to answer and a series of documents

19   that your lawyer did not allow us to ask questions

20   about.

21            We're obviously here together today

22   because we got a court order to have you come back

23   and answer those questions and for us to be able to

24   use certain documents to question you about.

25            Is that your understanding of why you're

```
 1    compensation to CRAs at Samumed?

 2         A    I -- I've never made a complaint.

 3         Q    Have you ever received a complaint from

 4    anybody at all regarding how CRAs are paid at

 5    Samumed?

 6         A    No, I have not.

 7         Q    How many CRAs does Samumed have

 8    approximately?  I know you said you supervise 12.

 9         A    About 26 total.

10         Q    Throughout the company?

11         A    Yes.

12              MS. TABACOPOULOS:  That's Number 13.

13              (Exhibit 13 marked.)

14              MS. TABACOPOULOS:  Please take a moment to

15    examine the document we've marked as Exhibit 13.

16    Let me know when you're finished.

17              THE WITNESS:  (Examining.)

18              MS. TABACOPOULOS:  And while you're

19    examining that, I'll just say for the record that

20    these documents have been stamped attorneys' eyes

21    only, but we fully have reserved the right to

22    challenge that designation should that become

23    necessary in the -- the coming weeks --

24              MR. TREGLIO:  Okay.

25              MS. TABACOPOULOS:  -- months of this
```

Dexter Pasis Volume II
March 01, 2018

 1   litigation.

 2        Q    Are you finished?

 3        A    Uh-huh.  Yes.

 4        Q    Do you recog- -- do you recognize

 5   Exhibit 13 as a true and correct copy of your

 6   Samumed application and related Samumed documents

 7   that you signed on June 23rd and 24th, 2016?

 8        A    Yes.  It looks familiar.

 9        Q    Okay.  Is all the handwriting that appears

10   on Exhibit 13 your handwriting and signature?

11        A    Yes, it looks like my handwriting.

12        Q    Okay.  Would it be fair to say that this

13   is a more complete copy of the document we marked as

14   Exhibit 3 at your prior deposition?

15        A    What --

16        Q    Do you not have the documents, the old

17   exhibits?

18             MR. TREGLIO:  We don't.  I didn't bring

19   them with me.

20             MS. TABACOPOULOS:  I can show you

21   Exhibit 3.

22             I'm showing the witness what we marked as

23   Exhibit 3 of the prior deposition.  It was one page.

24             THE WITNESS:  (Examining.)

25             Okay.  The front -- the front page.

Dexter Pasis Volume II
March 01, 2018

1    BY MS. TABACOPOULOS:

2        Q    Yeah.  That -- yeah.  So that -- Exhibit 3

3    is included in Exhibit 13 as page 2; correct?

4            MR. TREGLIO:  Flip to the second page.

5            THE WITNESS:  What?  Oh, okay.  Okay.

6    BY MS. TABACOPOULOS:

7        Q    So Exhibit 3 is included as page 2 on

8    Exhibit 13; correct?

9        A    That's correct.

10       Q    All right.  Directing your attention to

11   page 2 of Exhibit 13 -- let -- let me back up.

12   Let's look at the first page.  You filled this out

13   where on -- on June 23rd, 2016?

14       A    Where -- where I completed this

15   application?

16       Q    Right.

17       A    I don't remember.

18       Q    Is this something a recruiter sent to you

19   to complete?

20       A    I don't remember.  Possibly.

21       Q    Uh-huh.  Okay.

22            Okay.  Now you can turn to page 2.  We've

23   already discussed the representations that you made

24   to Samumed regarding your Parexel experience.  So

25   I'd like to direct your attention down to the

Dexter Pasis Volume II
March 01, 2018

1  information that you relayed about your prior tenure

2  with Cato Research.

3       A    Okay.

4       Q    Is all of the information that you told

5  Samumed regarding Cato Research accurate and

6  correct?

7       A    Yeah.  I think so.

8       Q    Did you inflate your starting or ending

9  annual salary at Cato Research?

10      A    I -- in my years at Cato Research, I never

11 received a raise.

12      Q    Did you inflate your starting --

13      A    Oh, I'm sorry.  No, I did not.

14      Q    So you earned $72,000 a year at Cato

15 Research.

16      A    Yes.

17      Q    Is that fair?

18      A    That's fair.  That's fair.

19      Q    Okay.  And you marked that as an hourly --

20 strike that.

