# EXHIBIT F

David Gortler, Pharm.D., FCCP
May 09, 2018

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCHOULEE CONES, an individual, ) | Case No. |
| DEXTER PASIS, an individual, ) | 3:16-cv-03084-L-BGS |
| on behalf of themselves and ) | |
| all others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| PAREXEL INTERNATIONAL ) | |
| CORPORATION, a Massachusetts ) | |
| corporation licensed to do ) | |
| business in the State of ) | |
| California; and PAREXEL ) | |
| INTERNATIONAL, LLC, a ) | |
| Massachusetts limited liability) | |
| company licensed to do business) | |
| in the State of California, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

VIDEOTAPED DEPOSITION OF DAVID GORTLER, PHARM.D, FCCP

Phoenix, Arizona
May 9, 2018
1:35 p.m.

REPORTED BY:
Janice Gonzales, RPR, CRR
AZ Certified Court
Reporter No. 50844

David Gortler, Pharm.D., FCCP
May 09, 2018

1    defer to him on -- for that exact list.

2         Q.   Okay.  The exact list of documents that

3    Mr. Keegan provided to you, was that something he

4    provided today or something he provided in the

5    past --

6         A.   In the past.

7         Q.   -- or both?

8         A.   In the past.

9         Q.   Since the time that Mr. Keegan provided

10   you documents for the first time in the past, has he

11   provided any subsequent documents?  Let's say

12   subsequent to the time you signed your declaration?

13        A.   Yes, he has.  Once again, I'll defer to

14   him for that exact list because I simply don't

15   remember it.

16        Q.   Do you remember which documents he

17   provided you subsequent to the time that you authored

18   your declaration or signed your declaration?

19        A.   I feel like you keep asking me the exact

20   same question over and over.  Like I said, I'll defer

21   to him on exactly what that list is.  I simply don't

22   recall.  Okay.

23        Q.   Well, for the record, these are not the

24   same questions, sir, and I'm entitled to probe.

25        A.   They sound like the same question.

David Gortler, Pharm.D., FCCP
May 09, 2018

1      Q.   Do you recall any document that

2  Mr. Keegan gave you subsequent to the time that you

3  signed your declaration in this case?

4      A.   He did provide me additional

5  documentation following my signing of the

6  declaration.

7      Q.   Understood.  I'm trying to ask you if you

8  recall any -- the names or the nature of any of those

9  documents?

10      A.   I sort of feel like we're going around in

11  circles here.  I don't remember the exact names of

12  those documents, ma'am.  I don't remember exactly

13  which ones I received when.  And for a full list of

14  those documents, I will, once again, defer to

15  Mr. Keegan.

16      Q.   I'm simply asking you if you have any

17  recollection of any nature of any of the documents

18  you reviewed subsequent to signing your declaration?

19  Yes or no?

20      A.   Yes, I was provided additional

21  documentation after I signed my declaration.

22          MR. KEEGAN:  I think she was asking --

23  BY MS. TABACOPOULOS:

24      Q.   And the question is, do you recall the

25  nature of any of those documents?  Yes or no?

David Gortler, Pharm.D., FCCP
May 09, 2018

1      A.   No.

2      Q.   After the time that you signed your

3  declaration in this case -- and I guess for the

4  record, you signed on April the 8th, 2018.  Would

5  that be a fair statement?

6      A.   Okay.  Yes.

7      Q.   Did you request from Mr. Keegan or

8  anybody else connected with this case to be provided

9  with additional documentation?

10     A.   No.

11     Q.   How many times have you spoken with

12  Mr. Keegan about this case?

13     A.   I really couldn't say.

14     Q.   Can you approximate the number of times

15  the two of you have had a conversation?

16     A.   Over the telephone, perhaps half a dozen

17  times.  Maybe more, maybe less.

18     Q.   And in person, how many discussions?

19     A.   Once.  Today.

20     Q.   You mentioned previously that you also

21  did independent research.  When did you do that

22  research?

23     A.   Prior to my writing the declaration.

24     Q.   What independent research did you do?

25     A.   Nothing too complicated.  Internet

David Gortler, Pharm.D., FCCP
May 09, 2018

1      Q.    Okay.  Which cases were those --

2      A.    I actually don't remember --

3      Q.    -- depos taken in?

4      A.    They were medical malpractice cases.

5  Whatever I stated.

6      Q.    Who were you engaged by in those cases?

7      A.    I don't recall the names of the

8  attorneys.  Those cases are over.

9      Q.    But when were those depositions taken

10  approximately?

11      A.    I still don't remember.

12      Q.    Did you testify in court in those cases?

13      A.    No.

14      Q.    Have you ever testified in court as an

15  expert witness?

