# EXHIBIT J

Pages 1 - 55

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Bernard G. Skomal, Magistrate Judge

SCHOULEE CONES, et al.,        )
                               )
            Plaintiffs,        )
                               )
    VS.                        )      NO. 16-CV-03084-L-BGS
                               )
PAREXEL INTERNATIONAL          )
CORPORATION,                   )
                               )
            Defendant.         )
_____)


San Diego, California
Friday, January 5, 2018

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

FTR 3:33 p.m. - 4:37 p.m. = 64 minutes


**APPEARANCES:**

For Plaintiffs:

                    KEEGAN & BAKER, LLP
                    6156 Innovation Way
                    Carlsbad, California 92009
            BY:  **PATRICK N. KEEGAN, ESQ.**


For Defendant:

                    SEYFARTH SHAW LLP
                    400 Capitol Mall, Suite 2350
                    Sacramento, California 95814
            BY:  **MICHAEL WARNER KOPP, ESQ.**




Transcribed By:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                 Official Court Reporter

| | |
|---|---|
| 1 | <u>Friday - January 5, 2018</u>                              <u>3:33 p.m.</u> |
| 2 | P R O C E E D I N G S |
| 3 | ---oOo--- |
| 4 | **THE CLERK:** Okay. We're on the record. |
| 5 | **THE COURT:** Okay. We're on the record. |
| 6 | This is Cones versus PAREXEL International Corporation. |
| 7 | This is a discovery conference. This is Judge Skomal speaking. |
| 8 | I have Mr. Patrick Keegan in person sitting at the table with |
| 9 | me, and I have Mr. Michael Kopp, who's on the phone speaking |
| 10 | from his office, I assume, in Sacramento. |
| 11 | Gentlemen, thank you, and can you make just your |
| 12 | appearances for the record? |
| 13 | **MR. KEEGAN:** Yes. |
| 14 | Patrick Keegan on behalf of the plaintiffs. |
| 15 | **MR. KOPP:** Michael Kopp on behalf of defendants. |
| 16 | **THE COURT:** All right. Thank you. |
| 17 | This is regarding a joint statement regarding a discovery |
| 18 | dispute, Document No. 44, that was submitted to me. I've |
| 19 | reviewed the numerous issues in it and have tried to wade |
| 20 | through and make some determination as to what is and is not |
| 21 | discoverable. In maybe some issues, it's a gray area. |
| 22 | So before I go through the rather laborious task of your |
| 23 | brief, anybody have any comments you want to make additional to |
| 24 | the brief? |
| 25 | Mr. Keegan? |

```
 1            MR. KEEGAN:  Your Honor, I'd rather wait to provide
 2    any comments until I hear your ruling here.
 3            THE COURT:  Well, the comments are now.  I mean, the
 4    ruling is going to be what the ruling is unless I have
 5    questions.
 6            MR. KEEGAN:  Okay.  No.  I'll accept Your Honor's
 7    ruling.
 8            THE COURT:  Okay.  And Mr. Kopp?
 9            MR. KOPP:  Likewise, Your Honor.
10            THE COURT:  Okay.  So I kind of went along the
11    plaintiffs' classification of his -- his document requests,
12    which, if we go -- and I don't know, (Inaudible), if you need
13    to sit through this whole thing.  It's --
14            THE CLERK:  Awesome.
15            THE COURT:  Okay.
16                          (Laughter)
17            THE CLERK:  Time for the hard part.
18            THE COURT:  Yeah.  You've got other things to do,
19    yeah.
20            THE CLERK:  If you need me, just call me.
21            THE COURT:  I will.  Thank you.
22        All right.  So I'm at B.  We start with B, which I think
23    are the document requests; right?  All the different document
24    requests are broken into categories.  I have B1 --
25            MR. KEEGAN:  Yes.
```

1    **THE COURT:** -- documents regarding defendants'

2  determination to classify the various CRA's and CMA's as

3  nonexempt.

4    **MR. KEEGAN:** Nonexempt, yes.

5    **THE COURT:** And I think -- and correct me if I'm

6  wrong, Mr. Kopp. You said that there are no documents other

7  than the ones you've produced, and you offered to produce all

8  the job descriptions of all the positions as well as template

9  offer letters.

10    **MR. KOPP:** Correct, Your Honor. There's no -- there's

11  no nonprivileged documents regarding determinations to, you

12  know, evaluate and classify any of these positions as exempt or

13  nonexempt.

14    The -- the requests were -- included a broad prefect that

15  said "reflect the determination that they're exempt." And, you

16  know, as we -- as we noted in our responses, you know, any

17  number of documents would reflect that these folks are

18  nonexempt. We've produced those documents as to the named

19  plaintiffs, and then we've produced the nationwide documents in

20  terms of those job descriptions and documents of that type.

21    **THE COURT:** And, Mr. Keegan, did you get those

22  documents?

23    **MR. KEEGAN:** Everything but the exemplars of documents

24  reflecting offer letters.

25    **THE COURT:** Or I guess the template offer letter

```
 1   exemplars.
 2              MR. KEEGAN:  Yeah.  I just need a template, yeah.
 3              THE COURT:  Are you going to provide those, Mr. Kopp?
 4              MR. KOPP:  Yes, we can provide -- provide those.
 5              THE COURT:  All right.  So with that caveat that
 6   you'll provide the offer -- template offer letters, it appears
 7   that this is resolved.
 8         Now, I just want to add something.  This also appears to
 9   me to be a merits issue, going directly to whether or not the
10   different categories are exempt or not, which is a motion for
11   summary judgment.  So I'm not too sure that is even relevant to
12   class certification, but it's kind of moot at this point
13   since -- and I think it's important to at least have the job
14   descriptions and that sort of thing so you know the duties and
15   that you can argue there's a common method of proof, so there's
16   commonality and predominance.
17              MR. KEEGAN:  Right.
18              THE COURT:  All right.  So that's resolved.
19         Now, the next one is B2, which is trial master file index,
20   monitoring visit report forms and guidelines, and monitoring
21   activity plans or monitoring plans.  I really don't know what
22   that meant until I kind of -- kind of read the guts -- and
23   you'll have to excuse me.  This building for some reason --
24              MR. KEEGAN:  Oh.
25              THE COURT:  -- every day goes through this ridiculous
```

1   noise.

2          MR. KEEGAN:  Oh, no.

3          THE COURT:  I try to wade through it as it rings out.

4      I think in -- that what the plaintiff is seeking were --

5   at least I'm reading from their thing -- exemplars of each

6   identified document for each clinical study on which the

7   plaintiffs and persons employed in all the positions in the

8   complaint -- named in the complaint and the class action worked

9   during the class period.

10     Now -- so these documents pertain to -- in different

11  clinical studies.  Is that it?

12         MR. KEEGAN:  Yeah.  So each -- each clinical trial

13  will have its own trial master file.  It will have its own

14  monitoring visit report guidelines.  It will have its own

15  monitoring visit report.  The testimony that we obtained --

16         THE COURT:  When you say "each clinical trial," what

17  are you referring to, that each of these different positions,

18  these CRA's, the CMA's -- their job is to work on different

19  clinical trials?

20         MR. KEEGAN:  It's based on the testimony of their

21  whatever -- referred to as Persons Most Knowledgeable.

22         THE COURT:  30(b)(6)'s.

23         MR. KEEGAN:  Right, although they weren't designated

24  that way, but they -- the work on two to four maybe clinical

25  trials.  So --

1          THE COURT:   And so what is the relevance to class cert

2   for those --

3          MR. KEEGAN:   Well, I think --

4          THE COURT:   -- clinical trials?

5          MR. KEEGAN:   Yeah.   So the relevance on class

6   certification is -- is that the defendants' defense in the case

7   is -- is that these classifications aren't subject to

8   certification because they work on different clinical studies.

9          THE COURT:   Let me stop you for a minute there.

10         MR. KEEGAN:   Sure.

11         THE COURT:   Again, that's a merits issue as to whether

12   or not they're exempt or not.

13         MR. KEEGAN:   Right.

14         THE COURT:   So what you're -- so what you're saying is

15   that they're going to argue that each clinical study might be

16   exempt or might not be exempt?

17         MR. KEEGAN:   Well, I think they're going to argue on

18   the class certification stage that the claims aren't typical

19   because they work on different clinical studies, and so my

20   point in seeking the information is to show that --

21         THE COURT:   You say the claims aren't typical.   What

22   claims are you talking about?

23         MR. KEEGAN:   The claims asserted on behalf of the

24   other classifications of CRA's.