21           You marked that as an annual salary.  Does

22 that mean that you were not paid overtime at Cato

23 Research?

24      A    I was not.

25      Q    And your job title was CRA there; correct?

Dexter Pasis Volume II
March 01, 2018

1      A    I -- yes.  I ended up with a CRA title.  I

2   didn't start out as a CRA.

3      Q    What did you start out as?

4      A    A -- a compliance document reviewer.

5      Q    Uh-huh.  When did that start?

6      A    I don't remember.  It is listed on my C.V.

7      Q    Where's that?

8           All right.  So we have a copy of your C.V.

9   marked as Exhibit 7.  So let's just look at the --

10  I'll just try to refresh your recollection with the

11  second page of that --

12     A    Sure.

13     Q    -- exhibit.

14          There you go.  Take a look.

15     A    Okay.

16          (Examining.)

17          Yes.  So you can see here, I transitioned.

18  I still was sort of a backup compliance specialist

19  document reviewer.  I -- I don't want to get into

20  specifics, but I -- I transitioned from that and

21  then into a CRA because there was an opportunity to

22  become a CRA.

23     Q    Uh-huh.

24     A    And so at the same time that I

25  transitioned to a CRA, I still remained sort of a --

Dexter Pasis Volume II
March 01, 2018

```
 1      Q    Where is he now?  Is he still there?

 2      A    He is not.  I don't know where he is.

 3      Q    Okay.  What about Mirna Lowery?

 4      A    Mirna Lowery, I knew her while I was at

 5  Arena Pharmaceuticals.  And she's no longer there.

 6      Q    Do you know where she is?

 7      A    I do not.

 8      Q    Okay.  And Jill DeFreitas?

 9      A    Yes.  Jill DeFreitas Robinson, she was my

10  manager.  Well, actually, she was a project manager

11  while I was at Cato.

12      Q    Where is she now?

13      A    I think she's still there, at Icon.

14      Q    Is Icon somehow related to Cato?

15      A    No.  That's another CRO, another clinical

16  research organization.

17           MS. TABACOPOULOS:  Okay.  All right.

18           Mark this as 14, please.

19           (Exhibit 14 marked.)

20           THE WITNESS:  So are we done with 13?

21  BY MS. TABACOPOULOS:

22      Q    For now.  Please review Exhibit 14 and let

23  me know when you're finished.

24      A    (Examining.)

25           Okay.
```

Dexter Pasis Volume II
March 01, 2018

 1        Q     At the last session of your deposition,

 2   your attorney refused to allow us to use this

 3   document in connection with your deposition.

 4              So now that we're back together, I'm going

 5   to ask you a few questions about this.

 6        A     Uh-huh.

 7        Q     Does this refresh your recollection as to

 8   whether you submitted a cover letter to Samumed in

 9   connection with your seeking employment there?

10        A     It doesn't refresh.  But, you know,

11   reading it --

12        Q     Do you have any reason to believe it's not

13   a true and correct copy of the cover letter that you

14   submitted to Samumed?

15        A     I have no reason to, you know, believe

16   that's -- it's probably something I sent to Samumed.

17   I'm sure it is.

18        Q     Okay.  Are all of the representations that

19   you made in this letter true, accurate, and correct?

20        A     I believe so.

21        Q     You mention in this letter that you

22   managed 17 study sites.  Is that an inflation of the

23   number of study sites that you managed at Parexel?

24        A     There -- there was a -- you know, in

25   the -- in the beginning, you know, there was a -- a

Dexter Pasis Volume II
March 01, 2018

1    regulatory documents, you know, to include the FDA

2    1572 form, the delegation of authority log, C.V.s,

3    medical licenses, certifications, training.

4            So all that and then submitted that -- all

5    that information as a packet to the IRB to get it

6    approved, then for the site to get approved to start

7    the study.

8        Q    Why is it that locality IRBs, you know,

9    make studies different?  I mean, what is it that's

10   so unique about local IRBs compared to, you know,

11   more central IRBs?

12           MR. TREGLIO:  Objection.  Calls for

13   speculation.  Incomplete hypothetical.