16      A.    No.

17      Q.    Were those the cases that involved

18  Merck --

19      A.    No.

20      Q.    -- pharmaceutical?

21          Do you remember the issues in those

22  cases, the med mal cases?

23      A.    No.

24      Q.    Where were they pending?

25      A.    I believe those cases have settled.

David Gortler, Pharm.D., FCCP
May 09, 2018

```
 1    asked them about their education.
 2    BY MS. TABACOPOULOS:
 3          Q.    All right.  I take it you've never been
 4    to law school?
 5          A.    As you can see by a cursory review of my
 6    CV, no, I have never been to law school.
 7          Q.    Have you ever taken any legal courses?
 8          A.    No.
 9          Q.    Have you ever been recognized as a wage
10    hour expert by anyone?
11                MR. KEEGAN:  Objection.  Vague, calls for
12    speculation.
13                THE WITNESS:  No.
14    BY MS. TABACOPOULOS:
15          Q.    Have you ever provided testimony in any
16    kind of wage hour case?
17          A.    No.
18          Q.    Have you ever testified previously in any
19    kind of a misclassification case?
20                MR. KEEGAN:  Objection.  Vague.
21                THE WITNESS:  I don't know what
22    "misclassification" means.
23    BY MS. TABACOPOULOS:
24          Q.    Have you ever been -- have you ever been
25    called upon to opine on exempt versus nonexempt
```

David Gortler, Pharm.D., FCCP
May 09, 2018

1   duties?

2          A.    Exempt versus nonexempt duties of what?

3          Q.    Of any particular job position.

4          A.    Ma'am, I'm a scientist.  I'm a pharmacist

5   and a pharmacologist.  That's stuff that's handled by

6   human resources.  I don't know much of anything about

7   that.

8          Q.    Just asking.

9          A.    No problem.

10         Q.    Have you ever evaluated jobs to see

11  whether they're exempt or nonexempt?  Would that also

12  be human resources?

13         A.    Yes, because I'm not really familiar with

14  those terms.  I imagine it would be.  I don't know.

15         Q.    All right.  Do you know how the law

16  defines the terms discretion and independent

17  judgment?

18         A.    Nope.  I could not even hazard a guess.

19         Q.    Do you know what the Fair Labor Standards

20  Act is?

21         A.    Fair Labor Standards Act?  No, ma'am, I'm

22  sorry.

23         Q.    Okay.  I take it from a review of your CV

24  and your declaration that you've never held the

25  clinical research associate or clinical monitor

David Gortler, Pharm.D., FCCP
May 09, 2018

1    associate CRA or CMA position; is that correct?

2                   MR. KEEGAN:  Objection.  Vague.

3                   THE WITNESS:  That's correct.  I've

4    managed a team that has those people, but I've never

5    been employed as one.

6    BY MS. TABACOPOULOS:

7         Q.    Okay.  Would it also be fair to say that

8    you've never worked at a clinical research

9    organization?

10                  MR. KEEGAN:  Objection.

11                  THE WITNESS:  No.  I --

12                  MR. KEEGAN:  I'm sorry.  Objection.

13   Vague.  Go ahead.

14                  THE WITNESS:  No, I've hired clinical

15   research organizations to conduct my clinical trials.

16   BY MS. TABACOPOULOS:

17        Q.    So the answer would be yes?

18        A.    Repeat the question.

19        Q.    Let me ask the question again.

20        A.    Thank you.

21        Q.    Have you ever worked at a clinical

22   research organization?

23        A.    No.

24        Q.    Which clinical research organizations

25   have you hired to conduct clinical trials?

David Gortler, Pharm.D., FCCP
May 09, 2018

1   Parexel as a study site"?

2        A.   Well, not a study site.  Used CRAs and

3   CMAs, I think, from Parexel to conduct studies which

4   I later reviewed for approval or labeling changes as

5   a medical officer at the Food and Drug

6   Administration.

7        Q.   When was that?

8        A.   During my tenure at the FDA.

9   Approximately 2007.  Sorry, I spoke over you.  Go

10   ahead.

11        Q.   Do you recall the names of any of the

12   studies that Parexel was involved with?

13        A.   No.

14        Q.   Would it be fair to say that you've never

15   spoken with any Parexel CRA or CMA?