25         THE COURT:   Well, what do you mean?   I mean, are you

```
 1    talking about -- the same claim is that "We were entitled to be
 2    paid out"?
 3              MR. KEEGAN:  Right.  Correct.
 4              THE COURT:  And so basically what all these different
 5    cat -- category of people do, even though your clients only
 6    worked what, two of these positions or four or something?
 7              MR. KEEGAN:  Yeah.  I mean -- but in particular,
 8    Mr. Dexter Pasis only worked on -- on one clinical study, and
 9    Schoulee Cones did training for two clinical studies but never
10    made any --
11              THE COURT:  Okay.  So they worked on these clinical
12    studies.  The thrust of the argument is that they were not
13    exempt.
14              MR. KEEGAN:  Right.
15              THE COURT:  And your -- you want the actual
16    clinical -- I mean, what is it that you want from these
17    clinical studies again?
18              MR. KEEGAN:  So it's -- so what it would show is that
19    the work that CRA has performed on clinical studies are all
20    standardized.  What has been produced is the SOP's outline --
21              THE COURT:  What are SOP's?
22              MR. KEEGAN:  Standard operating procedures on how
23    the -- what the CRA's do.  And as I stated in our prior call,
24    if defendant --
25              THE COURT:  Which I didn't understand --
```

9

```
1              MR. KEEGAN:  Right.
2              THE COURT:  -- in any event.
3              MR. KEEGAN:  No.  It's complicated.  I totally get
4   that.
5         And so the SOP's have been produced.  What hasn't been
6   produced and what's -- is the trial -- the monitoring visit
7   report forms and guidelines would show that the work is
8   standardized.
9         I don't mind standing on the SOP's themselves, but if
10  defendants are going to attack class certification on the
11  grounds that -- because CRA's in the class worked on different
12  studies other than the ones that Dexter Pasis worked on, then I
13  need to -- you know, I want to show through these standardized
14  forms that all the work is the same, no matter what study --
15             THE COURT:  Well, let me just stop for a minute.  For
16  class cert purposes, the issue is is there a current method
17  approved --
18             MR. KEEGAN:  Right.
19             THE COURT:  -- to show that they're not exempt
20  basically?
21             MR. KEEGAN:  Right.
22             THE COURT:  And what I -- what I tried to glean from
23  the various documents that have been submitted is we're talking
24  about different -- either professional exemption -- I don't
25  know if executives are even applicable, maybe administrative.
```

```
 1    And then the issue would be "primarily engaged in," and --
 2              MR. KEEGAN:  Right.
 3              THE COURT:  -- did they exercise independent judgment
 4    and discretion.  And what you want to say --
 5              MR. KEEGAN:  Correct.
 6              THE COURT:  -- and I think what you're entitled to
 7    show is that there's a common method of proof across class
 8    lines to show that they're not exempt.
 9              MR. KEEGAN:  Correct.
10              THE COURT:  And what I'm trying to get is what are
11    these individual documents for all the different studies, which
12    the defendant has proposed is rather extensive and actually
13    gave an approximate of 310,976 reports, but -- I'm interrupting
14    the --
15              MR. KEEGAN:  No, I'm not.
16              THE COURT:  -- and that we would need to seek consent
17    from each study sponsor for the production.
18         I'm trying to figure out what is it you need to show a
19    common method of proof that would rebut, I guess, any argument
20    by the defendant that in order to determine whether or not they
21    spent 51 percent of their time or they had independent
22    discretion, you would have to look at each individual study,
23    and it resulted in mini-trials; and therefore, there's no class
24    certification commonality or predominance.
25         I assume that is the argument --
```

```
 1          MR. KEEGAN:  Right.
 2          THE COURT:  -- that you are trying to rebut or --
 3          MR. KEEGAN:  Correct.  Absolutely correct, Your Honor.
 4          THE COURT:  And what I'm trying to figure out is --
 5   well, let me ask Mr. Kopp.  What is -- what is the argument or
 6   is there an argument in terms of exempt or nonexempt regarding
 7   the individual clinical studies?
 8          And I just want to give you -- you know, my initial
 9   understanding was that, you know, when people are hired to do
10   these different jobs, they're given a job description, and then
11   they're given a clinical study but that the same rules apply to
12   all the clinical studies -- maybe that's my naivete -- and
13   therefore, the clinical studies themselves are not what's
14   relevant.  It's what the task of the -- the plaintiffs or the
15   different positions.  That's what becomes relevant, whether
16   those tasks are exempt or nonexempt and whether they exercise
17   independent discretion and judgment.
18          But somewhere along the line, I'm down in the weeds with
19   you guys trying to figure out how these clinical studies become
20   relevant to this class certification argument.
21          MR. KOPP:  Yes.  So the -- in terms of the argument on
22   the -- on the clinical studies, I mean, our -- our position
23   would be -- is that these -- the nature of the putative class
24   members' participation in those studies and what they're doing
25   and the types of site challenges they're facing and addressing
```

1   and problem-solving are going to vary according to the type of
2   study.
3       If it's, you know, an asthma-type study, that's going to
4   involve, you know, patients with a different type of medical
5   history who have less complicated and extensive histories as
6   compared to -- compared to, you know, an oncology study and
7   that -- the other thing --
8       **THE COURT:** Well, let me -- let me stop you. You're
9   using that analogy, and there might be different tasks that
10  would be performed depending on the type of study. How does
11  that then -- and somehow impact the idea that they're exempt or
12  not exempt?
13      Are you saying that -- that in these different studies,
14  some of the studies require a more independent -- whatever that
15  term is -- independent judgment and discretion as opposed to
16  others or they follow more stringent guidelines which might
17  make them seem nonexempt, or, you know, are we talking about
18  not a position of class action but a studies class action?
19  That's where I'm getting confused.
20      **MR. KOPP:** Yes. So -- I mean, the -- to -- to your
21  point, Your Honor, the -- the -- you see variation on a number
22  of different levels, but with respect to the study level, in
23  order to determine -- to your question as to how that impacts
24  exempt versus nonexempt classification, on the California test
25  in particular, that runs off of the percentage of time spent in

```
 1   various -- in various tasks and whether those are --
 2        THE COURT:  That has to do with -- that has to do with
 3   "primarily engaged"; right?
 4        MR. KOPP:  Yeah.  Exactly.
 5        THE COURT:  But that's a separate element than the
 6   "Did they exercise independent judgment and discretion," right,
 7   at least for the professional one?  Maybe I'm --
 8        MR. KOPP:  Correct.
 9        THE COURT:  So I guess the issue is what relevance to
10   class cert does turning over all the independent -- the
11   clinical studies to the plaintiff -- is that -- does he need
12   that for -- to show that there -- there's commonality and
13   predominance?
14        MR. KOPP:  No.  I mean, it -- it sounds to me like --
15   I -- frankly, I don't understand that argument, why we need to
16   produce hundreds of thousands of clinical study documents to
17   show some sort of commonality.  I mean, what the -- what the
18   documents are -- what the documents would show is that there --
19   these folks are engaged on a number of different types of
20   studies in different therapeutic areas, and they're engaged in
21   different phases of the study, doing different tasks.
22        So, for example, if the study's in startup, they're going
23   to be, you know, spending, you know, 80 or 90 percent of their
24   time doing all the (Inaudible) visits where they're critically
25   evaluating a site in terms of whether it's going to be able to
```

1    successfully participate in the study.  If it's in the

2    initiation visit, they're going to be spending, you know, a

3    large portion of their time training the site to make sure that

4    they understand how to successfully participate in the study.

5        And if they're monitoring, where they're going to be

6    critically evaluating patient medical records for fraud, and

7    those are the type and nature of those records, like I said,

8    they're going to, you know, vary.  If you're dealing with a

9    cancer oncology case study where folks have medical records

10   that are extremely extensive, they're, you know, taking 20

11   medications at a time as opposed to some sort of a simple

12   follow-up --

13           THE COURT:  Right, but how does all of this impact the

14   actual "Are they exempt, or aren't they exempt?" in terms of

15   exempt versus nonexempt activities and exercising independent

16   judgment and discretion?  And that's all I'm kind of getting

17   to, is what does the plaintiff require in terms of discovery on

18   these clinical studies.

19       Now, albeit, he's gotten the job descriptions of the

20   different categories and what they're supposed to do.  I'm just

21   trying to figure out -- you know, it seems overbroad to me --

22   I'll be honest with Mr. Keegan -- what they're requesting.  And

23   I've been reading here that the defendant said he compromised

24   and produced tem- -- templates of these documents.

25       And will templates of the document give a current method

1    to show that all these folks are nonexempt?

2         MR. KEEGAN:  Your Honor, if -- as long as the playing

3    field is even, if the -- what I'm trying to prevent is them

4    making an argument and submitting documents that are individual

5    to some study and that I've never seen before in their

6    opposition.