14           But go ahead.

15           THE WITNESS:  It depends.  And it's more

16   or less processes they have.  You know, every local

17   IRB is different.  And so more or less, you'll find

18   that it's the process that's a little bit more

19   lengthy.  So, I mean, it's -- it's different for --

20   for every local IRB.  It's just -- and it's -- it's

21   known industry-wide that, you know, you want to

22   steer away from dealing with, one, academic sites

23   and then, two, local IRBs because of, you know, the

24   many hoops that a sponsor would need to go through

25   or a CRA needs to go through in order for them to

Dexter Pasis Volume II
March 01, 2018

1    get started on to a study.

2    BY MS. TABACOPOULOS:

3        Q    So would it be fair to say that managing

4    an academic site is different from managing a

5    doctor's office, single doctor's office?

6        A    Or -- or a clinical research site?

7        Q    Correct.

8        A    Yes.

9        Q    What did you mean here when you said in

10   your cover letter that we've marked as Exhibit 14,

11   quote, "Established strong relationships with

12   various types of site staff personalities as a

13   trusted CMA"?  What does that mean?

14       A    Well, as -- as someone, you know,

15   primarily in-house and not people facing, it's a --

16   it's a different dynamic when trying to establish

17   yourself or establish a relationship through the

18   phone.  So you find unique ways or -- or establish

19   soft skills to -- you know, especially with working

20   with -- with difficult site staff in making sure

21   that, you know, they -- they're doing what they're

22   supposed to do.

23            And I go back to, you know, examples of

24   trying to provide me a C.V.  You know, CMAs have a

25   difficult time, again, you know, without me being

Dexter Pasis Volume II
March 01, 2018

1    deal with difficult sites?

2              MR. TREGLIO:  Okay.  I would -- calls for

3    a narrative.  But there you go.

4              Answer, if you can.

5              THE WITNESS:  I could say that I -- I used

6    them once I was able to develop by -- by, again,

7    referring to those experts in that role.

8    BY MS. TABACOPOULOS:

9        Q    So did you consider yourself, then, to

10   have different skills than the so-called experts in

11   the role of the more advanced CMAs?

12       A    I don't know.

13       Q    Well, you just made a reference to the

14   experts in the role.  Is that what -- were those

15   the -- the more advanced CMAs?

16       A    Yeah.

17       Q    Okay.  Would it be fair to say, then, that

18   at that point in time, when -- as a CMA, you were

19   escalating to the more advanced CMAs that they were

20   capable of performing the CMA role differently from

21   how you were at those points in time?

22             MR. TREGLIO:  Objection.  Calls for

23   speculation.

24   BY MS. TABACOPOULOS:

25       Q    You were asking them for help.  Were you

Dexter Pasis Volume II
March 01, 2018

1    not?

2         A    Of course.

3         Q    So is the answer to the question yes,

4    then?

5         A    I -- I would, you know, on a continued

6    basis, you know, get their referral for help.

7         Q    From the more advanced CMAs?

8         A    Yes.  Well, in particularly with the those

9    CMAs in the same study.

10        Q    Okay.  And why was it more important to

11   rely on the CMAs in the same study?

12        A    Because if I relied on another CMA in a

13   different study, it wouldn't -- it wouldn't apply.

14   I mean, protocols are -- are different.  The

15   difficulty of the study is different between, you

16   know, studies.

17             So relying on those who have been in the

18   study for a long time who understands the protocol,

19   you know, in some sense, the expectations of -- of

20   the study as a whole is -- is a -- is a better

21   strategy in my own mind than, you know, reaching out

22   for those who have no clue on what the study's

23   about.

24             And that -- that doesn't include CMAs.

25   I -- I would, you know, ask project managers too.

Dexter Pasis Volume II
March 01, 2018

```
 1    So --

 2           Would be okay if we take a -- a break

 3    after five minutes, at 12:00?

 4           MS. TABACOPOULOS:  Sure.  I'm sorry.  What

 5    is your question?  You want to take a break in five

 6    minutes?

 7           THE WITNESS:  Yeah, in five minutes, if

 8    that's okay.

 9           MS. TABACOPOULOS:  Sure.

10       Q    Would it be fair to say that the CMAs that

11    you were escalating the difficult issues to had

12    different skills than you had at that point in time

13    or a different way of performing the job than --

14    than you did at that point in time when you were

15    escalating to them?

16           MR. TREGLIO:  Objection.  Calls for

17    speculation.

18           Answer, if you can.

19           THE WITNESS:  I don't know.  And, you

20    know, I'm sure they -- I'm sure they did.  And I'm

21    sure they had their own way of, you know, handling

22    whatever situation may be.  I mean, there's several

23    ways you could approach, you know, an issue, but

24    I'm -- I'm sure they did.  So --

25    / / / /
```

Dexter Pasis Volume II
March 01, 2018

1   speculation.