16        A.   I just don't remember.

17        Q.   Is there anything that can refresh your

18   recollection as to whether you've ever spoken with a

19   Parexel CMA or CRA?

20        A.   I don't think I would have kept a record

21   of it.  As a medical officer, I'm mostly focused on

22   the science.  So I'd probably be only speaking to

23   scientists that conducted the trial, not CRAs or

24   CMAs.

25        Q.   Paragraph 22 of your declaration you say

David Gortler, Pharm.D., FCCP
May 09, 2018

1      A.    Well, I was the head scientist and the

2   manager in charge of conducting the clinical trial to

3   make sure that everything was executed correctly and

4   in a timely fashion.  We also had other

5   responsibilities for safety and ethical restraints.

6      Q.    Okay.  Can you describe in detail the

7   supervisory role you had over the CRA group at

8   Pfizer?

9           MR. KEEGAN:  Objection.  Calls for a

10   narrative, vague.

11   BY MS. TABACOPOULOS:

12      Q.    I'm going to strike the question and ask

13   a -- and ask a better question.

14           Can you describe in detail the managerial

15   role or supervisory role you had over the CRA or CRAs

16   at Pfizer?

17      A.    It was really nothing more.  When I used

18   CRAs, they were of help to making sure that we had,

19   as they say, all the Ts crossed and all the Is

20   dotted.  They provided an important quality control

21   step just to make sure that everything was being done

22   per SOPs.

23      Q.    You last worked at Pfizer in January of

24   2005; is that correct?

25      A.    If that's what my CV says, then yes.

David Gortler, Pharm.D., FCCP
May 09, 2018

1      Q.   Why did you leave Pfizer?

2      A.   I took a position teaching at Yale

3   University.

4      Q.   Have any of your teaching positions been

5   tenured positions?

6      A.   No.

7      Q.   Have any of your publications been

8   peer-reviewed publications?

9      A.   All of them.

10      Q.   All of them?

11      A.   Every single one.

12      Q.   Was there any other reason why you left

13   Pfizer in January of 2005?

14      A.   No.  Teaching at Yale University was a

15   huge opportunity.

16      Q.   And why did you -- why did you leave that

17   position at Yale University in 2008?

18      A.   Well, I was given an invited opportunity

19   to present some of my findings at the Food and Drug

20   Administration, and the long and short of it is they

21   poached me.  I guess you could say they made me an

22   offer I couldn't refuse.

23      Q.   When you were at the FDA, in what

24   capacity did you have any involvement with CRAs?

25      MR. KEEGAN:  Objection.  Vague.

David Gortler, Pharm.D., FCCP
May 09, 2018

1    and how they assist in executing clinical trials.

2            Q.    Have you ever been retained previously to

3    opine on the job duties of certain positions at

4    companies that you've never worked at?

5            MR. KEEGAN:  Objection.  Vague.

6            THE WITNESS:  Companies that I've never

7    worked on?  What do you mean by that?

8    BY MS. TABACOPOULOS:

9            Q.    That wasn't the question.  The question

10   was, have you ever been retained previously to opine

11   on the job duties of certain positions at companies

12   that you've never worked at?

13           A.    Oh, worked at.  I'm sorry.  I heard "on."

14   Once again, there is some background feed noise.  No,

15   I haven't.

16           Q.    Let me direct your attention to Gortler

17   10, Footnote 2.

18           A.    Yes.

19           Q.    Can you tell me what the -- what the

20   purpose of this -- this footnote is?

21           A.    Well, it's my understanding that --

22           THE COURT REPORTER:  I'm sorry?

23           MR. KEEGAN:  What?

24           THE COURT REPORTER:  I didn't understand

25   what you --

David Gortler, Pharm.D., FCCP
May 09, 2018

```
 1            Q.   What did Mr. Keegan say to you in that

 2    respect?

 3            A.   Just that -- very simply that CRAs

 4    conduct -- in addition to their quality control

 5    duties, they're providing -- they're doing original

 6    research.

 7            Q.   Mr. Keegan told you that Parexel CRAs and

 8    CMAs are doing original research?

 9            A.   Well, no, they're doing research beyond

10    what's done in their check boxes and beyond quality

11    control forms that they fill out during site visits.

12            Q.   When did Mr. Keegan tell you that?

13            A.   I don't recall the exact date.

14            Q.   Okay.  Did Mr. Keegan tell you anything

15    else about what Parexel CRAs and CMAs do?

16            A.   No, the complaint told me the rest, and I

17    know what CRAs and CMAs do based on my two decades of

18    experience working in investigational medicine.

19            Q.   So the point of Footnote 2 was what then?

20            A.   Well, like I said, it was just to show

21    that the people who actually do research beyond check

22    boxes, beyond site initiation visits are paid quite a

23    bit more because they have more advanced degrees and

24    because they're actually doing research.  Almost

25    twice as much as CRAs or CMAs are paid, and that's
```

1    according to the U.S. Bureau of Labor Statistics.