7         So to the extent that they produce templates and if that's

8    the documents that we agree that we'll use to argue class

9    certification on, then I think it's fine at this point.

10        THE COURT:  What do you think, Mr. Kopp?  You know, in

11   terms of your argument that it isn't class-certifiable, are you

12   going to just pull out of left field all these different

13   clinical studies to show that "Hey, you know, these folks are

14   using independent judgment, and they're involved in, you know,

15   not" -- "in, you know, exempt activities"?

16        MR. KOPP:  So, Your Honor -- I mean, I think the

17   problem that we've had in terms of the -- on the process and

18   the -- and the meet-and-confer on this in terms of, you know,

19   addressing Mr. Keegan's concerns in his discovery request is

20   that we've really, you know, gotten a sort of all-or-nothing

21   demand that we just -- we wouldn't be capable of satisfying.

22        So I think to your point, I -- so what we have been

23   working on -- on with the client in terms of, you know, a

24   compromise is attempting to get sponsor consent for the release

25   of the sampling of reports for the -- the study that Mr. Pasis

1  worked on.  Cones never actually went out in the field and

2  worked on any -- any studies that there's -- there's nothing in

3  the sampling to produce with respect to her.

4       But even with respect to that small subset, the --

5  we're -- we're redacting those documents to -- to delete, you

6  know, proprietary information to the sponsor, and our paralegal

7  is on the second day of redactions and still hasn't completed

8  that.

9       So what we would propose is if we can get the sponsors'

10 consent that we produce the sampling as to the study that Pasis

11 worked on, and then if there's some sort of a demonstrated --

12 demonstrated need beyond that, that, you know, we meet and

13 confer on that.

14      But like I said, right now, the discussion -- or the

15 demands until, you know, on the eve of filing this joint brief

16 was, you know, "Give us 300,000 documents," which was --

17           THE COURT:  I get it.  I get it.  That's why we're

18 here today, and --

19           MR. KOPP:  Yeah.

20           THE COURT:  -- so let me just stop for a minute.

21      I think the concern Mr. Keegan has -- and correct me if

22 I'm wrong -- is that he's not surprised in -- when he's coming

23 to -- in rebuttal that you're going to pull out other samples

24 of other studies that you got consent on to say, "Hey, listen,

25 you know, this is mini-trials, and this is impossible," this,

```
1   that, and the other thing.  He wants to have access to that,

2   too.

3       Right?

4               MR. KEEGAN:  Exactly.  Yeah.

5               THE COURT:  And so I'm just saying -- I mean --

6               MR. KEEGAN:  If we limit it to Mr. Pasis's --

7               THE COURT:  Yeah.  Yeah.  I mean, if the understanding

8   is that what Mr. Pasis did in this study is -- is common to all

9   the studies and then the argument can be made that Mr. Pasis is

10  exempt or nonexempt and that is a common method of proof for

11  all the class members, then the District Judge can probably

12  make a reasoned determination based on the discovery produced.

13      But if it's going to be cherry-picking different studies

14  to make a point that it's class-certifiable or not, then I

15  think what's good for the goose is good for the gander, and

16  Mr. Keegan should -- should have access to those as well or

17  other ones that would support his position.

18              MR. KOPP:  Yeah.  And so to -- to that point,

19  Your Honor, I mean, the -- what we have been working with the

20  client on in terms of the sampling -- this was -- it was a very

21  large study in which many more people other than Mr. Pasis

22  participated.

23      And so the sampling wouldn't just simply be limited to

24  Mr. Pasis's reports but would seek to draw from reports from

25  other CRA's and CMA's who participated in the study, and we
```

```
1    think that could be sufficient to show already when you're
2    looking even at one study, you know, variation in terms of what
3    these different folks are doing.
4         But I think it makes sense to, you know, bite this off and
5    (Inaudible) and then evaluate whether, you know, a broader
6    production is -- is -- is warranted because, you know, I
7    suspect that even with that type of a sampling, it -- further
8    productions aren't going -- aren't going to, you know, further,
9    you know, elucidate or inform that point because, you know, the
10   existing -- the existing sampling that we'd be proposing would
11   be drawing from multiple CRA's and CMA's, and --
12        THE COURT:  So -- so -- but you'd be in a position,
13   then, when you make your arguments to the District Court that
14   this study would be kind of a representative sample of all the
15   variety of studies; and therefore, a conclusion can be made
16   based on the study and the job descriptions and all the other
17   discovery you've gotten whether or not this is a predominant
18   issue and it's common and typical or whether it's individual
19   mini-trials; and therefore, everybody should bring their own
20   lawsuit.
21        MR. KOPP:  Yeah.  I think -- I mean, I think we
22   would -- like I said, subject to the sponsors' consent, we'd
23   want -- we produce those materials, and then those parties
24   could evaluate.
25        But to the point of, you know, unfair surprise, I mean, I
```

```
1    think, you know, we'd be willing to, you know, agree that if we

2    were to rely on other study documents, that we would meet and

3    confer about some sort of a -- of a sampling in advance -- in

4    advance of production of those -- of those documents.

5            THE COURT:  Well, that seems reasonable to me.

6        Mr. Keegan?

7            MR. KEEGAN:  Yeah.  I think that's reasonable but just

8    with the caveat that I'll be filing, and as required, my motion

9    for class certification --

10           THE COURT:  Right.  And obviously --

11           MR. KEEGAN:  -- in January.  So --

12           THE COURT:  But -- I mean, you'll have -- at least

13   from me, you'll -- you'll get as a cheerleader if this becomes

14   an issue that you should get more time to reply.

15           MR. KEEGAN:  Thank you, Your Honor.

16           THE COURT:  And -- and -- but here's -- I mean -- I

17   mean, the thought keeps coming back in my head when we've had

18   numerous discussions of, you know -- you know, I think Mr. --

19   the plaintiffs' position was all the activities are nonexempt,

20   and I think the other activities -- well, some are, some

21   aren't.  There's a 51 percent, isn't it?

22       And so if the activities in this sampling are

23   representative and the arguments can be made on both sides

24   whether they qualify or don't qualify for exempt status, then

25   hopefully we won't need to go down the road for all the
```

```
 1   different studies because that is overbroad.  It's
 2   overburdensome, but it does put the plaintiff at a disadvantage
 3   if the defendant's going to cherry-pick two or three of these
 4   studies and don't give them a shot at requesting another
 5   sampling.
 6        So so long as everyone is willing to meet and confer
 7   before that happens and I'm involved, then I think there won't
 8   be a problem.
 9             MR. KEEGAN:  All right.
10             THE COURT:  So are we good on that?
11             MR. KEEGAN:  I agree, Your Honor.
12             THE COURT:  Mr. Kopp?
13             MR. KOPP:  Yes.  Yes, Your Honor.
14             THE COURT:  Okay.  So that's B2.
15        All right.  That was the big one.
16        Funny, I have here "Meet and confer regarding sampling.
17   Otherwise, plaintiff request is too broad."
18             MR. KEEGAN:  There you go.
19             THE COURT:  All right.  So then we have B3, job
20   descriptions, policy manual, wage policies.  Just cutting to
21   the chase, the defendant has stated they produced the above,
22   and the plaintiff would need to inform them on what, if
23   anything, is missing.
24        So what do you say about that one, Mr. Keegan?
25             MR. KEEGAN:  Yeah.  I don't --
```

1    THE COURT:  I'm just reading the brief.

2    MR. KEEGAN:  Yeah.  So -- yeah, absolutely.  So the

3    issue is -- is whether or not -- you know, it's a very large

4    production.  There's 430-some-odd documents produced so far

5    today.

6    THE COURT:  And, again, you're -- you're requesting

7    all the positions that --

8    MR. KEEGAN:  Well --

9    THE COURT:  And, again, I don't -- I'm not saying

10   that's relevant or not because I don't know if the positions

11   are all the same or they're different.  I know your plaintiffs

12   are only involved in a couple --

13   MR. KEEGAN:  Yeah.

14   THE COURT:  -- but it seems that since the defendants

15   are willing to produce them --

16   MR. KEEGAN:  I'm happy with exemplars.  I'm just not

17   confident that what has been produced is really exemplars for

18   the -- for all classes of persons.