2           THE WITNESS:   I don't know.

3           MR. TREGLIO:   Also assume --

4   BY MS. TABACOPOULOS:

5       Q    Why don't you know?

6           MR. TREGLIO:   I will go with another

7   objection.   Calls for speculation.

8           THE WITNESS:   Yeah, I -- I have no clue.

9   BY MS. TABACOPOULOS:

10      Q    Do you know how your starting annual base

11  salary in the CRA manager position at Samumed

12  compares to other CRA managers at Samumed?

13      A    I don't know what the other CRA managers

14  get paid.

15      Q    Do you know whether Samumed would have

16  offered you the hundred and 5,000-dollar annual base

17  salary if it had not been presented with false

18  information about your compensation at Parexel?

19      A    I don't know.

20      Q    What are you really tasked with doing as a

21  CRA manager at Samumed?

22      A    Managing the CRAs as a whole, ensuring

23  that they're properly trained on, first and

24  foremost, the regulations, the SOPs, work

25  instructions, protocol, different types of manuals,

Dexter Pasis Volume II
March 01, 2018

 1   please do not identify any communications you may

 2   have had with your counsel.

 3          THE WITNESS:  I'd rather not answer that

 4   question.

 5   BY MS. TABACOPOULOS:

 6      Q    Well, you can only not answer if it goes

 7   to attorney-client privileged information.

 8   Otherwise, you need to answer.

 9          MR. TREGLIO:  To the extent that you can

10   answer the question without revealing any

11   attorney-client discussions, please answer.

12          THE WITNESS:  And can you repeat the

13   question?

14   BY MS. TABACOPOULOS:

15      Q    Why do you think you're entitled to

16   overtime from Parexel?

17      A    Because I believe I -- I do -- I do

18   believe that I need to get compensated for that --

19   for the overtime hours.

20      Q    My question, though, is:  What is the

21   basis for claiming, though, that you're -- you're

22   due compensation for overtime hours.  Do you know?

23      A    Because I -- I worked overtime hours

24   during my tenure at Parexel.

25      Q    But why do you think you should be

1   compensated for the overtime hours that you worked?

2          MR. TREGLIO:  Objection.  Calls for

3   speculation.  Calls for a legal contention and legal

4   conclusion.

5          To the extent you can answer without

6   revealing any attorney-client discussions, please do

7   so.

8          THE WITNESS:  Because I do.

9   BY MS. TABACOPOULOS:

10     Q    Is that your full and complete answer?

11     A    Yes.

12     Q    Do you think that the CRAs at Parexel are

13   entitled to receive overtime?

14     A    For those in similar situation that I --

15   that I -- I was in, yes.

16     Q    What is that?  What are you referring to

17   by a similar situated situation?

18     A    Well, those who -- who did work overtime

19   hours and did get -- did not get paid for it.  I --

20   I do think they need to be compensated as well.

21     Q    Why's that?  What is the basis for your

22   statement?

23          MR. TREGLIO:  Objection.  Calls for

24   speculation.  Calls for a legal conclusion

25   contention and legal -- legal conclusion as well as

ATTORNEYS EYES ONLY

Δ π EXHIBIT _13_
Deponent _Pasis_
Date _3/14/8_ Rptr _DJR_
WWW.DEPBOOK.COM

# samumed

## Applicant Information

**Full Name:** Pasis (Last)   Dexter (First)   D (M.I.)   **Date:** 23-Jun-2016

**Address:** 6370 Hydra Ln.
Street Address

San Diego (City)   CA (State)   92126 (Zip Code)

**Phone:** (619) 708-9114   **Email:** dexter-pasi@gmail.com

**What job position are you applying for?** Sen. Clinical Research Assoc. / CRA Manager

**Have you ever applied to or worked for Samumed before?**   YES ☐   NO ☑

**If hired, would you have a reliable means of transportation to and from work?**   YES ☑   NO ☐

**If you are 18 years of age, if hired, can you submit proof of your eligibility of work?**   YES ☑   NO ☐

**Can you perform the essential functions of the job for which you are applying, with or without reasonable accommodation?**   YES ☑   NO ☐

*Note: We comply with all applicable federal, state and local laws related to disabled applicants and employees, and provide reasonable accommodation for qualified individuals with disabilities and disabled veterans in job application procedures. If you have any difficulty participating in our application process and you need an accommodation due to a disability, please contact Gerrica Clark, our Office Manager, at gerrica@samumed.com or 858-926-2900.