2         Q.   So these medical scientists that you

3    referred to in your declaration would be earning

4    somewhere in what salary range?

5         A.   It's stated at the very bottom of the

6    footnote.  Again, according to the U.S. Bureau of

7    Labor Statistics, it says -- and I'm reading verbatim

8    -- "Clinical investigational research scientists make

9    in excess of $100,000 a year, and CRA workers make a

10   median annual wage of $38,970 with the highest paid

11   10 percent of CRA/CMA workers making just over

12   $60,000 a year."  And then I provide a link which

13   states the same.

14        Q.   Did you ever make any effort to ascertain

15   what the salaries are for the CMAs and CRAs that are

16   at issue in this lawsuit against Parexel?

17        A.   No, I don't know their salaries.

18        Q.   Are you aware that over a third of the

19   CMAs and CRAs who are at issue in this lawsuit make

20   in excess of $100,000 --

21        A.   No.

22        Q.   -- as a base salary?

23             MR. KEEGAN:  Objection.  Lacks

24   foundation, assumes facts not in evidence.  Go ahead.

25             THE WITNESS:  No, I didn't know that.

David Gortler, Pharm.D., FCCP
May 09, 2018

1    BY MS. TABACOPOULOS:

2        Q.    Did you assume that CRAs and CMAs at

3    Parexel are paid consistently what -- the numbers

4    that you reflected in Footnote 2 of your declaration?

5        A.    It sounds like they're paid pretty well.

6        Q.    I'll restate the question.  Did you

7    assume in drafting your declaration that Parexel CRAs

8    and CMAs were paid consistently with the numbers that

9    you cite in paragraph 2 of your declaration?

10       A.    No, that doesn't affect everything else

11   I've written in my declaration.

12       Q.    That wasn't the question, sir.  I'm going

13   to have it reread to you.  Could you please focus on

14   the question and respond to it.

15            THE COURT REPORTER:  "Did you assume in

16   drafting your declaration that Parexel CRAs and CMAs

17   were paid consistently with the numbers that you cite

18   in paragraph 2 of your declaration?"

19            THE WITNESS:  No.

20   BY MS. TABACOPOULOS:

21       Q.    Then what was the purpose of adding

22   paragraph 2 to your declaration?

23       A.    Just as a reference to something I'd

24   stated.

25       Q.    The numbers that you cite in paragraph 2

David Gortler, Pharm.D., FCCP
May 09, 2018

```
1    are as of May 15, 2015, correct?
2         A.   Yes, that's what the reference states,
3    exactly that.
4         Q.   Were you aware that the named plaintiff
5    in this lawsuit Schoulee Cones earned a base salary
6    of $115,000 in March 2014?
7              MR. KEEGAN:  Objection.
8              THE WITNESS:  No, I wasn't.  That sounds
9    like a lot of money, though.
10   BY MS. TABACOPOULOS:
11        Q.   Who decided what documents you would
12   review in connection with preparing your declaration?
13        A.   Mr. Keegan sent me everything I needed to
14   review this, minus the small amount of research I did
15   online.  Another way to state that would be
16   Mr. Keegan provided 90 percent or greater than 90
17   percent of what I reviewed.
18        Q.   Is everything that Mr. Keegan provided
19   you to review stated at Gortler 24 and 25 of Exhibit
20   266?
21             MR. KEEGAN:  Page -- you're referring to
22   the page, correct?  Page numbers not the paragraph?
23             MS. TABACOPOULOS:  Correct.
24             MR. KEEGAN:  Right.
25             THE WITNESS:  What was the page number
```

David Gortler, Pharm.D., FCCP
May 09, 2018

1    BY MS. TABACOPOULOS:

2         Q.   The question is, did you ever seek to

3    review the testimony of any CMA or CRA at Parexel?

4              MR. KEEGAN:  Objection.  Documents speak

5    for themselves.

6              THE WITNESS:  No, those were provided to

7    me automatically.

8    BY MS. TABACOPOULOS:

9         Q.   I don't see any testimony of any CRA or

10   CMA at Parexel listed on Exhibit 26 -- 266, pages 24

11   and 25.  Are you -- are you referring to that in your

12   last answer or...

13        A.   I'll let you speak to Mr. Keegan about

14   getting an updated list of documents, but I did

15   review some depositions by CRA employees of Parexel.

16        Q.   Which depositions did you review?

17        A.   Two or more.  Cones and one other

18   individual named at the beginning of this deposition.

19        Q.   When did you review those?

20        A.   At some point after I was sent them.

21        Q.   Did you make any reference to those

22   depositions in your declaration?