19   THE COURT:  Well, they are in --

20                    (Simultaneous colloquy)

21   THE COURT:  -- exemplars or --

22   MR. KEEGAN:  Just exemplars, Your Honor, the job

23   descriptions, the job duty requirement, handbooks, training

24   manuals --

25   THE COURT:  Okay.

```
 1          MR. KEEGAN:  -- and the timekeeping policies.  So --
 2          THE COURT:  All right.  So, Mr. Kopp, the -- you put
 3   in your brief you've -- you've supplied all that?
 4          MR. KOPP:  Right.  Yeah, and I'm not sure -- I guess I
 5   don't understand what the qualification exemplar is.  I mean,
 6   we -- you know, we produced, for example, the job descriptions
 7   for these, you know, six different positions.  We produced
 8   timekeeping policies that apply to these positions, et cetera.
 9        So -- and yeah, we did, you know, prior to the submission
10   of the joint briefs asked for identification of any missing
11   documents, and today we haven't received any communication on
12   that.
13          MR. KEEGAN:  Well, it's kind of hard for me to
14   identify what's missing --
15          THE COURT:  Okay.  Why don't we do this.  I'm going to
16   leave it at -- that the plaintiff will go through and try to
17   identify what you feel is missing.
18          MR. KEEGAN:  Can I -- can I give you an example of
19   just my issue, which may --
20          THE COURT:  Yeah, lay it out.
21          MR. KEEGAN:  The issue is -- for example, if there's a
22   handbook produced in the case that's after -- dated after the
23   date of the filing of the complaint, I'm not sure if that's the
24   handbook that was in place during the class period.  There
25   might have been two or three versions of that.  I don't know.
```

1     I mean -- so --

2              THE COURT:  So you want the documents that are --

3              MR. KEEGAN:  Just one -- like, if they had two

4     versions of their handbook over the period of the course of the

5     class period, I just want a copy of each.  But the fact that

6     they produced one time-making policy or one job description --

7     I don't know if that's really the only job description in the

8     time period or not.  So --

9              THE COURT:  Oh, I see.

10             MR. KEEGAN:  -- I'm at a loss.

11             THE COURT:  So I see what you're saying.

12             MR. KEEGAN:  That's the only thing, yeah.

13             THE COURT:  Yeah.  You just want to make sure that

14    you're given -- if there's amendments or a supplement --

15             MR. KEEGAN:  Right.

16             THE COURT:  -- or changes, that you want -- you want

17    to be given those as well.

18             MR. KEEGAN:  Correct.

19             THE COURT:  Is there any way to do a due diligence to

20    figure out whether he's been supplied that, Mr. Kopp?

21             MR. KOPP:  Yeah, we can do that.

22             MR. KEEGAN:  Okay.

23             THE COURT:  All right.  Well, if you can do that, then

24    that will give at least some degree of confidence to Mr. Keegan

25    that he got everything he wanted.

```
1          Okay.  That should resolve the --
2               MR. KEEGAN:  That would resolve it, Your Honor, yes.
3               THE COURT:  Okay.  B4 says communications with
4     California and federal agencies regarding the classification
5     that's exempt of CRA's and CMA positions.  Plaintiff says it's
6     relevant to typicality, commonality, and predominance.
7     Defendant says there's no responsive documents.  BGS, me, says,
8     "What's the relevance to class cert?"  And if there's no
9     responsive documents, it's moot.
10              MR. KEEGAN:  Yeah.  And, Your Honor, the only reason
11    why I moved on this is they limited the response to
12    communications with those agencies on behalf of Cones and
13    Pasis, which is the plaintiffs.
14              THE COURT:  Uh-huh.
15              MR. KEEGAN:  And, you know, I just don't want to be,
16    like, "Oh, we had a" -- you know, "We asked the Department of
17    Labor for an opinion on some other employee that occupied a CRA
18    position."  That's my only point.  I mean --
19              THE COURT:  Right, but I'm not even too sure that's
20    relevant for class cert.  I think --
21              MR. KEEGAN:  They would use it as a defense maybe --
22              THE COURT:  Oh.
23              MR. KEEGAN:  -- unique to that person or persons that
24    they submitted requests --
25              THE COURT:  Well, I think all these people are being
```

1  deemed exempt.

2          MR. KEEGAN:  Yeah, that's true.

3          THE COURT:  So -- and, again, that is not a class cert

4  issue.  That's -- that's a merits issue.  So I'm going to leave

5  it as it is.

6          MR. KEEGAN:  Okay.

7          THE COURT:  And then we'll go to B5, documents

8  supporting defendants' contention that the folks were exempt.

9  Again, that's a merits issue.  I think it's been supplied

10  anyway on -- under -- and anyway, I think, Mr. Kopp, you said

11  you have no responsive documents as to this.

12       I'm just wondering, what's the difference between this,

13  B1 -- B5, B4, and -- was it B1?  Seems like they're all kind of

14  related to how the company decided to call these folks exempt,

15  whether there's communications, whether there's documents;

16  right?  Is that -- is that the whole --

17          MR. KEEGAN:  Well --

18          THE COURT:  -- thought here?

19          MR. KEEGAN:  Yeah.  I --

20          THE COURT:  Again, I --

21          MR. KEEGAN:  My point is -- is I'm trying to get

22  the -- just, you know, on an even playing field to have -- this

23  is part and parcel of what we talked about in B2.  So I'm just

24  trying to get an idea of what documents they're going to use to

25  argue whether or not they're exempt or not.

```
 1              THE COURT:  Yeah, but --
 2              MR. KEEGAN:  I think we resolved that with the B2
 3    issue.  So I would -- yeah, this is kind of a fallback for that
 4    issue.
 5         So to the extent they're going to cite other clinical
 6    studies and whatnot -- I mean, look, I have their production
 7    that they have now.  They're going to supplement it maybe with
 8    some additional exemplars and maybe with the Pasis study --
 9              THE COURT:  Okay.  Well, given B2, are you
10    satisfied --
11              MR. KEEGAN:  Yes.
12              THE COURT:  -- for now?
13              MR. KEEGAN:  Yes.
14              THE COURT:  Okay.  So we'll then --
15              MR. KEEGAN:  Yes.
16              THE COURT:  -- say that's kind of moot now, might not
17    become moot in the future.
18              MR. KEEGAN:  Right.  I may need it for merits but not
19    for class cert.
20              THE COURT:  Yeah.  I'd say merits is definitely a
21    different story.
22              MR. KEEGAN:  Right.
23              THE COURT:  And I don't know when you're going to deal
24    with that, but first --
25              MR. KEEGAN:  Right.
```

```
 1            THE COURT:   -- we're dealing with the class cert --
 2            MR. KEEGAN:  Right.
 3            THE COURT:   -- because that's coming up.
 4            MR. KEEGAN:  Gotcha.
 5            THE COURT:   And so -- okay.  So that's the documents.
 6       And then I -- and then there's an interrogatory section
 7    that is addressed, and mostly -- I think that the thrust is the
 8    class list, the nationwide and California class list, of the
 9    folks involved in the class period for all positions.
10       And it seems to me that the clear call, then, the clear
11    statement by the plaintiff is that he wants to be able to find
12    additional plaintiffs who fulfilled the different jobs to kind
13    of rebut any argument that his plaintiffs are not typical.
14            MR. KEEGAN:  Correct.
15            THE COURT:   And I'm -- and I'm not too sure -- and I
16    could be wrong -- whether or not that is an appropriate
17    discovery tool, I mean, to go after a class list to find
18    additional plaintiffs.
19            MR. KEEGAN:  Well, I'm anticipating the typical --
20    look, my problem -- I have two plaintiffs.  I have -- if
21    they're going to -- usually in these cases, in the employment
22    cases, you exchange the list, and then you get declarations
23    from other class members --
24            THE COURT:   Right.  That --
25            MR. KEEGAN:  -- and this and that.  So --
```

```
 1              THE COURT:  I mean, to me -- to me -- that seems to me
 2    that would be what you would need it for --
 3              MR. KEEGAN:  Right.
 4              THE COURT:  -- is to go after discovery to show
 5    there's common -- everybody is kind of treated the same, we all
 6    did the kind of same kind of tasks --
 7              MR. KEEGAN:  Right.
 8              THE COURT:  -- and whether or not -- I mean -- I mean,
 9    it's kind of like -- I had a restaurant case with assistant
10    managers, and --
11              MR. KEEGAN:  Right.
12              THE COURT:  -- but that was so restaurant-oriented.  I
13    had to -- the class became "Well, we're just going to give you
14    this restaurant because they did things different in this
15    restaurant than that restaurant."
16              MR. KEEGAN:  Got it.
17              THE COURT:  But what's the position?  I mean, it seems
18    to me that the class list would be relevant to some degree,
19    and -- and I want to know what -- Mr. Kopp, you said you're
20    trying to work out something.  What -- I mean, how many people
21    are we talking about?  1700?
22              MR. KEEGAN:  Let me make sure.
23              MR. KOPP:  Yeah, that's for -- that's for the
24    nationwide collective, which they wouldn't have any entitlement
25    to.  There's no -- there's been no motion to conditionally
```

1    certify.  There's a specific process on an FLSA collective in

2    terms of distribution of notice, and their own complaint

3    identifies that.