## Education

**High School:** Montgomery High School   **Address:** 3250 Palm Ave, San Diego, CA 92154

**From:** 1993   **To:** 1996   **Did you graduate?** YES ☑   NO ☐   **Diploma:** GED

**College/University:** San Diego State Univ.   **Address:** 5500 Campanile Dr. San Diego, CA 92182

**From:** 2001   **To:** 2004   **Did you graduate?** YES ☑   NO ☐   **Diploma:** B.S.

1

CONFIDENTIAL

SAM00327

**ATTORNEYS EYES ONLY**

| | | | |
|---|---|---|---|
| Vocational/ Business: | _____ | Address: | _____ |

From: _____ To: _____ Did you graduate? YES ☐ NO ☐ Diploma: _____

Health Care Training: _____ Address: _____

From: _____ To: _____ Did you graduate? YES ☐ NO ☐ Diploma: _____

Describe any specialized job-related training, certificates, skills, or qualities that would be applicable to the desired position that is not reflected above.

_____

_____

_____

## Employment History

List all present and past employment starting with your most recent employer (attach additional page(s) if necessary.)

Company: PAREXEL   Supervisor: Cynthia Vibar

Address: 9920 Pacific Heights Blvd. #500, San Diego, CA 92121

Job Title: In-house CRA II   ☐ Hourly Rate   $84K *Starting*   $84K *Ending*

☑ Annual Salary

From: 05/15 To: Present   Reason for Leaving: Presently employed

May we contact this employer for a reference?   YES ☐   NO ☑

Company: CATO Research   Supervisor: Chait Hicklin

Address: 6480 Weathers Pl. #104, San Diego CA 92121

Job Title: CRA   ☐ Hourly Rate   $72K *Starting*   $72K *Ending*

☑ Annual Salary

2

SAM00328

**ATTORNEYS EYES ONLY**

From: 01/11  To: 04/15    Reason for Leaving: _Left for PAREXEL_

May we contact this employer for a reference?    YES ☑    NO ☐

Company: _Arena Pharmaceuticals_    Supervisor: _Myrna Loughry_

Address: _6154 Nancy Ridge Dr. San Diego CA 9721_

Job Title: _QA Compliance Auditor II_    ☐ Hourly Rate    _Starting_ _____  _$67K_ _Ending_
                                        ☑ Annual Salary

From: 09/07  To: 01/11    Reason for Leaving: _Left for CATO / Pending lay-offs_

## References

List below three persons not related to you who have knowledge of your work ethic within the last three years.

Full Name: _Strait Hicklin_        Relationship: _Manager_
Address: _4490 Weathers Pl. #104_        Phone: _(760) 612-5044_
Occupation: _Director of Clinical Operations_    No. of Years Acquainted: _6_

Full Name: _Myrna Loughry_        Relationship: _Manager_
Address: _6154 Nancy Ridge Dr._        Phone: _(858) 886-0500_
Occupation: _Assoc Director, Clinical QA_    No. of Years Acquainted: _9_

Full Name: _Jill DeFratis-Robinson_    Relationship: _Clinical Trial Manager_
Address: _ICON PLC_        Phone: _(414) 208-5822_
Occupation: _Clinical Trial Manager_    No. of Years Acquainted: _6_

3

CONFIDENTIAL                                    SAM00329

**ATTORNEYS EYES ONLY**

### SAMUMED IS AN EQUAL OPPORTUNITY EMPLOYER. PLEASE READ CAREFULLY, INITIAL EACH PARAGRAPH TO SIGNIFY YOU AGREE WITH THE STATEMENTS, AND SIGN BELOW.

 I hereby certify that the information given by me herein is true, accurate and complete to the best of my knowledge. I understand that any omission, misstatement of fact, or false answers by me on this application, in any interview, or on any other document related to my seeking employment with Samumed, LLC (or "the Company") shall be grounds for denial of employment, or termination of employment if I should be employed by the Company, regardless of the time elapsed before discovery.