23        A.   My declaration speaks for itself.  No.

24        Q.   What title did Ms. Cones have at Parexel?

25        A.   I don't recall.  I don't recall.

David Gortler, Pharm.D., FCCP
May 09, 2018

1     Q.    Do you recall anything about what

2     Ms. Cones said regarding her experience at Parexel .--

3     A.    What specifically would you --

4     Q.    -- or her job duties?

5     A.    What specifically would you like me to

6     talk about?

7     Q.    Do you have any recollection of the job

8     duties that Ms. Cones performed at Parexel?

9     A.    It sounds like she was a supervisor there

10    for a couple of months.  What specific job duties did

11    you have questions about?

12    Q.    I'm just asking you for your recollection

13    of any of Ms. Cones' job duties while she was at

14    Parexel?

15    A.    If you don't mind, please be more

16    specific.  I didn't memorize the entire deposition.

17    Q.    What do you recall about Ms. Cones' job

18    duties at Parexel?  You said she was a supervisor for

19    a few months.  What else do you recall?

20    A.    Well, I assume that she was in charge of

21    other people under her with less experience.  As a

22    supervisor, that -- that's what a supervisor does.

23    Q.    Okay.  Do you recall anything else about

24    Ms. Cones' job duties at Parexel other than what

25    you've just testified to?

David Gortler, Pharm.D., FCCP
May 09, 2018

1      A.   Her specific job duties?  No, I don't.

2  Being a supervisor kind of speaks for itself.

3      Q.   All right.  Do you know what kind of

4  employee she was supposedly supervising?

5      A.   CRAs and/or CMAs.

6      Q.   Do you have an understanding why

7  Ms. Cones had a tenure of about two months at

8  Parexel?

9      A.   I know she only worked there for a brief

10 time.

11     Q.   Do you know why she only worked there for

12 a brief time?

13     A.   It didn't say anything in the deposition,

14 or if it did, I don't recall reading it.

15     Q.   What do you recall about the job duties

16 of the other transcript that you described having

17 read that's not reflected in Exhibit 266, page 24 and

18 25?

19     A.   What was the name?  What was that

20 person's name?

21     Q.   I don't know what you reviewed, sir, and

22 it's not reflected on Exhibit 266, pages 24 to 25.

23 So without Mr. Keegan's help, can you describe this

24 person whose transcript you are now claiming you

25 reviewed?

David Gortler, Pharm.D., FCCP
May 09, 2018

1    A.   Mr. Keegan isn't helping me answer these

2   questions.   I'm answering them based on what I

3   remember.

4    Q.   Okay.   Then please proceed.

5    A.   You want to know what I remember about

6   the other individual whose name I can't recall

7   suddenly?

8    Q.   Correct.

9    A.   He was a supervisor too for a longer

10   period of time, and he had a longer tenure there than

11   Ms. Cones' and voluntarily resigned after some years.

12   And as a supervisor --

13    Q.   Do you know why he resigned?

14    A.   I mean, the title supervisor kind of

15   speaks for itself.   I don't have the exact job

16   description memorized, but much like Ms. Cones, as a

17   supervisor, I would assume that he supervised people

18   who have less experience who were underneath him.

19   The level 1 CRAs and CMAs.   He managed a team.

20    Q.   Is this Mr. Pasis that you're talking

21   about?   Dexter Pasis?

22    A.   Yes, that's right.   It's a hard name to

23   remember.

24    Q.   Do you recall what Mr. Pasis said about

25   his supervisory responsibilities?

David Gortler, Pharm.D., FCCP
May 09, 2018

1          A.    No.

2          Q.    Do you recall what Mr. Pasis said about

3     CMAs or CRAs at Parexel?

4          A.    No, but you're welcome to refresh my

5     memory, if you'd like.

6          Q.    Have you ever spoken personally with

7     Ms. Cones?

8          A.    No.

9          Q.    Have you ever sought to speak with

10    Ms. Cones?

11         A.    No.

12         Q.    Have you ever spoken with Mr. Pasis?

13         A.    No.

14         Q.    Have you ever sought to speak with

15    Mr. Pasis?

16         A.    No.

17         Q.    In preparing your expert opinion in this

18    case, did you ever seek to interview anybody who

19    works at Parexel?

20         A.    No, I've worked with CRAs and CMAs for

21    long enough to know what their duties are or what

22    their -- what duties are expected of them.

23         Q.    So then, would it be fair to say that you

24    considered it completely unnecessary to speak to

25    anybody at Parexel regarding what CRAs and CMAs there

David Gortler, Pharm.D., FCCP
May 09, 2018

1   are?