4         And so in terms of what we've tried to work out with the

5    plaintiffs, I mean, notwithstanding that -- you know, you have

6    one plaintiff who worked one position on one site for a limited

7    period of time and another plaintiff who never even worked on

8    the position in terms of actually performing the position

9    duties.

10        And, you know, we've cited Southern District of California

11   authority where the Court says -- ordered afar -- including

12   Your Honor in the *Red Robin* case, the one that --

13        THE COURT:  Well, in the *Red Robin* case, it was

14   because the tasks were different by the assistant managers from

15   restaurant to restaurant.  I believe in a Coca-Cola case, I

16   also ordered it to just Orange County or LA County because

17   people were treated differently now.

18        It seems to me that if the -- if the idea that -- let's

19   just take California -- the California class action.  Are we

20   saying that people are treated differently in San Francisco

21   than San Diego, or is it more -- we're back to B2, which is

22   depending on the study they were involved in, or -- or is it

23   just they all kind of are in the -- you know, in the same

24   bowl -- fishbowl; and therefore, the plaintiff wants to get

25   some declarations to support his position that -- of

```
 1    commonality and predominance?
 2         MR. KOPP:  Your Honor, to that point, yeah.  Under --
 3    under Mantolete, plaintiffs haven't made any predicate showing
 4    that these -- these positions are treated the same regardless
 5    of who they're reporting to in terms of the line manager, where
 6    they're located, what type of study they're on.
 7         And even when you look to the -- and even to -- you know,
 8    to the experience of the named plaintiffs themselves if there
 9    is radically -- in terms of what these folks are actually
10    doing.  And we have -- we've proposed, you know, as far back as
11    October --
12         THE COURT:  Remember, I read the brief.  I read your
13    briefs and --
14                         (Laughter)
15         THE COURT:  Okay.
16         MR. KOPP:  So yeah.
17         THE COURT:  So what -- I mean, what are you proposing
18    now?  Because there's two issues here.  One is whether or not
19    the -- the different positions are similar to the ones of these
20    two plaintiffs; and therefore, I assume the plaintiff would
21    want discovery so we can interview the different people to say,
22    "Hey, the positions are all the same.  They're all nonexempt;
23    and therefore, it doesn't matter that our plaintiff didn't work
24    those positions," which would rebut that they're not typical
25    plaintiffs, Number 1.
```

```
 1          Number 2, there's an argument that can be made -- and
 2     there is California case law, and I even did an order that kind
 3     of quoted this -- that said that in some circumstances, you can
 4     use a class list precertification to find that plaintiffs have
 5     fit into different categories.
 6          And then -- and then, you know, lastly, at a minimum, I
 7     think he'd be entitled to at least the class list for people
 8     who did do the different positions that these plaintiffs have
 9     testified.  Again, this is discovery, and -- and I'm not going
10     to cut his arms off because the -- maybe he can't make a prima
11     facie showing, but I think he can make a showing that it's
12     likely that he will -- he will gain, you know, relevant
13     information, which is the other prong in *Mantolete*.
14          So what are you proposing is what I'm asking today for
15     today's purposes.
16          **MR. KOPP:**  Your Honor, we had -- we had proposed to
17     provide a California contact list subject to a *Belaire* process,
18     and we, you know, proposed that back in November.
19          **THE COURT:**  Yeah.  I read the brief.
20        Now, let me ask you:  Are you still willing to give over
21     the California list?
22          **MR. KOPP:**  Yes, Your Honor, subject to a *Belaire*
23     process.
24          **THE COURT:**  Now, when you say "*Belaire* process,"
25     that's that whole privacy thing.  I -- and isn't there a
```

1   protective order?  I think I've -- I've dealt with this issue.

2   I don't know if it's necessary or not.  My gut feeling is it's

3   not, but if you need -- need me to write an order and --

4            MR. KEEGAN:  Yeah.  Your Honor, on the *Belaire*

5   process, I cited a couple of Northern District of California

6   cases --

7            THE COURT:  I didn't pull all your cases.

8            MR. KEEGAN:  Right.

9            THE COURT:  I was quite frankly set back when I

10  caught -- when I certified it.  I mean, it said that we were

11  going to bifurcate to get this brief in the first place.  But

12  be that as it may, I'm trying to resolve it today.

13           MR. KEEGAN:  Sure.

14           THE COURT:  And it seems to me that -- that *Belaire*

15  is -- we have a protective order, right --

16           MR. KEEGAN:  Correct.

17           THE COURT:  -- in place?

18           MR. KEEGAN:  Yes, we do, Your Honor.

19           THE COURT:  And is there any burning necessity,

20  Mr. Kopp, to have a *Belaire* notice?

21           MR. KOPP:  Yes, your Honor, because the -- the

22  protective order doesn't address the issue of the -- the

23  intricateness of the context and the ability of the putative

24  class members to opt out of that process.

25       And so, you know -- I mean, the plaintiffs cited these,

1   you know, Northern District cases.   In the Central and Southern

2   District, I mean, courts have --

3        THE COURT:   Well, I'm not going to read all those

4   cases today.   It seems to me that's an issue that you want an

5   order on.   So if you're willing to turn over the California

6   list, I think that as -- at least a starting point as a sample

7   would be satisfactory.

8        MR. KEEGAN:   Yes, Your Honor.

9        THE COURT:   And then I would want -- I'll issue a

10  minute order as to --

11       MR. KEEGAN:   Well, Your Honor, I'd agree to the

12  *Belaire* process if -- but knowing that even with his proposal

13  that we only give class members 28 days -- 21 days to opt out,

14  that puts me past the filing of the class motions.   So --

15       THE COURT:   So you need more time for the class

16  motion?

17       MR. KEEGAN:   Right.   If I did, then I would just agree

18  to the --

19       THE COURT:   Okay.   Well, if he agrees to the *Belaire*

20  notice -- well, remind me -- why don't we deal with -- just by

21  pure coincidence, I went to the gym, and I was chatting with

22  Judge Lorenz's law clerk, but I think it's a different law

23  clerk on this case.   It's -- the woman I don't think has it.

24  Maybe we can -- I mean, I don't want to set it too long, but if

25  we need a *Belaire* notice, then we'll put it.

1      So are you going to object, Mr. Kopp, to a -- when's it

2  set for now, the class cert?

3          MR. KEEGAN:  I believe it's --

4          MR. KOPP:  January 31st.

5          MR. KEEGAN:  31st, yeah.

6          THE COURT:  Is that when you have to file your motion?

7  And so with this *Belaire* notice, how does that -- how does this

8  operate?  I know I've done orders on this.

9          MR. KEEGAN:  Yeah.  So what we would do is we would

10  have to pick a third-party administrator, we'd have to come up

11  with a notice, get it approved by the Court, have it mailed

12  out, give the class members 21 days after mailing to exclude

13  themselves.  If they didn't exclude, then I would get the list.

14  So that process would probably take 45 days conservatively.

15          MR. KOPP:  Your Honor, I don't know they would -- it

16  would necessarily take that long.  I mean, the -- the *Belaire*

17  notices -- I mean, they're pretty (Inaudible) of drafting them.

18      And, yeah, we're fine with the 21-day turnaround.  And if

19  the -- if the parties stipulate on the -- on the content of the

20  notice and that gets approved, I mean, I think it's not

21  unrealistic, you know, to have -- to have something turned over

22  or to have -- somewhere around 30 to 35 days.

23          MR. KEEGAN:  Well, let -- yeah, but I'd say 30 to 35

24  days after the Court approves the notice.