 I understand that, as part of Samumed, LLC's employment procedures, a routine inquiry may be made which will provide applicable information concerning my employment history, performance, and/or character. I hereby authorize Samumed, LLC and/or its agents to thoroughly investigate my references, work record, education and other matters related to my suitability for employment for the purpose of confirming the information contained on my application and/or obtaining other information which may be material to my qualifications for employment, in connection with this application, and during my employment if hired. I have authorized or will be authorizing the obtaining of such reports by third parties for Samumed, LLC. I also hereby authorize Samumed, LLC to obtain such information directly, without the use of any third party provider, and I hereby authorize all persons or businesses contacted by or on behalf of the Company about me to disclose to the Company any and all letters, reports, and other information related to my work records, without giving me prior notice of such disclosure. I further authorize the persons named as references above to provide to the Company any pertinent information they may have regarding me. In addition, I hereby release the Company, my former employers and all other persons, corporations, partnerships and associations from any and all claims, demands or liabilities arising out of or in any way related to such investigations or disclosures. I further understand that my employment with Samumed, LLC is subject to the satisfactory completion of this investigation.

 I understand that nothing contained in this employment application, or in the granting of an interview or conveyed during any interview, or in the conduct of the investigations above, is intended to create an employment contract between me and the Company for either employment or for the providing of any benefit. In addition, I understand and agree that if I am employed, my employment is "at will," meaning for no definite or determinable period and may be terminated at any time, with or without prior notice, and without cause, at the option of either myself or the Company, and that no promises or representations contrary to the foregoing are binding on the Company unless made in writing and signed by me and the CEO, CFO, or CLO of the Company.

In compliance with federal law, all persons hired will be required to verify identity and eligibility to work in the United States and to complete the required employment eligibility verification document form upon hire. I understand that my employment is contingent upon the presentation of documents establishing my identity and eligibility to work in the U.S.

Signature: _____     Date: _____

4

CONFIDENTIAL                                           SAM00330

**ATTORNEYS EYES ONLY**

The information requested below is necessary for the specific position for which you are applying. A "yes" answer will not necessarily disqualify you from the position. The nature of the offense, the date of the offense, the surrounding circumstances and the relevance of the offense to the position applied for may, however, be considered.

Any information regarding criminal history will be maintained confidentially.

Have you ever been convicted of a criminal offense (felony or serious misdemeanor)?
(Please do not list (1) any conviction specified in California Labor Code section 432.8 (which pertains to certain marijuana-related offenses that are more than two years old), (2) any conviction that resulted in a referral to and participation in any pretrial or post-trial diversion program pursuant to California Labor Code section 432.7, or (3) any misdemeanor convictions for which probation has been completed or otherwise discharged and the case has been dismissed by a court.)

YES ☐     NO ☑

If yes, state nature of the crime(s), when and where convicted, and disposition of the case.

_____

_____

_____

_____

_____

_____

Signature: _____     Date: _____



CONFIDENTIAL

5

SAM00331

**ATTORNEYS EYES ONLY**

### CONFIDENTIALITY ACKNOWLEDGMENT

As a condition for the opportunity to evaluate a possible employment, consulting or advisory relationship, I acknowledge the following:

1.  I agree to (i) maintain all Confidential Information in confidence using my best efforts; (ii) use such Confidential Information only as required for evaluating the employment, consulting or advisory opportunity with Samumed; (iii) not disclose or permit the disclosure of such Confidential Information to any persons.

2.  I further agree that Samumed is and shall remain the exclusive owner of the Confidential Information disclosed by Samumed and of all patent, copyright, trademark, trade secret and other intellectual property rights in, or arising from, such Confidential Information. No option, license or conveyance of such rights is granted to me or implied under this Agreement. Accordingly, I shall not (i) create or develop any derivative works, discoveries, or improvements, or (ii) make, have made, use or sell any product or provide any service, using, incorporating, or derived from any Confidential Information ("New Company IP"). In the event I do create or develop any New Company IP, I shall promptly disclose such New Company IP to the Samumed and ownership therein shall vest in Samumed. I hereby assign all right, title and interest in and to any and all New Company IP to Samumed.