2                MR. KEEGAN:  Objection.  Argumentative,

3   lacks foundation, calls for speculation, incomplete

4   hypothetical.

5   BY MS. TABACOPOULOS:

6        Q.   I believe my question got cut off.

7                Would it be fair to say that you decided

8   it was completely unnecessary to speak with anybody

9   at Parexel regarding the functions of the CMA and CRA

10  role at Parexel?

11               MR. KEEGAN:  Same objections.

12               THE WITNESS:  No, I didn't seek to talk

13  to them.  I didn't really think it was necessary

14  either.  As I said, I know what's expected of CRAs

15  and CMAs, and as you well know, I've been working in

16  investigational medicine for almost two decades.

17  BY MS. TABACOPOULOS:

18       Q.   Well, you certainly didn't know that the

19  CRAs at Parexel are paid as much if not more than the

20  scientists you referred to in Footnote 2 of your

21  declaration.  Would that be true?

22               MR. KEEGAN:  Objection.  Lacks

23  foundation, assumes facts not in evidence.

24               THE WITNESS:  So what.  I don't know your

25  salary either.  You don't know mine.  I don't know

David Gortler, Pharm.D., FCCP
May 09, 2018

1    Q.   Have you ever spoken with anybody at

2    Parexel or who has ever worked at Parexel regarding

3    what assessments are required to effectively manage

4    study sites?

5    A.   That question has been asked and

6    answered.

7    Q.   Please give me your answer, sir.

8    A.   No.

9    Q.   Do you recall what drugs you were

10   studying from 2007 to 2011 at the FDA?

11        MR. KEEGAN:  Objection.  Vague,

12   overbroad, calls for a narrative.

13        THE WITNESS:  It's a long answer.  You

14   want to hear about everything I did during my tenure

15   at the FDA; all the drugs I reviewed?

16   BY MS. TABACOPOULOS:

17   Q.   I'm just asking, do you remember the

18   names of the drugs that you evaluated at the FDA?

19   It's a yes-or-no answer.  It's a yes-or-no answer,

20   sir, if you listen to the question.

21   A.   I don't remember every -- I don't

22   remember every single one.  I can tell you what they

23   were to the best of my recollection, if you'd like.

24   Q.   What are you currently teaching at the

25   George Washington University School of Medicine?

David Gortler, Pharm.D., FCCP
May 09, 2018

1   information that relays the individual qualifications

2   and degrees held by the CRAs and CMAs that worked at

3   Parexel since December 2012?

4           MR. KEEGAN:  Well, you know that's an

5   improper question because you not only never produced

6   all of the names of the CRAs and CMAs and --

7           MS. TABACOPOULOS:  Excuse me, you're

8   making a speaking objection.

9           MR. KEEGAN:  You're asking him an

10  improper question when you know you have not

11  identified all the members -- all the CRAs and CMAs.

12  So it's an improper question.

13          MS. TABACOPOULOS:  The witness just

14  testified, Patrick, that he knows the degrees and the

15  qualifications of CRAs and CMAs at Parexel.  I'm

16  simply probing his conclusion.

17          MR. KEEGAN:  Well, he said based on the

18  job description.  So I think you're misconstruing his

19  testimony.  I object to the question.  It's improper.

20  Lacks foundation.  Assumes facts not in evidence.  If

21  you understand the question, you can answer it.

22          THE WITNESS:  No, I haven't seen them.

23  BY MS. TABACOPOULOS:

24      Q.   Have you made any personal assessment of

25  whether the CRAs and CMAs at Parexel perform the

David Gortler, Pharm.D., FCCP
May 09, 2018

1    duties that are listed in the job descriptions that

2    you reviewed?

3         A.   Well, since I've never talked to any of

4    them, I've not made a personal assessment, but I know

5    what the job ultimately entails.

6         Q.   Why did you -- why did you decide to

7    compare CRAs and CMAs to what you call medical

8    scientists?