25          THE COURT:  Well, if you stipulate to it, then I'll

```
1    approve it --
2             MR. KEEGAN:  Right.
3             THE COURT:  -- if I'm the one doing the approving.
4             MR. KEEGAN:  Right.
5             THE COURT:  And --
6             MR. KEEGAN:  Yeah.  If it's 40 days or -- they're all
7    the same.
8             THE COURT:  So we're still going to need to kick this
9    thing out.
10            MR. KEEGAN:  But -- I mean, it doesn't help me to have
11   the list and then file the class motion the day after I get the
12   list.  I mean, that defeats the whole purpose.
13            THE COURT:  No.  No.  It does.
14        So how much time are we talking?  You need at least
15   another month; right?
16            MR. KEEGAN:  Yeah, after I get the names, so to give
17   me a shot at getting some declarations, which is the whole
18   point.
19            THE COURT:  Okay.  Well, I think we'll have to explore
20   that because otherwise it handcuffs the plaintiff.
21            MR. KOPP:  Your Honor, we're not -- we'd be fine with
22   accommodating an extension on the class-cert-filing deadline if
23   that accommodates the *Belaire* process.  We won't --
24            THE COURT:  It would.  So I'll have to check with
25   Judge Lorenz's chambers, but we'll have to, you know, cushion
```

36

```
 1    out some time based on the Belaire notice --
 2            MR. KEEGAN:  Right.
 3            THE COURT:  -- so everybody can get their, you know --
 4            MR. KEEGAN:  Right.  I appreciate that.
 5            THE COURT:  Okay.  Okay.  So -- so I think we're good
 6    on the -- and now -- well, it says "Total Number of Class
 7    Members."  We need to go into that because I think it's -- I
 8    don't think -- and I could be wrong -- that the defense is
 9    going to argue that there's no numerosity.
10            MR. KOPP:  We won't argue that, Your Honor.
11            MR. KEEGAN:  And I don't --
12            THE COURT:  Okay.
13            MR. KEEGAN:  I'm fine, Your Honor.
14            THE COURT:  Okay.  Good.
15        Now, the idea of the -- the last thing -- we're on 13,
16    which says, "Identify class members subject to highly
17    compensated exemption."  I'm just wondering what the
18    relevance -- relevance is to the class --
19            MR. KEEGAN:  Class issue?
20            THE COURT:  Yeah.
21            MR. KEEGAN:  My -- I would just like to know the
22    number of persons.  I don't necessarily need to know the names,
23    but to know -- have them identify how many people are in the
24    class in case they argue that it creates a numerosity argument
25    or whether I need a subclass to, you know --
```

```
 1              THE COURT:  Like the highly compensated exemption --
 2      that only applies to the FLSA?
 3              MR. KEEGAN:  Correct.
 4              THE COURT:  And are all the FLSA members highly
 5      compensated or just some are, some aren't, Mr. Kopp?
 6              MR. KEEGAN:  Some are.
 7              MR. KOPP:  Some are, some aren't, Your Honor.
 8              THE COURT:  So do you object giving him a rough
 9      estimate of which ones you -- I mean, not who particularly but
10      how many?
11              MR. KEEGAN:  Just the numbers.
12              MR. KOPP:  No.  That's a -- yeah, that's a different
13      question than what he asked, but yeah, we -- we would be
14      willing to accommodate that.
15              THE COURT:  Okay.  Great.  So I'll hold you to that.
16              MR. KEEGAN:  Okay.
17              THE COURT:  Okay.  And moving right along, third-party
18      subpoena.  I -- I was looking over the different numerous
19      arguments back and forth, and the only thing I kept on going
20      back to is Rule 45 has a procedure to quash and modify.
21          And, you know, everybody has taken it on themselves to,
22      you know, accommodate each other.  But it seems to me no one
23      has followed the procedure, and I'm not inclined to step my
24      foot into a third-party subpoena where there's specific rules
25      under Rule 45.
```

1     And I'm not even too sure that the plaintiffs have any

2     standing to object under 35.  It has -- specifically under

3     (d)(3)(A) and (B), I don't think anything -- when it says when

4     a motion is required, I don't think that satisfies anything,

5     and (B) talks about "To protect a person subject to or affected

6     by a subpoena, the Court for the district where compliance is

7     required may, on motion, quash or" -- on motion to quash -- "or

8     modify the subpoena if it discloses a trade secret or other

9     confidential research, development, or commercial information."

10         I assume that's the only one that might be relatively --

11         **MR. KEEGAN:**  Your Honor, I was -- just to address that

12    point, I'm trying to follow your chamber rules --

13         **THE COURT:**  Right.

14         **MR. KEEGAN:**  -- on how to do it.  So it's fine --

15         **THE COURT:**  Well, chambers rules are for compelling

16    discovery.  Rule 45 --

17         **MR. KEEGAN:**  So I can just file Rule 45 motions

18    without meeting and conferring?

19         **THE COURT:**  Well, yeah.  Rule 45 motion -- first of

20    all, is -- is the issuing -- I mean, where is the company?

21    Here in San Diego?

22         **MR. KEEGAN:**  Correct.

23         **THE COURT:**  So you serve a subpoena in San Diego,

24    and -- or you didn't serve it.

25         **MR. KEEGAN:**  No.

```
1          THE COURT:  Mr. Kopp did, and he -- and his firm,
2    employment records, and they -- they turn over the employment
3    records.  So you would then -- so Mr. Kopp, in an abundance of
4    caution, informally turned over the records to the plaintiff to
5    review; right?
6          MR. KEEGAN:  Correct.
7          THE COURT:  And then the plaintiff had some --
8          MR. KEEGAN:  I produced a privilege log.
9          THE COURT:  Yeah, produced a privilege log and this,
10   that, and the next thing.
11         MR. KEEGAN:  Right.
12         THE COURT:  To me, I think it's all gobbledygook.  I
13   think they get everything personally.  I don't see why not.
14   It's free game.  Their credibility is an issue.  They cited
15   cases.
16       But, again, that's a discovery dispute, and I'm not too
17   sure you have standing to even bring a motion to quash -- quash
18   based on their feelings being hurt because their employment
19   information is turned over.
20         MR. KEEGAN:  You don't think they have a right to
21   privacy?
22         THE COURT:  Well, yeah.  I don't read --
23         MR. KEEGAN:  How is it relevant to class
24   certification?
25         THE COURT:  I don't read relevancy or right to privacy
```

```
 1    fits in any of these categories under Rule 45(d)(3).
 2          MR. KEEGAN:  So -- so --
 3          THE COURT:  Maybe -- maybe -- maybe there's other case
 4    law out there --
 5          MR. KEEGAN:  Okay.
 6          THE COURT:  -- and I'm willing to look at it.
 7          MR. KEEGAN:  Well --
 8          THE COURT:  But to me, you're going to have to file a
 9    motion to quash or modify under the Rule 45 procedures.
10          MR. KEEGAN:  So if I -- if I serve a subpoena on the
11    two witnesses I deposed in Boston for their former employers,
12    then that's fair game?  No relevance issue?
13          THE COURT:  I'm not making any rulings on what -- you
14    do whatever you need to do --
15          MR. KEEGAN:  Okay.
16          THE COURT:  -- and --
17          MR. KEEGAN:  That's fine, Your Honor.
18          THE COURT:  -- then the people who -- who are
19    subpoenaed -- they can bring a motion to quash -- quash
20    under -- under (d)(3)(A) if it's an undue burden or it involves
21    privilege or there is a reasonable -- not a reasonable time to
22    reply or there's geographical limits.
23       But when it's permitted under (B), there's only two
24    categories of things.  Now, maybe the case law expands it.  I
25    don't know.  I'm not an expert in third-party subpoenas.
```

```
 1              MR. KEEGAN:  Okay.

 2              THE COURT:  But -- your response, Mr. Kopp?

 3              MR. KOPP:  Your Honor, I just wanted to make sure I

 4    was tracking the Court's ruling.

 5         So -- I mean, I agree that -- I mean, the third party's --

 6    and that was the position we set out in our brief, and I

 7    won't -- won't burden you with repeating that, but I just want

 8    to make sure.  So the Court's ruling is that those -- these

 9    documents have already been turned over.  They've been in our

10    possession, and we as a courtesy have not exercised --

11              THE COURT:  Well, I don't want to prejudice

12    Mr. Keegan, either, because he was in good faith following the

13    chambers rules, and I appreciate that because we're saying,

14    "Don't file any motions to compel."  And, you know, this is

15    really a motion to quash a subpoena; right?

16              MR. KEEGAN:  Correct.

17              THE COURT:  So -- I mean, it seems to me that if he

18    wants to file a motion to quash a subpoena, he's entitled to do

19    it.

20         And what is it that you're actually looking for, and why

21    can't you come to some agreement about this?  I don't get it.

22              MR. KEEGAN:  Well, I think after you bifurcated

23    discovery on a class-wide basis, I failed to understand what --

24              THE COURT:  Well, he says it goes to credibility of

25    the class members, goes to typicality or adequate
```

```
 1    representation.  I know you cited the standard case -- case law
 2    that has those two requirements, but he cited numerous other
 3    case law --
 4              MR. KEEGAN:  Right.
 5              THE COURT:  -- that says credibility becomes an issue.
 6    I'm not the person judging credibility.  I don't know how it
 7    plays in because I'm not the District Court Judge.
 8              MR. KEEGAN:  Right.
 9              THE COURT:  But if it's relevant and they're entitled
10    to it, what's good for the goose is good for the gander, you
11    know, and they're probably going to get it.
12              MR. KEEGAN:  Well, yeah, but the issue that I have
13    is -- is not some -- the questions at the deposition were how
14    are other persons performing their CRA functions and how are
15    they paid at other competitors --
16              THE COURT:  No.  I'm talking about the subpoenas.
17              MR. KEEGAN:  Just the documents.
18              THE COURT:  I mean -- now, this is talking about the
19    sub- -- I mean, the subpoenaed documents are for what?
20              MR. KEEGAN:  They're for their entire employment
21    history file.
22              THE COURT:  So their employment history?
23              MR. KEEGAN:  Right.
24              THE COURT:  For the past and present and future and
25    everything else?
```

1    **MR. KEEGAN:** Right. Exactly.