3.  I shall not use Samumed's names (including the names of its subsidiaries or parent (if any)), symbols or marks, or any derivatives thereof in any form of publicity without the prior written consent of Samumed.

4.  The term "Confidential Information" means all information, whether disclosed before or after this acknowledgment, that is disclosed in written, oral, electronic, visual or other form by Samumed to me and (i) is marked or identified as "confidential" or "proprietary," or (ii) would reasonably be expected to be confidential in nature at the time of disclosure because it gives an actual or potential competitive advantage to Samumed as a result of not being widely known, or (iii) is disclosed under circumstances under which it reasonably appears that it would not be disclosed to me without a commitment to treat the information as confidential. Confidential Information shall include, without limitation, trade secrets, know-how, inventions, technical data or specifications, testing methods, prototypes, products, formulas, business or financial information, contracts with third parties, research and development information, product and marketing plans, customer, licensor, and supplier information and all information generated therefrom including analyses, summaries, extracts and evaluations thereof.

Acknowledged By: _____

Name: _Dexter Pacis_____

Date: _24Jun2014_____

**ATTORNEYS EYES ONLY**

## NOTICE TO CALIFORNIA APPLICANTS
## REGARDING CONSUMER CREDIT CHECK

Samumed, LLC (the "Company") will be requesting through HireRight, Inc. a consumer credit report about you because the position you are being considered for would require you to work in the following capacity (select all that apply):

\_\_\_\_   A managerial position;

\_\_\_\_   A sworn peace officer of other law enforcement position;

\_\_\_\_   A position that requires the information to be obtained by law;

\_\_\_\_   A position involving regular access to specified types of personal information other than In connection with the routine processing of credit card applications in a retail establishment;

\_\_\_\_   A position in which the person would be named signatory for employer's bank, financial and credit card accounts;

X   A position involving access to confidential and proprietary information; or

\_\_\_\_   A position involving regular access to $10,000 or more in cash.

**I acknowledge that I have been notified that a consumer credit report will be requested about me by the Company for the reasons identified above.**

☐ California residents, please check this box if you would like to receive a free copy of the credit report, if one is obtained on you by the Company.

Applicant Last Name: _Pasts_   First: _Dagger_   Middle: _D_

Applicant Signature: _[signature]_   Date: _24 Jun 2016_

CONFIDENTIAL

SAM00333

**ATTORNEYS EYES ONLY**

**samumed**

9381 Judicial Drive, Suite 160
San Diego, CA 92121

P: 858 926 2900
F: 858 552-9315
info@samumed.com
www.samumed.com

employment and earnings history, education, credit history, motor vehicle history, criminal history, military service, professional credentials and licenses.

By my signature below, I also certify the information I provided on and in connection with this form is true, accurate and complete. I agree that this form in original, faxed, photocopied or electronic (including electronically signed) form, will be valid for any background reports that may be requested by or on behalf of the Company.

☑ California, Minnesota or Oklahoma applicants only:  Please check this box if you would like to receive (whenever you have such right under the applicable state law) a copy of your background report if one is obtained on you by the Company.

Applicant Last Name ___ Pacis ___   First ___ Dexter ___   Middle ___ D ___

Social Security No.* ___ [redacted] ___ Date of Birth* ___ 10/27/77 ___

Present Address ___ 8370 Hydra Ln ___

City/State/Zip ___ San Diego , CA 92126 ___

Prior Addresses ___ 17015 Alta Carmel Ct. #279 ___ From: ___ 2010 ___ To: ___ 10/2012 ___
___ San Diego , CA 92128 ___ From: ___ To: ___
___ 10699 Twinning Ave. San Diego, CA 92154 ___ From: ___ To: ___ 2009 ___

Driver's License # ___ [redacted] ___

Applicant Signature ___ [signature] ___   Date ___ 24 Jun 2014 ___

* This information will be used only for background screening purposes and will not be taken into consideration in any employment decisions.

CONFIDENTIAL

SAM00334

ATTORNEYS EYES ONLY

"This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it was accurately copied from public records. Information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report."