9         A.   Well, medical scientists are people with

10   a doctorate or Ph.D. of some type in almost every

11   single case, and they're qualified to do research

12   based on their credentials.  CRAs and CMAs typically

13   have a bachelor's degree almost in every single case,

14   and people with bachelor's degrees aren't really

15   qualified to conduct research.  Perhaps --

16        Q.   Any other reason?

17        A.   -- they could opine on research, but I

18   don't think -- but it's -- it would be unethical,

19   according to the Department of Education, even that

20   they could conduct scientific studies.  I believe the

21   way that it's written just historically from being a

22   professor for as long as I have, you can't even say

23   you're a scientist until you finish a master's

24   degree, or even if you go from a bachelor's degree

25   all the way to a Ph.D. degree, you can't call

David Gortler, Pharm.D., FCCP
May 09, 2018

```
 1    recommendations are helpful or useful.

 2          Q.   Are you familiar with how Parexel

 3    utilizes a CMA as opposed to a CRA?

 4                MR. KEEGAN:  Objection, vague, overbroad,

 5    calls for a narrative.

 6                THE WITNESS:  The job descriptions are

 7    different.  I have a copy of the job descriptions

 8    somewhere over here.

 9    BY MS. TABACOPOULOS:

10          Q.   Well, sitting here today, are you -- in

11    connection with making your declaration, are you

12    aware of the differences between the CMAs and the CRA

13    positions at Parexel?

14          A.   Yes.

15          Q.   What is your understanding in that

16    regard?

17                MR. KEEGAN:  Objection.  Calls for a

18    narrative, vague, and ambiguous.

19                THE WITNESS:  I'm not able -- I'm not

20    going to start giving a dictionary definition here.

21    I know I'm under oath here.  I know this is a

22    deposition.  I mean, I can flip to the page and read

23    it, if you want, but I don't see how that's going to

24    do either of us any good.

25    BY MS. TABACOPOULOS:
```

David Gortler, Pharm.D., FCCP
May 09, 2018

1   anything having to do with safety.  Is that your --

2   is that your position?

3          A.   It's not really -- I mean, they could see

4   it as their own responsibility, but it's not really

5   within their training.  It's not fair to ask someone

6   to -- someone to do that when they really -- when the

7   vast majority of them are only going to have a

8   bachelor's degree and aren't scientists.

9          Q.   Well, are there other aspects to --

10  associated with safety that occur on -- at study

11  sites --

12                  MR. KEEGAN:   Object.

13  BY MS. TABACOPOULOS:

14         Q.   -- or would you not know since you've

15  never been to one?

16         A.   I -- who said I've never been to a study

17  site?  Is that your testimony?

18         Q.   You've never been to a study site

19  associated with -- let me start over.

20               You've never been to a study site that's

21  associated with a Parexel study; is that correct?

22         A.   Oh, Parexel, that's correct.  I haven't

23  been to a Parexel study site.

24         Q.   Are you aware of any safety

25  recommendations that Parexel CRAs and CMAs make with

David Gortler, Pharm.D., FCCP
May 09, 2018

```
 1    organizations like Parexel within the past five
 2    years?
 3              MR. KEEGAN:  Objection.  Vague.
 4              THE WITNESS:  Not that I recall, no, no.
 5    BY MS. TABACOPOULOS:
 6         Q.   Have you spoken with any CRA or CMA at
 7    any other clinical research organization like Parexel
 8    within the past five years or six years?
 9         A.   Oh, let's see.  I did when I was at the
10    FDA and that was 2012 and so, no, that's -- that was
11    six years ago so no.
12         Q.   Well, for the record, I have you leaving
13    the FDA in 2011.
14         A.   Oh, okay.  '11.  I think it was at the
15    very end of 2011.  I might have accidentally rounded
16    it up to '12.
17         Q.   Have you spoken with anybody at any
18    clinical research organization like Parexel about the
19    duties and responsibilities of CRAs or CMAs, and this
20    would be within the last five to six years?
21         A.   No.
22         Q.   Have you -- within -- strike that.
23              Within the past five to six years, have
24    you personally witnessed the performance of any CRA
25    or CMA at any clinical research organization like
```

David Gortler, Pharm.D., FCCP
May 09, 2018

```
 1    Parexel?

 2                  MR. KEEGAN:  Objection.  Vague, go ahead.

 3                  THE WITNESS:  No.

 4    BY MS. TABACOPOULOS:

 5         Q.   Within the past five or six years, have

 6    you seen any summary of the actual job duties

 7    performed by CMAs and CRAs at any clinical research

 8    organization like Parexel?

 9                  MR. KEEGAN:  Summaries?  Okay.

10    Objection.  Vague.

11                  THE WITNESS:  No.

12                  MS. TABACOPOULOS:  Let's go off the

13    record for a few minutes.

14                  THE VIDEOGRAPHER:  We're off the record

15    at 3:45.

16             (Recessed from 3:45 p.m. to 3:52 p.m.)

17                  THE VIDEOGRAPHER:  We're back on the

18    record at 3:52.

19    BY MS. TABACOPOULOS:

20         Q.   Are you able to continue with us and give

21    us your best testimony?

22         A.   Yes, of course.

23         Q.   All right.  Have you ever taught or

24    written about the actual job duties performed by CRAs

25    or CMAs at Parexel?
```

David Gortler, Pharm.D., FCCP
May 09, 2018

1        A.   No.

2        Q.   Have you ever taught or written about the

3    actual job duties performed by CRAs or CMAs at any

4    other clinical research organization such as Parexel?