2    **THE COURT:** Okay.

3    **MR. KEEGAN:** So --

4    **THE COURT:** So -- so what do you need out of that

5    conceivably, and can you come to some agreement?

6    **MR. KOPP:** Your Honor, in terms of what we need out of

7    it, I mean, we asked for documents relating to their

8    application, any cover letters, resumes, things of that sort,

9    and also their personnel file. And the only thing that has

10   been produced are their resumes. We need the -- we need the

11   remainder of the balance.

12       And, you know, the case law cited -- that we cited, you

13   know, confirms our position that -- and once there's some sort

14   of a privacy interest, that we're entitled to that. At least

15   in these misclass cases, it's really important.

16       And I do want to address the plaintiffs' point on the

17   issue of credibility, that that's speculative. It's really --

18   it's really not, and we need these additional documents,

19   including any communications from the subsequent employers

20   about their applications because one of the plaintiffs,

21   Schoulee Cones -- she was specifically let go because we -- we

22   could not verify the employers that she listed on her

23   application.

24       And, you know, she testified at deposition that, you know,

25   apparently someone else was, you know, monkeying around with

```
 1    her resume.  And we suspect that the same issue applied in
 2    other employers, that -- namely that she engaged in resume
 3    fraud.  You know, she's a twice-convicted felon, and it's
 4    not -- these are not speculative concerns.  We think that --
 5            THE COURT:  But -- but the cases you cited on Page 53
 6    of your brief --
 7            MR. KOPP:  Uh-huh.
 8            THE COURT:  -- all District Court cases, I assume;
 9    right?  No Ninth Circuit here?
10            MR. KEEGAN:  No.
11            THE COURT:  It basically says that the District Court,
12    in determining whether the representative is an adequate class
13    representative, is to look into whether they're trustworthy or
14    not.  An honest, credible class representative is relevant to
15    the adequacy inquiry because an untrustworthy plaintiff could
16    reduce the likelihood of prevailing on the class claims.
17        That's basically what you want this information for;
18    right?
19            MR. KOPP:  Right.  And we cited the Southern District
20    case on Kellgren v. Petco that -- it was -- it was a misclass
21    case directly on point that -- and there, the defendant's
22    subpoena requested documents from plaintiff's employment
23    records that may contain information provided by Kellgren about
24    the nature, scope, hours of his employment at Petco, and those
25    were -- those were relevant and should be turned over.
```

1          It also held that furthermore, contrary to plaintiff's

2     assertions, any documents that tend to implicate Kellgren's

3     credibility such as disciplinary records and performance

4     evaluations are also discoverable.

5          And, you know, these -- I mean, these documents have

6     already been turned over and produced and -- I mean, to

7     Your Honor's point there, there isn't any rule-based basis for

8     withholding them, and -- I mean, it's hearsay.

9          THE COURT:  Well, somebody thought there was because

10    in *Kellgren*, they filed a motion to quash, and so -- honestly,

11    some lawyer thought there was a privacy interest here.  So I --

12         MR. KEEGAN:  Well, let -- if I can discuss the files

13    that we're talking about that are -- that have been produced

14    are the files that Samumed produced.

15         I put together a privilege log because whoever did the

16    production and produced -- produced information in resumes and

17    documents about persons that have nothing to do with the

18    plaintiffs at all on this case or anybody who ever worked at

19    PAREXEL or anything to do -- looks like to me it's a

20    recruiter's file who was connected to --

21         THE COURT:  Someone didn't look through the file.

22         MR. KEEGAN:  So somebody didn't look, and I -- I mean,

23    that's why I put it on a privilege log.  Most of it has nothing

24    to do -- the only document -- so we produced all their -- all

25    their applications that were in the file.

1     Ms. Cones never worked for Samumed.  So there's no

2  employment file there.  There's e-mails amongst Samumed

3  members, their firm, talking about setting up an interview for

4  her, but that's it.  So I don't know how that's relevant.

5     And then -- and then Mr. Pasis works there.  So it has all

6  of his information beyond the scope of resumes or anything

7  other -- and I sent you -- and I see that Your Honor has it.

8  The protective order that they have is -- is -- that he had to

9  sign as an employee covers -- is very broad, and it covers all

10  that information.  So --

11     THE COURT:  But this is a subpoenaed document.  So --

12  but obviously, they didn't seem to respect any agreement if

13  they turned over his documents on the subpoena.  The company

14  did, and so I --

15     MR. KEEGAN:  I'm just saying I wanted -- I didn't want

16  him to be sued for whatever, not asserting his right --

17     THE COURT:  Well -- well, he brought -- the

18  third-party subpoena went directly to the company.  The company

19  turned the documents over to the defense.  Defense turned them

20  over to you.  I don't think they had to turn them over to you.

21     I think at that point in time, there should have been a

22  phone call here saying, "Hey, we want to move to quash or

23  modify the subpoena."

24     MR. KEEGAN:  Well --

25     THE COURT:  But you tried to work it out, and I get

1    it, and so --

2           MR. KEEGAN:  Well, I did call, and that's why we've

3    been on the -- we've had dozens -- I mean, we've probably had

4    at least six phone calls.  So when it came in, that's -- and --

5           THE COURT:  Okay.  Well, you tried to work it out.

6           MR. KEEGAN:  Your Honor, we're not going to have --

7    so --

8           THE COURT:  I appreciate it.

9           MR. KEEGAN:  So I didn't --

10          THE COURT:  You tried to work it out, but it didn't

11   get worked out because there's -- but can we work it out today?

12        I mean -- I mean, are you willing to turn over all the

13   documents that are specific to what the subpoena is asking and

14   leave out the rest and Mr. Kopp will be satisfied with that?

15          MR. KEEGAN:  Yeah.  I would just say you wouldn't

16   produce documents in that production that have nothing to do

17   with the plaintiffs in the case.

18          THE COURT:  Right.

19          MR. KEEGAN:  I mean, it's overbroad --

20          THE COURT:  I mean --

21          MR. KEEGAN:  -- at a bare minimum.

22          THE COURT:  -- are you looking for -- I mean, you

23   didn't -- you're not looking for that, too, are you?

24          MR. KOPP:  Your Honor, the problem -- the problem is

25   that, you know -- you know, as you mentioned, we did this as a

48

1    courtesy.  But as we, you know, mentioned in our brief, we feel

2    that this process has been abused.

3        I mean, just as, you know, one example, you know,

4    plaintiff has withheld the cover letter that Mr. Pasis

5    submitted along with his resume, which was prepared while he

6    was a PAREXEL employee, and he represented that that didn't

7    reference PAREXEL.  His own client's testimony seems, you know,

8    contrary to that.

9        And so we would like -- we can't trust the (Inaudible) at

10   this point, and there's -- there's nothing in the rules that

11   establishes his entitlement to -- to filter these documents

12   because frankly we're -- we're -- you know, we're relying on

13   just descriptions and representations, and, you know, we're

14   entitled to look at those documents ourselves.

15       And from everything I've heard from Mr. Keegan, I'm not

16   hearing anything that suggests that there's -- that the

17   documents implicate some sort of privacy interest that, you

18   know, can't -- can't be produced.  There is -- there's also a

19   protective order in place here.