California Consumers: You may view the file maintained on you by HireRight during normal business hours . You may also obtain a copy of this file, upon submitting proper identification and paying the costs of duplication services, by appearing at HireRight's offices in person, during normal business hours and on reasonable notice, or by mail; you may also receive a summary of the file by telephone upon written request with proper identification. HireRight has trained personnel available to explain your file to you, including any coded information. If you appear in person, you may be accompanied by one other person, provided that person furnishes proper identification. If you would like additional information regarding your disclosure rights, you can request this information from HireRight by e-mail at customerservice@hireright.com, by telephone at 866-521-6995 or by mail at 3349 Michelson Dr. Suite 150 Irvine, CA 92612.

"Este informe no garantiza la certeza ni la veracidad de la información en cuanto al sujeto de la investigación, pero sólo que fue copiado exactamente de archivos públicos. La información engendró a consecuencia del robo de la identidad, inclusive la evidencia de la actividad criminal, puede ser asociado inexactamente con el consumidor que es el sujeto del informe".

Los Consumidores de California: Usted puede ver el archivo mantenido en usted por HireRight durante horas de oficina normales. Usted puede obtener también una copia de este archivo, a someter identificación y pagar apropiados los costos de servicios de duplicación, apareciendo en oficinas de HireRight en la persona, durante horas de oficina normales y en la nota razonable, o por el correo; usted puede recibir también un resumen del archivo por teléfono sobre el pedido escrito con identificación apropiada. HireRight ha entrenado el personal disponible para explicarle su archivo a usted, inclusive información codificada. Si usted aparece en la persona, usted puede estar acompañado de uno otra persona, con tal de que persona proporcione identificación apropiada. Si usted querría información adicional con respecto a sus derechos de la revelación, usted puede solicitar esta información de HireRight por correo electrónico en customerservice @hireright.com, por teléfono en 866-521-6995 o por el correo en 3349 Michelson Dr. Suite 150 Irvine, CA 92612.

ATTORNEYS EYES ONLY

**Dexter Pasis**
8370 Hydra Ln.
San Diego, CA 92121
(619) 708-9114
dexter.pasis@gmail.com

Δ π **EXHIBIT** ___14___
Deponent Pasis
Date 3/11/18 Rptr DJR
WWW.DEPOBOOK.COM

May 20, 2016

Re: Samumed - Senior Clinical Research Associate (SRCRA)

To whom it may concern,

With my extensive experience as being a GCP compliance specialist and auditor, a CRA and now as a Clinical Monitoring Assoc. II (in-house CRA) with PAREXEL, I strongly believe that I'm well suited to perform the role of Senior Clinical Research Associate. This position would benefit from my 12 years of industry knowledge which includes strong sponsor, CRO and FDA inspection experience.

Below are a few of the several accomplishments since being employed by PAREXEL:

- Preserving a high performing position while managing 17 study sites and maintaining study metrics for a global cardiovascular (800-site) study.
- Established strong relationships with various types of site staff personalities as a trusted CMA.
- Given the opportunity by line management to mentor and train 25 new CMAs for the San Diego. I continue to be a valuable resource to team members new to the study to include Clinical Operation Leaders, CRAs and Clinical Monitoring Associates.
- Received multiple recognitions from all facets of my clinical research career.

Given the opportunity, I'm confident in my ability to provide excellent results warranted for this position in Samumed's high performance culture. Please feel free to contact me at your earliest convenience.

Sincerely,
Dexter Pasis

Enclosure: CV

CONFIDENTIAL

SAM00182

```
 1    UNITED STATES DISTRICT COURT           )
                                             ) ss
 2    FOR THE CENTRAL DISTRICT OF CALIFORNIA )

 3            I, DONNA J. RUDOLPH, RPR, CSR No. 9652,

 4    Certified Shorthand Reporter, certify:

 5            That the foregoing proceedings were taken

 6    before me at the time and place therein set forth,

 7    at which time the witness was put under oath by me;

 8            That the testimony of the witness, the

 9    questions propounded, and all objections and

10    statement made at the time of the examination were

11    recorded stenographically by me and were thereafter

12    transcribed;

13            That a review of the transcript by the

14    deponent was requested;

15            That the foregoing is a true and correct

16    transcript of my shorthand notes so taken.

17            I further certify that I am not a relative

18    or employee of any attorney of the parties, nor

19    financially interested in the action.

20            I declare under penalty of perjury under

21    the laws of California that the foregoing is true

22    and correct.

23            Dated this 18th day of March, 2017.

24    _____
      DONNA J. RUDOLPH, RPR
25    CA CSR NO. 9652, NV CCR NO. 420
```