5        A.   No.

6        Q.   Directing your attention to Gortler 33 on

7    Exhibit 266.

8        A.   My invoice?

9        Q.   Yes.  Your invoice indicates that you've

10   done some review of documents after April the 8th,

11   2018.  Are those the documents you described earlier

12   as having read the depositions of the two plaintiffs

13   in this case?

14       A.   Oh, yeah, I didn't get all the documents

15   at one time.  They were sent to me in chunks.

16       Q.   Okay.  I just wanted to confirm what

17   documents it is you reviewed after April the 8th,

18   2018, that are reflected as entries on your invoice

19   from the period 4/25 to 4/29/2018.

20       A.   I don't remember exactly which they were.

21   I didn't log that.  I just kind of have them stacked

22   into my Apple computer, and I just went right down

23   the folders and reviewed them in order as they came

24   in.

25       Q.   Are all of your opinions contained in

David Gortler, Pharm.D., FCCP
May 09, 2018

1    your declaration that was signed April the 8th, 2018?

2         A.    There might be -- I might revise it going

3    forward, but I would only add to it.  I don't think

4    I'd subtract anything.

5         Q.    And what would you add to it?

6         A.    It's a hypothetical question.  I don't

7    know.  It depends on what I find if I'm given more

8    documents and if I decide I want to add something

9    going forward.  I don't really know what I might add

10   or if I might add anything.

11        Q.    Well, do you consider the opinion that

12   you rendered in your April 8, 2018, declaration to be

13   a complete opinion?

14        A.    No, I just said I might -- I might revise

15   it.  It might add a little bit going forward just

16   depending on what else I'm sent to review by

17   Mr. Keegan.

18        Q.    Do you consider the opinion that you gave

19   in your April 8, 2018, declaration to be an

20   incomplete opinion?

21             MR. KEEGAN:  Objection.  Vague.

22             THE WITNESS:  It's current to date, but

23   if I get more documents -- and I even think I say I

24   reserve the right to revise this as -- I think in the

25   very last part of the very last paragraph I say I may

David Gortler, Pharm.D., FCCP
May 09, 2018

1    revise this as more information is borne forward.

2                MS. TABACOPOULOS:  Mark as Exhibit 267

3    Parexel 296 through 327, please.

4        (Exhibit 267 was marked for identification.)

5    BY MS. TABACOPOULOS:

6        Q.   Are these the collection of job

7    descriptions that you reviewed?

8        A.   They look dimly familiar.

9        Q.   Do you have any reason to believe that

10   the document we've marked as Exhibit 267 is not a

11   collection of the job descriptions you reviewed in

12   connection with this case?

13       A.   Like I said, it looks -- no, this looks

14   familiar.  It was, like, about four pages long.

15   Yeah, this is each description.  I think this is it.

16       Q.   Okay.  Did you ever seek to speak with

17   anyone at Parexel to determine what Parexel means by

18   the different statements in its job descriptions?

19       A.   No.  I assume this was articulated

20   accurately.

21               MS. TABACOPOULOS:  All right.  I don't

22   have any further questions for today.  Thank you very

23   much.

24               MR. KEEGAN:  I have a -- I have a couple

25   of questions just as a follow-up.  Dr. Gortler --

David Gortler, Pharm.D., FCCP
May 09, 2018

1                              CERTIFICATE

2

3               I, JANICE E. GONZALES, Certified Reporter

4       for the State of Arizona, certify:

5               That the foregoing proceeding was taken

6       by me; that I am authorized to administer an oath;

7       that the witness before testifying was duly sworn by

8       me to testify to the whole truth; that the questions

9       propounded by counsel and the answers of the witness

10      were taken down by me in shorthand and thereafter

11      transcribed by me or under my direction; that

12      deposition review and signature was requested; that

13      the foregoing pages are a full, true, and accurate

14      transcript of all proceedings and testimony had upon

15      the taking of said deposition, all done to the best

16      of my skill and ability.

17              I FURTHER CERTIFY that I am in no way

18      related to any of the parties hereto, nor am I in any

19      way interested in the outcome hereof.

20              DATED at Phoenix, Arizona this 14th day

21      of May, 2018.

22                            _____
                             Janice E. Gonzales, RPR, CRR
23                           Certified Reporter No. 50844
                             for the State of Arizona

24

25