20       And so we'd either like -- like to look at these documents

21   unfiltered.  And if they're -- if they're irrelevant, they're

22   irrelevant, and --

23           THE COURT:  But is there any way you can meet and

24   confer and treat them as attorneys' eyes only so you can review

25   the documents and the ones that aren't relevant because they

```
 1   involved third parties that have nothing to do with this --
 2   these two named plaintiffs, and you would agree that they
 3   would -- they would not be turned over or -- I mean, I'm just
 4   trying to -- you know, other than, you know, filing a motion
 5   and hearing the motion, this is going to delay it further for
 6   something that sounds like -- it sounds like, if I'm not
 7   correct, that Mr. Keegan might be willing to turn over.
 8           MR. KOPP:  Your Honor, we would be happy -- I think
 9   that's an elegant solution -- to agree that these things will
10   be marked attorneys' eyes only and we get to review them.
11        And, yes, if they're not relevant, then, you know, we
12   wouldn't -- we wouldn't use them.  We wouldn't take off the
13   attorneys' eyes only designation, but we just need to have
14   access.  We need to -- both parties need to have access to
15   review it because right now, it's been a one-sided review.
16           THE COURT:  What do you think?  What's your position,
17   Mr. Keegan?
18           MR. KEEGAN:  Yeah, Your Honor.  I think that's -- I
19   would tend to follow that.
20           THE COURT:  I mean, I don't really think -- you know,
21   this isn't rocket science.  I mean, they are what they are.  If
22   they are, they are.  Send it to Judge Lorenz, and he'll decide.
23   I don't think the decision is going to boil down to that
24   necessarily.  I think it's going to be whether or not there's a
25   common method or proof that they're exempt or not exempt.
```

```
1              MR. KEEGAN:  Right.
2              THE COURT:  And if there is, then chances are
3    everybody will want to settle.  If they don't, they don't.
4         So why don't we do that, then.  It will be, as I said,
5    designated attorneys' eyes only.  You'll turn over all the
6    documents, look through them, and then maybe you can agree
7    that -- what is relevant, what isn't relevant.  And to the
8    extent there's a disagreement, you'll contact the Court, and
9    we'll talk about Rule 45.
10             MR. KEEGAN:  Okay.
11             MR. KOPP:  And, Your Honor, just to make sure I
12   have -- I'm tracking the ruling -- so that's perfectly
13   acceptable to defendant.
14        Just in terms of logistics, if we can just have on the
15   record that the documents are currently attorneys' eyes only,
16   that's fine.  But there's no need for Mr. Keegan to turn over
17   because, you know, we already have the flash drives.  We can
18   just access them.
19             MR. KEEGAN:  Well, I would say that it would have your
20   third-party administrator mark them that way because you had a
21   third-party --
22             MR. KOPP:  Yeah, that's fine.  We can do that.
23             MR. KEEGAN:  Yeah.  Just make sure they're marked.
24             MR. KOPP:  Sure.
25             THE COURT:  Okay.  And after you look through them --
```

1  and maybe you can have a discussion as to -- if there's any

2  disagreement, then we'll go from there.

3          MR. KEEGAN:  Perfect.

4          THE COURT:  All right.

5          MR. KOPP:  Thank you, Your Honor.

6          THE COURT:  Otherwise, I'll have the Court's eyes

7  only, and I'll look at them.  I don't want to do that.

8          MR. KEEGAN:  Right.  There you go.

9          THE COURT:  And finally, it's deposition testimony.  I

10 haven't had an opportunity to read this, and there's questions.

11 But what I found interesting was the position that the

12 plaintiff was taking that they didn't have the information in

13 any event if -- if they were allowed to ask.  So --

14         MR. KEEGAN:  Yeah.  I mean, there was no foundation

15 laid that Mr. Pasis -- that he actually knows --

16         THE COURT:  Well, what --

17         MR. KEEGAN:  -- people are paid or how they're paid at

18 his current employer and -- and, again, that specific question

19 is confidential under his employment.

20         THE COURT:  Okay.  Well, I don't want to hear the

21 argument again because I think the argument is a little bit

22 suspect because the only -- the only -- the only thing -- the

23 only time you can tell somebody not to answer is if it's

24 privileged --

25         MR. KEEGAN:  Right.

52

```
 1              THE COURT:  -- and not because there's no foundation
 2   or it's not relevant --
 3              MR. KEEGAN:  Correct.
 4              THE COURT:  -- et cetera and so on.  So whether or not
 5   privilege extends to a confidential at-will employment
 6   agreement or not is the issue, and if it does not extend to
 7   that, then -- then what -- what do we -- I mean, where do we go
 8   from there?
 9        If -- if they reask those questions, are you saying,
10   Mr. Keegan, that --
11              MR. KEEGAN:  He's going to testify he doesn't know.
12              THE COURT:  He doesn't know.
13              MR. KEEGAN:  Right.
14              THE COURT:  If he's going to testify he doesn't know
15   and if he's willing to put that in a stipulation as opposed to
16   have to redo the whole -- would that satisfy -- Mr. Kopp, would
17   that satisfy you for purposes of evidence?
18              MR. KOPP:  Your Honor, it would not for the reason
19   that the -- they've only maintained that with respect to the --
20   the -- the Samumed employee.
21        So currently, he's serving as a manager of other CRA's,
22   and apparently, you know, he was instructed not to testify at
23   deposition when -- apparently, now the answer would be, you
24   know, "I simply don't know."  And there was a lot of
25   back-and-forth, a lot of breaks, and a lot of argument on this,
```

1    including calling chambers for -- in which Your Honor relayed a

2    tentative ruling.

3           THE COURT:  I remember.  I remember.

4           MR. KOPP:  Yeah.  And so -- so, you know, the idea

5    that a first-line supervisor who's worked in this industry

6    where frankly everyone in this industry classifies these

7    positions as exempt -- that he has no idea whether the people

8    that he directly manages punch clocks and are subject to

9    overtime, that he might need to pay attention to, that he has

10   no idea whether they're exempt or nonexempt, that's a position

11   that we're entitled to test at deposition because frankly we

12   don't find it credible, and we need to explore that.

13        The other thing is that plaintiffs' -- plaintiffs' counsel

14   blocked inquiry in terms of whether he was exempt salaried or

15   hourly at his prior employers at Cato Research, and certainly

16   he has to answer to that.

17        So -- so yes, Your Honor, we -- I mean, they were on clear

18   notice that the objection and instruction was improper.  They

19   ignored it at their peril, and we do need -- we do need that

20   testimony.

21          THE COURT:  Okay.  So I'm going to probably, unless --

22   unless there's an agreement to redo the testimony, to have

23   briefing on whether the -- the confidential agreement,

24   Number 1, covers these questions; and Number 2, if it does

25   cover them, whether it's privileged under the law.  And if it's

1  not, then I'm going to have to address Rule 37 as to who --

2  whether or not either party is going to pay for the exercise of

3  going through this discovery dispute, and -- and then we'll

4  redo it, I hate to say.

5      And I believe that provision specifically is

6  Rule 37(a)(5)(A) if the motion is granted and (B) if the motion

7  is denied, and then there's monetary consequences that follow

8  unless it's substantially justified or other circumstances make

9  an award of expenses unjust.  And I don't take it kindly that,

10  you know, witnesses are instructed not to answer questions that

11  seem pretty relevant based on their employment agreement.

12      So that being said, I'll probably issue a briefing

13  schedule, very short.  I just want the law on whether this is

14  privileged or not.  And then whoever wins or, as we say, if

15  it's granted or denied, will then put together their expenses

16  and -- on what they expend to do this exercise, and then we'll

17  also talk about who's going to pay for the depositions.

18          **MR. KEEGAN:**  Okay.  Thank you, Your Honor.

19          **THE COURT:**  All right.  Anything else?

20          **MR. KOPP:**  Thank you, Your Honor.

21          **THE COURT:**  Anything else, Mr. Kopp?

22          **MR. KOPP:**  Nothing from the defendant.  Thank you.

23          **THE COURT:**  All right.  All right.  So I think we've

24  resolved most of the issues.  We'll have -- actually, we only

25  have the briefing on the one issue, the deposition.  That will

```
1    be short.  We'll issue a minute order and --
2            MR. KEEGAN:  The rest of the issues that we've
3    covered -- do we need to reduce that to an order or
4    something --
5            THE COURT:  I'm not reducing it to an order.
6            MR. KEEGAN:  Okay.
7            THE COURT:  You can get a transcript --
8            MR. KEEGAN:  Yeah.  Thank you, Your Honor.
9            THE COURT:  -- if you want or rely on my memory.  I
10   think I pretty much know where we're going here, but --
11           MR. KEEGAN:  Got it.
12           THE COURT:  -- what you don't remember, we're going to
13   make -- we won't make -- necessarily make a transcript, unless
14   you want it, of this proceeding, but it is recorded.
15           MR. KEEGAN:  Okay.
16           THE COURT:  And --
17           MR. KEEGAN:  I appreciate your time, Your Honor.
18           THE COURT:  Yeah.  If it's all right, I'm going to
19   go -- just stop the recording.
20               (Proceedings adjourned at 4:37 p.m.)
21
22
23
24
25
```

1

2

3                    **CERTIFICATE OF TRANSCRIBER**

4            I certify that the foregoing is a true and correct

5    transcript, to the best of my ability, of the above pages of

6    the official electronic sound recording provided to me by the

7    U.S. District Court, Southern District of California, of the

8    proceedings taken on the date and time previously stated in the

9    above matter.

10           I further certify that I am neither counsel for,

11   related to, nor employed by any of the parties to the action in

12   which this hearing was taken, and further that I am not

13   financially nor otherwise interested in the outcome of the

14   action.

15

16   DATE:  Saturday, January 20, 2018

17

18

19

20            _____/S/ James C. Pence-Aviles_____

21          James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                        U.S. Court Reporter

22

23

24

25